IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ESTATE OF VALERIE YOUNG, et al.,                    ECF CASE

                                                    Case No.: 07-CV-06241 (LAK)

            plaintiffs,

    - against -

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, et al.,

          defendants.


# MEMORANDUM OF LAW IN SUPPORT
# OF PLAINTIFFS' MOTION FOR SANCTIONS


**Jonathan Bauer, Esq. and**
**the Catafago Law Firm, PC**
Empire State Building
350 Fifth Ave. Suite 4810
New York, NY 10118
212-239-9669
212-239-9688 (fax)
catafagolaw@verizon.net

*Attorneys for Plaintiff*

# **Table of Contents**

Table of Authorities................................................................................................ ii

Introduction.......................................................................................................1

Statement of Facts.............................................................................................2

    A.    Facts underlying this litigation...............................................................2

    B.    Procedural and litigation facts relevant to this motion ..................................7

        (i)   In their initial disclosure, interrogatory answers and production responses, defendants failed to identify, did not produce and omitted any reference to the 15-Minute Checks Log Books................................7

        (ii)  Defendants have forcefully and definitively stated that all documents have been produced..........................................................8

    C.    Evidence material to plaintiffs' prima facie case were destroyed, not preserved or otherwise subjected to spoliation, and were not identified ...................................................................................11

        (i)   Incontrovertible evidence that the 15-minute checks log books were created and .................................................................12

        (ii)  Spoliation was extensive; over 1000 pages of documentary evidence ..........................................................................14

Legal Points and Authority ....................................................................................16

    A.    Defendants were required, but failed to preserve the 15-minute checks log books ..................................................................17

        (i)   Defendants were obliged to preserve the 15-minute checks log books as a matter of law ........................................................17

        (ii)  Defendants knew or should have known that an action would be filed in connection Valerie's treatment at BDC and eventual death...................20

    B.    Defendants' conduct meets the legal standards for "Culpable state of mind" ....................................................................21

    C.    The evidence that was subject to spoliation was material...........................22

    D.    The imposition of sanctions, including an adverse inference and attorney fees is mandated by Defendants' spoliation.................................24

    E.    Conclusion ................................................................................25

# Table of Authorities

## Cases

*Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001)................................................. 16, 22

*Chan v. Triple 8 Palace, Inc.,* 2005 WL 1925579 (Case No. 03 Civ. 6048, SDNY August 11, 2005).......................................................................................................................... 16

*Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423 (2d Cir. 2001) ........................................... 20

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002) ........................................................................................................................ 16, 17, 21, 22

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776 (2d Cir. 1999) ........................................... 16

*WRT Energy Securities Litigation*, 246 FRD 185 (SDNY 2007) ............................................... 20

*Zubulake v. UBS Warburg LLC*, 220 FRD 212 (SDNY 2003).................................................... 20

## Federal Statutes, Rules & Regulations

42 CFR §456.411 ........................................................................................................................... 18

42 CFR §456.608(a)........................................................................................................................ 18

42 CFR §482.24 .............................................................................................................................. 18

42 CFR §483.315 .............................................................................................................................. 4

42 CFR §483.410(c)........................................................................................................................ 18

42 CFR §483.440(c)(6)(iv) ............................................................................................................. 23

42 CFR §483.450 ................................................................................................................... 4, 6, 23

42 CFR §483.450(e)(1)..................................................................................................................... 6

42 CFR §483(l)(2)(ii)...................................................................................................................... 18

42 CFR §485.60(c).......................................................................................................................... 18

Fed. Evid. Rule 401 ....................................................................................................................... 22

Fed. R. Civ. P. Rule 26(a)(1).................................................................................................... 7, 10

Fed. R. Civ. P. Rule 33(d) ............................................................................................................... 8

## State Statutes and Regulations

14 NYCRR § 681.1 ........................................................................................................................ 18

14 NYCRR §633.10(a)(2)............................................................................................................... 18

14 NYCRR §633.17(11) ................................................................................................................... 6

14 NYCRR §633.99(au) ............................................................................. 18

14 NYCRR §633.99(cj) ......................................................................... 18, 19

14 NYCRR §633.99(fd) ............................................................................. 18

14 NYCRR §633.99(r) ............................................................................... 17

14 NYCRR §681.2(j) ................................................................................. 18

NY Educ. Law §6530(32) .......................................................................... 18

## Introduction

Plaintiffs have brought this motion because the spoliation by defendants of hundreds of pages of evidence material to plaintiffs' prima facie case which evidence was destroyed, lost, or otherwise made unavailable by the defendants ("missing evidence").

This litigation concerns the care, treatment and ultimately, death at age 49 of Valerie Young ("Valerie"), a profoundly mentally retarded woman who was in the custody and care of the defendants. Material to liability and damages is the question whether Valerie was a person at risk for deep vein thrombosis ("DVT") by reason of inactivity. Missing, destroyed or otherwise subjected to spoliation are log books of "fifteen minute checks" amounting to approximately <u>one thousand (1,000) pages</u> of contemporaneous documentation detailing Valerie's level of activity.

The missing evidence consists of hundreds of pages of log entries that detail the activities of plaintiffs' decedent, Valerie Young, in the months preceding her death. These entries were made every fifteen minutes twenty-four hours each day, seven days each week from November 5, 2004 until Valerie's death over six months later on June 19, 2005. Two pages of these logs reflecting entries for the afternoon and evening of June 19, 2005 are submitted herewith as **Exhibit 16**; only two other pages, both undated, appear to have been produced. **Exhibit 17**.

The relief sought herein is an order:

1. Declaring that the logs of 15 minute checks of the decedent, Valerie Young, were destroyed or otherwise subjected to spoliation by defendants; and,

2. finding as a matter of law as an adverse inference that the decedent, Valerie Young, was maintained by defendants in a wheelchair, floor mat, bed, chair, other non-mobile condition without regular ambulation from November 5, 2004 up to and including the date of her death on June 19, 2005 and upon a trial directing that inference to the jury ; and,

3. permitting the plaintiff to advise the jury of the spoliation by defendants of the 15-minute checks log books; and/or in the alternative,

4. in the event that any defendant denies that he or she destroyed, participated in the destruction, and/or permitted or allowed the destruction or spoliation of the 15 minute checks log books, hold an evidentiary hearing to determine the responsible defendant or defendants; and,

5. an award of attorney fees in an amount to be determined after the determination of this motion for the time expended by plaintiffs' counsel in connection with this motion and any discovery proceedings necessitated by the spoliation of the subject documents.

## <u>Statement of Facts</u>

Valerie was a profoundly mentally retarded adult who was in the care and custody of defendant the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD") and the State of New York ("State"). Valerie resided at the Brooklyn Developmental Center, ("BDC") a residential Intermediate Care Facility for developmentally disabled persons operated by OMRDD.

The individual defendants are persons who either provided care directly to Valerie or were supervisory officers at BDC. They are: Peter Uschakow - Director of BDC; Jan Williamson - Deputy Director for Operations of BDC; Suresh Arya - Deputy Director for Operations of BDC (overlapping with defendant Williamson); Kathleen Ferdinand - Valerie's "Treatment Team Leader"; Gloria Hayes - Resident Unit Supervisor and a member of Valerie's Treatment Team; Jovan Milos - treating physician and member of Valerie's Treatment Team. The defendants were sued both personally and in their official capacities.

### A.  Facts underlying this litigation

On June 19, 2005, Valerie died from a Pulmonary Embolism caused by a DVT as the result of inactivity.  **Exhibit 7** at page 1 (Bates CQC6) New York State Commission on the Quality of Care and Advocacy for Persons with Disabilities ("Commission") Case Analysis and Death Investigation Report dated October 24, 2005 ("Commission Investigation"); see also, **Exhibit 18**, Autopsy Report, New York City Office of the Medical Examiner. The Commission summarized

*2*

its finding thus: "[Valerie] Died of a PE from DVT from inactivity. <u>The facility did not adequately address the implications</u>." **Exhibit 7**, Commission Investigation (emphasis added).

The Commission's investigation of Valerie's death was initially opened in response to a complaint made by plaintiff Viola Young, Valerie's mother, on July 8, 2005. **Exhibit 6**, undated note produced by the Commission pursuant to subpoena (Bates CQC26). The investigation proceeded in light of a subsequent complaint made by Mrs. Young after she received the cause of death information. **Exhibit 7**, Commission Investigation at page 2 (Bates CQC7).

We note that independent of Mrs. Young's complaint, the Commission had a legal obligation to investigate Valerie's death as a matter New York State law, and the defendants have had at all times an independent obligation to cooperate fully with any investigation. NY Mental Hygiene Law §16.13 (obligation to cooperate); 14 NYCRR §633.99(t) (Commission must review all deaths in all OMRDD operated or licensed facilities).

Defendants OMRDD, Uschakow, Williamson and Ferdinand were aware that Mrs. Young had made a complaint concerning the death of her daughter. E.g., **Exhibit 19**, July 13, 2005 Memorandum by Judith Beer directed to Peter Uschakow with copies to defendants Williamson and Ferdinand (Bates 0003) advising them that an investigator would be reviewing Valerie's death and that Mrs. Young had made a complaint.

The Commission found departures from the standards of care at BDC and directed corrections. **Exhibit 8**, October 24, 2005 Final Determination, Commission (Bates 0095-06). The Commission specifically recommended that to correct their departures, BDC should:

1.  For sedentary consumers[1] who are ambulatory, or where otherwise indicated, physicians will include orders for staff to walk with the consumers periodically during the day.

**Exhibit 8**, Final Determination at page 1 (Bates 0095)

Defendants sent a plan of correction to the Commission. **Exhibit 9**, November 5, 2005 letter over the signature of Judith Beer (Bates CQC5). In a letter directed to defendant Uschakow dated November 15, 2005, the Commission indicated satisfaction with the BDC plan to correct the departures identified in their October 24 Determination and closed their file. **Exhibit 10**, Letter to Peter Uschakow. **Exhibit 11**, November 15 2005 letter (Bates CQC13). In light of the November 5 letter (**Exhibit 9**), the Commission also wrote to Mrs. Viola Young to inform her that the Commission "identified several concerns about the care and treatment provided" and based upon the representations in the BDC November 5 letter, assuring Mrs. Young that "the proposed changes should help preventing a similar incident from recurring." **Exhibit 11**, letter of November 15, 2005, Commission to Mrs. Viola Young (Bates CQC13).

However, notwithstanding their representations to the Commission, there was and is no plan of correction and the plan alluded to in the BDC letter of November 5, 2005 (**Exhibit 9**) never actually existed and was not implemented. **Exhibit 12** at pages 2-3: Statement on the Record of Jose L. Velez, Esq. made during the deposition of Gloria Hayes at pages 17-18. Therefore, defendants' letter (**Exhibit 9**) was sent for the purpose of closing the State Investigation and without any intention of correcting the deficiencies that led to Valerie's death.

---

[1] For reasons unknown to plaintiffs, defendants refer to residents of the Brooklyn Developmental Center, including plaintiffs' decedent, Valerie Young, as "consumers." Compare: 42 CFR §483.450 ("clients"); 42 CFR §483.315 ("residents") 14 NYCRR §633.99(bp) ("person").

The Commission in its investigation noted that there was little information as to Valerie's actual level of activity; (**Exhibit 7**, Death Investigation at CQC9; **Exhibit 8**, Final Determination at Bates 0095A) and makes reference to the two 15-minute checks log pages submitted herewith as **Exhibit 16**. Nonetheless the Commission suspected that Valerie spent extended periods of time in her wheelchair. **Exhibit 8** at page 1 (Bates 0095). See also **Exhibit 28**, May 2, 2005 Physical Therapy Report finding, *inter alia*, that Valerie was only able to walk with the assistance of staff, and then for only 100 feet requiring two staff assistants (Bates 8176).

The Commission also expressed the suspicion that "Ms. Young may have spent extended period of time in her wheelchair." **Exhibit 8**, Commission Determination at page 1, Bates 0095. The Commission's suspicion is confirmed by documents that were apparently not made available during the Commission investigation. For example, a Core Office Log entry dated April 20, 2005 states that "V. Young is to remain in wheelchair at all times as per Dr [name redacted]." **Exhibit 20** at page 2 (emphasis added) (Bates 9947). See also, **Exhibit 23**, June 24, 2003 report (Bates 8815): Staff person found Valerie in wheelchair, unable to stand up.

The available evidence also suggests that Valerie was spending extended periods of time in her wheelchair or otherwise sitting and lying down because of medication sedation to control behavior, rather than physically incapacity.

The Annual Treatment Team meeting prior to Valerie's death included a physical assessment that found Valerie to be "fully ambulatory." **Exhibit 22** at page 3 (Bates 7653).

However, in a Special Case Conference held on April 20, 2005 the Treatment Team noted that the "physician feels that the most recent fall are contributed [sic] to medications which are

sedating" and recommended the use of a wheelchair for all mobility needs. **Exhibit 36**, Bates 7744 (emphasis added). An Occupational Therapy Note dated April 27, 2005 described Valerie as arriving "lethargic and was sliding forwards in the folding wheelchair." **Exhibit 30** (Bates CQC197). The Core Office Log notes include a direction that "V. Young is to remain in wheel-chair <u>at all times</u> per Dr. [name redacted]" **Exhibit 20** (Bates 9947) (emphasis added).

The overuse of medication was a long-standing issue in Valerie's care. In **September 2004**, defendant Dr. Milos ordered a psychiatry consult finding that Valerie appeared "increasingly se-dated, sleeping most of the time, [with reduced] ability to participate in daily activities. **Exhibit 29**, Psychiatry Consultation (Bates CQC138). In June 2003, an incident occurred where a BDC staff person reported that even though Valerie was consistently found to be physically "fully am-bulatory" (even in the last few weeks of her life, <u>see</u> **Exhibit 22**):

> at 3:00 when I came to work I found [Valerie Young] in a whellchair [sic] I tried to take her out the chair but <u>she can-not stand up alone</u>, and have a hard time taking steps and will slide to the floor <u>she cannot walk</u>.
>
> **Exhibit 23**, June 24, 2003 Report of Occurrence (emphasis added)

We bring to the Court's attention that the use of medication in doses that interfere with a mentally retarded resident's daily living activities violates the applicable standards of care as a matter of law. <u>See</u> Requirements for States and Long Term Care Facilities, Conditions for Par-ticipation for Intermediate Care Facilities for the Mentally Retarded at 42 CFR §483.450(e)(1). <u>See also</u>, 14 NYCRR §633.17(11) mandating that "special attention" be given to individuals re-ceiving psychotropic medication "to detect and prevent possible medical problems."

This action was brought by Mrs. Young personally and as administrator of the Estate, Sid-ney Young (Valerie's brother) and Loretta Lee (Valerie's sister) seeking damages for pain and

suffering caused by defendants' grossly substandard care of Valerie ultimately leading to and causing Valerie's death, and for loss of companionship and familial relations. Claims were brought pursuant to the Americans with Disabilities Act, §504 of the Rehabilitation Act and for the violations of rights secured by the Fourteenth Amendment to the United States Constitution. See generally, **Exhibit 1**, Complaint.

**B.     Procedural and litigation facts relevant to this motion**

As of the date of this motion, the parties have completed document discovery, all parties have been deposed and the parties are proceeding with expert discovery. As detailed below, defendants' counsel has unambiguously assured plaintiffs' counsel that all documents were produced. Nonetheless, after a laborious review of the over 10,000 pages of documents produced and careful examination of references therein, it is absolutely clear that the defendants have omitted material evidence prejudicing plaintiffs' ability to prepare their prima facie case.

**(i)     In their initial disclosure, interrogatory answers and production responses, defendants failed to identify, did not produce and omitted any reference to the 15-Minute Checks Log Books**

The defendants served their initial disclosure pursuant to Fed. R. Civ. P. Rule 26(a)(1) on or about October 9, 2007. **Exhibit 3**, Initial Disclosure. Defendants Initial Disclosure at ¶2 purports to describe documents "relevant to disputed facts" but entirely fails to indentify and omits any reference to the 15-minute checks logs.

Plaintiffs served their First Interrogatories and Requests for Production to which defendants made an initial response on about November 30, 2007 by service of their Answers to Interrogatories and Production Response. **Exhibit 4**, Defendants' Interrogatory Answers and Production Response dated November 30, 2007. In their Interrogatory Answers the defendants declined to identify any documents, but instead referred the plaintiffs to documents separately produced, ap-

parently pursuant to Fed. R. Civ. P. Rule 33(d). See Declaration of Jose L. Velez, dated March 17, 2008 at ¶8, previously filed with this Court and docketed as Document 17.

The Production Responses were made with reference to demands for documents for the files of the plaintiffs' decedent from January 1, 2000 through the date of her death or the present (with reference to any investigation of her death). See generally, **Exhibit 4** at pages 8-11 (Production Responses, quoting the demands).

The Interrogatory Answers did not identify or make reference to the 15-minute checks logs. The Production Responses did not identify or mention the 15-minute checks logs and they were not produced. The responses merely referred the plaintiffs to approximately nine thousand pages of documents separately produced[2].

**(ii)    Defendants have forcefully and definitively stated that all documents have been produced**

Defendants, by counsel, on multiple occasions informally and on the record stated definitively to plaintiffs' counsel that all documents relating to Valerie's care had been produced. **Exhibit 12** through **Exhibit 15** consists of statements made on the record by the defendants' counsel making those assurances, in addition to off-the-record assurances made by telephone, representations in formal discovery responses and in a sworn statement to this Court submitted in opposition to plaintiffs' earlier motion to compel discovery.

In his **March 17, 2008** sworn statement filed with this Court, the Assistant Attorney General stated that "defendants have produced exactly 10, 464 pages of documents … which are all of the documents identified by defendants as being in their possession that are responsive to the

---

[2] Of the 10,464 pages ultimately produced, approximately half were responsive to plaintiffs' demands, the balance (about 5,200 pages) were documents created *prior* to January 1, 2000, neither sought nor required and produced by defendants for no reason known to the plaintiffs.

discovery requirements under the Fed. R. Civ. P. and plaintiffs' discovery requests." Declaration of Jose L. Velez, dated March 17, 2008 at ¶5 (emphasis added), previously filed with this Court and docketed as Document 17.

On **March 27, 2008**, during the deposition of defendant Jovan Milos, Assistant Attorney General Velez stated: "I will say again that <u>we have produced all documents related to this case</u>." **Exhibit 13** at page 2, Jovan Milos Deposition at page 157 (emphasis added).

On **April 7, 2008**, during the deposition of defendant Kathleen Ferdinand, Assistant Attorney General Velez stated: "<u>We produced the full medical records</u>." **Exhibit 14** at page 2, Kathleen Ferdinand Deposition at page 189 (emphasis added).

On **April 8, 2008**, during the deposition of defendant Suresh Arya, Assistant Attorney General Velez made the following forceful representation that all documents have been produced:

> Mr. Catafago:  I'm going to call for the production of that. According to my notes, those certifications were not produced.
>
> AAG Velez:  Counsel, the full medical file was produced. Maybe you just need to make a second look, because it's 10,000 pages.
>
> **Exhibit 15** at page 2, Suresh Arya Deposition at page 75
>
> Mr. Catafago:  So we ask for all records relating to [Valerie's] treatment.
>
> AAG Velez:  And <u>all records were produced</u>.
>
> **Exhibit 15** at page 3, Suresh Arya Deposition at page 80 (emphasis added)

On April 18, 2008, during the deposition of defendant Gloria Hayes, in an extended colloquy between counsel, Assistant Attorney General Velez again assured plaintiffs' counsel that all

documents relating to Valerie's care and treatment had been produced. **Exhibit 12** at pages 4-8, Gloria Hayes Deposition at pages 163-167.

In response to queries from counsel during that deposition, the Assistant Attorney General stated on the record:

> AAG Velez:    If she [the witness] writes a memo, that goes into Valerie Young's records, <u>and all that has been produced</u>, counsel.
>
> \*   \*   \*
>
> AAG Velez:    They [the documents] have been provided to you already. <u>You have everything</u> that was in the file.
>
> **Exhibit 12** at page 6, Gloria Hayes Deposition at page 165 (emphasis added).

Therefore, the creation of the 15-minute checks log books was obscured by the defendants' failure to identify them in their initial disclosure pursuant to Fed. Civ. P. Rule 26(a)(1) and by the wholesale production of documents, including over five thousand pages of documents that were not the subject of any request. The Attorney General's Office subsequently repeatedly stated that all documents have been produced. The Attorney General omitted the fact that the 15-minute checks logbooks, evidence material to plaintiffs' prima facie case, had been destroyed or were otherwise subject to spoliation.

Thus the defendants have resisted every effort to identify and secure production of the log book comprising the 15-minute checks by burying the information amongst the thousands of pages of production and failing to identify the documents where required.

**C.    Evidence material to plaintiffs' prima facie case were destroyed, not pre-
served or otherwise subjected to spoliation, and were not identified**

The documents subjected to spoliation were notations made in a log book every fifteen
minutes by the assigned staff person, inter alia, "Documents consumer's activities every 15 min-
utes in a 1:1 log." **Exhibit 5**, BDC Policy & Procedure Manual, signed and approved by
defendant Peter Uschakow (Bates D14552). The stated purpose of this type of observation is to
provide "a heightened level of supervision for consumers who present a danger to the physical
well being of themselves or others." **Exhibit 5** at page 1 (Bates D14551).

In Valerie's case, 15-minutes checks were initiated because she was observed with unex-
plained injuries. **Exhibit 33**, November 5, 2005 Special Case Conference. The 15-minute checks
were continued up to and including the date Valerie died to monitor her behavior (*e.g.* **Exhibit
35**, December 24, 2004 Special Case Conference) and because Valerie was frequently injured
from falls. *E.g.* **Exhibit 36**, April 20, 2005 Special Case Conference.

Out of the over ten thousand pages of documents produced (including 5,200 pages that
plaintiffs neither requested nor required), plaintiffs were able to locate and identify just four
pages as being taken from the 15-minute checks log books. **Exhibit 16** (two pages, log entries
from 3:00 pm on June 19, 2005); **Exhibit 17** (two pages, undated log entries from 9:45 pm).

As set forth in the following sections, there is incontrovertible evidence that the logs were
created and that complete production would have amounted to over one thousand pages of
documents. Under the controlling legal authority, these missing documents were material, defen-
dants had a legal obligation to preserve them, plaintiffs have been prejudiced and the imposition
of sanctions is appropriate.

**(i)     Incontrovertible evidence that the 15-minute checks log books were
created and**

On November 3, 2004 Valerie was observed with an injury to her left hand. **Exhibit 31**

(Bates 08366), Nursing Notes of November 3, 2004 at 4:30 pm; **Exhibit 32** (Bates 08147) Inter-

disciplinary Treatment Team ("ITT") Notes of November 3, 2004 at 4:40 pm; see also, **Exhibit**

**21** at page 2 (Bates 7788) Individual Program Plan ("IPP") Quarterly Review of January 12,

2005, (in relevant part, narrative description of the injuries, treatment and documenting that 15-

minute checks were initiated).

On November 5, 2004, Valerie's Treatment Team recommended that Valerie be placed on

fifteen minute checks. **Exhibit 33** at page 2 (Bates 7784) Special Case Conference of November

5, 2004 (initiating fifteen minute checks for Valerie). The use of fifteen minute checks is author-

ized and the procedures detailed in the Brooklyn Developmental Services Policy and Procedure

Manual ("Manual") at Topic 3.1.11, "Special Observation" submitted herewith as **Exhibit 5**. The

Manual requires, among other procedures, that assigned staff shall "document consumer's activi-

ties every 15 minutes in 1:1 log." **Exhibit 5** at page 2 (Bates D1452).

The sparse evidence produced confirms that assigned staff actually documented Valerie's

behavior by making entries every fifteen minutes. **Exhibit 16** consists of two log book pages re-

corded the date that Valerie died, June 19, 2005 from 3:00 pm through 9:30 pm. The entries are

specific as to the nature and level of Valerie's activities at the time; for example:



Excerpt, page 1 (Bates 0129) 15-minute checks, reproduced in full at **Exhibit 16**.

Fifteen minute checks were ordered to commence the next day by a directive under defendant Treatment Team Leader Kathleen Ferdinand's name issued November 5, 2004 and renewed on December 22, 2004. **Exhibit 24** (Bates 0013), defendant Ferdinand's Memorandum to "All Staff" (directing fifteen minute checks begin immediately). See also, **Exhibit 34** (Bates 7782) Special Case Conference of December 17, 2004 (directing that fifteen minute checks be continued) under the signature of defendant Ferdinand.

There is further direct evidence that the fifteen minute checks were continuous through the date of Valerie's death. **Exhibit 35** (Bates 7780) Special Case Conference of 12/21/04 (fifteen minute checks to continue); **Exhibit 21** (Bates 7788) Quarterly IPP Review of 1/12/05 in relevant part  (reporting that "Valerie was also placed on 15 minute checks"); the Annual IPP of April 13, 2005 (**Exhibit 22** at Bates 7630) (same);  1/26/05 Memorandum from defendant Ferdinand to defendant Hayes, **Exhibit 26** (Bates 0267) (administrative sanctions to certain staff for failing to complete Valerie's fifteen minute check logs on 12/17-12/21/04); **Exhibit 27**, February 16, 2005  Memorandum of defendant Hayes to non-party Donna Carter, with a copy to defendant

Ferdinand (Bates 0273) (confirming staff were "counseled" for failing to complete Valerie's logs on four days during December 2004).

Defendants' awareness of the importance of the 15-minute checks log books is confirmed by a January 20, 2005 Memorandum from defendant Ferdinand Memorandum to "All [Building] 3-1 Mid-Level Supervisors" with copies to defendants Williamson and Hayes **Exhibit 25** (Bates 0274). This memorandum was a reminder to building supervision that they must inspect log entries of residents on special observation including fifteen minute checks, the purpose of inspection being to "ensure that the required documentation is being completed." Id.

Two pages from the 15-minute checks log books for the date that Valerie died, commencing at 3:00 pm were produced, although the day shift pages were not produced. Exhibit 16, Log pages (Bates 0129). Two other pages, undated, were produced from a night shift, reproduced at **Exhibit 17**. The section immediately following demonstrates that production of the log books of 15-minutes checks should have been over one thousand pages.

**(ii)    Spoliation was extensive; over 1000 pages of documentary evidence**

The log book entries produced, and reproduced in full at **Exhibit 16** cover what is described in the document as the "Evening Shift" from 3:00 pm until 9:30 pm on June 19, 2005. The log book entries produced, and reproduced in full at **Exhibit 17** cover what is described in the document as the "Night Shift" from 11:15 (presumed to be "pm" as Valerie is noted sleeping, although not specified) until 7:15 (presumed to be "am" although not specified).

From November 5, 2004, when 15-minute checks were commenced (see **Exhibit 33**) through June 19, 2005 (the date that Valerie died) is 227 days. By simple arithmetic this should have resulted in the production of approximately one thousand one hundred thirty-five pages of

15-minute checks log book entries; basing the calculation on five pages per day (two pages for the night shift, two pages for the evening shift and, conservatively, one page for the day shift).

The undersigned counsel has been provided with 15 minute check logs in the matter of *Cosentino v. OMRDD, et al*. 07-CV-04159 (AKH). Those log pages are consistent with the log pages disclosed herein and arithmetical calculation; that is, about five pages for each day. For example, 15-minute check log book entries produced in *Cosentino* for the period November 7, 2004 through January 14, 2005 filled a book of three hundred and three (303) pages. January 15, 2005 through March 19, 2005 filled a book of two hundred and ninety-eight (298) pages. See **Exhibit 2**, Bauer Declaration at ¶¶ 3-6.

Accordingly, based upon production in this case and in the *Cosentino* matter, defendants have failed to produce and subjected to spoliation over one thousand one hundred (1,100) pages of evidentiary material; contemporaneous documents describing the nature and level of Valerie's activity during the last months of her life.

## <u>Legal Points and Authority</u>

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 at 106-07 (2d Cir. 2002) (citations omitted); <u>in accord</u> *Chan v. Triple 8 Palace, Inc.,* 2005 WL 1925579 at *4 (Case No. 03 Civ. 6048, SDNY August 11, 2005),

A party seeking sanctions for destruction of evidence or for making evidence unavailable (i.e., missing evidence) must establish:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."
>
> *Residential Funding Corp.*, 306 F.3d at 107 (citing *Byrnie*, 243 F.3d at 107-12.

*16*

Similarly, a party seeking an adverse inference instruction based on the untimely production of evidence must show:

> (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

> *Residential Funding*, 306 F.3d at 107.

An application of the criteria set forth by the Second Circuit in *Residential Funding* and *Byrnie* mandates the imposition of the sanctions sought.

## A.   Defendants were required, but failed to preserve the 15-minute checks log books

Defendants' obligation to preserve the log books flows from two separate sources. Defendants were obligated to preserve those documents as a matter of law, because (i) the missing documents were treatment records and a part of Valerie's service plan, and (ii) the missing documents were obviously relevant to litigation, which litigation should have been anticipated because Mrs. Young promptly complained about her daughter's treatment at BDC in the time leading up to her death, and the Commission Report was openly critical of the facility, including defendants herein.

### (i)   Defendants were obliged to preserve the 15-minute checks log books as a matter of law

The Brooklyn Developmental Center ("BDC") is an Intermediate Care Facility for mentally retarded persons (ICF/MR). See 14 NYCRR §633.99(r) (defining Developmental Center). As such, BDC is required to maintain a recordkeeping system that includes a separate record for

each client documenting all health care and treatment. 42 CFR §483.410(c)[3]. See also, 14 NYCRR §633.10(a)(2) (there shall be a current record that includes all information concerning or relating to the examination or treatment of the person whom the record is kept and which includes a plan of services, by whatever name known), see also 14 NYCRR §633.99(cj) (defining of a "plan of services" to incorporate all services and interventions provided to the resident); 14 NYCRR §633.99(fd)  and 14 NYCRR §633.99(au) (defining an individual or person who has been or is receiving services by, *inter alia*, a State facility, and for whom a record is maintained or possessed.) Records must also be maintained for Medicaid utilization review (42 CFR §456.411) and periodic inspection, which include a review of each Medicaid recipient's medical record. 42 CFR §456.608(a).

There does not appear to be a specific requirement for records retention under New York state law. However, the applicable regulations require facilities such as BDC to comply with the requirements of 42 CFR Part 483. See, 14 NYCRR § 681.1; see also, 14 NYCRR §681.2(j). Under Part 483, long term care facilities must in general maintain records for a minimum of five years from the date of discharge if there is no state law requirement, 42 CFR §483(l)(2)(ii). Hospitals, under Federal law, a minimum of five years, 42 CFR §482.24; outpatient rehabilitation facilities under federal must retain and preserve records for a minimum of five years after patient discharge, 42 CFR §485.60(c); physicians in New York are required to maintain records for a minimum of six years. NY Educ. Law §6530(32).

---

[3] Intermediate Care Facilities providing residential care for mentally retarded or developmentally disabled persons are required by State (as well as Federal) law to comply with te requirements of Section 42, Parts 456 and 483 of the Code of Federal Regulations. *E.g.*, 14 NYCRR §681.2(j).

The special observation logs of 15 minute checks were a part of Valerie's plan of services. See, 14 NYCRR §633.99(cj) (a service plan is a records system "by whatever name known" which documents the process of developing, implementing, coordinating, reviewing, and modifying the plan developed for a specific person. It is maintained as the functional record indicating all planning as well as all services and interventions provided to that person.)

The internal operating procedures at BDC required that in the event of the death of a resident, the records of the deceased are to be boxed and brought "immediately to the Deputy Director of Operations" (in this case, defendant Williamson) among other requirements, including compliance with incident reporting requirements. **Exhibit 5** at page 4 (Bates D1562), BDC Policy and Procedure Manual, Topic No. 4.2.24 - Reporting Deaths.

It is abundantly clear that defendants did not protect and preserve the subject log books as that material was not made available to the Commission in its statutory investigation other than the two pages submitted herewith as Exhibit 16, and this deficiency in the defendants' records of Valerie Young was noted explicitly by the Commission Investigator. See, **Exhibit 7**, Death Investigation at pages 4-5 (noting lack of information concerning Valerie's level of activity and suspecting that she was confined to the wheelchair for extended periods) and **Exhibit 8**, Commission Final Determination at page 1 (to the same effect).

The only reasonable inference is that the subject documents were subjected to spoliation around or shortly after the date of Valerie's death, effectively undermining the Commission investigation and in outright violation of the defendants' statutory obligations at that time. This misconduct was compounded on the date that the defendants made their initial disclosure be-

cause they not only have failed to produce the documents, but have also by misdirection and omission, attempted to cover up the documents' original creation.

    **(ii)**    **Defendants knew or should have known that an action would be filed in connection Valerie's treatment at BDC and eventual death**

In addition to the legal requirement to preserve clinical records set forth above, the "obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation - most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (citations omitted); see also *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). "Identifying the boundaries of the duty to preserve involves two related inquiries: when does the duty to preserve attach, and what evidence must be preserved?" *Zubulake v. UBS Warburg LLC*, 220 FRD 212, 216 (SDNY 2003); *In re WRT Energy Securities Litigation*, 246 FRD 185 at 195 (SDNY 2007).

In addition to being legally obligated to preserve and maintain Valerie's record, the defendants knew or should have known that an action might be filed. The initial investigation made by the Commission was in response to a complaint made by plaintiff Mrs. Viola Young, Valerie's mother. See **Exhibit 7**, Case Analysis Report and Draft Death Investigation, at Bates CQC6 and CQC7 (indicating that investigation made in response to complaint by Mrs. Young); see also **Exhibit 6**, undated note produced pursuant to Subpoena by the New York State Commission on the Quality of Care documenting Mrs. Young's complaint.

BDC was aware that Mrs. Young had registered a complaint concerning her daughter's treatment and eventual death. *E.g.*, **Exhibit 19**, July 13, 2005 Memo of Judith Beer to Defendant Peter Uschakow with copies to Defendants Williamson and Ferdinand.

The knowledge that Valerie's mother had made a complaint, and especially that the Commission found deficiencies in Valerie's care should have triggered the duty to preserve. Instead, the defendants apparently made a decision to destroy the evidence.

**B.    Defendants' conduct meets the legal standards for "Culpable state of mind"**

Under Second Circuit precedent, the "culpable state of mind" factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or negligently." *Residential Funding*, 306 F.3d at 108. Analyzing a party's actions only for "bad faith" or "gross negligence" does not satisfy the applicable legal standard.

"A party charged with preservation will not be subject to sanctions if, for example, the evidence is destroyed by lightning. But the responsible party need not have acted intentionally or in *196 bad faith; negligence alone is sufficient to justify the imposition of some sanction. See *Residential Funding*, 306 F.3d at 108; *Chan*, 2005 WL 1925579, at *6-7; *Zubulake v. UBS Warburg LLC*, 229 FRD 422, 431 (SDNY 2004). This is because one of the purposes of spoliation sanctions is to prevent the innocent victim from suffering a detriment because of the loss of evidence. Therefore, "each party should bear the risk of its own negligence." *Residential Funding*, 306 F.3d at 108 citing *Turner v. Hudson Transit Lines, Inc*., 142 FRD 68, 75 (SDNY 1991) and *Kronisch*, 150 F.3d at 126. The nature of the sanction chosen will depend in part on the degree of culpability. See *Residential Funding*, 306 F.3d at 112-13; *Chan*, 2005 WL 1925579, at *6; *WRT*, 246 FRD at 195.

In the case herein, the defendants were statutorily obligated to preserve the log books, a part of Valerie's clinical record. The log books represent the best and possible only contemporaneous evidence of nature and level of Valerie's activities during the last months of her life. In that re-gard, we remind the Court that the subject logs reflect entries made every fifteen minutes. No other documentation was made contemporaneously in Valerie's case. The subject log books were the record of her actual care.

**C.    The evidence that was subject to spoliation was material**

For the "relevance" prong of the test, the Court in *Residential Funding* instructed that to obtain an adverse inference instruction, a party must establish that the unavailable evidence is "relevant" to its claims or defenses; (*Byrnie*, 243 F.3d at 109; *Kronisch*, 150 F.3d at 128), but that "relevant" in this context means something more than sufficiently probative to satisfy Fed. Evid. Rule 401. Rather the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that "the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." *Kronisch*, 150 F.3d at 127; *Byrnie*, 243 F.3d at 110. Courts must take care not to "hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evi-dence," because doing so "would subvert the ... purposes of the adverse inference, and would allow parties who have ... destroyed evidence to profit from that destruction." *Kronisch*, 150 F.3d at 128; *Byrnie*, 243 F .3d at 110. Id. at 108-09.

The special observation 15 minute check logs form a record of Valerie's activities in the months prior to her death. See, Exhibit 16 (Valerie's activities described every 15 minutes). Her level of activity, or lack thereof, directly bears upon the cause of her death (determined by the New York City Medical Examiner as due to "inactivity," see, Autopsy, **Exhibit 18** at page 1).

Over medication and medication side-effects were raised by Valerie's Treatment Team, including defendants herein as related to Valerie's inability to adequately ambulate and as restricting her movement (see discussion and exhibits referenced on pages 5-6, above). The 15-minute checks log pages that were produced document her inability to engage in activities, and the documents produced suggest that had the complete 1000 or more pages of logs had been produced, those missing logs would in detail document Valerie's inability to engage in activities.

The failure to address Valerie's lack of mobility and (apparently) drug-induced confinement to a wheelchair and/or other non-mobile positions bears directly upon the standards of care as set forth by the Commission in its Final Determination (**Exhibit 8**).

This is not only relevant to the circumstance that caused her death, but also relevant to the claim that Valerie was subjected to discriminatory and sub-standard treatment in the months prior to her death. See generally Complaint, **Exhibit 1**. This is also legally relevant because Federal standards for the use of medication to control behavior prohibit such uses of medication that "interfere with the individual client's daily living activities." 42 CFR §483.450(e). Federal standards also require that clients be provided with "mechanical supports, if needed, to achieve proper body position, balance, or alignment" [42 CFR §483.440(c)(6)(iv)] and that clients "spend a major portion of each waking day out of bed and outside the bedroom area, moving about by various methods and devices whenever possible." 42 CFR §483.440(c)(6)(v) (emphasis added).

Thus the special observation 15 minute check logs are directly relevant to materials facts in this case: her level of activity as relates to the cause of death, to the use of medication for behavioral control purposes and thus plaintiffs' prima facie case.

*23*

**D.    The imposition of sanctions, including an adverse inference and attorney fees is mandated by Defendants' spoliation**

Evidence of bad faith is "sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." *Byrnie*, 243 F.3d at 109 (citation omitted). In addition, evidence of gross negligence in the destruction or untimely production of evidence "will in some circumstances, standing alone, ... support a finding that the evidence was unfavorable to the grossly negligent party." Id. The evidence relied on to satisfy the "culpable state of mind" factor may be the same evidence relied on to satisfy the "relevance" factor, or it may be different. Id.

In the case herein, we have demonstrated that spoliation occurred in violation of applicable regulations and statutes. In addition the log entries, such as have been disclosed, are consistent with and favorable to the plaintiffs' case. Additional documents, referenced in the preceding sections, also support the contention that Valerie was maintained during her last months, in a drug-induced state of lethargy. The autopsy report authoritatively and finally determined the underlying cause of death to have been inactivity leading to the DVT and resulting pulmonary embolism.

Accordingly, this Court should issue an Order sanctioning the defendants in the form sought herein.

**E.    Conclusion**

For all the reasons set forth herein Plaintiffs respectfully request that this Court grant this

Motion and issue an order:

1. Declaring that the logs of 15 minute checks of the decedent, Valerie Young, were destroyed or otherwise subjected to spoliation by defendants; and,

2. finding as a matter of law as an adverse inference that the decedent, Valerie Young, was maintained by defendants in a wheelchair, floor mat, bed, chair, other non-mobile condition without regular ambulation from November 5, 2004 up to and including the date of her death on June 19, 2005 and upon a trial directing that inference to the jury ; and,

3. permitting the plaintiff to advise the jury of the spoliation by defendants of the 15-minute checks log books; and/or in the alternative,

4. in the event that any defendant denies that he or she destroyed, participated in the destruction, and/or permitted or allowed the destruction or spoliation of the 15 minute checks log books, hold an evidentiary hearing to determine the responsible defendant or defendants; and,

5. an award of attorney fees in an amount to be determined after the determination of this motion for the time expended by plaintiffs' counsel in connection with this motion and any discovery proceedings necessitated by the spoliation of the subject documents.

Dated:  New York, New York
        May 13, 2008

Respectfully submitted,

**Catafago Law Firm, PC**
**and Jonathan Bauer, Esq.**
Empire State Building
350 Fifth Ave. Suite 4810
New York, NY 10118
212-239-9669
212-239-9688 (fax)
catafagolaw@verizon.net

**s/**
By: Jonathan Bauer

*25*