CC: (H
Broderick
Reardon



GEORGE E. PATAKI
GOVERNOR

STATE OF NEW YORK
COMMISSION ON QUALITY OF CARE AND
ADVOCACY FOR PERSONS WITH DISABILITIES
401 STATE STREET
SCHENECTADY, NEW YORK 12305-2397
(TTY) 800-624-4143
www.cqc.state.ny.us

GARY O'BRIEN
CHAIR

ELIZABETH W. STACK
ANGELO T. MUCCICROSSO
COMMISSIONERS

October 24, 2005

RECEIVED
OCT 25 2005
COMMIS...

Peter Uschakow
Director
Brooklyn DDSO
888 Fountain Avenue
Brooklyn, NY 11208-5997

Re: Valerie Young
QCCID: 0506138

Dear Mr. Uschakow:

The Commission has completed its investigation into the death of Ms. Valerie Young, a consumer who had resided at the Developmental Center. To complete our investigation, I visited the facility, reviewed Brooklyn DC clinical records, investigation materials, the Mortality Review, and the autopsy report. I also discussed the case with Ms. Beer.

The Commission notes that the cause of death (per autopsy) was pulmonary embolism due to deep vein thrombosis of lower extremities due to inactivity due to seizure disorder of undetermined etiology.

The Mortality Review provided a summary of Ms. Young's medical history, noting that her medication regimen did not predispose her to pulmonary embolism, that her edema was addressed, and that past testing did not reveal reasons for concern. The most recent episode of edema was reviewed, and it was noted that this was an unlikely sign for DVT. Preventive measures were discussed, and recommendations included:

1. For sedentary consumers who are ambulatory, or where otherwise indicated, physicians will include orders for staff to walk with the consumers periodically during the day.

2. For non-ambulatory consumers, physicians will consider the use of elastic stockings or pressure boots where tolerated.

The documentation that I reviewed provided little information as to Ms. Young's actual level of activity. Although the Mortality Review reports that Ms. Young was ambulatory and used the wheelchair for transfers, it was also noted that staff tended to not have her walk for fear of her falling. I suspect that Ms. Young may have spent extended periods of time in her wheelchair. For example, the documentation tracking her whereabouts/activity on the evening of her death suggests that she may have sat in her wheelchair from 3:00 p.m. until 8:00 p.m.

AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER
REASONABLE ACCOMMODATION WILL BE PROVIDED ON REQUEST
PRINTED ON RECYCLED PAPER

YOUNG 11/07 - 0095

2

The Mortality Review noted that the cause of death was a pulmonary embolism, but did not address the fact that the ME determined that the embolism was due to inactivity. While the review addressed some preventive measures (e.g., anticoagulant therapy, elastic stockings, walking during the day), other possible preventive measures were not listed. I noted that no assessment for DVT risk was made when the wheelchair was obtained, no formal ROM was ordered, TED stockings were not ordered, no formal monitoring of her level of activity was implemented, no additional tests were conducted (e.g., Doppler), and no nursing care plan was developed. It appears that there was no representation from Nursing in the review process.

The Commission recommends that the DDSO develop and implement policies and procedures to address the issue of DVTs, and suggests you consider including the following:

- Obtain or develop a DVT risk assessment process/form.

- Establish standards for a medical regimen when DVT is suspected (testing, TEDs, anticoagulants/aspirin, etc.).

- Establish nursing procedures (Nursing Care Plan, nursing assessment) for DVT.

- Establish documentation requirements to track the level of activity for consumers with impaired/restricted mobility.

- Request the Physical Therapy department establish guidelines for range of motion (ROM) for mobility impaired/restricted consumers.

- Obtain PT consults addressing DVT risk/prevention when a consumer has limited or impaired mobility.

I have appended a copy of the Commission's "Could This Happen" addressing DVT/PE's. Although this report is oriented to a hospital setting, the guidelines can be adjusted for consumers residing in developmental centers and in the community.

Finally, our investigation revealed that the medication administration record (MAR) for Ms. Young was initialed indicating medications were administered on May 20, 2005, the day after Ms. Young's death. The DDSO should address these medication errors.

The Commission requests a review of the concerns identified in this letter, and would appreciate a written response by November 28, 2005. If you have any questions, please call me at (518) 388-2603. Please thank Ms. Beer for her assistance.

Under Article 6 of the Public Officers Law, final agency determinations are required to be available for public inspection. This letter will be deemed a final agency determination 30 days after the date of this letter, which affords you an opportunity to

3

respond to our findings prior to any disclosure pursuant to the Public Officers Law. Material which is required to be kept confidential or which is protected from disclosure under the Public Officers Law or other laws will be redacted prior to any such disclosure.

Sincerely,

Mark Rappaport, RN, MS, NP-P
Quality Assurance Facility
Review Specialist II
Division of Quality Assurance
and Investigation

cc: Commissioner, OMRDD



# In the Matter of Francine Charlot: Preventing Pulmonary Emboli

## Case32 #

### Background

In life, Francine Charlot was a clerk with the Department of Motor Vehicles. Her death, at age 49, was a driving force in changing policies at a local hospital to better protect the health and safety of countless future patients.

Ms. Charlot emigrated to the States with her parents and three younger brothers from her Carribean-island homeland when she was 25 years old. Little is known about her early years. She had completed 10 years of school, and was close to her parents and siblings. She was also soft-spoken, well dressed and friendly.

Soon after her arrival in the States, Ms. Charlot was hospitalized for major depression with psychotic features. Reportedly, she became depressed over a failed relationship with a man and had isolated herself in her bedroom, staying in bed "all covered up" days on end.

Following this hospitalization, Ms. Charlot continued to live at home with her family in New York City. Over the years, her younger brothers married and moved out. She spent her days at home, cooking and cleaning for her aging parents and enjoying her role as aunt of her brothers' children. She was personable, but had few close friends and spent most of her time at home. She did, however, attend an outpatient clinic where she was seen by a psychiatrist, for medication purposes, and a social worker for counseling.

Twenty years after her first hospitalization, Ms. Charlot was again hospitalized for recurrent major depression with psychotic features. A secondary diagnosis of mixed personality disorder with dependent features was added, as were medical diagnoses of hypertension and glaucoma.

During her three-week hospitalization, Ms. Charlot was treated with antidepressants; she was discharged to live with her parents.

Following discharge, Ms. Charlot was enrolled in an outpatient program which offered vocational training services. Through its assistance, she honed secretarial and clerical skills, first attained in business school in her homeland, and was placed in her first out-of-home job as a part-time clerk with the Department of Motor Vehicles. Ms. Charlot continued outpatient treatment while working; her diagnosis was major depression with psychotic features in remission.

In the summer of her 49th year, however, Ms. Charlot stopped taking her daily medications.

Triavil 50 mg and Ambien 10 mg.

**Final Hospital Admission**

Ms. Charlot decompensated over a three week period. She complained of hearing voices, feeling depressed and being scared and preoccupied with death.

On July 31, Ms. Charlot's mother brought her to the emergency room of a local hospital. Ms. Charlot's speech was incoherent and rambling, she appeared disheveled and was agitated. Although denying suicidal ideation, Ms. Charlot did not cooperate with a mental status exam. She was admitted with the initial diagnosis of paranoid schizophrenia and started on Stelazine and Ativan PRN for agitation.

During her first hospital day, Ms. Charlot refused meals and was agitated, requiring PRN medications. By her second day, Ms. Charlot was selectively mute and refused medications, food and fluids. As the day progressed, Ms. Charlot became unresponsive to verbal stimuli. She was sweating and had a fixed stare. With the exception of Procardia, which was started for tachycardia when she was admitted, Ms. Charlot refused all medications.

A psychiatrist was summoned who noted that Ms. Charlot was selectively mute, and experiencing some stiffness, localized sweating and fluctuations in blood pressure. His tentative diagnosis was rule out Neuroleptic Malignant Syndrome vs. Catatonia. His plan was to discontinue Stelazine, start Ativan 2 mg po every four hours for catatonia, and request a medical consult.

A medical specialist who examined Ms. Charlot was of the opinion that she was not experiencing NMS and that her muteness and rigidity, which appeared to be voluntary, were the result of her psychiatric condition.

By evening, Ms. Charlot became very agitated, pacing the hallways with her eyes closed. When redirected back to bed, she would not stay there. Even with bed rails in the upright position, Ms. Charlot would not stay in bed; in a disorganized state she would attempt to climb over the rails, placing her at risk of harm. As such, restraints were ordered.

Over the course of hospital day three, Ms. Charlot remained in restraint. Her temperature rose to 103 degrees and her blood pressure fluctuated between 120/80 to 170/100. She was also delusional and was seen by psychiatric and medical specialists. Her condition raised the possibility of Neuroleptic Malignant Syndrome or infection, and she was transferred to a medical service for treatment of NMS and further diagnostic tests and treatments for infection.

Over the next five days while on the medical unit, Ms. Charlot was followed by both medical and psychiatric services. When she wasn't mute and resting in bed, she was agitated, requiring mechanical restraint in bed. She essentially spent the last days of her life immobile. As she wouldn't regularly take nourishment, she was placed on IV hydration.

During this period, she was treated prophylactically for NMS and she also underwent tests for possible infections which, as the results came in sometime after her death, proved to be negative.

On her sixth day on the medical service, a nurse released Ms. Charlot from her restraints to reposition her in bed. As Ms. Charlot was being turned, she gave a large sigh, and expired.

Upon autopsy, death was attributed to a pulmonary thromboembolism due to deep vein thrombosis due to catatonia.

**Lessons Learned**

Investigations into Ms. Charlot's death raised several areas of concern.

First, it was noted that although Ms. Charlot was refusing food and fluids and required IV hydration, documentation of the level of her oral and IV intake was inconsistent. This was largely a documentation problem, as blood chemistries indicated that she was not dehydrated; nursing staff were reeducated on the importance of monitoring and documenting intake and output.

Similarly, for a two-day period of Ms. Charlot's stay on the medical service, there were gaps in documentation pertaining to restraint. The need for restraint was apparent in the record, but evidence that Ms. Charlot was released from restraint for range of motion exercises, as called for by facility policies, was missing. Nursing staff were counseled on this matter.

But more importantly, the investigations into Ms. Charlot's death led to the development of a treatment protocol to prevent future catastrophic ends.

For the last week of her life, Ms. Charlot was immobile: either bedridden in a catatonic state, or restrained in bed during periods of agitation. Prolonged periods of immobility place patients at risk of developing phlebitis, deep vein thrombosis and pulmonary emboli, which was Ms. Charlot's fate.

In response, the hospital developed a treatment protocol for the prevention of pulmonary emboli, identifying at-risk populations and preventive interventions.

The hospital's protocol identified the following individuals to be at risk of pulmonary emboli:

- Patients with catatonia;

- Severely depressed patients who are bedridden;

- Elderly patients who do not ambulate;

- Patients immobilized by fractures or weakness;

- Patients in restraint for prolonged periods; and

- Patients whose mobility is markedly decreased due to medications.

Among the preventive interventions called for by the hospital's protocol for these at-risk populations were:

- Assisting the patient to ambulate every two hours;

- Assisting the patient to a sitting position without legs dangling;

- Elevating legs every three hours to minimize stasis and increase venous return;

- Encouraging complete range of motion, including toes, feet and legs;

- Applying elastic stockings; and

- Placing high-risk patients on anti-coagulant drug therapy.

According to the hospital policy, all psychiatric patients' risk status for pulmonary emboli will be assessed by their psychiatrists, who will order the appropriate level of intervention needed and consult with medical specialists for high risk patients who may require the use of anti-coagulant therapy.

### Considerations for Other Agencies

The lessons learned by Ms. Charlot's acute care provider are worthy of consideration by other care providers, be they acute-care or long-term service providers. Acute-care service providers should consider:

- Are all staff aware of agency policies concerning the use of restraint and safeguards put in place to monitor and protect individuals in restraint (i.e., standards for release from restraint, range of motion, documentation concerning monitoring, etc.)?

- Are nursing staff aware of documentation expectations concerning basic care, such as monitoring intake, output, vital signs, etc? And are these expectations reinforced through supervision?

- Should the agency develop a standard protocol for the prevention of pulmonary emboli, as Ms. Charlot's facility did?

- Providers of long-term care often serve individuals who periodically require acute, inpatient hospital care. Sometimes these individuals require the intervention of restraint, or other aspects of their condition place them at risk for pulmonary emboli. Long-term care providers can serve as these individuals' advocates by:

Case 1:07-cv-06241-LAK-DCF    Document 21-10    Filed 05/14/2008    Page 8 of 8

- Becoming familiar with factors which place an individual at-risk for pulmonary emboli;

- Establishing a rapport with the acute care providers to allow an exchange of information with the provider on the patient's condition; and

- Suggesting, encouraging or advocating for interventions to prevent pulmonary emboli, if the patient's condition presents the risk of such.

---


Return to Case Titles


Return to Commission Home Page

CQC271

http://www.cqc.state.ny.us/could_this_happen/case32.htm                8/29/2005