UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

Estate of VALERIE YOUNG by VIOLA YOUNG, :
as Administratrix of the Estate of Valerie Young,
and in her personal capacity, SIDNEY YOUNG,  :
and LORETTA YOUNG LEE,
                                             :
                Plaintiffs,        07-CV-6241 (LAK)(DCF)
                                             :        ECF Case
     -against-
                                             :

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL                :
DISABILITIES, PETER USCHAKOW, personally
and in his official capacity, JAN WILLIAMSON, :
personally and in her official capacity, SURESH
ARYA, personally and in his official capacity, :
KATHLEEN FERDINAND, personally and in her
official capacity, GLORIA HAYES, personally and :
in her official capacity, DR. MILOS, personally and
in his official capacity,                    :

                Defendants.       :

----------------------------------------------------------------X


**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SANCTIONS**

                                            ANDREW M. CUOMO
                                            Attorney General of the
                                            State of New York
                                            Attorney for Defendants
                                            120 Broadway
                                            New York, New York 10271
                                            (212) 416-8164

JOSE L. VELEZ
Assistant Attorney General
  of Counsel

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................... ii

PRELIMINARY STATEMENT .................................................. 1

STATEMENT OF THE CASE .................................................. 3

    A.     Facts Relevant to Decedent Valerie Young .................................. 3

    B.     Facts Relevant to Special Observation Logs ................................ 5

ARGUMENT .............................................................. 7

POINT I       PLAINTIFF FAILED TO FOLLOW THE LOCAL RULES AND THIS
               COURT'S RULES BEFORE MAKING THE MOTION ................... 7

POINT II      PLAINTIFFS' MOTION FOR SANCTIONS SHOULD BE DENIED ........ 8

    A.     Standard .......................................................... 8

    B.     Plaintiffs' Claim for Spoliation Must Be Denied Because Plaintiffs Have Failed
          to Demonstrate Prejudice ............................................ 9

CONCLUSION ........................................................... 13

**TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Page**

Byrnie v. Town of Cromwell,
    243 F.3d 93 (2d cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

Cosentino v. OMRDD, et al.,
    07-CV-04159 (AKH) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fujitsu Ltd. v. Federal Express Corp.,
    247 F.3d 423 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Kronisch v. United States,
    150 F.3d 112 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11

Skeete v. McKinsey & Co. Inc.,
    1993 WL. 256659 (S.D.N.Y. July 7, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Grammatikos,
    633 F.2d 1013 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

West v. Goodyear Tire & Rubber Co.,
    167 F.3d 776 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Zubulake v. UBS Warburg LLC,
    220 F.R.D. 212 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Zubulake v. UBS Warburg LLC,
    229 F.R.D. 422 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Federal Rules**

Fed. R. Civ. P. 30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Local Rule 37.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**PRELIMINARY STATEMENT**

This memorandum of law is submitted on behalf of defendants State of New York Office of

Mental Retardation and Developmental Disabilities ("OMRDD"), Brooklyn Developmental Disabilities Service Office ("BDDSO") Director Peter Uschakow, Deputy Director of Operations Jan Williamson, Residential Unit Supervisor Gloria Hayes, Treatment Team Leader Kathleen Ferdinand and Medical Doctor Jovan Milos, and Hudson Valley Developmental Disabilities Services Office Deputy Director of Operations Suresh Arya (collectively "defendants") in opposition to plaintiffs' motion for sanctions. Also submitted in opposition to the motion is the declaration of Kathleen Ferdinand, dated May 30, 2008, and the declaration of Donna Limiti, dated May 28, 2008.

By their motion, plaintiffs seek the imposition of certain sanctions and an award of attorneys fees based on defendants' failure to locate and produce non-clinical log books which recorded 15-minute checks ("Special Observation Logs") of plaintiffs' decedent's level of activity from November 2004 through her death on June 19, 2005. More specifically, plaintiffs seek:

- a declaration that the logs of 15 minute checks of the decedent, Valerie Young, were destroyed or otherwise subjected to spoliation by defendants; and
- a finding as a matter of law as an adverse inference that the decedent, Valerie Young, was maintained by defendants in a wheelchair, floor mat, bed, chair, other non-mobile condition without regular ambulation from November 5, 2004 up to and including the date of her death on June 19, 2005 and upon a trial directing that inference to the jury; and
- permission to advise the jury of the spoliation by defendants of the 15-minute checks log books; and/or in the alternative,
- in the event any defendant denies that he or she destroyed, participated in the destruction, and/or allowed the destruction or spoliation of the 15-minute checks log books, hold an evidentiary hearing to determine the responsible defendant or defendants; and
- an award of attorney fees in an amount to be determined after the determination of this motion for the time expended by plaintiffs' counsel in connection with this motion and any discovery proceedings necessitated by the spoliation of the subject documents.

See Plaintiffs' Notice of Motion. For the reasons set forth below, because plaintiffs have not been prejudiced by the absence of the Special Observation Logs, they are not entitled to any of the

requested sanctions.

Plaintiffs have been provided with decedent's detailed medical records, documenting the delivery of extensive medical care that she received which is the focus of this action.[1] Plaintiffs have also been provided with two independent logs (Wing and Core Logs) which further record 24 hours a day 7 days a week various non-clinical actions that the decedent engaged in and the staff performed in caring for decedent.[2] Accordingly, insofar as the non-clinical Special Observation Logs are missing, the medical records, and these other logs, furnish plaintiffs with the requisite medical history and non-clinical information to allow them to proceed with their case. In addition, contrary to plaintiffs' claim that decedent was kept in an immobile state during the months preceding her death, her medical records do not show this type of confinement. Therefore, it is unlikely that the Special Observation Logs would support their claim that decedent's purported immobility caused her Deep Vein Thrombosis ("DVT") and, in turn, her sudden death. However, in recognition that

---

[1] Defendants have produced approximately 11,000 pages of documents to plaintiffs, that reference the continuous care that decedent received. Approximately 10,000 pages of these documents consist of decedent's medical records while she resided at the BDDSO from 1990 to 2005, which averages to approximately two pages per day. These clinical records clearly document the extensive level of treatment and care that decedent received at the BDDSO. These records include medication and treatment records, consultation request and reports, treatment team notes, progress notes, quarterly nursing reviews, clinical nursing notes, medication reviews, lab results, physicians order sheets, interdisciplinary treatment team notes, behavior management review committee notes, goal plans, and treatment team quarterly and annual review records. Indeed, this extensive level of care is clearly illustrated in the last annual review in 2005, consisting of approximately 50 pages, that decedent received just prior to her death. See BDDSO Annual CFA Team Meeting Discussion for consumer Valerie Young, dated April 13, 2005, annexed to Velez Declaration under Exhibit Tab H.

[2] Notably, in addition to decedent's voluminous medical records, her activities were also summarized in other logs that were maintained by BDDSO on each wing of each residential hearing. See Ferdinand Declaration at ¶¶ 9-10. Over 500 pages of BDDSO Core Logs and Wing Logs entries were produced to plaintiffs during discovery.

these Special Observation Logs cannot be accounted for, defendants are prepared to pay plaintiffs' reasonable attorneys' fees for bringing this motion. Velez Decl. at ¶ 9.

## STATEMENT OF THE CASE

**A.      Facts Relevant to Decedent Valerie Young.**

BDDSO is a residential treatment facility operated by the New York Office of Mental Retardation and Developmental Disabilities ("OMRDD"). It currently provides care and treatment to about 300 consumers who have a primary diagnosis of mental retardation or a developmental disability that require a level of care not available in a community setting. See Declaration of Kathleen Ferdinand, dated May 30, 2008 ("Ferdinand Decl."), at ¶ 5.[3]

Decedent was a 49-year old woman who had resided at the BDDSO since 1990. She had a history of profound mental retardation, seizure disorder, schizoaffective disorder, tardive dyskinesia, constipation, right brachial plexopathy, and left foot drop due to mononeuropathy. She had a normal echocardiogram and a negative venous duplex ultrasound in 2001. She had frequent episodes of agitation, aggressive behavior and behavioral decompensation requiring psychiatric hospitalization and/or frequent adjustment of her psychotropic medications. See Defendants' Expert Report of Dr. Diane Sixsmith, dated February 26, 2008 ("Sixsmith Report"), at pp. 1-2, annexed to the Declaration of Jose L. Velez, dated May 30, 2008 ("Velez Decl.") as Exhibit A; Plaintiffs' Exhibit 9 at pp. 2-3 (Bates Stamp QC7, 8).

In March of 2005, it was noted that decedent's gait was worsening and she was falling more

---

[3] Defendant Kathleen Ferdinand was the Treatment Team Leader for decedent from approximately May 2001 to the date of her death in June 2005. She supervised approximately 80 staff members during this time and there were approximately 50 other consumers on decedent's wing. Ferdinand Decl. at ¶ 11.

frequently. In April of 2005, she had an extensive annual physical and psychiatric evaluation that included neurological consultation, X-rays of the lumbar spine, and physical therapy evaluation. X-rays of her lumbar spine were negative. An EMG was scheduled for June 3, 2005 to evaluate her gait disturbance and foot drop. Id.

Because of frequent falls, decedent's medication regimen was adjusted with reduction in her Zyprexa dose. After a fall that caused a laceration on her scalp on May 20, 2005, a wheelchair was used for all mobility needs such as transfer between buildings, out-of-facility appointments and outings into the community. However, she continued to have physical therapy and walked with assistance. On May 27, 2005, decedent was noted to have bilateral ankle edema (swelling), but had no calf tenderness and a negative Homann's sign (a physical examination test for deep vein thrombosis). Her edema was assumed to be positional (i.e., her legs in a prolonged dependent position) and leg elevation during rest periods was recommended. Id.

On June 19, 2005, decedent collapsed in the shower. Resuscitative efforts were instituted by BDDSO staff including CPR, intravenous dextrose, and oxygen. After CPR, she again became responsive and was agitated. On the arrival of the paramedics, decedent was given intravenous atropine and was intubated for ventilatory support. She was transported to the hospital where she was pronounced dead shortly thereafter. At autopsy she was found to have bilateral embolism and bilateral deep vein thrombosis ("DVT"). Id.

It was the opinion of defendants' expert, Dr. Sixsmith, that decedents' care providers could not have reasonably anticipated that she would develop DVT and a fatal pulmonary embolism because she had none of the currently accepted risk factors or symptoms that are recognized to increase the likelihood of a diagnosis of DVT. Decedent also continued to receive physical therapy,

continued to ambulate with assistance of BDDSO staff, and appeared to remain completely asymptomatic for the three weeks preceding her death. Accordingly, in Dr. Sixsmith's opinion, the oversight, monitoring, evaluation, and treatment of decedent by BDDSO staff was thorough and according to the accepted standard of care. Sixsmith Report at p. 2.

**B.      Facts Relevant to Special Observation Logs**

As part of its care and treatment of consumers, BDDSO maintains non-clinical logs for each wing of each residential building. These Wing Logs provide a summary of the activities of the consumers and staff on a particular Wing for each shift, twenty-four hours a day, seven days a week. Ferdinand Decl. at ¶ 9. BDDSO also maintains a Core Log that summarizes the activities of supervisors on each of three shifts for their respective units, comprised at that time of four wings, and may note events on more than one wing of a building. They reflect the rounds that are made during each shift and may state, for example, the time decedent or other consumers fell asleep on a particular night, or an injury that occurred. Id. at ¶ 10. BDDSO also maintains Special Observation Logs for consumers who need heightened supervision. These logs are summaries of staff observing a consumer in a manner designated by that consumer's Interdisciplinary Treatment Team ("ITT"). The level of supervision utilized depends on the degree of the problem. The Special Observation Logs are kept in composition notebooks with the assigned staff member for each shift. When one book is completed, it is placed in the supervisor's office or in the storage area on that wing. Id. at ¶ 11.

In November 2004, decedent was placed on 15- minute checks that required staff to observe her and make entries in a Special Observation Log. She was placed on this check because of an

accident.

From Ms. Ferdinand's review of records of decedent's Individualized Program Plan ("IPP"), it appears that she was on 15-minute checks until her death in June 2005. Id. at ¶ 14. On December 21, 2004, following an incident with plaintiff, Ms. Ferdinand learned that log entries had not been made for that date. Following an investigation of the incident, Ms. Ferdinand reissued to the staff her memorandum in which she had previously instructed the staff to observe decedent every fifteen minutes and make entries in the Special Observation Log that had been provided. Staff was also counseled for their previous failure to make entries on other occasions in the past. Id. at ¶ 15.

In response to plaintiffs' motion for sanctions, Ms. Ferdinand conducted a thorough search of the unit, the record room and any other place where she thought the Special Observation Logs might be. She also directed her residential supervisor to conduct another search of their storage area for the Special Observation Logs on May 16, 2008 and none were found. She asked the client coordinator and a mid-level supervisor to conduct searches as well, and has been advised that they did not locate the Special Observation Logs. To date, the Special Observation Logs have not been located. Id. at ¶ 16. Ms. Ferdinand did not destroy the Special Observation Logs nor direct any one to do so. Id. at ¶ 17.

Donna Limiti, BDDSO Acting Director, also initiated a search for these Special Observation Log books pertaining to decedent. See Declaration of Donna Limiti, dated May 28, 2008 ("Limiti Decl.") at ¶4. Ms. Limiti personally conducted a search of the Director's office, which included having a maintenance worker break into a locked file cabinet. She did not locate the Special Observation Log books. Id. at ¶ 6.

In addition to requesting that Ms. Ferdinand search for the Special Observation Logs in every

room where developmental plans and log books are held on her wing, Ms. Limiti directed Alicia Mendegorin, the Health Information Manager at BDDSO, to search all areas where medical records are stored in the event that these Special Observation Logs had been misplaced. Id. at ¶¶ 7-8. Ms. Limiti also directed Richard Lippel to search the Quality Assurance office, which maintains all incident reports investigations, and mortality review reports, because he had conducted the investigation into the circumstances about decedent's death. Unfortunately, the Special Observation Logs were not found. Id. at ¶¶ 6-9. Finally, Ms. Limiti contacted Peter Uschakow, the former Director at BDDSO, who advised her that he never had the log books in his possession. Id. at ¶ 10.

## ARGUMENT

### POINT I

**PLAINTIFFS FAILED TO FOLLOW THE LOCAL RULES AND THIS COURT'S RULES BEFORE MAKING THE MOTION**

The filing by plaintiffs of a motion for sanctions on May 14, 2008 was the first indication to defendants that plaintiffs believed there was a discovery dispute concerning the Special Observation Logs that required court intervention. See Velez Decl. at ¶ 3. Indeed, during plaintiffs' depositions of six defendants (one of whom also served as a Fed. R. Civ. P. 30(b)(6) witness), their counsel did not question any of the defendants regarding the location of the documents that are the basis for the sanctions motion. Id. at ¶ 4. Plaintiffs made no attempt to address their purported dispute with defendants prior to filing this motions, failed to comply with the requirements of Local Rule 37.2 when they did not request an informal conference with the Court before making this motion, and have failed to comply with this Court's Motion Rules and Procedures regarding discovery disputes for ECF cases by raising their discovery disputes with the Court promptly once it was clear to them that the issues could not be resolved by agreement. Id. at ¶ 5. In addition,

plaintiffs made improper references in their sanction motion to Cosentino v. OMRDD, et al., 07-CV-04159 (AKH), which is the subject of a confidentiality order. Id. at ¶ 6. The motion for sanctions should be denied for these reasons alone.

## POINT II

### PLAINTIFFS' MOTION FOR SANCTIONS SHOULD BE DENIED

**A.     Standard**

Spoilation is the destruction, alteration, or the failure to preserve property for another's use as evidence in litigation that is pending or reasonably foreseeable. See West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). If spoilage occurs, a federal district court may impose sanctions against the responsible party regardless of whether it occurs in violation of a court order or even with no discovery order at all. Id. Appropriate sanctions "should be designed to: (1) deter parties from engaging in spoilation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" Id. (citing Kronisch v. United States, 150 F.3d 112, 126 (2d cir. 1998).

The government "has long been on notice of its duty to preserve discoverable evidence" and if sanctions are to be imposed, the extent and appropriateness of the sanctions should be dependent upon a "case-by case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof." United States v. Grammatikos, 633 F.2d 1013, 1019-20 (2d Cir. 1980). "[T]he determination of an appropriate sanction for spoilation, if any, is confined to the sound discretion of the trial judge." Fujitsu Ltd.

v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001).  However, if evidence is merely lost, sanctions should not necessarily be imposed on the government for the loss of such material.  United States v. Grammatikos, 633 F.2d at 1019.

A party alleging spoliation and seeking sanctions must establish three elements: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 430 (S.D.N.Y. 2004).  The party seeking sanctions bears the burden of establishing all elements of a claim for spoliation of evidence.  Byrnie v. Town of Cromwell, 243 F.3d 93,109 (2d Cir. 2001).  In general, an adverse inference instruction is an extreme sanction and should not be imposed lightly. Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003).

**B.  Plaintiffs' Claim for Spoliation Must Be Denied Because Plaintiffs Have Failed to Demonstrate Prejudice.**

Spoliation cases are addressed on a "case by case" basis.  Byrnie, 243 F.3d 93 at 108.  A court has broad discretion in evaluating whether the moving party is prejudiced by the non-moving party's inability to locate evidence.  Before a sanction is imposed, the moving party is required to show "the destroyed [or lost] evidence is relevant to the contested issue", and that the party is thereby prejudiced.  See Kronisch, 150 F.3d at 127 (noting that before an adverse inference is drawn, there is a requirement of "some showing" of relevance), citing Skeete v. McKinsey & Co. Inc., 1993 WL 256659, at *7 (S.D.N.Y. July 7, 1993).

In Skeete, the plaintiff sued her former employer for racial and sexual discrimination.  The employer sought an adverse inference instruction because the plaintiff had lost audiotapes which she

had made of voice mails, phone messages at her home, and conversations she had with other employees. The court refused to draw an adverse inference because the employer had "not demonstrated a nexus between the content of the materials and the inference the defendants wish to have drawn." Id. The court held that "Skeete's mere negligence in losing the materials at issue, without any showing as to the relevance of such materials to the lawsuit or prejudice to the defendants, clearly [did] not support" sanctions for spoliation or an adverse inference charge. Id. at *8. The same result should follow here.

Plaintiffs contend that decedent died as a result of inactivity and that the Special Observation Logs documenting 15-minute checks of her activity would support this theory. However, the 15-minute checks were not intended to monitor decedent for the risk of DVT by reason of inactivity. Rather, the stated purpose of this type of observation is to provide "a heightened level of supervision for consumers who present a danger to the physical well being of themselves or others." See BDDSO Policy & Procedure Manual attached to Plaintiffs' Exhibit 21 at page 1 (Bates D 1452). The staff was to monitor decedent's activity to prevent her from incurring any further injuries due to her unstable gait. Indeed, plaintiffs concede that this was the Log's purpose: "[i]n Valerie's case, 15-minutes checks were initiated because she was observed with unexplained injuries." See Plaintiffs' Memorandum of Law at p.11; see also Ferdinand Decl. at ¶ 14. As such, they are not probative, much less relevant, to plaintiffs' claim regarding her sudden death due to DVT.

Further, Byrnie, 243 F.3d at 107-108, on which plaintiffs' rely (see Plaintiffs' Memorandum of Law at p. 22), is readily distinguishable from the facts of this case, and itself indicates that a sanction for spoliation is appropriate only where the requisite showing of relevance is made. In Byrnie, id. at 107, the documents in question, which included numerous clearly relevant documents,

were destroyed after the plaintiff had filed an administrative charge of discrimination and in violation of a governing document retention regulation. Even in that case, the Second Circuit noted that the determination of spoliation must be made on a "case by case" basis, with "the burden on the 'prejudiced party' to produce 'some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files.'" Id. at 108 citing Kronish 150 F.3d at 128. Here, plaintiffs will not be able to adduce sufficient evidence from which a reasonable trier of fact could infer that "the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." Kronisch, 150 F.3d at 127; Byrnie, 243 F.3d at 110. The non-clinical Special Observation Logs were not intended to record decedent's medical condition and, as such, have no bearing on decedent's medical condition of DVT or on her death.

While plaintiffs argue that "[decedent's] level of activity, or lack thereof, directly bears upon the cause of her death" ( Plaintiffs' Memorandum of Law at p. 22), and contend that the missing log entries would have shown that decedent was continuously maintained in a non-mobile condition, the overwhelming available evidence is otherwise. The entries in decedent's medical records, the entries from the 500 pages from the other log books that were produced, as well as the deposition testimony of both defendants and plaintiffs clearly show that decedent was not maintained in a non-mobile condition, but was instead, ambulatory and did walk, albeit with a limp, a hop, or the assistance of staff.

Further, although plaintiffs conclusorily state that the available evidence suggests that decedent was maintained by defendants in a wheelchair, floor mat, bed, chair, or other allegedly non-mobile condition without regular ambulation from November 5, 2004 up to and including the

date of her death on June 19, 2005, see Plaintiffs' Memorandum of Law at p. 1, they concede that the April 13, 2005 "Annual Treatment Team meeting prior to Valerie's death included a physical assessment that found Valerie to be 'fully ambulatory.'" See Plaintiffs' Memorandum of Law at p. 5. Plaintiffs also concede that the May 2, 2005, Physical Therapy Report found, inter alia, that decedent was able to walk with the assistance of BDDSO staff. Id. In fact, plaintiffs testified during their depositions that decedent was ambulatory prior to her death, although they were concerned about her gait, i.e., limping and swelling, related to her foot drop for which she was receiving physical therapy twice a week. For example, plaintiff Viola Young testified that at "the end Valerie would be limping, I would ask the doctor what it was." She also testified that at "the end I was complaining about her limping then her feet started swelling up." She further testified that "[a]ll I know is she couldn't walk - - I mean she could walk. They were sending her for therapy." See Deposition Transcript of Viola Young at p. 53, ln. 21 - p. 56, ln. 25, annexed to Velez Decl. as Exhibit B.

Plaintiff Loretta Young Lee testified that when she visited decedent "she would be sitting down. Sometimes she would be walking around. Mostly she would be sitting." She also testified decedent "was hopping around. Somebody had to help her. She couldn't walk. . . . Her leg would swell." She further testified that "[decedent] was limping. She was having problems walking. They all saw it. They were there. We came to visit. She was with them all the time." She also testified that Viola Young would ask "'[w]hy is Valerie walking like this?'" See Deposition Transcript of Loretta Young Lee at p. 29, lns. 20-25, p. 40, lns. 2-9, p. 42, lns. 10-15, p. 52, lns. 5-22, annexed

to Velez Decl. as Exhibit C.[4]

Accordingly, plaintiffs have failed to establish that the non-clinical information contained in the Special Observation Logs would be relevant, and that they have been prejudiced by their unavailability. The medical records negate their claim and demonstrate that decedent was ambulatory at the time of her death. Because plaintiffs have failed to demonstrate any prejudice as a result of the alleged spoliation, their motion should be denied.

## CONCLUSION

Defendants respectfully request that this Court deny plaintiffs' motion and grant such other and further relief as this Court deems just, proper and appropriate.

Dated: New York, New York
         May 30, 2008

                                        ANDREW M. CUOMO
                                        Attorney General of the
                                          State of New York

---

[4] Likewise, defendants testified during their depositions that decedent was ambulatory prior to her death, although she was limited by her gait related to the foot drop. Defendants also testified that they were aware that plaintiff was receiving physical therapy and had observed decedent walking around with the assistance of BDDSO staff. See Deposition Transcript of Peter Ushakow at p. 16, ln. 16 - p. 27, ln. 15, p. 76, lns. 9-23, annexed to Velez Decl. as Exhibit D; Deposition Transcript of Jan Williamson at p.45, ln. 24 - p.7, ln. 10, annexed to Velez Decl. as Exhibit E; Deposition of Kathleen Ferdinand at p. 35, lns. 11-19, p. 75, ln. 21 - p. 76, ln. 16, p. 80, ln. 25 - p. 81, ln. 5, p. 104, ln.12 - p. 105, ln. 2, p. 146, ln. 21 - p. 147, ln. 11, p. 227, ln. 12 - p. 230, ln. 21, p. 238, lns. 11-16, annexed to Velez Decl. as Exhibit F; Deposition Transcript of Gloria Hayes at p. 39, ln. 5 - p. 40, ln. 23, p. 140, ln. 21 - p. 142, ln. 8, p. 146, ln. 16 - p. 148, 22, annexed to Velez Decl. as Exhibit G; Deposition Transcript of Dr. Jovan Milos at p. 40, ln. 16 - p. 41, ln. 4, p. 90, lns. 7-18, p. 140, ln. 13 - p. 141, ln. 5, p. 147, ln. 1 - p. 148, ln. 25, annexed to Velez Decl. as Exhibit H.

        Attorney for Defendants
        By:

        S/_____
        JOSE L. VELEZ
        Assistant Attorney General
        120 Broadway, 24th Floor
        New York, New York 10271
        (212) 416-8164

TO:  JONATHAN BAUER, ESQ.
      The Catafago Law Firm, P.C.
      Empire State Building
      350 Fifth Avenue, Suite 4810
      New York, NY 10118
      (212) 239-9669

Docket No.  07 CV 6241 (LAK) (DCF)
_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

Estate of VALERIE YOUNG by VIOLA YOUNG,

as Administratrix of the Estate of Valerie Young,
and in her personal capacity, SIDNEY YOUNG,
and LORETTA YOUNG LEE,

                        Plaintiffs,

     -against-

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, PETER USCHAKOW, personally
and in his official capacity, JAN WILLIAMSON,
personally and in her official capacity, SURESH
ARYA, personally and in his official capacity,
KATHLEEN FERDINAND, personally and in her
official capacity, GLORIA HAYES, personally and
in her official capacity, DR. MILOS, personally and
in his official capacity,

                        Defendants.
_____

DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SANCTIONS
_____

           ANDREW M. CUOMO
           Attorney General of the
           State of New York

           ATTORNEY FOR
             Defendants

           Office and Post Office Address
           120 Broadway, 24th Floor
           New York, New York 10271
           (212) 416-8164

_____