# EXHIBIT A



**New York Hospital Queens**

56 Main Street, Flushing, NY 11355 / Tel. 718-670-1426 / Fax. 718-661-7746

**Department of Emergency Medicine**

February 26, 2008

Jose L. Velez, Esq.
Assistant Attorney General
New York Sate Department of Law
Litigation Bureau—24th Floor
120 Broadway
New York, NY 10271

Re: Estate of Valerie Young by Viola Young, Administratrix, et al, v. State of New York
Office of Mental Retardation and Developmental Disabilities, et al

Dear Mr. Velez:

At your request, I have reviewed the following material in the above matter in order to
formulate my opinion on the medical care given to Valerie Young:

Summons;
Investigation of Consumer Death, stamped "Young 11/07", pages
    0001 to 0241;
Medical records, 2004-2005, stamped "Young", pages 7628 to 8797;
"Minor Occurrence" forms, 11/30/04; 12/1/04; 12/10/04; 12/21/04; 12/23/04;
    12/24/04; 1/2/05; 1/9/05; 1/18/05; 1/25/05; 1/27/05; 2/11/05; 3/10/05;
    3/14/05; 3/17/05; 3/22/05; 3/28/05; 4/7/05; 5/4/05.

Valerie Young was a 49 year old woman who had resided at the Brooklyn Developmental
Center since 1990. She had a history of profound mental retardation, seizure disorder,
schizoaffective disorder, tardive dyskinesia, constipation, right brachial plexopathy, and
left foot drop due to mononeuropathy. She had a hemorrhoidectomy in 1998 and a
fractured right index finger in 2002. She had a normal echocardiogram and a negative
venous duplex ultrasound in 2001. She had frequent episodes of agitation, aggressive
behavior and behavioral decompensation requiring psychiatric hospitalization and/or
adjustment of her psychotropic medications. Her medications at the time of her death
were Inderal, Klonopin, Topomax, Prevacid, Remeron, Vitamin B, Zyprexa, Tegretol,
Colace, Metamucil, and Fleet's enema.

In March of 2005, Ms. Young was noted to have worsening of her gait problems and
increasing falls. In April, 2005, she had an extensive annual physical and psychiatric
evaluation that included neurological consultation, x-rays of the lumbar spine, and

physical therapy evaluation. X-rays of her lumbar spine were negative. An EMG was scheduled for 6/3/05 to evaluate her gait disturbance and foot drop.

Because of frequent falls, her medication regimen was adjusted with reduction in her Zyprexa dose. After a fall that caused a laceration of her scalp on 5/20/05, a wheelchair was used for "all mobility needs" although she continued to have physical therapy and was ambulated with assistance. On 5/27/05, she was noted to have bilateral ankle edema (swelling) but had no calf tenderness and a negative Homann's sign (a physical examination test for deep vein thrombosis). Her edema was assumed to be positional, (i.e., her legs in a prolonged dependent position) and leg elevation during rest periods was recommended.

On 6/19/05 Ms. Young collapsed in the shower. Resuscitative efforts were instituted by the staff including CPR, intravenous dextrose, and oxygen. After CPR, she again became responsive and was agitated. On the arrival of the paramedics, Ms. Young was given intravenous atropine and was intubated for ventilatory support. She was transported to the hospital where she was pronounced dead shortly thereafter. At autopsy she was found to have bilateral pulmonary embolism and bilateral deep vein thrombosis.

In my opinion, the oversight, monitoring, evaluation, and treatment of Ms. Young was thorough and according to the accepted standard of care. When it was noted she was not only having increasing gait disturbance but increasing frequency of falls in April, 2005, she was referred for further evaluation, and the appropriate restrictions were placed on her activities to prevent further injury. When her ankle edema was noted on 5/27/05, her physician made the completely reasonable diagnosis of positional or dependent edema. That diagnosis was reasonable for at least three reasons—previous evaluation of her edema had been negative for deep vein thrombosis in 2001 when she had a negative venous duplex ultrasound; her examination was non-diagnostic for deep vein thrombosis in that her legs were non-tender; and her edema was bilateral. Typical physical findings in deep vein thrombosis are unilateral edema, calf tenderness, and/or pain on ambulation, none which she had. Recognizing that her edema may have been aggravated by her periodic confinement to a wheelchair, her physician recommended leg elevation, which is the usual treatment for dependent edema.

It is further my opinion that her care providers could not have reasonably anticipated that Ms. Young would develop bilateral deep vein thrombosis and fatal pulmonary embolism. Ms. Young had none of the currently accepted risk factors or symptoms that are recognized to increase the likelihood of a diagnosis of deep vein thrombosis, which are: active cancer; recently bedridden for major surgery; unilateral calf or leg edema; paralysis or a leg cast in the recent past; localized calf tenderness; collateral superficial veins. And the fact that she continued to receive physical therapy, continued to ambulate with assistance at her facility, and appeared to remain completely asymptomatic for the next three weeks until her death would have reinforced the impression that she was not at risk for any serious condition.

At the time of Ms. Young's collapse on 6/19/05, immediate and appropriate measures were taken to provide emergency care and resuscitation. According to the records there was prompt recognition of her agonal state and notification and rapid response of the nurse and physician on site. In fact, although Ms. Young initially was observed to be not breathing and without a pulse, the resuscitative measures instituted by the staff were sufficient to revive her to the point of responsiveness and agitation until EMS arrived to take over her care.

Therefore, in summary, it is my opinion that Ms. Young was treated according to the accepted standard of care both prior to and at the time of her collapse on 6/19/05.   I have formulated these opinions based on the following qualifications: my board certifications in internal medicine and emergency medicine; my experience as a clinician for more than 30 years treating many patients with both deep vein thrombosis and pulmonary embolism; my experience as a teacher of medical students and resident physicians in various specialties on the presentation and treatment of deep vein thrombosis and pulmonary embolism; and my experience in the last few years treating many patients with developmental disabilities in the Emergency Department at New York Hospital Queens, which is a major referral source for care for a local center for patients with developmental disabilities.

That latter experience has demonstrated to me that the treatment of these patients is challenging and complex. As they are often unable to articulate their needs, precisely describe their symptoms, or cooperate with examination and testing, it requires both patience and attention to the smallest nuances of behavior to make an accurate diagnosis. While I did not personally observe the care administered to Ms Young, a review of her medical records demonstrates an ongoing process of attention to Ms. Young's needs and well-being.. From ensuring that she had good tooth brushing to providing stimulation during activity periods to dealing with and addressing her aggressive behavior without over-sedating her, there is evidence of ongoing monitoring and follow-up to ensure that care plans were carried out and symptoms were expeditiously addressed.

I am being compensated for my time at the rate of $350/hour for record review and report preparation. Attached to this report is a current copy of my curriculum vitae listing my qualifications and my publications. Also attached is a list of cases in which I have served as a medical expert and in which I have been deposed or testified in the preceding four years.

Sincerely,

Diane M. Sixsmith, M.D., M.P.H., FACEP

# CURRICULUM VITAE

**Diane M. Sixsmith, M.D., M.P.H., FACEP**
**Department of Emergency Medicine**
**New York Hospital Queens**
**56-45 Main Street**
**Flushing, New York 11355**

Work Telephone: (718) 670-1426
Facsimile: (718) 661-7746; (212) 749-1514
Home Telephone: (212) 749-7697
E-mail: dmsixsmi@nyp.org

## EDUCATION:

Trinity College, Washington, D.C., B.A., Cum Laude, 1969
Major Field: English Literature; Minor Fields: Chemistry, Biology, Theology

University of Pittsburgh School of Medicine, Pittsburgh, PA.
M.D., 1973

Columbia University School of Public Health, New York, New York
M.P.H. in Health Administration, 1977

## PROFESSIONAL TRAINING:

Internship, Straight Medicine, Harlem Hospital Center,
in Affiliation with the College of Physicians and Surgeons, New York, New York
July 1, 1973 - June 30, 1974

Residency, Internal Medicine, Harlem Hospital Center
July 1, 1974 - June 30, 1976

## ACADEMIC APPOINTMENTS:

1994 – Present  Assistant Professor of Emergency Medicine in Clinical Medicine, Weill Medical College of Cornell University

1994 - 2001  Co-Chief, Div of Emergency Medicine, Departments of Medicine and Surgery

1992 - 1994  Assistant Clinical Professor in Medicine, New York University School of Medicine and Bellevue Hospital Center

1989 - 1992  Instructor in Medicine, New York University School of Medicine and Bellevue Hospital Center

1987 - Present        Adjunct Professor, Department of Allied Health, Borough of Manhattan Community College, City University of New York;  Medical Director, Paramedic Training .

1976 - 1980        Instructor in Clinical Medicine, Department of Medicine, Columbia University College of Physicians & Surgeons,

1976 - 1982        Faculty, Emergency Medicine, Physicians Assistant Program, Harlem Hospital Center & the Sophie Davis School of Biomedical Education of the City University of New York

## HOSPITAL APPOINTMENTS:

1992 - Present
Chairman, Department of Emergency Medicine, New York Hospital Medical Center of Queens (formerly Booth Memorial Medical Center), Flushing, New York

1997 - 1999
Director, Department of Emergency Medicine, New York Flushing Hospital,  Flushing, New York

1992 – 1998
Attending Physician, Emergency Department, Hudson Valley Hospital Center, Peekskill, NY

1980 - 1992
Medical Director, Emergency Department, New York Downtown Hospital (formerly New York Infirmary-Beekman Downtown Hospital), New York, New York

1980 - 1993
Attending Physician, Department of Medicine, New York Downtown Hospital

1977 - 1980
Chief of Emergency Services, Harlem Hospital Center, New York, New York

1976 - 1979
Staff Physician, Rikers Island Health Services, Montefiore Hospital   and Medical Center, New York City

## AWARDS AND HONORS:

Fellow, American College of Emergency Physicians, awarded 1989

## OTHER PROFESSIONAL POSITIONS:

Reviewer, Academic Emergency Medicine,  1999-present

Member, Board of Professional Medical Conduct, New York State Department of Health, 2004-present

Consultant, Research Triangle Institute, Center for the Study of Social Behavior, Research Triangle Park, N.C., Medical Costs of Drug Abuse, 1977 - 1980

Consultant, New York County Health Services Review Organization.
1977 - 1984

## LICENSE AND CERTIFICATIONS:

New York State License - 122203 issued July, 1974
DEA - AS6300723
Diplomate, American Board of Emergency Medicine, October, 1986; Recertified, December, 1996; November, 2006
Diplomate, American Board of Internal Medicine, June 1976
Diplomate, National Board of Medical Examiners, March 1974
Licensed Physician, New York State, Registration No. 122203
Certified Basic & Advanced Cardiac Life Support Instructor
Certified Advanced Trauma Life Support Instructor
Certified Pediatric Advanced Life Support Instructor

## COMMITTEE MEMBERSHIPS:

Chairman of the Medical Board, 2003-2004; Vice Chairman of the Medical Board, 1996—2002; Secretary of the Medical Board, 1994-1996; New York Hospital Medical Center of Queens

Member, Board of Trustees, New York Hospital Medical Center of Queens, 1998—2004

Member, Board of Directors, Heritage Affiliate (New York City, Long Island, New Jersey, Connecticut), American Heart Association, 1999—2004

Member, Board of Directors, National Marfan Foundation, 2004—present

Member, Board of Directors, New York Heart Association, 1984 - 1990;
1992 - 1999

3

President, American Heart Association, New York City Affiliate, 1997-1999; President-Elect, 1995-1997

Member, Board of Directors, New York Chapter, American College of Emergency Physicians, 1991 - 1994

Member, Advisory Council, Emergency Medicine Section, New York Academy of Medicine, 1993 - Present

Woman Liaison Officer, Women in Academic Medicine, Association of American Colleges, 1994 - 2000

Chairman, Practice Management Committee, New York Chapter
American College of Emergency Physicians, 1990 - 1992

Chairman, Council on Community Programs, New York Heart Association 1989 - 1993

Chairman, Resource Council, New York Heart Association, 1993 - 1997

National Faculty, ACLS and BCLS, American Heart Association,
1984 - 1990

Chairman, New York Heart Association Subcommittee on Hospital Training, 1982 - 1987

Chairman, New York Heart Association Emergency Cardiac Care Committee, 1987 - 1989, Member 1981 - 1989

Member, N.Y.C. Regional Emergency Medical Services Council        1982 - 1989

Chairman, Regional Emergency Medical Services Council
1984 - 1988

Member, N.Y.C. E.M.S. Advanced Life Support Committee        1978 - Present

Member, New York City EMS Committee on General Emergency Department Standards, 1977 - 1984

Chairman, New York City Medical Advisory Committee Subcommittee on Paramedic Training & Testing - 1980 - 1983

Consultant, New York State Department of Substance Abuse Services
Task Force on PCP, 1979 - 1981

4

## PROFESSIONAL SOCIETIES:

Member, Society for Academic Emergency Medicine, 1993 - Present
Member, American College of Emergency Physicians, 1986 - Present
Member, American College of Physicians, 1990 - 1994
Member, American Women's Medical Association, 1986 - 2000

## BIBLIOGRAPHY

### Peer Review Journals:

Sixsmith, D., "Case Studies in Acute Aortic Dissection: Strategies to Avoid a Catastrophic Outcome," ASHRM Journal. 2005, Vol. 25, No.2:15-18.

Cregin, R., Segal-Maurer, S., Weinbaum, F., Rahal, J., Karbowitz, S., Sixsmith, D., Cassata, V., Danek, M., Battelman, D., Callahan, M., "Multidisciplinary Approach to Improving Treatment of Community Acquired Pneumonia," American Journal of Health-System Pharmacy. February 15, 2002, Vol. 59, No. 4:364-68.

McClain, W., Shields, C., Sixsmith, D., "Autonomic Dysreflexia Presenting as a Severe Headache," American Journal of Emergency Medicine, May, 1999, Vol.17, No. 3:238-40.

Lee, E., Rosenberg, C., Sixsmith, D., Pang, D., "Does a Physician-Patient Language Difference Increase the Probability of Hospital Admission?", Academic Emergency Medicine, January, 1998, Vol. 5, No. 1: 86-89.

Tasso, S., Shields, C., Rosenberg, C., Sixsmith, D., Pang, D., "Effectiveness of Selective Use of Intravenous Pyelography in Patients Presenting to the Emergency Department with Ureteral Colic," Academic Emergency Medicine, August, 1997, Vol. 4, No. 8: 780-784.

Sixsmith, D., Weissman, L, & Constant, F, "Telephone Follow-up for Case Finding of Domestic Violence in an Emergency Department," Academic Emergency Medicine, April, 1997, Vol. 4, No. 4: 301-304.

Weinbaum, F., Lavie, S., Danek, M., Sixsmith, D., Heinrich G., & Mills, S., "Doing It Right the First Time: Quality Improvement and the Contaminant Blood Culture," Journal of Clinical Microbiology, March, 1997, V. 35, No. 3: 563-565.

Shields, C. & Sixsmith, D., "Treatment of Moderate to Severe Hypothermia in an Urban Setting," Annals of Emergency Medicine, October, 1990, V. 19, No. 10:1093--1097.

Hammer JS; Jones JW; Lyons JS; Sixsmith D; Afficiando E , "Measurement of Occupational Stress in Hospital Settings: Two Validity Studies of a Measure of Self-reported Stress in Medical Emergency Rooms," General Hospital Psychiatry, 1985 Apr; 7(2):156-62.

Sixsmith, D. & Goldman, F., "The Medical cost of Drug Abuse in an Inner-City Community, American Journal of Public Health, May 1979, Vol 69, No. 5:505-7.

## Abstracts

Chen, P., Sixsmith, D., "Early Treatment Unit Does Not Improve Hospital Length of Stay for ED Boarders," Academic Emergency Medicine, May, 2007, Vol 14, No. 5, Supp 1, S54.

Shuchat, S., Sixsmith, D., Hei Shun Yu, "Perception of Language as a Barrier to Care among Non-English Speaking Patients," Academic Emergency Medicine, May, 2007, Vol 14, No. 5, Supp 1, S201.
Also presented at the Fourth Mediterranean Emergency Medicine Conference, Sorrento, Italy, September 19, 2007.

Sixsmith, D., Rosenberg, C., Silber, S., Leviton, R., Schor, J., Leo, P., "Excess Length of Stay in the ED Increases Inpatient Length of Stay," Academic Emergency Medicine, May, 2000, Vol 7, No. 5: 544.

Sixsmith, D., Weinbaum, F., Chan, S., Nussbaum, M., Magdich, K., "Reduction of Hemolysis of Blood Specimens Drawn from ED Patients for Routine Chemistry Tests by Use of Low Vacuum Collection Tubes," Academic Emergency Medicine, May, 2000, Vol 7, No.5:525.

Aziz, G., Karbowitz, S., Gumpeni, R., Sixsmith, D., Rosenberg, C., Tavares, J., "Randomized Trial to Study Helium:Oxygen as a Delivery Vehicle to Nebulize Albuterol in Acute Asthma Exacerbation in the Emergency Department," Academic Emergency Medicine, May 1998, Vol. 6, No. 5.

Shields, C., & Sixsmith, D., "Isolated Prehospital Hypostension in Blunt Trauma," Academic Emergency Medicine, May, 1997, Vol. 5, No. 5.

## Book Chapters

Sixsmith, D., "Approach to Multiple Trauma," and "Head Trauma," in <u>Pediatric Emergency Medicine, Self-Assessment and Review, 2nd Edition</u> edited by Rubin, D., Caple, S., Conway, E., and Barkin, R., St Louis, Missouri: Mosby Press, 1998.

Sixsmith, D., & Rehm, C., "Accidents and Emergencies," in <u>The Women's Complete Healthbook,</u> Edited by Epps, R., and Stewart, S., Delacorte Press, 1995.

Sixsmith, D., "Food Poisoning," <u>House Calls</u>, edited by Couzens, G., Simon and Schuster, New York, 1993.

## INVITED LECTURES

Medical Liability Mutual Insurance Company Annual Risk Management Seminar, "Top Five Risk Management Issues in Your ED," New York, NY, November 4, 2005.

Risk Management and Patient Safety Institute, "High Risk Areas in Emergency Medicine," Minnesota and North Dakota, September 13-17, 2004.

Risk Management and Patient Safety Institute, "Emergency Medicine: Focusing on High Risk Areas", Audio Conference, 7/21/2004.

Marfan Syndrome Symposium, "Emergency Management of Aortic Dissection, Cedars-Sinai Medical Center, Los Angeles, CA, 7/9/2004.

Philadelphia Area Society for Healthcare Risk Management, "Top Five Conditions Leading to ER Malpractice Claims", Plymouth Meeting, PA., 5/20/2004.

Risk Management and Patient Safety Institute, "High Risk Conditions Leading to Emergency Room Malpractice Claims," St. Joseph, MI., 3/30-31/2004.

Risk and Quality Conference, Providence Health System, "How to Make the ED Safer," Seattle, WA., 3/25/2004.

American Society for Healthcare Risk Management, "Top Five Conditions Leading to Emergency Room Malpractice Claims," Nashville, TN, 11/2-3/2003.

Lincoln Hospital and Mental Health Center, Emergency Medicine Residency Program Grand Rounds, " "Acute Aortic Dissection—Diagnosis and Management", Bronx, NY, 6/4/2003.

Lincoln Hospital and Mental Health Center, Emergency Medicine Residency Program Grand Rounds, "Ethics in Emergency Medicine", Bronx, NY, 11/20/2002

Stamford Hospital Department of Medicine Grand Rounds, "Acute Aortic Dissection—Diagnosis and Management", Stamford, CT., 7/10/2002.

New York Chapter, American College of Emergency Physicians, Annual Scientific Assembly, "Gyn Emergencies" and "Trauma in Pregnancy", Lake George, NY, 7/8/2002.

American Heart Association Conference on Marfan's Disease, New York Academy of Medicine, "Acute Aortic Dissection—Diagnosis and Management", New York, NY, 5/1/2002.

## FUNDED RESEARCH

Co-Principal Investigator, HEW Grant No. 1R01DA00-86-02A
Grant Received March, 1979, National Institute on Drug Abuse, "Improved Reporting Methods for Detecting Utilization of Health Resources Because of Complications of Drug Abuse"

Revised 10/12/07

Expert Witness Trial and Deposition Testimony, 2003--2008
Diane Sixsmith, M.D.

Armitage, Carl (Kreisman-Medical Legal Evaluation)—**Deposition, NJ, 10/27/06**
Babb, Crystal (Gary Wais)—**Deposition, Maryland, 6/20/07.**
Bartholomew, Emily (Kennedy, Johnson)—**Deposition, CT., 9/15/06**
Beattie, Allan (Jacques)-**Deposition, CT., 2/6/03, Trial, CT, 10/8/03**
Blumenthal v Augustin (Pilkington & Leggett)-**Trial, Monticello, NY, 1/17/03,**
Bovell (Andel) **Deposition, New Jersey, October 23, 2001, Trial, Passaic County,**
    **1/14/04**
Brooks, Gerrod (Gary Wais)—**Deposition, 7/1/03, Maryland**
Bueno v. Keefer (Peltz & Walker)-**Trial, New York County, 1/16/03**
Carson, Barbara v. Janicke  (Paul Beltz)—**Trial, Buffalo, NY, 5/2/07**
Choi, Samuel (Blume,Goldfaden)—**Deposition, March 21, 2003, May 20, 2003,**
Curzi, Dewey v. Warren Hospital (Arthur J. Russo) **Deposition, October 29,**
    **2004, Phillipsburg, NJ**
Davis, Rodney (State of NY—Criminal)—**Trial, April 30, 2007, NY Cty**
DeJesus, Ruby (Littlepage)-**Deposition, Maryland, 4/19/06**
Doorandish (Hillman Brown)-**Trial, Annapolis, MD., 2/11/03, Closed**
Fuller-Baker, Kenyon (Meisrow & Stravitz)—**Deposition, MD, 8/10/04**
Gardner, Linda (Richard Lenter)-**Deposition, 9/11/06 (Michigan)**
Giangeruso, Michael (Eichen, Levinson)-**Deposition (NJ)—8/22/06**
Gibbs, Eugenia v. Kovachs, et al (Kline & Specter)—**Deposition, NJ, 11/18/05**
Hammons,Susan (Peter Ervin)-**Deposition, Louisville, KY, 5/12/06**
Harris v. South Nassau (Bartlett)—**Trial, Nassau County, 8/16/04**
Harris, John (Kolsby Gordon)—**Trial, Philadelphia, 6/27/06**
Holcomb, Charles (Andel)—**Trial, Philadelphia, April 14, 2003**
Jacoby, Toby (Harry I. Kate)—**Trial, Nassau Cty, 10/7/05**
Jett, Christa (Blume,Goldfaden)—**Deposition, NJ, 4/2/03**
Jones, Jeffrey (Cardaro & Peek)—**Deposition, 10/20/06, Baltimore, Maryland**
Jones, Linda (Littlepage)—**Deposition, 9/30/05, Maryland**
Kresky, Lawrence (Andel-Colleran)—**Deposition, Pa, 4/16/04**
Lahtinen v. Allyne (Pilkington & Leggett)—**Trial, Orange County, NY, 9/18/03**
LaSalle, Joe (Eshelman Legal Group)-**Trial, Akron,OH, 3/2/06**
Lanza v. Westchester County Medical Center  **Trial, White Plains, July 15, 2004**
Loyd, Dorothy v. Cass Medical Center (Dempsey & Kingsland)—**Deposition,**
    **10/24/06, Jackson Cty, Missouri, Trial, Jackson Cty, 4/17-18/07**
Massey, Norma (Andel)-**Deposition, 11/02/05 North Carolina**
Mathews, Lori (Andel-Kline)—**Deposition, May 14, 2004**
McKeever vs. Pollizzi (Wingate)-**Trial, 2/16/06, Bronx**
McKenstry v. UMMSC, et al (Snyder, Weltchek) **Deposition, Baltimore, MD, 12/7/07**
Miller v. Madell and the Cornwall Hospital (Tancredi)—**Trial, Goshen,  NY,**
    **12/8/2003**
Moyer, Scott v. Aultman Hospital (Harrington, Schweers)-**Deposition, Ohio,**

4/25/06

Olszyk, Christine (Blume, Goldfaden)-**Deposition, NJ, 3/2/07**

Pauling, Isaiah (Ferraro & Zugibe)—**Trial, 4/26 and 4/28/05,**
     **Rockland County, NY**

Placek v. Community Medical Center (Blume, Goldfaden)—**Deposition, Ocean Cty, NJ,**
**2/26/08**

Pepe, Samantha (Kennedy Johnson)—**Deposition, CT, 3/9/07**

Polis (Andel)—**Trial, Doylestown, Pa, (Bucks Cty), 5/25/04**

Rosado, Gina v. Montefiore (Wilson)—**Trial, Bronx, 2/3/06**

Schoch, Kaitlyn (Blume,Goldfaden)-**Deposition, NJ, 5/5/06**

Spiro, Marilyn (Weiner & Weltchek)—**Deposition, MD—9/22/05.**
     **Trial, Montgomery County, Md., 5/16/06**

Suschenko v. Dyker Emergency Physicians (vonSalis)—**Trial,**
     **Kings Cty, 10/12 and 10/14/ 2004**

Thompson, Stevie (Kline and Specter)—**Deposition, NJ, 4/15/04**

Watkins, Tamara (Ward & Caggiano)-**Deposition, Orlando, Fl—Brevard Cty),**
     **10/18/06**

Wetzel, Timothy, Estate of (Meub Associates)—**Deposition, Grand Rapids,**
     **Michigan, December 12, 2003**

Winfree, Daryl (Landers)—**Trial, March 2006, Queens Cty**

# EXHIBIT B

1                                        COPY

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    -----------------------------------------X

5    Estate of VALERIE YOUNG, by VIOLA YOUNG, as
     Administratrix of the Estate of Valerie Young,
6    and in her personal capacity, SIDNEY YOUNG, and
     LORETTA YOUNG LEE,
7
                              Plaintiffs,
8
                    -against-              Index No.
9                                          07CV6241

10   STATE OF NEW YORK OFFICE OF MENTAL RETARDATION
     AND DEVELOPMENTAL DISABILITIES, PETER USCHAKOW,
11   personally and in his official capacity, JAN
     WILLIAMSON, personally and in her official
12   capacity, SURESH ARYA, personally and in his
     official capacity, KATHLEEN FERDINAND, personally
13   and in her official capacity, GLORIA HAYES,
     personally and in her official capacity, DR.
14   MILOS, personally and in his official capacity,
                              Defendants.
15
     -----------------------------------------X
16

17

18                EXAMINATION BEFORE TRIAL of the

19   Plaintiff, VIOLA YOUNG, taken by the Defendant,

20   pursuant to Notice, held at the Office of the

21   Attorney General, 120 Broadway, New York, New

22   York  10271, on January 29, 2008, at 10:20 a.m.,

23   before a Notary Public of the State of New York.

24

25

```
 1                           V, YOUNG

 2            Q.    Then during the years, what else in

 3      terms of medical problems did Valerie have?  What

 4      medical problems was she diagnosed with?

 5            A.    Valerie she had surgery one time it

 6      was a like a lymph node.  They did surgery on

 7      that.

 8            Q.    What other medical problems did she

 9      have as the years went by?

10            A.    I am not sure what it was.

11            Q.    Did you just say, "I am not sure

12      what it was?"  I am not sure that I heard what

13      you said?

14            A.    I am trying to think.

15            Q.    Why don't you do it this way.  You

16      were talking about her left arm, sometimes her

17      right arm.  You mentioned the lymph node, any

18      other parts of her body were causing her

19      problems?

20            A.    (No response).

21            Q.    Problems with her legs?

22            A.    Oh, yes.

23            Q.    When did she first start having

24      problems with her legs?

25            A.    One time Valerie was in the --
```

```
                                                      56
 1                         V, YOUNG

 2              Q.    We were talking about Valerie's

 3    medical condition while she was at BBC.  We were

 4    focusing on her leg.  Now, I asked you if they

 5    let you know what was wrong with her leg.  Did

 6    they give you a diagnosis?  I just want to

 7    clarify what your answer is, did they tell you

 8    and you don't remember?

 9              A.    I remember the last thing they told

10    me was that she had a dropped foot.  Yes, a

11    dropped foot and they were getting a brace and

12    they never did.

13              Q.    Did they explain to you what they

14    meant by dropped foot?

15              A.    No.

16              Q.    What else did they tell about her?

17              A.    All I know is she couldn't walk --

18    I mean she could walk.  They were sending her for

19    therapy.  You know, they let her sit on a

20    wheelchair too long and   they didn't let her

21    exercise.  The only time she walked was when she

22    went to therapy on Tuesday and Thursday.  The

23    therapist told me that she needed to be walked

24    around the area during the evening.  And they

25    didn't do that.
```

# EXHIBIT C

1

2    UNITED STATES DISTRICT COURT                    **COPY**

3    SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------------------X

5    Estate of VALERIE YOUNG, by VIOLA YOUNG, as
     Administratrix of the Estate of Valerie Young,
6    and in her personal capacity, SIDNEY YOUNG, and
     LORETTA YOUNG LEE,
7                              Plaintiffs,

8                   -against-                    Index No.
                                                 07CV6241
9    STATE OF NEW YORK OFFICE OF MENTAL RETARDATION
     AND DEVELOPMENTAL DISABILITIES, PETER USCHAKOW,
10   personally and in his official capacity, JAN
     WILLIAMSON, personally and in her official
11   capacity, SURESH ARYA, personally and in his
     official capacity, KATHLEEN FERDINAND, personally
12   and in her official capacity, GLORIA HAYES,
     personally and in her official capacity, DR.
13   MILOS, personally and in his official capacity,
                             Defendants.
14
     ------------------------------------------X
15

16                EXAMINATION BEFORE TRIAL of the

17   Plaintiff, LORETTA LEE, taken by the Defendant,

18   pursuant to Notice, held at the Office of the

19   Attorney General, 120 Broadway, New York, New

20   York  10271 on January 28, 2008, at 12:45 p.m.,

21   before a Notary Public of the State of New York.

22

23

24

25

```
                                                    29
     1                        L. LEE

     2           A.    Because I work during the week and

     3      I always made it my business to at least visit

     4      her once a month.

     5           Q.    You said you visited her on a

     6      Saturday?

     7           A.    Yes, that is right.

     8           Q.    Do you work on Saturday?

     9           A.    I work Monday to Friday.

    10           Q.    Did Valerie know who you were when

    11      you visited her?

    12           A.    Yes, she did.

    13           Q.    I want to show you a copy of the

    14      complaint that's been filed in this lawsuit.

    15           A.    Okay.

    16           Q.    Okay.

    17                 Why don't you look through all the

    18      pages to make sure what is on each page.

    19           A.    Okay.

    20           Q.    When you visited Valerie at the

    21      Brooklyn Development Center, what would she be

    22      doing?

    23           A.    She would be sitting down.

    24      Sometimes she would be walking around.  Mostly

    25      she would be sitting.
```

```
 1                          L. LEE
 2          Q.    What problem are you referring to?
 3                MR. KAISER:  Objection.
 4          A.    She was hopping around.  Somebody
 5    had to help her.  She couldn't walk.
 6          Q.    You are referring to the problem
 7    relating to her gait because she would have
 8    problems walking because of one of her legs?
 9          A.    Yes.  Her leg would swell.
10          Q.    Why did you sue Brooklyn
11    Developmental Disabilities Service Office,
12    Medical Doctor Jovan Milos, M-I-L-O-S?
13                MR. KAISER:  Objection.
14          A.    Because he should have sent her out
15    for treatment in the beginning to see what was
16    causing.
17          Q.    You mentioned all the other
18    defendants, you mentioned negligence.  Now,
19    since, he is a doctor, do you feel also medical
20    practice is that what you are saying?
21                MR. KAISER:  Objection.
22          Q.    Is it just negligence as a doctor?
23          A.    He did not do his job like he was
24    supposed to have done.  He didn't look into the
25    situation and sent her out.
```

```
                                                        42
 1                           L. LEE

 2      that circle around and they all should have been

 3      aware of what was going on with Valerie.

 4            Q.    So I am clear.  You seem like you

 5      are sure of what was going on with Valerie, but

 6      they weren't.  What do you mean they should have

 7      been aware of what was going on with Valerie?

 8            A.    Because you could see Valerie was

 9      having a problem, we saw it and she was there.

10            Q.    What kind of problem she was

11      having?

12            A.    She was limping.  She was having

13      problems walking.  They all saw it.  They were

14      there.  We came to visit.  She was with them all

15      the time.

16            Q.    Do you think they knew what the

17      problem was and they decided to ignore it?

18                 MR. KAISER:  Objection.

19            A.    I don't think they knew what the

20      problem was.  They did not send her out to find

21      out what the problem was.

22            Q.    That is why you feel they are

23      negligent?

24            A.    That is right.

25                 MR. KAISER:  Objection.
```

```
                                                  52
 1                        L. LEE

 2     to this?

 3                  MR. KAISER:  Objection.

 4            A.    Oh, yes.

 5            Q.    What did your mother communicate to

 6     the hospital regarding Valerie's leg?

 7                  MR. KAISER:  Objection.

 8            A.    She would ask them, "Why is Valerie

 9     walking like this?"

10            Q.    You know this because your mother

11     would tell you?

12            A.    Yes, and I was there at times when

13     she would ask.

14            Q.    What would be the response that she

15     got?

16            A.    They always told mommy that it was

17     her dropped foot.

18            Q.    So is it fair to say you and your

19     mother were concerned with her gait, the way she

20     was walking?  You wanted to know what was wrong

21     with her leg that lead her to walk like that?

22            A.    Yes.

23            Q.    Prior to June 19, 2005, you weren't

24     concerned that her gait or the problem with her

25     leg was going to lead to have her blood clot that
```

# EXHIBIT D

ORIGINAL

1

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ----------------------------------------X
   Estate of VALERIE YOUNG, by VIOLA YOUNG,
4  as Administratrix of the Estate of
   Valerie Young, and in her personal
5  capacity, SIDNEY YOUNG, and LORETTA
   YOUNG LEE,
6                      Plaintiffs,
                                    Index No.:
7            vs.                    07CV6241
8  STATE OF NEW YORK OFFICE OF MENTAL
   RETARDATION AND DEVELOPMENTAL
9  DISABILITIES, PETER USCHAKOW,
   personally and in his official
10 capacity, JAN WILLIAMSON, personally
   and in her official capacity, SURESH
11 ARYA, personally and in his official
   capacity, KATHLEEN FERDINAND,
12 personally and in her official
   capacity, GLORIA HAYES, personally and
13 in her official capacity, DR. MILOS,
   personally and in his official capacity,
14
                     Defendants.
15 ----------------------------------------X
16                   April 11, 2008
                     10:06 a.m.
17
18          Examination before trial of PETER
19 ALEXANDER USCHAKOW, held at the offices
20 of The Catafago Law Firm, P.C., 350 Fifth
21 Avenue, New York, New York, pursuant to
22 Notice, before Wendy D. Boskind, a
23 Registered Professional Reporter and
24 Notary Public of the State of New York.
25

16

1                          Uschakow

2      recommendation.

3           Q.    Do you know if -- withdrawn.

4                 Were you ever involved in

5      meetings with the policy and procedure

6      committee, participated in?

7           A.    I do not participate in the

8      development of the policies and

9      procedures because eventually I have to

10     review them.

11          Q.    And approve them or

12     disapprove?

13          A.    Approve and disapprove.

14          Q.    That's, ultimately, your

15     responsibility.

16          A.    Yes.

17          Q.    Do you know if --

18          A.    I --

19                MR. VELEZ:  I think he needs

20          to --

21                MR. CATAFAGO:  I'm sorry.

22          A.    At some point in time, I

23     signed off on policies and procedures

24     that are developed by a committee.  Prior

25     to that, I reviewed it and allowed the

27

2    not anything had been done following your

3    discussion with the deputy director?

4          A.    I periodically make rounds of

5    all of the program areas, and happened to

6    see Valerie.

7          Q.    And you saw her being

8    assisted with someone?

9          A.    Yes.

10         Q.    Do you know who was assisting

11   her?

12         A.    No.

13         Q.    Was it one person or more

14   than one?

15         A.    I remember one person.

16         Q.    Was she using a wheelchair at

17   the time?

18         A.    No.

19         Q.    Was the wheelchair beside her

20   at the time?

21         A.    I don't recall seeing it.

22         Q.    Did you ever see Valerie

23   Young in a wheelchair at all?

24         A.    Yes.

25         Q.    How many times?

76

```
 1              Uschakow
 2      A.    Yes.
 3      Q.    Can you read Recommendation
 4  number 2 into the record?
 5      A.    "For non-ambulatory
 6  consumers, physicians will consider the
 7  use of elastic stockings or pressure
 8  boots, where tolerated".
 9      Q.    Did you consider Valerie
10  Young to be a "non-ambulatory consumer"?
11      A.    No.
12            MR. VELEZ:  No further
13        questions.
14            (Time noted:  11:37 a.m.)
15  BY MR. CATAFAGO:
16      Q.    Would you say she was "fully
17  ambulatory"?
18      A.    She was gait-impaired.
19      Q.    Was she "fully ambulatory"?
20      A.    At what period of time?
21      Q.    2005.
22      A.    She ambulated with
23  assistance.
24      Q.    Was she using a wheelchair
25  for any reason, other than
```

# EXHIBIT E

ORIGINAL

1

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

3   ----------------------------------------X
    Estate of VALERIE YOUNG, by VIOLA YOUNG,

4   as Administratrix of the Estate of
    Valerie Young, and in her personal

5   capacity, SIDNEY YOUNG, and LORETTA
    YOUNG LEE,

6                           Plaintiffs,

                                     Index No.:
7              vs.                   07CV6241

8   STATE OF NEW YORK OFFICE OF MENTAL
    RETARDATION AND DEVELOPMENTAL

9   DISABILITIES, PETER USCHAKOW,
    personally and in his official

10  capacity, JAN WILLIAMSON, personally
    and in her official capacity, SURESH

11  ARYA, personally and in his official
    capacity, KATHLEEN FERDINAND,

12  personally and in her official
    capacity, GLORIA HAYES, personally and

13  in her official capacity, DR. MILOS,
    personally and in his official capacity,

14

                           Defendants.
15  ----------------------------------------X

16                      April 10, 2008
                        10:09 a.m.

17

18         Examination before trial of JAN

19  WILLIAMSON, held at the offices of The

20  Catafago Law Firm, P.C., 350 Fifth

21  Avenue, New York, New York, pursuant to

22  Notice, before Wendy D. Boskind, a

23  Registered Professional Reporter and

24  Notary Public of the State of New York.

25

VERITEXT REPORTING COMPANY

7

1          Williamson

2      Q.    How long were you a treatment

3   team leader at BDC?

4      A.    From 2001 until September --

5   well, actually, until -- 2006, I think --

6   I was the acting deputy director until it

7   was approved to be -- so I held the team

8   leader item, in terms of Civil Service,

9   but I was the acting deputy director.

10     Q.    So you were the acting deputy

11  director of BDC from in or about

12  September 2004 until 2006.

13     A.    It was late 2005 or early

14  2006, it was a long time.

15          The government moves slow.

16     Q.    Was anyone else an acting

17  director -- deputy director of operations

18  at the same time that you were?

19     A.    No.

20     Q.    And why were you acting, as

21  opposed to actual?

22     A.    Higher-level positions within

23  Civil Service require the approval and

24  support of the governor, so it's when the

25  governor chooses to make it official.

45

1                      Williamson
2          Q.     Okay.
3          A.     It's an on as-needed basis.
4          Q.     As deputy director of
5    operations, from September 2004 through
6    June 30th, 2005, did you ever review any
7    of the records pertaining to the
8    treatment and care of Valerie Young?
9          A.     No.
10          Q.     Did you ever ask to review
11   any of those records?
12          A.     No.
13          Q.     Did you ever speak to Peter
14   Uschakow about Valerie Young, or he to
15   you?
16          A.     Wow --
17          Q.     If you know.
18          A.     I don't remember.
19          Q.     Did you ever speak to any
20   member of Valerie's family?
21          A.     No -- um -- you know what?  I
22   don't remember if I spoke to her mom or
23   not on the phone.
24          Q.     Did you ever -- while you
25   were deputy director of operations, from

# EXHIBIT F

ORIGINAL

1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

3    ----------------------------------------X
     Estate of VALERIE YOUNG, by VIOLA YOUNG,

4    as Administratrix of the Estate of
     Valerie Young, and in her personal

5    capacity, SIDNEY YOUNG, and LORETTA
     YOUNG LEE,

6                          Plaintiffs,

                                  Index No.:

7                 vs.             07CV6241

8    STATE OF NEW YORK OFFICE OF MENTAL
     RETARDATION AND DEVELOPMENTAL

9    DISABILITIES, PETER USCHAKOW,
     personally and in his official

10   capacity, JAN WILLIAMSON, personally
     and in her official capacity, SURESH

11   ARYA, personally and in his official
     capacity, KATHLEEN FERDINAND,

12   personally and in her official
     capacity, GLORIA HAYES, personally and

13   in her official capacity, DR. MILOS,
     personally and in his official capacity,

14

                         Defendants.

15   ----------------------------------------X
                         April 7, 2008

16                        10:11 a.m.

17

18          Examination before trial of KATHLEEN

19   A. FERDINAND, held at the offices of The

20   Catafago Law Firm, P.C., 350 Fifth Avenue,

21   New York, New York, pursuant to Notice,

22   before Wendy D. Boskind, a Registered

23   Professional Reporter and Notary Public

24   of the State of New York.

25

35

```
 1                        Ferdinand
 2    the time --
 3           A.    She was using a wheelchair
 4    for transport.
 5           Q.    Only for transport.
 6           A.    To transport to and from
 7    program.
 8           Q.    Was she using a wheelchair
 9    for any other reason?
10           A.    No.
11           Q.    Did you ever see anyone walk
12    with her?
13           A.    Yes.
14           Q.    Assist her walking?
15           A.    Yes, staff would have to
16    assist her in walking.
17           Q.    Did you ever personally
18    observe her --
19           A.    Yes.
20           Q.    Which staff members did you
21    personally observe walking her?
22           A.    Oh, God, you're asking me to
23    remember --
24           Q.    Yes.
25           A.    I can't remember -- I don't
```

75

1              Ferdinand

2        Young 109.

3              (Deposition Exhibit

4        Plaintiffs' Ferdinand 9, document,

5        Bates stamped Young 108, Young 109,

6        marked for identification, as of

7        this date.)

8        A.    That particular document --

9   let me just go back a minute -- that

10  particular document -- um -- I think

11  there was a recommendation in there that

12  PT was going to re-evaluate her, too;

13  wasn't there?

14        Q.    You're referring to Exhibit

15  8?

16        A.    Yes.

17        Q.    Let me show you Exhibit 8.

18              Tell me what you need to

19  about Exhibit 8.

20        A.    (Pause.)

21              Yeah, just the second line, I

22  want to be very clear that the physician

23  recommended continued use of a wheelchair

24  until PT was going to re-evaluate her,

25  okay?

76

1                     Ferdinand

2          Q.    Say it again?

3          A.    They were going to

4    re-evaluate her, her ability to ambulate.

5          Q.    When were they going to do

6    that?

7          A.    Right after this meeting.

8          Q.    Do you know if they did it

9    after this meeting?

10         A.    I don't remember.

11         Q.    They were supposed to?

12         A.    They were supposed to.

13         Q.    And that was the

14   responsibility of PT, the physical

15   therapist?

16         A.    Yes.

17         Q.    Did they attend the meeting,

18   as indicated on Exhibit 8?

19         A.    I believe they were there --

20   yeah -- yes, (indicating), right there.

21         Q.    You're indicating the

22   signature line on the first page of

23   Exhibit 8?

24         A.    Is my signature here,

25   (indicating)?

80

1                          Ferdinand

2          Q.    In this Special incident

3    review committee report, it is indicated,

4    and I quote:  "It was also noted that,

5    fearing she might fall, staff may not

6    have encouraged Ms. Young to walk",

7    period, closed quote.

8              Do you agree with that, that

9    the staff didn't encourage her to walk,

10   prior to her death?

11         A.    I don't necessarily agree

12   with that, no.

13         Q.    And what about the sentence

14   that reads:  "Ms. Young had a history of

15   pitting edema", do you know what that

16   means?

17         A.    Well, I know what "edema" is,

18   it's swelling.

19         Q.    Do you know if she had a

20   history of pitting edema?

21         A.    I have no idea.

22         Q.    And it says --

23         A.    I don't know what "pitting

24   edema" is, by the way.

25         Q.    At the time of her death,

81

1                          Ferdinand

2      June 19th, 2005, was Ms. Young

3      ambulatory?

4              A.     Was she -- she could walk,

5      yes.

6              Q.     Did anyone ever consider

7      using elastic stockings for her?

8              A.     I really don't know that.

9                     That would have been ordered

10     by the doctor.

11             Q.     Was that ever discussed with

12     you, as --

13             A.     No.

14             Q.     -- treatment team leader?

15             A.     It wasn't -- I was not aware

16     that she had pitting edema, to tell you

17     the truth.

18             Q.     And --

19             A.     I don't remember it being

20     discussed.

21             Q.     Going back, how often in June

22     of 2005 did you observe staff walking

23     with Ms. Young?

24             A.     You really expect me to

25     remember that?

104

1              Ferdinand

2    believe, that she found it when she was

3    braiding -- doing her hair.

4         Q.    And there was no --

5    ultimately, there was insufficient

6    evidence to support any allegation of

7    neglect?

8         A.    I think that's --

9         Q.    I'm reading from 0208.

10        A.    Yeah, I think that was the

11   final finding.

12        Q.    And in the conclusions, 0208,

13   0209, this is as of May 26, 2005 --

14        A.    Mm-hmm.

15        Q.    -- it says, and I quote:

16   "Ms. Young was unstable at that time and,

17   although she can ambulate independently,

18   she required the use of a wheelchair".

19             Was that something that you

20   were aware of at the time?

21        A.    Where are you reading now?

22        Q.    0208 to 0209.

23        A.    (Pause.)

24             Okay.  And I see it's in

25   writing, so I guess that's what was going

105

1                        Ferdinand

2    on at the time.

3              Q.    And what about the next page,

4    0210, what is -- that's the -- this is

5    attendees at the meeting regarding the

6    incident; right?

7              A.    Right.

8              Q.    And you were there?

9              A.    Yes, I was there.

10             Q.    And ultimately, although Ms.

11   Daly was returned to work assignment,

12   there was a finding, was there not, that

13   the other direct care worker, Toni,

14   T-O-N-I, McNeil, had failed to properly

15   supervise her attending -- assigned

16   supervisory duties.

17                   I'm reading from 0209.

18             A.    (Pause.)

19                   Yes.

20             Q.    And do you recognize the --

21   that portion of the document which is

22   Bates stamped 0212?

23             A.    0212 -- (pause).

24             Q.    Was that something you

25   prepared?

146

1                         Ferdinand

2    tolerated"?  Did you agree with that?

3          A.    Yeah, I guess there is no

4    reason not to agree with it.

5          Q.    Do you know whether Dr. Milos

6    ever considered the use of elastic

7    stockings for Valerie Young?

8                MR. VELEZ:  Objection.

9          A.    Well --

10               MR. VELEZ:  But you can

11         answer.

12         A.    Well, Valerie wasn't non-

13   ambulatory, so I don't know whether he

14   ever ordered stockings for her or not, I

15   don't --

16         Q.    Did he or anyone else ever

17   discuss with you the use, or potential

18   use, of elastic stockings for Valerie

19   Young?

20         A.    No.

21         Q.    Did he or anyone else at

22   OMRDD ever discuss with you, or you with

23   them, the need to walk Valerie Young when

24   she had the wheelchair?

25         A.    No, because she was walking.

147

1                      Ferdinand
2    She was walking at times.  She wasn't
3    just sitting in the wheelchair all the
4    time.
5          Q.    How many times a day was she
6    walked?
7          A.    How many times a day was she
8    walked?  She was periodically walked.
9    She would walk in program.
10               Again, the wheelchair was
11   basically used for transport.
12         Q.    Well, how many minutes or
13   hours a day would she walk typically --
14         A.    I don't know.
15         Q.    -- in May of 2005?
16         A.    I can't tell you how many
17   times.
18         Q.    Can you tell me in any of the
19   months preceding her death --
20         A.    I have no idea.  I can't
21   remember.
22         Q.    That's fair.
23               MR. CATAFAGO:  Let's have
24         this two-page document, Bates
25         stamped Young 0013 and Young 0266,

227

Ferdinand

1

2    each discipline discuss their findings

3    and recommendations, and then there's a

4    team discussion.  So my job, as the team

5    leader, is to make sure all the team

6    consensus really gets into the minutes.

7          Q.    Did you believe that as of

8    that time, in April 2004, that Valerie

9    was fully ambulatory?

10         A.    Yes, I do.  If the wheelchair

11   was discontinued.

12         Q.    Did there come a time when

13   you believed that she was no longer fully

14   ambulatory?

15         A.    Uh -- there must -- yes,

16   there must -- well, when she was falling

17   a lot.

18         Q.    When was that?  When did you

19   come to believe that she was no longer

20   fully ambulatory?

21         A.    She was ambulatory, but she

22   was falling a lot.

23         Q.    Well, take a look at --

24         A.    That's why I said, she was

25   ambulatory but she had been falling an

230

```
 1                    Ferdinand
 2        A.    It says -- under where?
 3        Q.    "Stress."
 4              MR. VELEZ:  (Indicating.)
 5        A.    Right.  It says "fully
 6   ambulatory", but it also says at the top
 7   that she "continues to require close
 8   supervision when walking to and from
 9   facilities, social events, due to her
10   non-compliant behavior".
11        Q.    Right.  What was your
12   understanding of "fully ambulatory"?
13        A.    She was able to walk.
14        Q.    And what is "has full ROM in
15   all her extremities"?  "ROM", what does
16   that mean?
17        A.    Range of motion.
18        Q.    And was it your understanding
19   that she could walk with assistance at
20   that time?
21        A.    Yes.
22              (Deposition Exhibit
23         Plaintiffs' Milos 2, document,
24         which looks like an IPP review
25         reading on July 20th, 2004, Bates
```

238

1                    Ferdinand

2    coordinator, who is recording the

3    meeting, would record anything that was

4    going on with physical therapy in that

5    area.

6        Q.    Did Valerie Young ever

7    receive physical therapy at any point in

8    2004?

9        A.    Didn't we just -- I don't

10   remember.

11       Q.    Did she receive physical

12   therapy at any point in 2005?

13       A.    I don't remember.

14       Q.    Did you ever correct this --

15       A.    In 2005, she did get physical

16   therapy.

17       Q.    When in 2005 did she get

18   physical therapy?

19       A.    I don't know.

20             I don't have the whole record

21   in front of me.

22       Q.    Well, what you have in front

23   of you, ma'am, indicates that your team

24   recommends integration of the following

25   services.

# EXHIBIT G

ORIGINAL

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - - - - -x

5    Estate of VALERIE YOUNG, by VIOLA
     YOUNG, as Administratrix of the

6    Estate of Valerie Young, and LORETTA
     YOUNG LEE,

7
                              Plaintiffs,

8
               -against-

9
     STATE OF NEW YORK OFFICE OF MENTAL

10   RETARDATION AND DEVELOPMENTAL
     DISABILITIES, PETER USCHAKOW,

11   personally and in his official
     capacity, JAN WILLIAMSON, personally

12   and in her official capacity, SURESH
     ARYA, personally and in his individual

13   capacity, KATHLEEN FERDINAND,
     personally and in her official

14   capacity, GLORIA HAYES, personally
     and in her official capacity,

15   DR. MILOS, personally and in his
     official capacity,

16
                              Defendants.

17
     - - - - - - - - - - - - - - - - - - - - -x

18
                         75 Morton Street

19                       New York, New York

20                       April 18, 2008
                         10:25 A.M.

21

22

23

24

25

VERITEXT REPORTING COMPANY

212-267-6868                              516-608-2400

2

1

2          DEPOSITION of GLORIA HAYES, one of the

3    Defendants in the above-entitled action,

4    held at the above time and place, taken

5    before Gretchen A. Milton, a Shorthand

6    Reporter and Notary Public of the State of

7    New York, pursuant to the Federal Rules of

8    Civil Procedure, Notice and stipulations

9    between Counsel.

10

11

12              *        *        *

13

14

15   APPEARANCES:

16

         CATAFAGO LAW FIRM, P.C.

17           Attorneys for Plaintiffs

             350 Fifth Avenue

18           New York, New York 10118

19      BY:   JACQUES CATAFAGO, ESQ.

20

21      STATE OF NEW YORK

        OFFICE OF THE ATTORNEY GENERAL

22      ANDREW M. CUOMO

             Attorneys for Defendants

23           120 Broadway

             New York, New York 10271-0332

24

        BY:   JOSE L. VELEZ, ESQ.

25

39

1                      GLORIA HAYES

2      communicated to you?

3          A.    From my team leader with a team

4      meeting.

5          Q.    Are you aware of any special

6      precautions that were ever discussed with

7      you regard to Valerie Young prior to her

8      death?

9          A.    I recall her having to be

10     transported in a wheelchair.  But she was

11     being ambulated when she wasn't being

12     transported, or when she didn't have to

13     use the wheelchair for any special

14     reasons.

15         Q.    Would you say Valerie Young was

16     fully ambulatory, somewhat ambulatory, or

17     not all ambulatory in the month before her

18     death?

19         A.    In the month before... I don't

20     know the time, but she was fully

21     ambulatory.  And then she needed a

22     wheelchair.  I don't know how long before

23     her death it was, I don't remember, but

24     she needed a wheelchair for transport.

25         Q.    Do you remember if she received

40

1                     GLORIA HAYES

2    any physical therapy in the year before

3    her death?

4        A.    She received physical therapy,

5    yes.

6        Q.    When was the last time, if you

7    know, that she received physical therapy?

8        A.    I don't remember.

9        Q.    Can you tell us if it was more or

10   less than three months before her death,

11   if you can?

12       A.    I believe it was less than three

13   months before her death.

14       Q.    How do you know she received

15   physical therapy?

16       A.    Because any time something was

17   going to be done, we have a team meeting.

18       Q.    Other than the fact that it may

19   have been discussed or was discussed at a

20   team meeting, do you have any personal

21   knowledge of her receiving physical

22   therapy?

23       A.    Yes.    She would be taken to PT.

24       Q.    You know she would have been

25   taken --

140

| | |
|---|---|
| 1 | GLORIA HAYES |
| 2 | Q.   She injured her eye? |
| 3 | A.   Yes. |
| 4 | Q.   Do you remember what, if |
| 5 | anything, was done in response to this? |
| 6 | A.   I don't remember. |
| 7 | Q.   I will show you now what has been |
| 8 | marked Exhibit AAA, Bates stamped Young |
| 9 | 9079 through 9081, it is a report on an |
| 10 | incident that occurred March 28, 2005. |
| 11 | Do you recognize this document? |
| 12 | A.   I don't recall. |
| 13 | Q.   Showing you this document, it is |
| 14 | another incident report which has been |
| 15 | marked as Hayes Exhibit BBB, Bates stamped |
| 16 | Young 9082 through 9084.  It is regarding |
| 17 | an incident that occurred on April 5, |
| 18 | 2005.  Please tell me if you recognize |
| 19 | that document. |
| 20 | A.   I don't recall it. |
| 21 | Q.   When was it that you first became |
| 22 | aware that Valerie was receiving physical |
| 23 | therapy? |
| 24 | A.   I don't know.  I mean I can't |
| 25 | remember exactly when it was. |

142

1               GLORIA HAYES

2    therapists?

3        A.    The physical therapist at the IDT

4    meeting?

5        Q.    The physical therapist that told

6    you she was providing physical therapy to

7    Valerie Young.

8        A.    Yes.

9        Q.    Looking at the IDT report for

10   April 2005 which was previously marked as

11   Plaintiffs' Exhibit 4 at the deposition of

12   Dr. Milos on March 27th, and it is Bates

13   stamped Young 7626 through 7682, I direct

14   your attention to the next-to-last page of

15   the document Bates stamped 7681.  It was a

16   report for Valerie for 2005.

17       A.    Yes.

18       Q.    Is correct to say that no report

19   was prepared subsequent to this one

20   because they were done on a quarterly

21   basis; is that right?

22             So the next one would have been

23   done in July 2005; is that correct?

24       A.    This is an annual.  An annual is

25   done yearly.

146

1                    GLORIA HAYES

2        A.   I don't recognize the document,

3    but I remember the incident.

4        Q.   Tell me what you remember about

5    this incident.

6        A.   I remember staff saying they

7    heard a thumping noise, so they went to

8    investigate, and Valerie Young was on the

9    floor, so they suspected she fell.  From

10   her bed.

11       Q.   Can you tell me what, if

12   anything, was done in response to this

13   incident?

14       A.   No.  I can't tell you.  I don't

15   remember.

16       Q.   Where was physical therapy

17   administered?

18       A.   In building 5.

19       Q.   They have a room in building 5?

20       A.   In building 5, yes.

21       Q.   How many times, when Valerie was

22   getting physical therapy, how many times a

23   day or week was she going?

24            MR. VELEZ:  Objection, asked and

25        answered.

148

1                        GLORIA HAYES
2   Valerie's ability to walk, was that
3   discussed at the meeting?
4        A.    Repeat that, please.
5             MR. CATAFAGO:  Please read that
6        back.
7             (The requested portion of the
8        record was read.)
9             MR. CATAFAGO:  Mr. Velez, don't
10       do that.
11            Let me withdraw the question.
12       Q.    As of April 13, 2005, was Valerie
13  Young fully ambulatory with good range of
14  motion in her extremities?
15       A.    As of April 13th... I don't
16  remember exactly when during that time,
17  but Valerie could ambulate.  She was given
18  the chair at certain points for
19  transporting her around the wing to and
20  from program or whatever, but staff would
21  walk her.  She sometimes -- many times --
22  she would get up by herself.
23       Q.    Was she fully ambulatory around
24  April 13th --
25       A.    I can't recall the date.

VERITEXT REPORTING COMPANY

212-267-6868                          516-608-2400