IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ESTATE OF VALERIE YOUNG, et al.,                    ECF Case

                    plaintiffs,                     Case No.: 07-CV-06241 (LAK)

        - against -                                 **DECLARATION OF JONATHAN
                                                    BAUER, ESQ.**

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, et al.,

                    defendants.

JONATHAN BAUER, an attorney admitted to practice before the Courts of the State of

New York and this Court, certifies pursuant to 28 USC §1746 and under penalty of perjury, that

the following is true and correct:

1.      I am co-counsel for plaintiffs together the Catafago Law Firm, PC. I make this Decla-

ration of my personal knowledge and based upon my review of the records and documents of this

case. I submit this Declaration in support of this Motion for Sanctions.

## <u>Introduction</u>

2.      Defendants admit that Special Observation Logs covering the period November 5,

2004 through the date of Valerie's death, June 19, 2005 were ordered and existed. Opposition,

Declaration of Kathleen Ferdinand ("Ferdinand Declaration") at ¶14.

3.      Defendants admit that the Special Observation Logs were not produced and are miss-

ing. Declaration of Jose L. Velez, Esq. ("Velez Declaration") at ¶9; Ferdinand Declaration at

¶¶16-17; Declaration of Donna Limiti ("Limiti Declaration") at ¶¶6-9.

4.      Defendants also admit that in addition to being missing, they are unable to account for the reason why they are missing and admit that plaintiffs are entitled to recover attorney fees in connection with this motion. Velez Declaration at ¶9.

5.      Missing from the Opposition are any of the thousands of pages of documents that they claim support their contentions.

6.      Strikingly missing are sworn statements from defendants (former) Director Uschakow, Deputy Director Williamson, Unit Physician Milos and OMRDD General Counsel Pawlowski (who attended each defendant's deposition[1] when counsel misrepresented that all documents had been produced), all of whom had legal obligations to preserve the missing, destroyed documents. We respectfully refer this Court to the Memoranda of Law submitted in support of this motion for a discussion of the legal requirement to preserve documents.

7.      No explanation for the destruction of these documents, their loss, or the failure to preserve them via a litigation hold or other means was provided in the opposition papers. No explanation for defendants' failure to comply with statutory and regulatory requirements regarding the security, retention and preservation of the decedent's treatment records was provided in the opposition papers. Defendants Arya, Hayes, OMRDD, Uschakow and Williamson did not submit opposition statements.

8.      Defendants in opposition merely attach three declarations prepared for the purpose of this motion (Velez, Ferdinand, and Limiti, the current director of the Brooklyn Developmental Center), excerpts from depositions and a single document, a treatment plan, which by its own terms was not prepared contemporaneously with the events it purports to describe.

---

[1] See defendants' depositions appearance pages, appearance of OMRDD by Patricia Pawlowski, Esq., **Exhibit 39** at page 3 and **Exhibits 40-44** at page 2.

9.    Defendants in opposition also attempt to convert this motion into a Rule 37 discovery motion, which it is not. I respectfully refer this Court to the Declaration of Jacques Catafago, Esq. submitted herewith for a recitation of the many assurances made on and off the record that defendants' production was complete, including the logbooks. This motion does not reflect a discovery dispute. It seeks an adverse evidentiary inference for destruction and/or grossly negligent loss of documents.

10.    Defendants in opposition suggest that it was improper for plaintiffs to mention the pending action, *Cosentino v. OMRDD*, 04-CV-04159-AKH on the grounds that some documents in that case are subject to a confidentiality order. This is absolutely contrary to law and public policy. The pending *Cosentino* litigation is a public matter accessible to anyone with an internet connection via the United States Court's file system at http://pacer.psc.uscourts.gov/ ("PACER"). This is especially the case in this matter and *Cosentino*, both of which raise issues of public importance – this mistreatment of profoundly mentally retarded persons in a State facility.

11.    I respectfully refer this Court to the Memoranda of Law submitted in support of this motion for a discussion of the legal chain of authority and legal consequences of the defendants' admitted failure to preserve, and the defendants' failure to provide any explanation whatsoever of the loss of the Special Observation Logs, material evidence subject to multiple preservation requirements.

## **Prejudice to the Plaintiffs**

12.    Plaintiffs submitted with this motion several documents which taken together support the inference that the spoliated documents would have supported the plaintiffs' contentions, including, among others, the two dated pages of Special Observation Logs that survived **(Exhibit 16)**, a Psychiatry Consultation **(Exhibit 29)** and an Occupational Therapy Note **(Exhibit 30)**.

13.   In opposition to this motion (other than an award of attorney fees, which has been concluded), the defendants have made broad assertions suggesting that the documents actually produced are sufficient and denying that the plaintiffs have been prejudiced by the destruction of decedent Valerie Young's ("Valerie") Special Observation Logs. *E.g.*, Opposition Memorandum at page 11, Velez Declaration at ¶¶7-8.

14.   Defendants in opposition did <u>not</u> attach any of the documents that supposedly showed Valerie to be walking independently or being walked by staff regularly; nor did defendants identify any such documents.

15.   Consequently plaintiffs, are effectively in the position of demonstrating a negative (that she was not walked regularly by staff), and respond to the defendants' diligent destruction of the very evidence that could establish the plaintiffs' prima facie case.

16.   Therefore, plaintiffs have submitted herewith true copies of the records that they have been able to identify that were prepared contemporaneously with the events that they describe for the period covering the three months immediately preceding Valerie's death so that this Court may make an independent evaluation.

17.   In this Declaration, plaintiffs provide for the assistance of this Court a summary and analysis of those documents, which include Core Office and Wing Logs, Nursing Logs, Medical Notes (including notes by defendant Jovan Milos), and medical consultations that were prepared during the three months prior to Valerie's preventable death, all of which demonstrate that defendants in their sweeping generalizations are misleading this Court.

**A.   Medical and other treatment records**

18.   The defendants did not submit in opposition <u>any</u> medical or treatment records that were prepared contemporaneously with the events that they purport to describe. The only treat-

ment document submitted was the Treatment Team plan, discussed in the section immediately following.

**(i)    The April 2005 Treatment Team Meeting document**

19.    The sole treatment document submitted by defendants in opposition is an Annual Team Meeting Discussion. Attachment to Defendants' Exhibit H commencing at Bates 7629 (hereafter referred to as Exhibit H with the Bates number reference).

20.    Defendants merely assert that a physical assessment found Valerie to be fully ambulatory, characterizing this as evidence that Valerie was not maintained in a sedentary state. (Defendants' Memorandum at page 12). **Exhibit H**, Bates 7653 (Plaintiffs' **Exhibit 22** at page 3), an assessment by defendants found within the Recreational Annual Summary.

21.    This is a misleading characterization. Plaintiffs do not claim that Valerie was physically disabled. Plaintiffs' claim is that the defendants rendered her unable to walk or ambulate independently as the result of improper medication and failure to provide ordinary physical care.

**(ii)    Core Office and Wing 314 Logs**

22.     Contrary to the sweeping statements of defendants, the Core Office and Wing Logs do not support defendants' contentions because they do not provide detailed observations of the nature and extent of Valerie's activities, and to the extent that Valerie's activities are documented, these logs support the contention that the close observation logbooks that are the subject of this motion, had they not been destroyed would have materially supported plaintiffs' claims.

23.    In addition, this Court should note that although not formally within this motion, pages of the produced log books were also subject to spoliation, including, but not limited to, the Core Office Log page(s) from the date that Valerie died and nine pages of the Wing Log from June 16 – June 19, 2005.

24.    Defendants in the Opposition memorandum, grandiosely and untruthfully state that the entries from the "500 pages of other log books that were produced .. clearly show that decedent was not maintained in a non-mobile condition" and "did walk, albeit with a limp, a hop, or the assistance of staff." Opposition Memorandum at page 11 (emphasis original).

25.    Defendants do not attach even one page of the Core Office or Wing 3-14 Logs in support of their contention. The reason why they did not is simple. The statement quoted from defendants' Opposition Memorandum at page 11 is misleading.

26.    Plaintiffs have filed herewith the complete production of Core Office Logs (**Exhibit 53**) and Wing 314 Logs (**Exhibit 54**) for the last three months of Valerie's life so that the Court may make an independent review of the documents. We respectfully refer the Court to the following analysis of these documents and comparison between the produced log books with the destroyed observation logs that are the subject of this motion.

### (a) Close observation logs and Core Office/Wing Logs compared and contrasted

27.    Defendants appear to suggest that Core Office/Wing Logs provide information comparable to the destroyed close observation logs. This is <u>false</u>, demonstrated by even the most cursory examination of the two corresponding pages of the close observation logs.

28.    The close observation logs recorded, every fifteen minutes, a description of the person's activities. <u>See</u> Moving Papers **Exhibit 16** (two log pages from June 19, 2005, the only pages produced); e.g., Moving Papers **Exhibit 33** (Special Case Conference ordering 15 minute checks); Moving Papers **Exhibit 34** (Special Case Conference ordering checks continue).

29.    During the June 19, 2005 evening shift, staff made **twenty-five entries** into Valerie's <u>Close Observation Log</u> between 3:00 pm and 9:30 pm, when she was taken to the hospital (and died shortly thereafter) (Moving Papers, **Exhibit 16**, Bates 0129 – 0130).

30.    However, in the <u>Wing Log</u> for the same day, during the same shift, there is exactly **one** entry concerning Valerie; a summary note (timed 7:30-9:30) briefly reporting on the circumstances of Valerie's collapse and transport to the hospital (**Exhibit 54**, Bates 10069).

31.    Defendants did not produce the Core Office Log entry for June 19, 2005 (it is missing and not available for direct comparison), however defendant Deputy Director Williamson described the Core Office Logs and explained their purpose:

> Q.  Incidentally, what is a "core log"?
>
> A.  Every residential unit has what's called a "core office", it's the supervisor's office, and they maintain a logbook for each shift of the -- unusual occurrences, let's say, that take place during the course of the shift, so the "core log" will record things that are reported to them for their entire unit for that shift.
>
> Q.  Only something that would be unusual would be reported?
>
> A.  Generally, something unusual, untoward, staffing issues, if somebody was sent out to the hospital.
>
> Q.  Okay.
>
> A.  It's used as a communication book from shift to shift.
>
> **Exhibit 42** Williamson Deposition at pages 63 – 64.

32.    In contrast, the Brooklyn Developmental Services Policy and Procedure Manual require that staff assigned to close observation document the "consumer's activities every 15 minutes in a 1:1 log" (moving papers at **Exhibit 5**, Bates 1452) and in Valerie's case, this is precisely what was ordered. E.g., Moving Papers, **Exhibits 33-35** (Special Case Conferences).

33.    The differing criteria and requirements of Special Observation Logs versus Wing and Core Office Logs are borne out by a physical comparison of the documents produced in this case.

34.    The Core Office entries (**Exhibit 53**) are similar to the Wing Log entries (**Exhibit 54**). For example, the Core Office Log for May 27, 2005 includes just one entry for Valerie,

timed at 5:15-7:15 and stating "V Young's feet appear swollen. Nurse notified." **Exhibit 53**,

Bates 9970. The Wing Log for the same shift on the same date also has just one entry for Valerie,

timed at 9:00-10:00 pm and stating "... most consumers are [in] bed sleep except [redacted] Vale-

rie." **Exhibit 54**, Bates 10055.

35.    The Special Observation Logs are entirely different.

36.    As mentioned earlier, staff made <u>twenty-five entries</u> during one six and one-half hour

period in the only Special Observation Log pages that were produced.

37.    Entries in the Special Observation are specific, particular, exclusive to Valerie and de-

scribe in detail what she was doing at the particular time. Compare: Close Observation Log,

**Exhibit 16** (observations recorded contemporaneously every fifteen minutes) with the Wing

Logs, **Exhibit 54** and Core Office Log, **Exhibit 53**. (observation recorded only when required,

summarized a span of time and including all residents).

38.    Defendant Ferdinand characterizes the entries in Special Observation logs as "sum-

maries" of observations by staff (Ferdinand Opposition Declaration at ¶11). Plaintiffs submit that

the Special Observation Logs cannot be reasonably or accurately characterized as "summaries"

and respectfully refer this Court to copies of the actual documents; annexed at **Exhibit 16** (Spe-

cial Observation Log pages), **Exhibit 54** (Wing Logs) and **Exhibit 53** (Core Office Logs).

39.    For example, the undated[2] Special Observation Log filed with the moving papers at

**Exhibit 17** (Bates 0237) includes the following specific, detailed entries:

> 6[:00 am]   Awake she is on the mat on her knees waving
>             her hand. Valerie is assisted into wheel chair for
>             shower with head gear

---

[2] Although undated, this log page appears to have been prepared during the early morning of
May 21, 2005, based upon an incident report of that date produced as Bates 0199-0238 relating
to a laceration to Valerie's head that may have occurred between 5:45 and 6:00 am while the staff
person was attending to other residents.

6:15 [am]   Valerie is waiting to be showered

6:30 [am]   Valerie is transported from her wheel chair to her shower chair with helmet meds given

6:45 [am]   Valerie is being dressed cut found in head I/R [Incident Report] written

7[:00 am]   Valerie is assisted back into wheel chair.

Moving Papers, **Exhibit 17** at Bates 0237

40.    The Special Observation Logs were made in the first place because the ordinary observation procedures were insufficient. See, Special Case Conferences attached to the moving papers as **Exhibits 33 – 35**, (ordering and continuing close observation) and April 20, 2005 Special Case Conference, **Exhibit 36** at Bates 7744 ("she will be monitored closely during the time of transition" and ordering continued use of a wheelchair for all mobility needs with staff escorts for showering); see also, BDC Policy and Procedure Manual, Moving Papers at **Exhibit 5**, Bates D1451-1453 describing the rationale and procedure for Special Observation.

41.    Therefore, defendants' suggestion that the Wing and Core Office Logs could function within this litigation as a substitute for the contemporaneously made, detailed Special Observation Logs is specious and defies reality.

**(b) Content of the Core Office and Wing 314 Logs for the last three months of Valerie's life**

42.    The Core Office and Wing Log entries filed herewith as Exhibit 53 and Exhibit 54, respectively for the last three months of Valerie's life amount to 153 pages, most with a single line or two lines concerning Valerie. This is a far cry from the missing Special Observation Logs which consist of eighty-eight entries each day (every fifteen minutes, twenty-four hours a day, all seven days of the week). See e.g. moving papers at **Exhibit 16** (Special Observation Log dated June 19, 2005) and **Exhibit 17** (undated Special Observation Log).

43.    Appended as a Rider to this Declaration, and documented by the attached logs, contrary to the assertions of the opposition, the produced logs contain a modest amount of information, and what there is does not support the contention that Valerie was provided with regular or frequent "ambulation" or other healthful physical activity.

44.    Because these Wing and Core Logs are timed in two hour segments, it is impossible to determine the actual length of time involved, as compared to the Special Observation Logs, which are timed in fifteen minute intervals (four per hour).

45.    The majority of the log entries merely document medical appointments, inability to sleep, and visits from Valerie's mother. Only three entries describe Valerie as walking (two of which are explicitly in the context of behavioral incidents) and none describe Valerie as being "ambulated," that is, assisted by staff with walking or similar healthful physical activity.

46.    Several entries describe Valerie (in the middle of the night) sitting in her wheelchair and two entries document an April 20, 2005 order that Valerie remain in her wheelchair at all times. **Exhibit 53** Core Log at Bates 9947; **Exhibit 54 Wing Log** at Bates 10020.

47.    Not one single note in either the Core Office or Wing Logs identify so much as a single instance of Valerie being walked by staff or otherwise assisted with physical activity.

48.    The balance of the notes concern such matters as visits from Valerie's mother, medical appointments, and Valerie being unable to sleep (numerous notes). Exact page references are provided in the attached Rider.

49.    These produced Core and Wing logs are not comprehensive and do not reflect the detailed observations that would necessarily be provided in the Special Observation Logs, which are made at fifteen minute intervals, twenty-four hours each day.

*10*

50.    To assist this Court, the undersigned attorney has prepared an honest and detailed catalog stating the sum and substance of the Core Office (**Exhibit 53**) and Wing Logs (**Exhibit 54**) for the three months prior to Valerie's death, attached as a Rider to this Declaration.

51.    This was necessary because the defendants did not attach any page from these logs in support of their sweeping generalizations. Because plaintiffs must demonstrate a negative, the original documents are attached together with the annexed catalog for the assistance of this Court.

**(iii)    Analysis of the Medical Treatment Team Progress Notes**

52.    Production herein included Interdisciplinary Treatment Team ("ITT") Notes apparently made by medical staff. The Treatment Team Notes for the three months preceding Valerie's death that plaintiffs have been able to identify[3] are submitted herewith as **Exhibit 48**.

53.    None of the medical ITT Notes document defendants' sweeping contention that Valerie was provided with assisted walking or "ambulation" or any other healthful physical activities. In fact, the medical ITT Notes document Valerie's deteriorating physical condition as a result of sedation and confinement to wheelchair and lack of physical activity. *E.g.* see ¶57 below (venous insufficiency caused by sitting in a wheelchair).

54.    An April 15, 2005 medical note states that Valerie fell during a shower. The note states that "Sedation from psychotropic meds ie. [sic] Zyprexa may have contributed to fall." **Exhibit 48**, Bates 8185 (emphasis added).

---

[3] We must remind this Court that the defendants have consistently refused to identify the documents produced. Their refusal to identify production substantially delayed plaintiffs' ability to detect the documents subjected to spoliation that form the subject of this motion.

55.    An April 20, 2005 follow up note confirms the suspicion that the medication was implicated in Valerie's fall – a team meeting was held and a decision made to lower the dose of Zyprexa administered to Valerie because of sedation noted. **Exhibit 48** Bates 8185-8186.

56.    On May 2, 2005, the dose of Zyprexa administered was again lowered to minimize daytime sedation. **Exhibit 48** Bates 8186.

57.    The May 27, 2005 note states that Valerie was suffering from "Venous insufficiency positional (<u>sitting in a wheelchair</u>)" (emphasis added) at **Exhibit 48** Bates 8188.

58.    The defendants in opposition did not attach one single page of medical ITT Notes. The foregoing illustrate why they did not attach any medical notes – there are no notes that support the defendants' contentions.

59.    The medical notes provide evidence that the Special Observation Logs that were destroyed by the defendants are consistent with the few surviving pages, that is, staff did not walk with Valerie periodically during the day, and Valerie spent extended periods of time in her wheelchair. <u>See also</u> Moving Papers **Exhibit 8**, State Commission Determination.

**(iv)    Nursing Notes**

60.    Production also included nursing notes. The notes during three months prior to Valerie's death on June 19, 2005 do not document staff walking with her regularly (or ever) or any mobility exercises. At lease one entry provides additional confirmation that Valerie was using a wheelchair. **Exhibit 49** at Bates 8345, May 16, 2005 entry noting Valerie in wheelchair.

61.    Again, because plaintiffs must prove a negative, and defendants did not attach one single page of Valerie's medical or other treatment records made contemporaneously with the events they describe, we have filed herewith all of the nursing notes recorded during the three months prior to Valerie's death for the Court's review as **Exhibit 49**.

**(v)    Medical and other treatment consultations**

62.    Defendants in opposition did not attach single page of medical or other treatment consultation reports or notes in support of their contentions.

63.    Notwithstanding defendants' failure and omissions, during the months prior to Valerie's death, she was seen by medical and other treatment consultants within and outside of the facility. See, *e.g.*, moving papers at **Exhibit 28** (Physical Therapy Consultation, May 2, 2005); **Exhibit 29** (Psychiatry Consultation September 17, 2004); **Exhibit 30** (Occupational Therapy Note, April 27, 2005).

64.    The aforementioned reports do not support the defendants' contentions and are discussed in detail in the moving memorandum.

65.    We have isolated additional medical consultations buried[4] within the defendants' production, which have been filed herewith collectively as **Exhibit 50**, Bates 8174-75, 8177-81 and 8183-84. None of these consultation reports support the defendants' sweeping generalizations; to the contrary, if any conclusion can be made from these documents, it is that Valerie was maintained in a sedentary state.

66.    **Exhibit 50** at Bates 8174 is an eye clinic exam. It does not indicate that Valerie was walked by staff and incorporates no note concerning mobility.

67.    **Exhibit 50** at Bates 8175 is a second eye clinic exam, also not relevant to the instant motion.

68.    **Exhibit 50** at Bates 8177 is an Occupational Therapy consult for a helmet. The consulting service notes that Valerie "has been falling frequently and injuring her head."

---

[4] We are constrained to remind this Court that the defendants, most unfortunately, produced thousands of pages of documents that were not a subject of any interrogatory or production request and did not produce the documents with an index or with any other identifying system.

69.  **Exhibit 50** at Bates 8178 is another Occupational Therapy consult, this time for a custom helmet.

70.  **Exhibit 50** at Bates 8179 is a Podiatry consult that appears to concern an evaluation or treatment for onychomycosis (a fungal infection of the toenails or fingernails).

71.  **Exhibit 50** at Bates 8180-8181 is a radiology examination made because of a history of pain, finding that Valerie suffered from "degenerative changes" at points on her spine.

72.  **Exhibit 50** at Bates 8183 is an order to radiology for a screening mammogram.

73.  **Exhibit 50** at Bates 8184 is a neurology consult diagnosing Valerie with a peroneal mononeuropathy and recommending treatment with a splint. This most certainly does not support any contention that Valerie was walking with assistance or otherwise provided with regular physical activity. To the contrary, it suggests that Valerie was maintained in a confined physical state without appropriate movement. Moreover, as in the previous consultations, the consulting service diagnosis and recommendation on its face does not indicate that Valerie was being provided with appropriate physical activities.

**B.   Defendants' self-serving deposition testimony**

74.  Defendants in opposition are proffer selected portions of their depositions (the only defendant to submit a statement concerning the loss and destruction of the subject documents was Kathleen Ferdinand, discussed in the accompanying Memorandum). These are referenced in the Opposition Memorandum at page 13, footnote 4. Although they were not discussed in any detail in defendants' Memorandum it appears from the footnote that the depositions excerpts were submitted for the proposition that the defendants observed Valerie walking with assistance.

75.  The documents discussed above, in the Rider to this Declaration (all of which have been submitted herewith as exhibits) do not support the generalized testimony of the defendants submitted in opposition.

76.    In particular, during the three months prior to Valerie's death, there are **no** documented occasions where Valerie was walked by staff. The only documented occasions of Valerie walking occurred during the night and in connection with an escalation of her behavior on March 23 and 24, 2005 and on April 13, 2005, although the surrounding circumstances were not described. <u>See</u> **Exhibit 54 Wing Log** at Bates 9981 and 9984 and **Exhibit 53** Core Log at Bates 9940. These incidents were not connected with a practice of staff-assisted walking, but were isolated behavioral occurrences.

77.    Furthermore, the cause of death, determined by the New York Medical Examiner found, and the State Investigative Commission agreed, that inactivity was the underlying factor in Valerie's death. See Moving Papers **Exhibit 8** (Commission, Final Determination); **Exhibit 51**, submitted herewith (New York City Medical Examiner Autopsy).

**C.    Plaintiffs' Deposition Testimony**

78.    Defendants take out of context short excerpts of two of the plaintiffs' depositions in an effort to suggest that the plaintiffs were satisfied that Valerie was walking and mobile. Defendants mislead this Court.

**(i)    Deposition of Mrs. Viola Young (Valerie's mother)**

79.    Defendant extracted two pages from the one-hundred forty-two page deposition they took of Mrs. Young taking a statement out of context to plant the suggestion that Mrs. Young observed Valerie as having mobility.

80.    This is a false and misleading tactic. Attached as Exhibit 45 is the entire sequence of questions counsel posed on that topic, amounting to twenty-four pages of the transcript (the two page excerpt submitted in opposition only included the introductory questioning).

81.    Mrs. Young's testimony taken in context and as a whole was not ambiguous. She was critically concerned about the extensive time in her own observation that Valerie was confined to the wheelchair. See Exhibit 45, Viola Young Deposition:

(a) Page 56:19 ("You know, they let her sit on a wheelchair too long and they didn't let her exercise.");

(b) Page 58:10 ("She was always in a wheelchair and that wheelchair wasn't even comfortable. It was an old fashion wheelchair.");

(c) Page  58:23 (describing how Mrs. Young tried to walk Valerie, holding her);

(d) Page 60:19 (describing the wheelchair) and 60:24 (Valerie sitting in a wheelchair when her mother visited);

(e) Page 61:4 (Valerie unable to get up out of the wheelchair);

(f) Pages 61:21 – 62:6 (Valerie could not move around and would just sit);

(g) Page 62:14 (Valerie always in a wheelchair during her last months);

(h) Page 62 (generally, Valerie not walked by staff);

(i) Page 64:3 – 64:9 (Staff did not walk Valerie);

(j) Page 69:8 – 69:15 (Mrs. Young able to walk a few steps with Valerie but only with the assistance of Valerie's sister).

82.    Accordingly, the defendants' characterization of Mrs. Young's testimony is entirely misleading.

**(ii)    Deposition of Loretta Lee (Valerie's sister)**

83.    Defendants also take the testimony of Loretta Lee out of context and, in the Memorandum, omitting the questions used to lead the witness. According we have attached as **Exhibit 46** the entire section from which the defendants excerpted five pages.

84.    For example, omitted from the defendants' exhibit was a question asking Ms. Lee to describe what "Valerie was doing the last time" she visited her; to which Ms. Lee responded, "She was sitting in a wheelchair." **Exhibit 46** Loretta Lee Deposition at page 30:11 – 30:13.

85.    The responses quoted (and excerpted in defendants' exhibit) were made to questions that were general in nature and not bound in scope to any particular date or period of time. See defendants' **Exhibit C**.

86.    Mrs. Viola Young elaborated and provided additional context describing that she and her daughter, Loretta, "walked" Valerie by holding her up." **Exhibit 45** at page 69:8.

87.    Furthermore, much of the questioning in Loretta Lee's deposition was in the nature of provocative argument, with the Assistant Attorney General asking questions consistent with an accusation that Ms. Lee was being untruthful and suggesting that Ms. Lee did not actually visit her sister. *E.g.*, **Exhibit 46** Loretta Lee Deposition at pages 31:11 – 32:4.

88.    We respectfully refer this Court to Exhibit 46 providing the context of the questioning Ms. Lee's responses.

**(iii)   The deposition of Sidney Young (Valerie's brother)**

89.    Defendants did not attach any portion of deposition of Valerie's brother, Sidney Young.

90.     We have submitted herewith the brief section of Mr. Young's deposition  where there was discussion of Valerie's level of activity. See **Exhibit 47** Deposition of Sidney Young pages 49 - 54

91.    Mr. Young testified that Valerie "... just wasn't moving at all. She was sitting on one spot" (Page 50:13) and that previously Valerie "... would be moving all over the place, running around and then all of a sudden, she was just sitting on one spot." **Exhibit 47** Page 50:19.

92.    Similar to the deposition of Loretta Lee, the Assistant Attorney General asked questions consistent with an accusation that Mr. Young was being untruthful and suggesting that he did not actually visit his sister, Valerie.

## Conclusion

93.    The documents produced in this case that were prepared contemporaneously with the events that they describe support the plaintiffs' contention that the Special Observation Logs, diligently destroyed without any explanation, would show that decedent Valerie Young spent extended periods of time in her wheelchair, staff did not walk with her regularly and she was not otherwise provided with adequate exercise or mobility and thus her treatment by the defendants fell substantially below minimum professional standards.

94.    The defendants in opposition rely primarily upon self-serving litigation statements, and vague deposition testimony. This Court should soundly reject the defendants' misleading generalizations and impose the sanctions sought by plaintiff, as well as an award of attorney fees and expenses against the defendants and in favor of the plaintiffs upon submission to this Court of appropriate documentation.

## Certification of Exhibits

95.    Exhibits 1 through 54, filed in support of this Motion and Reply are true copies of documents produced in discovery, of deposition transcripts of the parties and/or of documents previously filed in this case.

Dated:  June 6, 2008

Respectfully Submitted,

s/ _____

Jonathan Bauer

*18*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ESTATE OF VALERIE YOUNG, et al.,                    ECF Case

        plaintiffs,                                        Case No.: 07-CV-06241 (LAK)

    - against -                                            **RIDER TO DECLARATION OF**
**JONATHAN BAUER, ESQ.**

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, et al.,

        defendants.

1.    A review of the produced logs[1] during the last three months of Valerie's life identifies only **three** instances out of **ninety-one days** where Valerie is described as walking: March 23, 2005 **Exhibit 54 Wing Log** at Bates 9981; March 24, 2005, see **Exhibit 54 Wing Log** at Bates 9984; April 13, 2005, see **Exhibit 53** Core Log at Bates 9940.

2.    The logs document **zero** instances of Valerie be walked by staff during that period.

3.    A review of the produced logs[1] during the last three months of Valerie's life also include references to her use of the wheelchair and sitting:

    (a) April 20, 2005 – (untimed) stating Valerie "is to be in wheelchair at all times."
**Exhibit 54 Wing Log** at Bates 10020 (emphasis added); and Valerie "is to remain in wheelchair at all times as per Dr. [name redacted]." **Exhibit 53** Core Log at Bates 9947.

    (b) April 27, 2007 – a note timed at approximately 1:00 pm stated "Valerie got a new [wheel] chair & new helmet today." **Exhibit 53** Core Log at Bates 9952;

---

[1] We remind this Court that while it is not a direct part of this motion, pages of the produced log books were also subject to spoliation, including, but not limited to, the Core Office Log page(s) from the date that Valerie died and nine pages of the Wing Log from June 16 – June 19, 2005.

(c) May 8, 2005 (undated, date extrapolated from prior and subsequent pages) – a note timed at approximately 5:00 am states that Valerie "is in her [wheel] chair." **Exhibit 54 Wing Log** at Bates 10030.

(d) May 13, 2005 – a note timed at approximately 4:00 am states that Valerie "is out of bed and in her [wheel] chair because she was on floor." **Exhibit 54 Wing Log** at Bates 10034.

(e) May 21, 2005 – a note timed as 3:15-5:15 am states "Valerie still sitting in her w/c [wheelchair]. Exhibit 54 Wing Log at Bates 10042.

(f) May 24, 2005 – notes timed between approximately 1:15 am and 5:15 am state that Valerie is out of bed and in her wheelchair, and a subsequent note states that Valerie is still out of bed. **Exhibit 54 Wing Log** at Bates 10047.

(g) May 27, 2005 – a note made after 1:15 am (the timing is redacted) states that Valerie is "in w/c [wheelchair]." **Exhibit 54 Wing Log** at Bates 10049.

(h) June 8, 2005 – a note timed between 9:00 and 11:00 pm describes Valerie as "sitting quietly" although it does not indicate whether she was sitting in her wheelchair, another chair or on the floor. **Exhibit 54 Wing Log** at Bates 10062.

4. Several of the notes document visits to Valerie by her mother, Mrs. Viola Young: **Exhibit 54** Core Log at Bates 10022 and 10028; **Exhibit 53** Wing Log at Bates 9925, 9946 (with mother and sister), 9948, 9953, 9962, 9971 and 9973.

5. Numerous entries document circumstances where Valerie is unable to sleep at night. Other than a few exceptions noted, those entries do not provide any description beyond the fact that she is "up" or "awake":

(a) Entries from the Wing Log (Exhibit 53) noting that Valerie is "up" or "awake" include Bates 9979, 9981 (see also ¶1 herein), 9991, 9993, 9994(and noting Valerie is "sitting with staff"), 9996, 9998, 9999 (and noting an abrasion to Valerie's eye), 10002, 10006, 10007, 10008, 10010, 10012, 10014, 10017, 10019, 10025, 10031, 10034 (and noting Valerie in her chair, see ¶2d herein), 10043, 10045, 10046, 10055, 10056, 10058 (and out of bed without any further description) and 10067.

(b) Entries from the Core Log (Exhibit 54) include 9920, 9922, 9927 (and out of bed without any further description), 9932, 9933, 9938, 9940 (and see ¶1 herein), 9961, 9963 (and refusing to go to bed, sitting in Area A) and 9974.

6.     Two entries from the Wing Log (**Exhibit 53**) identify aggressive behavior: 10037 (no description, indicates referral to physician) and 10046 (hit staff, refused medications and dinner); one entry from the Core Log (**Exhibit 53)** identifies "uncooperative" behavior, Bates 9940.

7.     Numerous entries document circumstances where Valerie is out of bed. Those entries do not provide any description beyond the bare fact that Valerie is not in bed, with exceptions as noted:

(a) Entries from the Wing Log (**Exhibit 53**) noting that Valerie is "out of bed." for the most part have no comment other than that bare fact. The exceptions are 10047 (out of bed and in her wheelchair), 10054 (then in bed), 10057 (out of bed then escorted to her bed), 10062 (out of bed sitting quietly). Other entries include Bates 9983, 9986, 9987, 9988, 10005, 10009, 10013, 10018, 10023, 10027, 10029, 10032, 10033, 10035, 10036, 10038, 10041, 10044 (then put in bed), 10050, 10051, 10053, 10059, 10060, 10064, 10065, and 10068.

(b) Entries from the Core Log (**Exhibit 54**) noting that Valerie is "out of bed" for the most part have no comment other than that bare fact. The exceptions are 9963 (refuses to go back to seat in Area A) and 9972 (fell out of bed and continues to slide out of bed). Other entries are located at Bates 9923, 9924, 9937, 9942, 9957, 9958, 9960, and 9975.

8.  Entries document incident occurrences, including:

(a) Entries from the Core Log (**Exhibit 54**) at Bates 9933 (Slipped, injured and awake rest of night), 9935 (Getting up from floor, injured eye), 9943 (Scratch on left eye), 9944 (Dropped to the floor while taking a shower causing a cut), 9964 (Received four sutures and order that Valerie should not be using mat by bed).

(b) Entries from the Wing Log (Exhibit 53) at Bates 9980 (Bruise to left eye), 10015 (Large cut [redacted]), 10039 (Found unspecified injury, report made).

9.  The following entries record medical treatment and appointments:

(a) Entries from the Core Log (**Exhibit 54**) at Bates 9921 (Blood work done), 9931 (Seen by doctor for her fingers), 9936 (Seen by doctor [name redacted]), 9945 (Seen by doctor [name redacted]), 9950 (Seen by doctor - sutures removed), 9954 (Dental visit), 9956 (Blood work done).

(b) Entries from the Wing Log (**Exhibit 53**) at Bates 9982 (Blood work done), 9997 (Eye appointment), 10000 (Sutures due to fall), 10004 (Neurology appointment), 10016 (Seen by doctor [name redacted]), 10026 (Unspecified purpose), 10040 (Received four sutures), 10048 (EKG appointment), 10066 (Podiatry).

10. Entries document injuries although without detail (note that there is some duplication between these and the list of incidents):

(a) Entries from the Core Log (**Exhibit 54**) at Bates 9933 (Slipped, injured and awake rest of night), 9935 (Getting up from floor, injured eye), 9943 (Scratch on left eye), 9944 (Dropped to the floor while taking a shower causing a cut), 9964 (Received four sutures).

(b) Entries from the Wing Log (**Exhibit 53**) at Bates 9980 (Bruise to left eye), 10015 (Large cut [redacted]), 10039 (Found unspecified injury, report made).

11.    The following entries record miscellaneous matters that do not fit squarely within a particular category:

(a) Entries from the Core Log (**Exhibit 54**) at Bates 9919 (In treatment room), 9926 (Valerie is unsteady, nurse notified), 9928 (remained on Wing has a cold), 9929 (Cold symptoms, sent back from program), 9930 (Went to sleep), 9939 (Did not go to program (without explanation), 9941 (Had a meeting [illegible] [redacted]), 9949 (Unclear reference to a "procedure for V Young will be implemented"), 9951 (Returned from appointment), 9955 (Has loose bm treatment given), 9959 (Escorted to BDC Pod).

(b) Entries from the Wing Log (**Exhibit 53**) at Bates 9985 (Nurse giving enema), 9990 (Given enema), 9992 (remained on Wing has a cold), 9995 (remained on Wing has a cold), 10011 (Remained on Wing [no explanation given]), 10021 (Given enema), 10024 (Hair braided), 10052 (On "311 with [redacted] class").

12.    The pages and categories of entries enumerated above account for the bulk of these logs. While there may be a few isolated entries that do not fit into or were otherwise not detected for incorporation into the major categories, there are none that plaintiffs observed suggesting that Valerie was walked regularly by staff or otherwise provided with mobility or other healthful physical activities.

Dated:  June 6, 2008

Respectfully Submitted,

_s/ _____
Jonathan Bauer