UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

Estate of VALERIE YOUNG by VIOLA YOUNG,  :
as Administratrix of the Estate of Valerie Young,
and in her personal capacity, SIDNEY YOUNG,   :      **DEFENDANTS'**
and LORETTA YOUNG LEE,                                            **RULE 56.1 STATEMENT**

                                        :

                     Plaintiffs,                 07-CV-6241 (LAK)(DCF)
                                        :                 ECF Case

        -against-
                                        :

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL                  :
DISABILITIES, PETER USCHAKOW, personally
and in his official capacity, JAN WILLIAMSON,       :
personally and in her official capacity, SURESH
ARYA, personally and in his official capacity,            :
KATHLEEN FERDINAND, personally and in her
official capacity, GLORIA HAYES, personally and :
in her official capacity, DR. MILOS, personally and
in his official capacity,                                                    :

                     Defendants.                 :

------------------------------------------------------------------X

      Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern and

Eastern Districts of New York, defendants State of New York Office of Mental Retardation and

Developmental Disabilities ("OMRDD"), Brooklyn Developmental Disabilities Service Office

("BDDSO" or "BDC") Director Peter Uschakow, Deputy Director of Operations Jan Williamson,

Residential Unit Supervisor Gloria Hayes, Treatment Team Leader Kathleen Ferdinand and Medical

Doctor Jovan Milos, and Hudson Valley Developmental Disabilities Services Office Deputy

Director of Operations Suresh Arya (collectively "defendants"), by their attorney, ANDREW M.

CUOMO, Attorney General of the State of New York, hereby submit the following statement of the

material facts, as to which they contend that there exists no genuine issue to be tried:

**Parties**

1.      Plaintiffs, Viola Young, Loretta Young Lee and Sidney Young's decedent, Valerie
Young, was a 49-year old woman who had resided at the BDC since 1990.  Ms. Young was
institutionalized at age 35 at BDC due to behavior problems, including increasingly aggressive
behavior.  Deposition Transcript of Viola Young, taken January 29, 2008 ("Viola Young Dep. Tr."),
at p. 14, ln. 8 - p. 18, ln. 10, annexed to Declaration of Jose L. Velez, dated August 1, 2008 ("Velez
Decl."), under Exhibit Tab D; Deposition Transcript of Loretta Young Lee, taken January 28, 2008
("Loretta Young Dep. Tr."), at p. 11, lns. 3-13, annexed to Velez Decl. under Exhibit Tab E;
Deposition Transcript of Sidney Young, taken January 28, 2008 ("Sidney Young Dep. Tr."), at p.
13, ln. 14 - p. 14, ln. 18, p. 25, lns. 4-8, annexed to Velez Decl. under Exhibit Tab F.

2.      Ms. Young had a history of profound mental retardation, seizure disorder,
schizoaffective disorder, tardive dyskinesia, constipation, right brachial plexopathy, bilateral feet
edema, and left foot drop due to mononeuropathy.  Declaration of Jovan Milos, M.D., dated July 23,
2008 ("Milos Decl."), at ¶ 14.

3.      Defendant Peter Uschakow  was employed at the BDC since 1991 and was the
Director from 2000 until his retirement from state service in 2008.  From 1972 to 1991, he was
employed by the OMRDD and the New York State Office of Mental Health ("OMH") at several
facilities in lower New York State.  Declaration of Peter A. Uschakow, dated July 21, 2008
("Uschakow Decl."), at ¶ 1.

4.      Defendant Suresh Arya has been employed since September 2004 at OMRDD's
Hudson Valley Developmental Disabilities Services Office ("HVDDS" or "HVDC") as Deputy
Director of Operations.  Prior to that he was employed at BDC from July 2000 to September 2004,

also as Deputy Director of Operations. At BDC he reported directly to the Director. Declaration of Suresh Arya, dated July 15, 2008 ("Arya Decl."), at ¶ 1.

5. Defendant Jan Williamson has been employed by the BDC as Deputy Director of Operations since September 2004, initially in the capacity of Acting Director before being permanently appointed late 2005 or early 2006 as permanent Deputy Director. She reports directly to the Director of BDC. Prior to that, from 1992 to 2001, she was a Social Worker II at another OMRDD developmental center. From 2001 to September 2004, she was a Treatment Team Leader at BDC's Day Treatment program. Declaration of Jan Williamson, dated July 17, 2008 ("Williamson Decl."), at ¶ 1.

6. Defendant Kathleen Ferdinand has been employed by the BDC as a Treatment Team Leader since 1994. Prior to that, from 1974 to 1994, she was employed by the New York State Office of Mental Health ("OMH") at the Kingsboro Psychiatric Center as a social worker and social worker supervisor before becoming a treatment team leader there starting in 1985. She also was employed one year with OMH's Manhattan Psychiatric Center as a treatment team leader. Declaration of Kathleen Ferdinand, dated July 24, 2008 ("Ferdinand Decl."), at ¶ 1.

7. Defendant Gloria Hayes has been employed by the BDC as a Residential Unit Supervisor since 2003. She is a member of the Treatment Team and her immediate supervisor is Treatment Team Leader Kathleen Ferdinand. She was previously employed at the BDC as a Wing Leader from 1984 to 1997, and a Developmental Aide from 1980 to 1984. Declaration of Gloria Hayes, dated July 18, 2008 ("Hayes Decl."), at ¶ 1.

8. Defendant Dr. Jovan Milos is a physician licensed to practice medicine in the State of New York since July 2000 and is Board Certified in the field of Internal Medicine. Milos Decl.

3

at ¶ 1.  Since September 14, 2000, he has been a Medical Specialist for the OMRDD at BDC providing medical care for between 55 to 70 consumers.  Prior to this position, he was a resident at Kings Brook Jewish Medical Center from July 1, 1997 to June 30, 2000.  Id. at ¶ 3.  His immediate supervisors are the BDC Deputy Director of Operations and the BDC Director.  Id. at ¶ 6.

### The Office of Mental Retardation and Developmental Disabilities

9.      The OMRDD is the State agency responsible for providing services to persons with mental retardation and developmental disabilities.  OMRDD tries to the extent possible to provide such services in the community, but some of the persons it serves require residential care.  These services include rehabilitation and habilitation to its consumers.  Uschakow Decl. at ¶¶ 3, 4.

10.      OMRDD operates thirteen Developmental Disabilities Services Offices ("DDSOs") responsible for providing programs in one or more counties.  The DDSO seeks to provide specially designed person-centered assistance to each individual with developmental disabilities.  The DDSO seeks to improve the quality of life of individuals through the provision of cognitive habilitation, behavioral health interventions, support, training in activities of daily living, cost-effective housing, employment and family support services.  BDC is the DDSO for Kings County, New York.  Id. at ¶ 5.

11.      OMRDD provides care, treatment, and services to many persons with severe disabilities.  OMRDD staff are trained to identify abilities in even the most severely disabled consumer that can be encouraged and strengthened to improve that consumer's quality of life.  Id. at ¶ 6.

12.      In order to provide appropriate services to its consumers, OMRDD engages in "Person-Centered Planning."  Person-Centered Planning is a process that focuses on the capabilities

and strengths of an individual, not on deficits and deficiencies.  Id. at ¶ 7.

13.    As part of OMRDD's comprehensive, integrated system of services for persons with mental retardation and developmental disabilities, the needs of individuals with mental retardation and developmental disabilities are met through active participation from parents, advocates, friends and others, including not-for-profit providers.  Id. at ¶ 9.

### Services Offered by Brooklyn Developmental Center

14.    BDC is a residential treatment facility operated by OMRDD for persons with severe or profound mental retardation.  It serves individuals who have a primary diagnosis of mental retardation or a severe developmental disability, or a profound lack of skills that affect their ability to communicate or live in the community.  Uschakow Decl. at ¶ 10; Milos Decl. at ¶ 4.

15.    To qualify for placement at BDC, actual assignment of a diagnosis with psychometric testing must be performed on the potential consumer by age twenty-two.  Additionally, the potential consumer must have severe adaptive behavior deficits involving communication, community living, maladaptive behaviors, and activities of daily living.  Uschakow Decl. at ¶ 11.

16.    Although BDC is not a hospital, its  staff includes psychiatrists, psychologists, physicians, nurses, dentists, social workers, physical and occupational therapists.  There are presently five medical doctors at BDC who are responsible for the day-to-day medical care of the consumers.  If a consumer requires special attention, he or she is referred to a medical specialist outside the facility.  Milos Decl. at ¶ 5.

17.    Currently, BDC serves about 300 consumers.  This number has been decreasing over many years, as OMRDD places less impaired and/or better psychiatrically compensated consumers in supervised residences in the community, while retaining institutions such as BDC for consumers

who most need that level of care. Uschakow Decl. at ¶ 12; Milos Decl. at ¶ 4.

### BDC's Campus and Supervision

18.    BDC's campus is made up of five buildings. Three of those buildings are residential buildings. The residential buildings are divided into two units, one unit on each floor. Each floor is divided into four wings. Consumers are housed in the wings, and each wing is organized as a basic treatment unit through which consumers receive rehabilitation and the other care and treatment they need. Each of BDC's wings has 24-hour supervision. Uschakow Decl. at ¶ 13; Ferdinand Decl. at ¶¶ 3, 4.

19.    Each wing is assigned a Wing Leader who supervises the Developmental Aides who provide direct care. The Wing Leader and Developmental Aides are supervised by a Resident Unit Supervisor ("RUS"), or on the weekends, evenings and holiday shifts, by a Shift Supervisor. The RUS and Shift Supervisors are supervised by the Treatment Team Leader assigned to that building. Uschakow Decl. at ¶ 14; Ferdinand Decl. at ¶ 4.

20.    Each consumer in a residential unit at BDC has an Interdisciplinary Treatment Team ("ITT") comprised of a psychiatrist and/or psychologist, medical providers, social worker and other staff who provide direct care, recreation, speech, physical therapy and occupational therapy. Uschakow Decl. at ¶ 15; Williamson Decl. at ¶ 4; Ferdinand Decl. at ¶ 6.

21.    The medical provider reports to other members of the consumer's ITT. He also discusses medical issues with the other staff physicians on an as needed basis, as well as with the Director of Quality Assurance. Uschakow Decl. at ¶ 15; Williamson Decl. at ¶ 4; Ferdinand Decl. at ¶ 6; Milos Decl. at ¶ 7.

22.     The Deputy Director of Operations oversees the discipline coordinators for each of the speciality areas, including psychiatry and medicine.  She holds monthly meetings with them related to the general operation of their departments or more frequently if there is a special concern. Williamson Decl. at ¶ 6.

23.     The Deputy Director of Operations has no personal involvement in the care and medical treatment provided to consumers.  Id.

24.     Each ITT has a Treatment Team Leader.  Treatment Team Leaders have both administrative and program responsibilities in connection with accomplishing the goals of the ITT, including the oversight, evaluation and discipline of direct care staff.  Uschakow Decl. at ¶ 15; Williamson Decl. at ¶¶ 4, 5; Ferdinand Decl. at ¶ 7.

25.     Treatment Team Leaders report to the Deputy Director of Operations to discuss issues related to general operations, but do not discuss patient issues unless there is some unusual situation such as behavior problems.   Williamson Decl. at ¶ 5.

### Care and Treatment of BDC Consumers

26.     BDC provides care to its residents twenty-four hours a day, seven days a week. Uschakow Decl. at ¶ 17; Williamson Decl. at ¶ 6; Ferdinand Decl. at ¶ 5; Milos Decl. at ¶ 7.

27.     Most care and treatment provided to BDC consumers is supervised by Qualified Mental Retardation Professionals ("QMRP").  A QMRP has at least one year's experience in providing services to persons with developmental disabilities and is qualified as either an applied behavioral sciences specialist, human services practitioner, psychologist, registered or licensed practical nurse or social worker. Physicians are not considered QMRP.  Uschakow Decl. at ¶ 18; Ferdinand Decl. at ¶ 5.

7

28.     Matters related to the medical treatment of consumers are for the physician to determine, because all decisions related to medical treatment and care of the consumer are considered part of the medical professional practice.  Arya Decl. at ¶ 5; Ferdinand Decl. at ¶ 20; Hayes Decl. at ¶ 8

29.     The ITT prepares an Individualized Program Plan ("IPP") for each consumer, which contains information from the annual assessments of the various clinical disciplines.  These assessments are the basis for developing a program to address the consumer's needs.  The psychologist assesses the consumer's behavior over the past year and prepares a behavior management plan to address problematic behaviors.  Similarly, the psychiatrist performs an annual psychiatric evaluation and assessment and may recommend psychotropic medications to treat the consumer's mental illness.  Uschakow Decl. at ¶ 19; Ferdinand Decl. at ¶ 9; Milos Decl. at ¶ 8.

30.     As part of BDC's interdisciplinary team approach, the ITT reviews the IPP on an annual and quarterly basis, and also meets on an as needed basis.  A consumer's guardian and/or family is invited to participate in the IPP meetings.  Ms. Young's mother was present at most of these meetings during the time that Dr. Milos was Ms. Young's physician.  Uschakow Decl. at ¶ 20; Ferdinand Decl. at ¶¶ 6, 10; Milos Decl. at ¶ 9.

31.     As part of BDC's informed consent process, the ITT sends written requests to a consumer's family and/or guardian for consent on matters related to the consumer's care and treatment.   Williamson Decl. at ¶ 4; Ferdinand Decl. at ¶¶ 6, 10, 20; Milos Decl. at ¶ 9.

32.     Each consumer has a Developmental Plan ("DVP") that contains all of the consumer's treatment and care records in one comprehensive binder.  On a routine basis, the ITT records its notes in the DVP.   The most recent active documentation is temporarily filed in the

nurses office pending further action, if necessary, after which it is filed in the DVP. Uschakow Decl. at ¶ 21; Ferdinand Decl. at ¶ 11; Milos Decl. at ¶ 10.

33.    A consumer's DVP includes a copy of her IPP, ITT notes, behavior management program, consultations, medication request reports, lab reports, pharmacy, charts, dental, dietary, leisure time notes, recreation, occupational therapy, psychology, physical therapy, and social worker notes. Uschakow Decl. at ¶ 22; Ferdinand Decl. at ¶ 11; Milos Decl. at ¶ 10.

34.    Direct care is provided by Developmental Aides, sometimes referred to as "direct care staff." Direct care staff provide the services as identified in consumers' IPPs. For example, direct care staff supervise consumers on the living unit, escort consumers off the living unit, transport consumers to and from their programs, the dining hall, the hospital, to clinical appointments, and on recreational trips or activities. They assist consumers with their activities of daily living, such as toileting and bathing, intervene in altercations between consumers, and calm consumers in the event of a behavioral emergency with verbal and physical calming techniques, and data collection. Uschakow Decl. at ¶ 23; Ferdinand Decl. at ¶ 12.

35.    Developmental Aides receive both classroom and on-the-job training in areas such as bathing consumers, brushing their teeth, feeding them, and other activities of daily living. They are also trained in Strategies for Crisis Intervention and Prevention, OMRDD's approved program for training direct care staff in the development of skills for crisis intervention and prevention. This program trains staff in methods of assisting and teaching individuals to maintain self-control and crisis prevention, including the use of verbal prompts and physical calming techniques. Uschakow Decl. at ¶ 24; Ferdinand Decl. at ¶ 13.

**Defendants' Role in Ms. Young's Care and Medical Treatment**

<u>Peter Uschakow</u>

36.     As the Director of BDC, Peter Uschakow supervised the Deputy Director of Operations, the Director of Institutional Human Resources, the Safety Department, the Director of Quality Assurance, and the Affirmative Action Officer.  Uschakow Decl. at ¶ 25.

37.     Mr. Uschakow was generally responsible for overseeing the daily operations of BDC, which included making periodic rounds of all of the program activities attended by consumers, but he was not involved directly in the treatment and care of consumers.  Uschakow Decl. at ¶ 26; Deposition Transcript of Peter Ushakow, taken on April 11, 2008 ("Ushcakow Dep. Tr."), at p. 35, ln. 23 - p. 36, ln. 14, p. 54, ln. 8 - p. 56, ln. 11, p. 67, ln. 16 - p. 68, ln. 20, annexed to Velez Decl. under Exhibit Tab G.

38.     Although Mr. Uschakow does not recall any instance in which he specifically discussed Ms. Young's care and treatment with BDC staff members, he recalls telling the Deputy Director about a telephone call he received from Ms. Young's mother during the Spring of 2005 regarding Ms. Young's worsening gait.  Mr. Uschakow expected the Deputy Director to speak to the Treatment Team to follow-up on Mrs. Young's concern.  Uschakow Decl. at ¶ 29; Ushcakow Dep. Tr. at p. 25, ln. 2 - p. 26, ln. 2.

39.     After the telephone call with Ms. Young's mother, Mr. Uschakow saw Ms. Young walking with the assistance of BDC staff members during his periodic rounds.  Uschakow Decl. at ¶ 30; Ushcakow Dep. Tr. at p. 26, lns. 6-12, p. 26, ln. 23 - p. 27, ln. 15, p. 37, lns. 5-11, p. 73, ln. 16 - p. 75, ln. 12.

40.    Mr. Uschakow was not involved in the November 2004 decision to place Ms. Young on fifteen minute checks which required entries in Special Observation Logs.  Uschakow Decl. at ¶ 32.

Suresh Arya

41.    As the Deputy Director of BDC, Suresh Arya oversaw the business office, discipline coordinators, residential services, housekeeping, maintenance and the power plant.  Arya Decl. at ¶ 3.  He had no personal involvement in the treatment and care provided to consumers, including Ms. Young.  Id. at ¶ 4.

42.    At the time Mr. Arya left BDC in September 2004, Ms. Young was able to walk around the facility although she was unsteady on her feet.  Id. at ¶ 6; see also Deposition Transcript of Suresh Arya, taken on April 8, 2008 ("Arya Dep. Tr."),  p. 41, lns. 8-18, p. 13, lns. 8-11, annexed to Velez Decl. under Exhibit Tab H.

43.    Since leaving BDC in September 2004, Mr. Arya was not made aware of the matters about which Plaintiffs complain related to Ms. Young's reduced walking ability, which  required her to be placed on fifteen minute checks, the use of a wheelchair for transportation, and the prescription for physical therapy.  Id.

44.    Mr. Arya was not involved in the November 2004 decision to place Ms. Young on fifteen minute checks which required entries in Special Observation Logs.  Arya Decl. at ¶ 6. Mr. Arya was no longer at BDC when these decisions occurred.  Arya Decl. at ¶ 6.

Jan Williamson

45.    As the Deputy Director of Operations of BDC, Jan Williamson oversees the business office, discipline coordinators, residential services, housekeeping, maintenance and the power plant.

Her responsibilities include overall supervision of residential units at BDC, including the treatment team leaders, as well as the day treatment on campus program. The day treatment program serves all consumers in residence at BDC. Williamson Decl. at ¶ 3.

46.     At the time that Ms. Williamson assumed her duties as Acting Deputy Director in September 2004, Ms. Young was able to walk around the facility even though she was unsteady on her feet. Williamson Decl. at ¶ 8.

47.     During the period of September 2004 through June 2005, Ms. Williamson did not review any documents relating to Ms. Young's care and medical treatment prior to her death, nor did she attend any team meeting involving any conference about her. Williamson Decl. at ¶¶ 8, 9; Deposition Transcript of Jan Williamson, taken on April 10, 2008 ("Williamson Dep. Tr."), at p. 25, lns. 6-21, p.38, ln. 24 - p. 41, ln. 25, p. 45, lns. 4-12, p. 44, lns. 2-20, annexed to Velez Decl. under Exhibit Tab I.

48.     Ms. Williamson had a few telephone conversations with Kathleen Ferdinand about Ms. Young's continued agitation and aggression, dropped foot, unsteadiness on her feet, and the Treatment Team's April 2005 agreement that Ms. Young needed a wheelchair to transport her safely around the facility. Id.

49.     Ms. Williamson's  responsibility was not to medically prescribe the wheelchair, but to obtain a wheelchair for Ms. Young for the stated purpose. Id.

50.     Ms. Williamson observed Ms. Young anywhere from two to twenty times a week while making her rounds around the facility. During these observations, it did not appear to her that Ms. Young was heavily sedated. Williamson Decl. at ¶ 10; Williamson Dep. Tr. at p.45, ln. 24 - p.47, ln. 10.

51.    After the wheelchair was issued, Williamson also observed Ms. Young walking with assistance by staff anywhere from thirty to forty times.  Most of the time, she was assisted by one person, but a second person would be nearby.  She observed Ms. Young being transported in a wheelchair, but never saw her in a wheelchair for any other purpose.  Id.

52.    Ms. Williamson was not involved in the November 2004 decision to place Ms. Young on fifteen minute checks which required entries in Special Observation Logs.  Williamson Decl. at ¶ 8.

Kathleen Ferdinand

53.    Kathleen Ferdinand was the Treatment Team Leader for Ms. Young from approximately May 2001 to the date of her death in June 2005.  During that time, Ms. Young lived in Building 3, Unit 1.  There were approximately 50 other consumers on Unit 3-1.  Ms Ferdinand supervised approximately 80 staff members during this time.  The staff to consumer ratio on this Unit was four to one.  Uschakow Decl. at ¶ 16; Williamson Decl. at ¶ 5; Ferdinand Decl. at ¶ 8.

54.    As a Treatment Team Leader, Ms. Ferdinand has both administrative and program and responsibilities in connection with accomplishing the goals of the ITT.  She makes sure consumers' plans and programs are implemented and coordinates clinical programs with activities on the residential unit.  Her position also includes the oversight, training, evaluation and discipline of the direct care staff.  Ferdinand Decl. at ¶ 7.

55.    Ms. Ferdinand's responsibilities as the Treatment Team Leader include instructing the RUS regarding the care of consumers, including Ms. Young.  Ferdinand Decl. at ¶ 14.

56.    Over the years, Ms. Ferdinand had periodic conversations with Ms. Young's mother, Viola Young, regarding ongoing issues related to Ms. Young's treatment and care.  Ferdinand Decl.

13

at ¶¶ 6, 10, 20.

57.     During her discussions with Ms. Young's mother, Ms. Ferdinand would tell her generally how her daughter was doing.  If she had any further questions, Ms. Ferdinand referred her to Ms. Young's medical doctor, Dr. Jovan Milos.  Ferdinand Decl. at ¶ 20; Viola Young Dep. Tr. at p. 79, ln. 17 - p. 80, ln. 9, p. 98, ln. 19 - p. 99, ln. 22; p. 100, ln. 3 - p. 106, ln. 7.

58.     Prior to 2005, Ms. Young's mother had called for a couple of special meetings because she was concerned with Ms. Young's aggressive behavior.  Mrs. Young complained that Ms. Young was unmanageable, uncontrollable.  She wanted to increase the psychotropic medications that Ms. Young was receiving.  It is Mr. Arya's understanding that Ms. Young's doctors did not think it was appropriate to increase these medications.  Arya Decl. at ¶ 5; Ferdinand Decl. at ¶ 20; Hayes Decl. at ¶ 8; Arya Dep. Tr. at p. 10, ln. 7 - p. 12, ln. 6; p. 31, ln. 6 - p. 32, ln. 2; p. 41, ln. 19 - p. 42, ln. 19; Deposition of Kathleen Ferdinand, taken on April 7, 2008 ("Ferdinand Dep. Tr."), at p. 44, ln. 23 - p. 45, ln. 17, annexed to Velez Decl. under Exhibit Tab J.

59.     During an April 20, 2005 Special Meeting held by the ITT to discuss the difficulty Ms. Young experienced while walking and the several falls she had taken, the doctor recommended that Ms. Young be issued a wheelchair to be used solely to transport her.  He also directed that she be re-evaluated by the physical therapy department.  At this time Ms. Ferdinand advised RUS Hayes to make sure that Ms. Young was ambulated with one or two of the staff walking with her.  Ms. Ferdinand also told Ms. Hayes that at times they would have to elevate Ms. Young's legs.  The purpose of these instructions was to assist Ms. Young with her walking since she was not steady on her feet and because her legs swelled.  Ferdinand Decl. at ¶¶ 14, 16, 17; see also Ferdinand Dep. Tr. at p. 34, ln. 19 - p. 35, ln. 10, p. 49, lns. 3-13, p. 74, lns. 4-15, p. 182, ln. 4 - p. 183, ln. 11, p. 217,

ln. 22 - p. 218, ln. 10, p. 222, ln. 18 - p. 223, ln. 5, p. 223, ln. 12 - p. 228, ln. 24, p. 282, ln. 23 - p. 284, ln. 16,  annexed to Velez Decl. under Exhibit Tab J.

60.    Ms. Ferdinand made rounds on the Wing two to three times a day, and observed Ms. Young being walked with the assistance of staff.  She was able to ambulate with the assistance of just one staff member with another staff nearby should further assistance be needed.   Ferdinand Decl. at ¶¶ 16, 19; Ferdinand Dep. Tr at p. 35, ln. 11 - p. 38, ln. 17, p. 80, ln. 25 - p. 81, ln. 5, p. 104, ln.12 - p. 105, ln. 2, p. 146, ln. 21 - p. 147, ln. 11, p. 227, ln. 12 - p. 230, ln. 21, p. 238, lns. 11-16.

61.    As the Treatment Team Leader, Ms. Ferdinand was not involved in Ms. Young's medical treatment decisions, because they were left for the physician to determine with the consent of Ms. Young's mother.  Ferdinand Decl. at ¶¶ 6, 10, 20, 21.

Gloria Hayes

62.    Gloria Hayes was the Residential Unit Supervisor for Ms. Young from 2003 to the date of her death.  Ms. Hayes directly supervised eleven Wing Leaders, and indirectly supervised all direct care workers and developmental aides.  Hayes Decl. at ¶ 3.

63.    As a Residential Unit Supervisor, Ms. Hayes' responsibilities include assigning and scheduling staff members to perform the actual direct care to consumers, the supervision and training of consumers, distributing policy and procedure memos or information obtained during a meeting, and providing in-house training to these staff on matters related to their care of the consumers.  Hayes Decl. at ¶ 3.

64.    Ms. Hayes attended meetings with the Treatment Team regarding Ms. Young's frequent falls related to her difficulty walking and her need to use a wheelchair starting around April 2005.  She would then meet with the Wing Supervisors who would, in turn, meet with the direct care

staff.  Hayes Decl. at ¶¶ 4 - 6; Deposition Transcript of Gloria Hayes, taken on April 18, 2008 ("Hayes Dep. Tr."), at p. 26, ln. 25 - p. 28, ln. 8, p. 171, lns. 9-25, p. 175, ln. 22 - p. 176, ln. 17, annexed to Velez Decl. under Exhibit Tab K.

65.    During these meetings it was emphasized that the wheelchair was to be used only for transporting Ms. Young and that she needed to be ambulated with one or two of the staff walking with her.  Ms. Hayes consistently reminded the supervisors of this and they would then remind the direct care staff.  Id.

66.    Ms. Hayes recalls telling staff that at times they would have to elevate Ms. Young's legs.  The purpose of these directions was to assist Ms. Young because she was not steady on her feet and her legs would sometimes swell.  There was also in-service training to the direct care staff about one to two staff assisting Ms. Young with her ambulation with two staff assisting her.  Id.

67.    Ms. Hayes never saw Ms. Young confined to a wheelchair.  When she made rounds on the Wing, she observed Ms. Young walking with the assistance of staff.  She was also told by staff that they walked Ms. Young around, or that Ms. Young would sometimes get up herself and walk around.  Hayes Decl. at ¶ 7;  Hayes Dep. Tr at p. 39, ln. 5 - p. 40, ln. 23, p. 44, lns. 8-20, 46, lns. 11-23, p. 52, ln. 23 - p. 54, ln.4, p. 61, lns. 9-15, p. 148, lns. 12-22, p. 149, lns. 10-14, p. 151, ln. 15 - p. 153, ln. 17, p. 160, lns. 10-15, p. 168, ln. 11 - p. 169, ln. 21.

68.    Ms. Hayes also observed staff elevating Ms. Young's leg when she was on the Wing and the program area and was told that this was also being done at other times.  Id.

69.    As the Residential Unit Supervisor, Ms. Hayes was not involved in Ms. Young's medical treatment decisions, because they were left for the physician to determine the appropriate course of action.  Hayes Decl. at ¶ 9.

Dr. Jovan Milos

70.     Dr. Milos was Ms. Young's treating physician from January 2002 until the time of her death in June 2005.  Milos Decl. at ¶¶ 14, 30; Deposition Transcript of Jovan Milos, taken on March 27, 2008 ("Milos Dep. Tr."), at p. 18, lns. 5-17, annexed to Velez Decl. Under Exhibit Tab L.

71.     At the time of her death on June 19, 2005, Ms. Young's DVP consisted of over 10,000 pages of documents.  Milos Decl. at ¶ 10.

72.     Dr. Milos observed Ms. Young twice a day during the weekdays when he made his morning and afternoon rounds in the residential unit.  He also saw her in the BDC clinic for her medical conditions, including injuries related to falls.  If Ms. Young required medical treatment, she either received it at BDC or was referred for outside treatment.  Ms. Young's medications were reviewed on a regular basis, including during her quarterly and annual reviews.  Milos Decl. at ¶ 15; Milos Dep. Tr. at p. 145, lns. 2-9.

73.     Over the years, Dr. Milos had multiple conversations with Ms. Young's mother regarding ongoing issues related to Ms. Young's treatment and care.  Williamson Decl. at ¶ 4;  Milos Decl. at ¶ 9.  Viola Young did not hesitate to voice her opinion if she did not agree with some of the medical treatment that was being provided by BDC to Ms. Young.  Viola Dep. Tr. at p. 55, lns. 5-9; p. 84, lns. 4-25; p.114, ln. 24 - p. 115, ln. 13.

## Ms. Young's Medical and Mental Health Treatment and Care

74.     Ms. Young had a generally stable medical health status.  She had a history of seizure disorder, which was well controlled with medication.  She also suffered from a neurological condition that affected her gait and caused her left foot drop for which she saw a neurologist yearly

17

or as needed.  She had bilateral feet edema or swelling that was managed with leg elevation.  She further suffered from constipation with a history of severe impaction, for which she received medication.  Milos Decl. at ¶ 16.

75.    Ms. Young's mental condition at BDC  would go back and forth between better and worse, prompting the ITT, including her mother, Viola Young, to try different medication.  Viola Young Dep. Tr. at p. 43, lns. 7-25.

76.    In November 2004, the ITT placed Ms. Young on fifteen minute checks that required direct service staff to watch her closely to prevent her from falling.  Staff was required to make entries concerning these checks in Special Observation Logs kept in composition notebooks.  The purpose of this type of observation is to provide additional supervision for consumers as deemed necessary by the ITT.  Ms. Young was placed on 15-minute checks at that time because of an unexplained injury.  Ferdinand Declaration at ¶ 20; Hayes Decl. at ¶ 10; Milos Decl. at ¶ 17.  See Special Case Conference Summary of Meeting (Bates 7783 - 7784), dated November 3, 2004, annexed to Milos Decl. under Exhibit Tab A; see also Individual Program Plan Review Meeting (Bates 7787 - 7794), dated January 12, 2005, annexed to the Milos Decl. under Exhibit Tab B.

77.    The 15- minute checks were not intended to monitor Ms. Young for the risk of DVT by reason of inactivity.  Rather, the stated purpose of this type of observation is to provide a heightened level of supervision for consumers who present a danger to the physical well being of themselves or others.   The staff was to monitor Ms. Young's activity to prevent her from incurring any further injuries due to her unstable gait, because she was observed with unexplained injuries.  Ferdinand Decl. at ¶ 25.

78.     Defendants understand that the Special Observation Logs cannot be found.  None of the defendants destroyed the Special Observation Logs nor did they direct anyone to do so. Uschakow Decl. at ¶ 32; Arya Decl. at ¶ 6; Williamson Decl. at ¶ 8; Ferdinand Decl. at ¶ 27; Hayes Decl. at ¶ 10; Milos Decl. at ¶ 17.

79.     During the first few months of 2005, Ms. Young fell frequently.  Ms. Ferdinand was concerned that Ms. Young was going to fall and hit her head.  She observed Ms. Young on a daily basis and never saw her with her eyes closed or drooping because of her medications.  There was no indication that Ms. Young was overmedicated or sedated her to the point that she could not walk during this time. Ferdinand Decl. at ¶ 15;  Ferdinand Dep. Tr. at p. 51, ln. 22 - p. 52, ln. 20, p. 258, ln. 21 - p. 260, ln. 11, p. 261, lns. 11-19; Hayes Decl. at ¶ 5.

80.     On April 7, 2005, Ms. Young was seen for her yearly neurology evaluation.  Chronic gait disorder was noted with left foot drop and high steppage gait.  Milos Decl. at ¶ 18.

81.     On April 13, 2005, the ITT met for Ms. Young's annual review.  Ms. Young's mother was invited to the meeting, but she did not attend.  During this meeting, the ITT reviewed Ms. Young's physical development and health status in detail.  Her health status was stable at that time.  However, there was concern about Ms. Young's behavior status and psychotropic medication regimen.  Milos Decl. at ¶ 19.  See, e.g., Annual CFA Team Meeting Discussion (Bates 7629 - 7682), dated April 13, 2005, annexed to the Milos Decl. under Exhibit Tab C.

82.     On April 20, 2005, the ITT had a Special Case Conference concerning Ms. Young's falls.  The most recent fall had been on April 15, 2005 in the morning, when she fell down in the shower sustaining a laceration 2.5 cm long over the left eyelid.  During this meeting, Dr. Milos stated that he  believed that the most recent falls were contributed to by medications that are

sedating, and the left foot drop which was more pronounced.  He also stated that when Ms. Young did not sleep during the night, her unsteadiness was more pronounced the following day.  Milos Decl. at ¶ 20; Ferdinand Decl. at ¶ 17; Hayes Decl. at ¶ 5.  See Special Case Conference Summary of Meeting (Bates 7743 - 7744), dated April 20, 2005, annexed to the Milos Decl. under Exhibit Tab D.

83.     During the April 20, 2005 Special Conference, the ITT also discussed that while Ms. Young's behavior had improved during the couple of months prior to her annual review, during the preceding year she had frequent episodes of agitation, aggressive behavior and behavioral decompensation that required psychiatric hospitalization and frequent adjustment of her psychotropic medications.  Milos Decl. at ¶ 21.

84.      Therefore, Dr. Milos recommended a reduction in the Zyprexa dose.  Ms. Young's medication regimen was adjusted accordingly.  Milos Decl. at ¶ 22; Ferdinand Decl. at ¶ 17.

85.     The ITT also recommended at the Special Case Conference that a wheelchair be issued to Ms. Young to transport her between buildings, to out-of-facility appointments and outings into the community.  Ferdinand Decl. at ¶¶ 16, 17; Hayes Decl. at ¶ 5; Milos Decl. at ¶ 23; Milos Dep. Tr. at p. 39, ln. 21 - p. 41, ln. 16, p. 59, lns. 7-12, p. 88, ln. 18 - p. 89, ln. 3, p. 140, ln. 13 - p. 141, ln. 25.  The wheelchair was issued to Ms. Young on April 27, 2005.  See Emergency Adaptive Equipment Shop Work Request, dated April 26, 2005, annexed to the Milos Decl. under Exhibit Tab E.

86.     Ms. Young attended programs from 9:00 a.m. to 3:00 p.m., and because of the foot drop condition she had developed, it was difficult for her to walk from the building she resided to the building where she had her programs.  Milos Decl. at ¶ 23.

20

87.     At the ITT's request, Ms. Young was also measured and issued a protective Danmar halo helmet to protect her head in case of a fall.  Milos Decl. at ¶ 24.

88.     The ITT also recommended sending Ms. Young to physical therapy, with an evaluation for possible orthosis (plastic splint to provide support) for the left foot.  Dr. Milos referred Ms. Young for a physical therapy evaluation on or about April 27, 2005.  Milos Decl. at ¶ 24; Milos Dep. Tr. at p. 90, lns. 7-18, p. 147, ln. 2 - p. 149, ln.154, p. 166, lns. 2-15.

89.     On May 2, 2005, Ms. Young was evaluated and scheduled for physical therapy two times per week to assist her with walking.  She attended twice a week on Tuesdays and Thursdays.  At physical therapy, Ms. Young  received mat exercises, ambulation exercise, and range of motion exercises for both the upper and lower extremities.  Milos Decl. at ¶ 25; Viola Young Dep. Tr. at p. 56, ln. 13 - p. 57, ln. 18, p. 104, ln. 19 - p. 105, ln. 5, p. 106, lns. 13-21; See  physical therapy referral (Bates CQC95), dated April 27, 2005, and Report (Bates CQC95), dated May 2, 2005, annexed to the Milos Decl. under Exhibit Tab F.

90.     During the evaluation, the physical therapist found that Ms. Young could stand up from the edge of a table with minimal to moderate physical assistance and was able to maintain standing without assistance for two minutes.   Inside the parallel bars, she could stand up independently and could maintain standing holding onto the bars.  She was able to walk with moderate assistance for fifty feet.  Outside the parallel bars she was able to walk for 100 feet with two staff to walk with her since she had a tendency to lean to the staff, and also lean forward during the course of walking.  Minimal left foot drop was observed during her walking.  Milos Decl. at ¶ 26.

91.     On May 2, 2005, Ms. Young also had X-rays of the lumbar spine to evaluate her gait disturbance and foot drop, both of which were negative. Milos Decl. at ¶ 28. <u>See</u> Radiology Report Bates CQC92 - CQC93), dated May 5, 2005, annexed to the Milos Decl. under Exhibit Tab G.

92.     An EMG had been scheduled for June 30, 2005 to also evaluate her gait disturbance and foot drop. Milos Decl. at ¶ 28. <u>See</u> Progress Notes (Bates 0124, 8188), dated May 26 and 27, 2005, annexed to the Milos Decl. under Exhibit Tab H.

93.     On May 27, 2005, Dr. Milos noted that Ms. Young had bilateral ankle edema (swelling), but no calf tenderness and a negative Homann's sign (a physical examination test for deep vein thrombosis). Her edema was assumed to be positional (i.e., her legs in a prolonged dependent position) and leg elevation during rest periods was recommended. Milos Decl. at ¶ 29.

94.     After Ms. Young began physical therapy in May of 2005, Dr. Milos continued to see her walking during his rounds with the assistance of staff. Up until the time of her death, she was ambulatory with assistance. Milos Decl. at ¶ 27; Milos Dep. Tr. at p. 140, ln. 13 - p. 141.

95.     Plaintiffs observed that Ms. Young was ambulatory prior to her death, although they were concerned about her gait, i.e., limping and swelling, related to her foot drop for which she was receiving physical therapy twice a week. <u>See</u> Deposition Transcript of Viola Young ("Viola Young Dep. Tr."), taken on January 29, 2008, at p. 53, ln. 21 - p. 56, ln. 25, annexed to Velez Decl. under Exhibit Tab D; Deposition Transcript of Loretta Young Lee ("Loretta Young Dep. Tr."), taken on January 28, 2008, at p. 29, lns. 20-25, p. 40, lns. 2-9, p. 42, lns. 10-15, p. 52, lns. 5-22, annexed to Velez Decl. under Exhibit Tab E.

96.     On June 19, 2005, Ms. Young collapsed in the shower. None of the defendants were at the BDC, because it was a Sunday, a scheduled day off. Resuscitative efforts were instituted by

BDC staff including CPR, intravenous dextrose, and oxygen. After CPR was administered, she became responsive and was agitated. On the arrival of the paramedics, Ms. Young was given intravenous atropine and was intubated for ventilatory support. She was transported to the hospital where she was pronounced dead shortly thereafter. Milos Decl. at ¶ 31.

97.    According to the autopsy report that Dr. Milos reviewed, the cause of Ms. Young's death was pulmonary embolism due to deep vein thrombosis of the lower extremities due to inactivity due to seizure disorder of undetermined etiology. Her manner of death was stated as caused by natural causes. Milos Decl. at ¶ 32. See Report of Autopsy Bates 0099 - 0104), dated June 20, 2005, annexed to the Milos Decl. under Exhibit Tab I.

98.    On July 26, 2005, BDC's Mortality Review Committee members, consisting of the Quality Assurance Coordinator, six physicians, three psychiatrists, a neurologist and the Deputy Director of Operations, discussed this case. The members noted that Ms. Young's medication regimen appeared appropriate and would not have predisposed her to a pulmonary embolism. The issue of her history of mild pitting edema was also discussed and it was noted that in the past, diagnostic testing had not revealed reasons for concern. The most recent episode of edema was reviewed. Dr. Milos noted that the bilateral pitting ankle edema she had was an unlikely sign for DVT, because she had no calf tenderness and a negative Homann's sign. Ms. Young's edema was assumed to be positional leg elevation during rest periods had been recommended. Milos Decl. at ¶ 33. See Mortality Review - Valerie Young (Bates 0111 - 0113), dated July 26, 2005, annexed under Exhibit Tab J.

99.    The Mortality Review Committee members also noted that Ms. Young was ambulatory but used a wheelchair for transport because of foot drop and gait instability. It was also

discussed that staff who monitored her may not have encouraged her to walk around because of fear of her falling.  It was further discussed whether the use of anti-coagulants would have helpful and whether elastic stockings could have been used.  Milos Decl. at ¶ 34.

100.    In Dr. Milos' opinion,  that the use of anti-coagulants would have been too risky for Ms. Young, because she was prone to falls.  Likewise, the use of elastic stockings could have increased the risk for blood clots because the stockings roll down and squeeze the leg, further preventing circulation.  Milos Decl. at ¶ 34.

101.    As Ms. Young's medical care provider, Dr. Milos never reached the medical conclusion that she was suffering from DVT.  In his opinion, with a reasonable degree of clinical certainty, Ms Young had none of the accepted risk factors or symptoms that are recognized to increase the likelihood of a diagnosis of DVT.  These factors or symptoms are active cancer, recently bedridden for major surgery, unilateral calf or leg edema, paralysis or a leg cast in the recent past, localized calf tenderness, and collateral superficial veins.  Milos Decl. at ¶ 35.

102.    Ms. Young also continued to receive physical therapy, continued to ambulate with assistance of BDC staff, and appeared to remain completely asymptomatic for the three weeks preceding her death.  Therefore, Dr. Milos had no reason to change her medication at that time or recommend other changes to her care and treatment.  Milos Decl. at ¶ 36.

103.    It is Dr. Milos' medical opinion that the oversight, monitoring, evaluation, and treatment of Ms. Young was thorough and according to the accepted standard of care.  Milos Decl. at ¶ 37.

104.    It is the opinion of defendants' expert in emergency medicine, Dr. Diane M. Sixsmith, that Ms. Young's medical care providers could not have reasonably anticipated that she

would develop DVT and a fatal pulmonary embolism because Ms. Young had none of the currently accepted risk factors or symptoms that are recognized to increase the likelihood of a diagnosis of DVT. Ms. Young also continued to receive physical therapy, continued to ambulate with assistance of BDC staff, and appeared to remain completely asymptomatic for the three weeks preceding her death. Accordingly, in Dr. Sixsmith's opinion, the oversight, monitoring, evaluation, and treatment of Ms. Young by BDC staff was thorough and according to the accepted standard of care. See Defendants' Expert Witness Report of Diane M. Sixsmith, M.D., M.P.H., FACEP, dated February 26, 2008, attached under Exhibit Tab A to the Declaration of Dr. Diane M. Sixsmith ("Sixsmith Decl."), dated July 21, 2008, at p. 2.

105.    It is the opinion of plaintiffs' expert in forensic pathology, Dr. Richard P. Bindie, that "DVT is frequently asymptomatic or the symptoms are not classical. The first sign of DVT can be pulmonary emboli or sudden death." See Plaintiffs' Expert Witness Report of M.D., Forensic Pathologist, dated April 25, 2008, attached under Exhibit Tab B to the Sixsmith Declaration, at p. 2.

106.    At no time prior to her death on June 19, 2005, were any of the defendants aware that Ms. Young had any of the symptoms of or had been diagnosed with deep vein thrombosis ("DVT"), nor were they made aware that Ms. Young was in danger of suffering from DVT due lack of mobility. Uschakow Decl. at ¶ 33; Arya Decl. at ¶ 6; Williamson Decl. ¶ 9; Ferdinand Decl. at ¶ 14; Hayes Decl. at ¶ 4; Milos Decl. at ¶ 35.

107.    Plaintiffs were concerned that Ms. Young be walked around to keep the circulation going and did not think that the swelling in her legs would create a blood clot that would kill her. Viola Young Dep. Tr. at p. 76, ln. 3-11, p. 71, ln. 21 - p. 72, ln. 6; Loretta Young Dep. Tr. at p. 52,

ln. 18 - p. 53, ln. 10.

108.    Plaintiffs believe that defendants would have taken care of any medical condition that Ms. Young had that might kill her.  If plaintiffs had believed that Ms. Young was suffering from any condition that might kill her, they would have let defendants know that they had this concern. Viola Young Dep. Tr. at p. 77, lns. 11-25, p. 78, ln. 18 - p. 79, ln. 2, p. 130, ln. 19 - p. 131, ln. 2; Loretta Young Dep. Tr. at p. 43, ln. 11 - p. 46, ln. 6; Sidney Young Dep. Tr. at p. 56, ln. 11 - p. 57, ln. 7.

109.    Plaintiffs have no proof that any of the defendants knew Ms. Young had a potentially dangerous, fatal problem and deliberately chose to ignore it.  Viola Young Dep. Tr. at  P. 79, lns. 7-14, p. 80, ln. 10 - p. 82, ln. 2.

Dated:  New York, New York
        August 1, 2008

                                        ANDREW M. CUOMO
                                        Attorney General of the
                                          State of New York
                                        Attorney for Defendants
                                        By:

                                        S/_____
                                        JOSE L. VELEZ
                                        Assistant Attorney General
                                        120 Broadway, 24th Floor
                                        New York, New York 10271
                                        (212) 416-8164