# EXHIBIT A

%AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Southern                        District of                        New York

Estate of VALERIE YOUNG by VIOLA YOUNG, as
Administratrix of the Estate of Valerie Young, and in her
personal capacity, SIDNEY YOUNG, and LORETTA
YOUNG LEE,

### SUMMONS IN A CIVIL ACTION

V.

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL DISABILITIES,
PETER USCHAKOW, personally and in his official capacity,
JAN WILLIAMSON, personally and in her official capacity,
SURESH ARYA, personally and in his official capacity,
KATHLEEN FERDINAND, personally and her in official
capacity, GLORIA HAYES, personally and in her official
capacity, DR. MILOS, personally and in his official capacity.

CASE NUMBER CV    **6241**

TO: (Name and address of Defendant)

New York State Office of Mental Retardation and Developmental
Disabilities, Peter Uschakow, Jan Williamson, Suresh Arya, Kathleen
Ferdinand, Gloria Hayes, Dr. Milos: State of New York, Office of Mental
Retardation & Developmental Disabilities. 75 Morton St., New York, NY,
10014

YOU ARE HEREBY SUMMONED and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Catafago Law Firm, PC
Empire State Building
350 Fifth Avenue, Suite 4810
New York, NY 10118
(212) 239-9669

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

JUL 0 6 2007

J. MICHAEL McMAHON
CLERK

DATE

(By) DEPUTY CLERK

℅AO 440 (Rev. 8/01) Summons in a Civil Action

| RETURN OF SERVICE | |
|---|---|
| Service of the Summons and complaint was made by me[1] | DATE |
| NAME OF SERVER (PRINT) | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

   Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL $0.00 |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                    Date                              *Signature of Server*


                                              _____
                                              *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

# 07 CV 6241

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Estate of VALERIE YOUNG by VIOLA YOUNG, as
Administrator of the Estate of Valerie Young, and in her
personal capacity, SIDNEY YOUNG, and LORETTA
YOUNG LEE,

                plaintiffs,

- against -

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, PETER USCHAKOW, personally and in
his official capacity, JAN WILLIAMSON, personally and
in her official capacity, SURESH ARYA, personally and in
his official capacity, KATHLEEN FERDINAND,
personally and her in official capacity, GLORIA HAYES,
personally and in her official capacity, DR. MILOS,
personally and in his official capacity,

                defendants.

------------------------------------

ECF CASE

Case No.:

JUL 0 6 2007

U.S.D.C. S.D. N.Y.
CASHIERS

COMPLAINT

Trial by jury is demanded on all
claims so triable

      VALERIE YOUNG, through her attorneys, the CATAFAGO LAW FIRM, P.C.. and

JONATHAN BAUER, complaining of the defendants, alleges, upon information and belief:

## PRELIMINARY STATEMENT

      1. This is an action brought to vindicate the rights of VALERIE YOUNG, who suffered

physical and emotional pain leading ultimately to her death as direct and proximate result of the

defendants' violations of her rights secured by the Fourteenth Amendment to the United States

Constitution and/or the Americans With Disabilities Act, 42 U.S.C. §12131 *et seq.*, and/or the

Rehabilitation Act of 1973.

## PARTIES

2. Plaintiff, VIOLA YOUNG has been issued Letters of Administration for Plaintiff Estate of VALERIE YOUNG (the Estate shall hereafter bc referred to as "YOUNG" or "Plaintiff" or "Decedent") pursuant the April 13, 2008 order of the New York State Surrogate Court, Kings County, New York.

3. VIOLA YOUNG is the mother of the decedent and brings this action both on behalf of the estate of her daughter, VALERIE YOUNG, and personally.

4. Plaintiff, SIDNEY YOUNG, is the decedent's brother.

5. Plaintiff, LORETTA YOUNG LEE, is the decedent's sister.

6. Defendant, the NEW YORK STATE OFFICE OF MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES, ("OMRDD") is an agency of the STATE OF NEW YORK with its offices located in the County of New York, among other places.

7. Defendant, PETER USCHAKOW, ("USCHAKOW") was at all times relevant to this Complaint employed by OMRDD. His county of residence is unknown to plaintiff. USCHAKOW is being sued personally and in his official capacity.

8. At all times relevant herein, USCHAKOW was acting under color of state law within the meaning of 42 USC §1983.

9. Defendant, JAN WILLIAMSON, ("WILLIAMSON") was at all times relevant to this Complaint employed by OMRDD. Her county of residence is unknown to plaintiff. WILLIAMSON is being sued personally and in her official capacity.

2

10. At all times relevant herein, WILLIAMSON was acting under color of state law within the meaning of 42 USC §1983.

11. Defendant SURESH ARYA, (ARYA) was at all times relevant to this Complaint employed by OMRDD. His county of residence is unknown to plaintiff. ARYA is being sued personally and in his official capacity.

12. At all times relevant herein, ARYA was acting under color of state law within the meaning of 42 USC §1983.

13. Defendant, KATHLEEN FERDINAND, ("FERDINAND") was at all times relevant to this Complaint employed by OMRDD. Her county of residence is unknown to plaintiff. FERDINAND is being sued personally and in her official capacity.

14. At all times relevant herein, FERDINAND was acting under color of state law within the meaning of 42 USC §1983.

15. Defendant, "DR. MILOS", ("MILOS") was at all times relevant to this Complaint employed by OMRDD. Complete is unknown to plaintiff. MILOS is being sued personally and in his official capacity.

16. At all times relevant herein, MILOS was acting under color of state law within the meaning of 42 USC §1983.

17. USCHAKOW, WILLIAMSON, ARYA, FERDINAND and MILOS may be hereafter referred to as "the Individual Defendants."

3

## JURISDICTION

18. This Court has jurisdiction over this case pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343 in that this action arises under and seeks redress for the deprivation of rights secured by the Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act, 42 USC §12131, *et seq.* and §504 of the Rehabilitation Act of 1973, 29 USC §794.

19. This action is properly brought in this Judicial District because one or more of the defendants are doing business and/or are residents of this Judicial District.

## FACTS

20. At all times relevant herein, YOUNG was a resident of the Brooklyn Developmental Center ("BDC").

21. BDC is an adult residential care and treatment facility owned, operated, managed and/or controlled by OMRDD.

22. YOUNG was at all times relevant herein, disabled within the meaning of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("Rehabilitation Act") by reason of developmental disabilities and other conditions.

23. YOUNG was at all times relevant herein, a qualified individual with a disability within the meaning of the Rehabilitation Act.

24. OMRDD is a recipient of Federal funds.

25. During the time that YOUNG was a resident of BDC, she was in the care and custody of OMRDD and the State of New York.

4

26. At all times relevant herein, YOUNG was denied necessary health and related care by the OMRDD and the Individual Defendants.

27. As a result of the denial of health and related care, YOUNG was caused physical and emotional suffering and pain by the Defendants and ultimately died.

28. YOUNG was denied health and related care because the OMRDD and the Individual Defendants were deliberately indifferent to her known medical needs and/or acted with reckless indifference to those needs.

29. Additionally and/or in the alternative, the denial to YOUNG of health and related care was as the result of discrimination within the meaning of the ADA and Rehabilitation Act.

30. At all times relevant to this complaint, plaintiffs VIOLA YOUNG, SIDNEY YOUNG and LORETTA YOUNG LEE were involved with the life of the decedent, visited with her regularly and enjoyed her companionship and the familial relations between them.

31. As a result of the death of YOUNG, plaintiffs VIOLA YOUNG, SIDNEY YOUNG and LORETTA YOUNG LEE, have been denied and lost the companionship of and familial relations with the decedent VALERIE YOUNG.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*Fourteenth Amendment against the Individual Defendants*

32. Plaintiffs hereby repeat and reiterate the allegations of paragraphs 1 through 31 as if fully set forth herein.

5

33. As the result of the deliberate indifference to and/or reckless disregard of the Individual Defendants for the health and safety of VALERIE YOUNG, decedent YOUNG was caused to suffer physical and emotional pain of time leading ultimately to her death.

34. The conduct of the Individual Defendants violated YOUNG's rights under the Fourteenth Amendment to the United States Constitution.

35. Wherefore, Plaintiff ESTATE OF YOUNG demands an award of compensatory damages be made against the Individual Defendants, jointly and severally, in an amount to be determined by the jury upon a trial of this action.

### SECOND CLAIM FOR RELIEF

*Americans With Disabilities Act against OMRDD and the Individual Defendants*

36. Plaintiffs hereby repeat and reiterate the allegations of paragraphs 1 through 35 as if fully set forth herein.

37. As the result of the discriminatory acts and omissions of OMRDD and the Individual Defendants, decedent YOUNG was caused to suffer physical and emotional pain ultimately leading to her death.

38. The conduct of OMRDD and the Individual Defendants constituted unlawful discrimination against YOUNG within the meaning of the ADA.

39. Wherefore, Plaintiff demands an award of damages be made against the defendants, jointly and severally, in an amount to be determined by the jury upon a trial of this action.

6

**THIRD CLAIM FOR RELIEF**

*The Rehabilitation Act of 1973 against OMRDD and
the Individual Defendants*

40. Plaintiffs hereby repeat and reiterate the allegations of paragraphs 1 through 39 as if fully set forth herein.

41. As the result of the discriminatory acts and omissions of OMRDD and the Individual Defendants, decedent YOUNG was caused to suffer physical and emotional pain ultimately leading to her death.

42. The conduct of OMRDD and the Individual Defendants constituted unlawful discrimination against YOUNG within the meaning of the Rehabilitation Act.

43. Wherefore, Plaintiff ESTATE OF YOUNG demands an award of damages be made against the defendants, jointly and severally, in an amount to be determined by the jury upon a trial of this action.

**FOURTH CLAIM FOR RELIEF**

*Fourteenth Amendment against the Individual
Defendants*

44. Plaintiffs hereby repeat and reiterate the allegations of paragraphs 1 through 43 as if fully set forth herein.

45. Plaintiffs VIOLA YOUNG, SIDNEY YOUNG and LORETTA YOUNG LEE, have been denied and lost the companionship of and familial relations with the decedent VALERIE YOUNG as a result of the deliberate indifference to or reckless disregard for the health and safety of decedent VALERIE YOUNG.

7

46. Wherefore, Plaintiffs VIOLA YOUNG, SIDNEY YOUNG and LORETTA YOUNG LEE demand an award of damages be made against the Individual Defendants, jointly and severally, in an amount to be determined by the jury upon a trial of this action.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

an award of damages on the FIRST CLAIM FOR RELIEF in an amount to be determined by the jury upon a trial of this action jointly and severally against the Individual defendants;

(A) an award of damages on the SECOND CLAIM FOR RELIEF in an amount to be determined by the jury upon a trial of this action all defendants;

(B) an award of damages on the Third CLAIM FOR RELIEF in an amount to be determined by the jury upon a trial of this action jointly and severally against the all defendants;

(C) an award of damages on the Fourth CLAIM FOR RELIEF in an amount to be determined by the jury upon a trial of this action against the Individual defendants;

(D) Reasonable attorney fees, together with the costs and disbursements of this actions, including expert witness fees, pursuant to 42 USC §1988, the Americans With Disabilities Act and the Rehabilitation Act of 1973;

(E) Any such further and different relief as to which this Court may deem just, fair

and equitable.

Dated: New York, New York
June 29, 2007

JACQUES CATAFAGO (?8??)
JONATHAN BAUER (JB1966)
*Attorneys for Plaintiff*
Empire State Building Suite 4810
350 Fifth Avenue
New York, New York 10118
(212) 239-9669 [voice]
(212) 239-9688 [facsimile]

9

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

Estate of VALERIE YOUNG by VIOLA YOUNG, :
as Administratrix of the Estate of Valerie Young,
and in her personal capacity, SIDNEY YOUNG,      :
and LORETTA YOUNG LEE,

Plaintiffs,

-against-

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL            :
DISABILITIES, PETER USCHAKOW, personally
and in his official capacity, JAN WILLIAMSON,   :
personally and in her official capacity, SURESH
ARYA, personally and in his official capacity,    :
KATHLEEN FERDINAND, personally and in her
official capacity, GLORIA HAYES, personally and :
in her official capacity, DR. MILOS, personally and
in his official capacity,                          :

Defendants.

----------------------------------------------------------------X

* Electronic case filing

**ANSWER**

:     **JURY TRIAL DEMANDED**

:     07-CV-6241 (LAK)(DCF)

:

Defendants State of New York Office of Mental Retardation and Developmental Disabilities

("OMRDD"), Brooklyn Developmental Disabilities Service Office Director Peter Uschakow,

Deputy Director Operations Jan Williamson, Residential Unit Supervisor Gloria Hayes, Treatment

Team Leader Kathleen Ferdinand and Medical Doctor Jovan Milos, and Hudson Valley

Developmental Disabilities Services Office Deputy Director Operations Suresh Arya, in their

official capacities and individually ("Defendants"), by their attorney, Andrew M. Cuomo, Attorney

General of the State of New York, hereby answer the allegations in the above-captioned Complaint

as follows:

As to Preliminary Statement

1.    Deny the allegations contained in paragraph 1, except deny knowledge or information

sufficient to form a belief as to the truth or falsity of the allegations that Valerie Young suffered

physical and emotional pain leading ultimately to her death, and admit that Plaintiffs purport to bring

this action alleging the violation of the rights of Valerie Young under the Fourteenth Amendment

to the United States Constitution and/or the Americans With Disabilities Act, 42 U.S.C. §12131, et

seq., and/or the Rehabilitation Act of 1973.

As to Parties

2.    Deny knowledge or information sufficient to form a belief as to the truth or falsity

of the allegations contained in paragraph 2.

3.    Admit the allegations contained in paragraph 3.

4.    Admit the allegation contained in paragraph 4.

5.    Admit the allegation contained in paragraph 5.

6.    Admit the allegations contained in paragraph 6.

7.    Admit the allegations contained in paragraph 7.

8.    Admit the allegations contained in paragraph 8.

9.    Admit the allegations contained in paragraph 9.

10.   Admit the allegations contained in paragraph 10.

11.   Admit the allegations contained in paragraph 11.

12.   Admit the allegations contained in paragraph 12.

13.   Admit the allegations contained in paragraph 13.

14.   Admit the allegations contained in paragraph 14.

2

15.    Admit the allegations contained in paragraph 15.

16.    Admit the allegations contained in paragraph 16.

17.    Neither admit nor deny the allegation contained in paragraph 17, which sets forth the manner to which the individual defendants may be referred to and not to statements of fact and, therefore, requires no response.

As to Jurisdiction and Venue

18.    Deny the allegations contained in paragraph 18, except admit that Plaintiffs purport to bring this action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343 alleging the violation of rights under the Fourteenth Amendment to the United States Constitution, the Americans With Disabilities Act, 42 U.S.C. §12131, et seq., and §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

19.    Admit that allegation contained in paragraph 19 that venue properly lies with the Southern District of New York, because OMRDD maintains an office located in the County of New York, among other places.

As to Facts Underlying Plaintiffs' Claims for Relief

20.    Admit the allegation contained in paragraph 20.

21.    Admit the allegations contained in paragraph 21.

22.    Admit the allegations contained in paragraph 22.

23.    Admit the allegations contained in paragraph 23.

24.    Admit the allegations contained in paragraph 24.

25.    Admit the allegations contained in paragraph 25.

26.    Deny the allegations contained in paragraph 26.

27.    Deny the allegations contained in paragraph 27.

3

28.    Deny the allegations contained in paragraph 28.

29.    Deny the allegations contained in paragraph 29.

30.    Admit the allegations contained in paragraph 30.

31.    Admit the allegations contained in paragraph 31, except deny that it is the result of

any wrongdoing by Defendants.

As to Claims for Relief

32.    In response to paragraph 32, Defendants repeat and reallege their above responses

to

paragraphs 1 through 31 as though fully set forth herein.

33.    Deny the allegations contained in paragraph 33.

34.    Deny the allegations contained in paragraph 34.

35.    With respect to paragraph 35, it contains requests for relief, to which no response is

required, but to the extent a response is warranted, Defendants deny each allegation contained

therein and that Plaintiffs are entitled to any relief whatsoever.

36.    In response to paragraph 36, Defendants repeat and reallege their above responses

to

paragraphs 1 through 35 as though fully set forth herein.

37.    Deny the allegations contained in paragraph 37.

38.    Deny the allegations contained in paragraph 38.

39.    Paragraph 39 contains requests for relief, as to which no response is required, but to

the extent a response is warranted, Defendants deny each allegation contained therein and that

Plaintiffs are entitled to any relief whatsoever.

4

40.     In response to paragraph 40, Defendants repeat and reallege their above responses
        to

paragraphs 1 through 39 as though fully set forth herein.

41.     Deny the allegations contained in paragraph 41.

42.     Deny the allegations contained in paragraph 42.

43.     Paragraph 43 contains requests for relief, as to which no response is required, but to
the extent a response is warranted, Defendants deny each allegation contained therein and that
Plaintiffs are entitled to any relief whatsoever.

44.     In response to paragraph 44, Defendants repeat and reallege their above responses
        to

paragraphs 1 through 43 as though fully set forth herein.

45.     Deny the allegations contained in paragraph 45.

46.     Paragraph 46 contains requests for relief, as to which no response is required, but to
the extent a response is warranted, Defendants deny each allegation contained therein and that
Plaintiffs are entitled to any relief whatsoever.

### As to Prayer for Relief

47.     The unnumbered Wherefore Clause paragraph on pages 8 and 9 contains requests for
relief, as to which no response is required, but to the extent a response is warranted, Defendants
deny each any every allegation contained therein.

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

48.     The Complaint, in whole or in part, fails to state a claim upon which relief can be
granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

49.     This Court lacks jurisdiction over the subject matter of the cause of actions set forth in the Complaint in that the federal claims do not rise to a constitutional level and this Court lacks subject matter jurisdiction over any state law claims by Plaintiffs.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

50.     One or more of Plaintiffs' claims are barred by the applicable statue of limitations.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

51.     Plaintiffs have failed to exhaust administrative remedies available to one or more claims alleged in their Complaint.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

52.     The alleged injuries sustained by Plaintiffs in this action were caused in whole or in part by the conduct of one or more parties or entities for whose conduct these Defendants are not responsible.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

53.     Plaintiffs cannot recover damages against individual supervisory defendants based upon the legal theory of respondeat superior.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

54.     Plaintiffs have failed to state a claim against Defendants by failing to allege with specificity their personal involvement in the events which are alleged to have caused Plaintiffs' injuries.

## AS AND FOR A EIGHTH AFFIRMATIVE DEFENSE

55.     Defendants are protected from liability by qualified immunity because at all relevant

6

times herein acted without malice, in good faith, and under the reasonable belief that their actions were reasonable and did not violate any clearly established constitutional rights of Plaintiffs.

## AS AND FOR A NINTH DEFENSE

56.    Any alleged conduct or omission was, in whole or in part, properly within the discretionary authority committed to Defendants to perform their official functions, and the relief requested would constitute an improper intrusion by the federal judiciary into that discretionary authority.

## AS AND FOR A TENTH DEFENSE

57.    Principles of comity bar Plaintiffs' claims.

## AS AND FOR A ELEVENTH DEFENSE

58.    Plaintiffs were not deprived of any rights, privileges or immunities secured to them under the United States Constitution, the laws of the United States, or the laws of the State of New York.

## AS AND FOR A TWELFTH DEFENSE

59.    Defendants have no official policy, custom, statute or regulation which permits or promotes the violation of any person's civil rights, and, moreover, no official policy, custom, pattern or practice of Defendants caused Plaintiffs any injury.

## AS AND FOR A THIRTEENTH DEFENSE

60.    Any claims brought pursuant to 42 U.S.C. Section 1983 against the Defendants in their official capacity for money damages are barred by the Eleventh Amendment to the United States Constitution.

## AS AND FOR A FOURTEENTH DEFENSE

7

61.    Defendants at no time acted willfully or in malicious disregard of Plaintiffs'

constitutional rights. As such, Plaintiff is not entitled to punitive or other relief.

WHEREFORE, Defendants respectfully request that the Complaint be dismissed in

its entirety and that this Court grant such other and further relief as the Court deems reasonable and

just.


Dated: New York, New York
      September 21, 2007

                                      ANDREW M. CUOMO
                                      Attorney General of the
                                        State of New York
                                      Attorney for Defendants
                                      By:

                                      S/ Jose L. Velez
                                      JOSE L. VELEZ
                                      Assistant Attorney General
                                      120 Broadway, 24th Floor
                                      New York, New York 10271
                                      (212) 416-8164


TO:    JACQUES CATAFAGO, ESQ.
        The Catafago Law Firm, P.C.
        Empire State Building
        350 Fifth Avenue, Suite 4810
        New York, NY 10118
        (212) 239-9669

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

Estate of VALERIE YOUNG by VIOLA YOUNG, :
as Administratrix of the Estate of Valerie Young,
and in her personal capacity, et al.,                        :

              Plaintiff,                                      :

              -against-                                       :

STATE OF NEW YORK OFFICE OF MENTAL         :
RETARDATION AND DEVELOPMENTAL
DISABILITIES, et al.,                                        :

              Defendants.                                    :

------------------------------------------------------------X

* Electronic case filing

**CERTIFICATE OF SERVICE**

07-CV-6241 (LAK)(DCF)

JOSE L. VELEZ, certifies that:

He is an Assistant Attorney General in the office of ANDREW M. CUOMO, the Attorney

General of the State of New York, attorney for the defendants. On September 21, 2007, he served

the annexed defendants' answer to plaintiffs' complaint upon the following named person:

> Jacques Catafago, Esq.
> Catafago Law Firm, P.C.
> Empire State Building
> 350 Fifth Avenue, Suite 4810
> New York, NY 10118

attorney of plaintiffs in the within entitled action by electronic case filing and by depositing a true

and correct copy thereof, properly enclosed in a post-paid wrapper, in a post office box regularly

maintained by the United States Postal Service at 120 Broadway, New York, New York 10271,

directed to said person at the address within the State designated by him for that purpose.

S/ Jose L. Velez
JOSE L. VELEZ

Executed September 21, 2007

Docket No. 07 CV 6241 (LAK) (DCF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Estate of VALERIE YOUNG by VIOLA YOUNG,
as Administratrix of the Estate of Valerie Young,
and in her personal capacity, SIDNEY YOUNG,
and LORETTA YOUNG LEE,

Plaintiffs,

-against-

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, PETER USCHAKOW, personally
and in his official capacity, JAN WILLIAMSON,
personally and in her official capacity, SURESH
ARYA, personally and in his official capacity,
KATHLEEN FERDINAND, personally and in her
official capacity, GLORIA HAYES, personally and
in her official capacity, DR. MILOS, personally and
in his official capacity,

Defendants.

ANSWER

ANDREW M. CUOMO
Attorney General of the
State of New York

ATTORNEY FOR
Defendants

Office and Post Office Address
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8164

# EXHIBIT C



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ESTATE OF VALERIE YOUNG, et al.,                    ECF Case

       plaintiffs,                              Case No.: 07-CV-06241 (LAK)

    - against -                                 **JOINT PRETRIAL ORDER**

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, et al.,

       defendants.

```
.S SDNY
  :UMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/3/08
```

    The parties having conferred among themselves and with the Court pursuant to Fed. R. Civ.

P. Rule 16, the following statements, directions and agreements are adopted as the Pretrial Order

herein.

### I. NATURE OF THE CASE

    This is an action brought pursuant to 42 USC §1983 for claims arising under the Four-teenth Amendment to the United States Constitution, The Americans with Disabilities Act, 42 USC §12131, et seq. and §504 of the Rehabilitation Act of 1976 seeking damages for the mis-treatment and ultimately, death at age 49 of Valerie Young ("Valerie"), a profoundly mentally retarded woman who was in the custody and care of the defendants.

    This action seeks damages in favor of the estate of the deceased; and for Viola Young, Valerie's mother, Sidney Young, Valerie's brother and Loretta Lee, Valerie's sister for their loss of companionship and familial relations.

### II. JURY/NON-JURY

All parties have demanded a trial by jury.

### III. STIPULATED FACTS

The parties have not stipulated to any facts.

### IV. PARTIES' CONTENTIONS

    The pleadings are deemed amended to embrace the following, and only the following, con-

tentions of the parties:

## A. Plaintiff's Contentions

Decedent Valerie Young ("Valerie") was a profoundly mentally retarded adult who was in the care and custody of defendant the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD") and the State of New York ("State"). Valerie resided at the Brooklyn Developmental Center, ("BDC") a residential facility for developmentally disabled persons operated by OMRDD. BDC is an Intermediate Care Facility/Mental Retardation ("ICF/MR") within the meaning of and pursuant to, *inter alia*, 42 CFR Parts 440, 456, 483, 485 and corresponding local regulations found at Title 14, New York Code, Rules and Regulations.

The individual defendants are persons who either provided care directly to Valerie or were supervisory officers at BDC. They are: Peter Uschakow - Director of BDC; Jan Williamson - Deputy Director for Operations of BDC; Suresh Arya - Deputy Director for Operations of BDC (overlapping with defendant Williamson); Kathleen Ferdinand - Valerie's "Treatment Team Leader"; Gloria Hayes - Resident Unit Supervisor and a member of Valerie's Treatment Team; Jovan Milos - treating physician and member of Valerie's Treatment Team. The defendants were sued both personally and in their official capacities.

On June 19, 2005, Valerie died from a Pulmonary Embolism caused by a DVT as the result of inactivity. During the last months of her life, Valerie was largely confined to a wheelchair or was otherwise maintained without mobility as a result of sedative medication and untreated and/or inadequately treated insomnia, untreated and/or inadequately treated back pain and an untreated and/or inadequately treated drop foot.

Valerie died because defendants failed to take prophylactic measures meeting minimum professional standards.

Critical to the evaluation of care provided to Valerie were certain logbooks of clinical observations, known as special observation logs; providing detailed information about the decedent every fifteen minutes, twenty-four hours every day from November 2004 up to and including the date of Valerie's death, June 19, 2005. Defendants destroyed these special observation logbooks and/or caused them to be destroyed, actions consistent with a destruction of material evidence and amounting to an effort to "cover up" the defendants' treatment of decedent.

An investigation of Valerie's death conducted by the New York State Commission on the Quality of Care and Advocacy for Persons with Disabilities ("Commission") established deficiencies and departures from the standards of care applicable to an ICF/MR. Defendants acknowledged those deficiencies, promised to correct those deficiencies, but did not do so.

Liability for defendants' violation of the Fourteenth Amendment to the United States Constitution (personal capacity claims) is governed by *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452 (1982) explained and followed by the Second Circuit in *Society for Goodwill to Retarded Children v. Cuomo*, 737 F.2d 1239 (1984) holding that the plaintiffs must show that defendants' conduct was a substantial departure from minimum professional standards.

Liability under the Americans with Disabilities Act and §504 of the Rehabilitation Act (official capacity claims) is governed by *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003), cert. denied, 541 U.S. 936, 124 S. Ct. 1658, 158 L. Ed. 2d 356 (2004), requiring that

plaintiffs show that the decedent was a "qualified individual" and was denied the benefit of the services, programs or activities of the entity (here, BDC) or was otherwise discriminated against and that the exclusion or denial or discrimination was by reason of decedent's disability.

## B.  Defendant's Contentions

Brooklyn Developmental Disabilities Service Office ("BDDSO") is a residential treatment facility operated by the New York Office of Mental Retardation and Developmental Disabilities ("OMRDD"). Decedent was a 49-year old woman who had resided at the BDDSO since 1990. Decedent had a history of profound mental retardation, seizure disorder, schizoaffective disorder, tardive dyskinesia, constipation, right brachial plexopathy, and left foot drop due to mononeuropathy.

Decedent had a normal echocardiogram and a negative venous duplex ultrasound in 2001. Decedent had frequent episodes of agitation, aggressive behavior and behavioral decompensation requiring psychiatric hospitalization and/or frequent adjustment of her psychotropic medications. In March of 2005, it was noted that decedent's gait was worsening and she was falling more frequently. In April of 2005, decedent had an extensive annual physical and psychiatric evaluation that included neurological consultation, X-rays of the lumbar spine, and physical therapy evaluation. X-rays of her lumbar spine were negative. An EMG was scheduled for June 3, 2005 to evaluate her gait disturbance and foot drop.

Because of frequent falls, decedent's medication regimen was adjusted with reduction in her Zyprexa dose. After a fall that caused a laceration on her scalp on May 20, 2005, a wheelchair was used for all of decedent's mobility needs such as transfer between buildings, out-of-facility appointments and outings into the community. However, she continued to have physical therapy and walked with assistance. On May 27, 2005, decedent was noted to have bilateral ankle edema (swelling), but had no calf tenderness and a negative Homann's sign (a physical examination test for deep vein thrombosis). Her edema was assumed to be positional (i.e., her legs in a prolonged dependent position) and leg elevation during rest periods was recommended.

On June 19, 2005, decedent collapsed in the shower. Resuscitative efforts were instituted by BDDSO staff including CPR, intravenous dextrose, and oxygen. After CPR, she again became responsive and was agitated. On the arrival of the paramedics, decedent was given intravenous atropine and was intubated for ventilatory support. She was transported to the hospital where she was pronounced dead shortly thereafter. At autopsy decedent was found to have bilateral embolism and bilateral deep vein thrombosis ("DVT").

Decedents' care providers could not have reasonably anticipated that she would develop DVT and a fatal pulmonary embolism because she had none of the currently accepted risk factors or symptoms that are recognized to increase the likelihood of a diagnosis of DVT. Decedent also continued to receive physical therapy, continued to ambulate with assistance of BDDSO staff, and appeared to remain completely asymptomatic for the three weeks preceding her death. The oversight, monitoring, evaluation, and treatment of decedent by BDDSO staff was thorough and according to the accepted standard of care.

The Complaint, in whole or in part, fails to state a claim upon which relief can be granted. This Court lacks jurisdiction over the subject matter of the cause of actions set

forth in the Complaint in that the federal claims do not rise to a constitutional level and this Court lacks subject matter jurisdiction over any state law claims by Plaintiffs. To succeed on their substantive due process claims, Plaintiffs must show that the state's action was arbitrary, conscience-shocking, or oppressive in a constitutional sense and not merely incorrect or ill-advised. Catanzaro v. Weiden, 188 F.3d 56, 64 (2d Cir. 1999).

In the context of a state's affirmative duties arising out of the fact that an individual is in the custody or care of the state, officials may be liable under 42 U.S.C. § 1983 only if their omissions were a substantial factor leading to the denial of a constitutionally protected liberty or property interest, and the officials displayed a mental state of deliberate indifference with respect to those rights. Doe v. New York City Dept. of Social Servs., 649 F.2d 134, 141 (2d Cir. 1981).

In determining whether the State has met its constitutional obligations to mentally retarded residents of state facilities, decisions concerning the care of such individuals that are made by an appropriate professional are presumed valid and may only be challenged if the decision "is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." Youngberg v. Romeo, 457 U.S. 307, 323 (1982).

The alleged injuries sustained by Plaintiffs in this action were caused in whole or in part by the conduct of one or more parties or entities for whose conduct these Defendants are not responsible. Plaintiffs cannot recover damages against individual supervisory defendants based upon the legal theory of respondeat superior.

Plaintiffs have failed to state a claim against Defendants by failing to allege with specificity their personal involvement in the events which are alleged to have caused Plaintiffs' injuries. Defendants are protected from liability by qualified immunity because at all relevant times herein acted without malice, in good faith, and under the reasonable belief that their actions were reasonable and did not violate any clearly established constitutional rights of Plaintiffs. Any alleged conduct or omission was, in whole or in part, properly within the discretionary authority committed to Defendants to perform their official functions, and the relief requested would constitute an improper intrusion by the federal judiciary into that discretionary authority. Plaintiffs were not deprived of any rights, privileges or immunities secured to them under the United States Constitution, the laws of the United States, or the laws of the State of New York.

Most cases Section 504 of the Rehabilitation Act and Title II of the ADA adopt the same standards which prohibit discrimination against qualified individuals by requiring that they receive reasonable accommodations that permit them to have access to and take a meaningful part in public services and public accommodations. Henrietta D. V. Bloomburg, 331 F.3d 261, 272 (2d Cir. 2003). Plaintiffs must establish that decedent was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or that she was subjected to discrimination by that entity. See, e.g., 42 USC § 12132.

Defendants have no official policy, custom, statute or regulation which permits or promotes the violation of any person's civil rights, and, moreover, no official policy, custom, pattern or practice of Defendants caused Plaintiffs any injury. Any claims brought pursuant to 42

U.S.C. Section 1983 against the Defendants in their official capacity for money damages are barred by the Eleventh Amendment to the United States Constitution. Defendants at no time acted willfully or in malicious disregard of Plaintiffs' constitutional rights. As such, Plaintiff is not entitled to punitive or other relief.

## V. ISSUES TO BE TRIED

Whether decedent Young was denied necessary health and related care by OMRDD and the individual Defendants which caused her physical and emotional suffering and pain, and hedonic losses, and ultimately her death within the meaning of the Fourteenth Amendment to the United States Constitution.

Whether decedent Young was denied health and related care which caused her physical and emotional suffering and pain and ultimately to her death as the result of discrimination within the meaning of the ADA and Rehabilitation Act.

Whether the plaintiffs herein suffered a loss of companionship and familial relations as a result of the death of Valerie Young.

## VI. PLAINTIFF'S EXHIBITS

**PX 1**     Adaptive Equipment Shop February 3, 2005 Work Request (Bates 8721);

**PX 2**     Adaptive Equipment Shop April 26, 2005 Work Request (Bates 8720);

**PX 3**     Adaptive Equipment Shop May 10, 2005 Work Request (Bates CQC196);

**PX 4**     Adaptive Equipment Shop May 20, 2005 Work Request (Bates CQC195);

**PX 5**     Autopsy Report dated June 20, 2005, Office of Chief Medical Examiner, City of New York, Frede I. Frederic, MD (Bates 0099 - 0102);

**PX 6**     Case Conference of December 17, 2004 (Bates 7781-82);

**PX 7**     Case Conference of December 24, 2004 (Bates 7779-80);

**PX 8**     Case Conference of November 5, 2005 (Bates 7783-84);

**PX 9**     Death Transcript, New York State Department of Health and Hygiene re: Valerie Young Denise Young (Bates P000010);

**PX 10**    Defendants' Initial Disclosure pursuant to Rule 26(a)(1);

**PX 11**    Defendants' Interrogatory Answers and Production Response dated November 30, 2007;

**PX 12**    Fax cover page of July 28, 2005 July 28, 2005 with attached documents (Bates 0128 through 0130);

**PX 13**    Incident Report June 25, 2004 (Bates 8976-8988);

**PX 14**    Incident Report, June 24, 2003 (Bates 8815-17);

**PX 15**    Incident Report, May 20, 2005 (Bates 0199 *et seq.*);

**PX 16**    Individualized Program Plan Review of January 12, 2005 (Bates 7787 – 7794);

**PX 17**    Individualized Program Plan Annual of April 13, 2005 (Bates 7629 – 7682);

**PX 18**    Interdisciplinary Treatment Team Notes March 14, 2005 – June 19, 2005 (Bates 8153 and 8186 – 8192).

**PX 19**    Letter dated November 5, 2005 directed to the Commission in response to their investigation of the death of Valerie Young, sent on behalf of BDC under the signature of Judith Beer (Bates CQC5);

**PX 20**    Letter November 15, 2005, New York State Commission on the Quality of Care directed to defendant Peter Uschakow (Bates CQC14);

**PX 21**    Letter November 15, 2005, New York State Commission on the Quality of Care directed to plaintiff Mrs. Viola Young (Bates CQC13);

**PX 22**    Letter October 24, 2005, New York State Commission on the Quality of Care to Peter Uschakow (final agency determination) (Bates 0095 - 0096) with attachment (Bates CQC267 - CQC271);

**PX 23**    Log Books (Core Office) from March 21, 2005 through June 16, 2005, (Bates 9917 – 9976);

**PX 24**    Log Books (Wing 315) from March 18, 2005 through June 23, 2005, (Bates 9977 – 10069);

**PX 25**    Log entry page (Special Observation) timed and dated from 3:00 pm - 8:15 pm on June 19, 2005 (Bates CQC76)

**PX 26**    Log entry pages (Special Observation) timed and dated from 3:00 pm - 9:30 pm on June 19, 2005 (Bates 0129 - 0130);

**PX 27**    Manual, Policy & Procedure, Brooklyn Developmental Center;

**PX 28**    Memorandum of February 16, 2005 from defendant Hayes to one Donna Carter with a copy to defendant Ferdinand (Bates 0273);

**PX 29**    Memorandum of January 20, 2005 from defendant Ferdinand to all Building 3-1 supervisors (Bates 0274);

**PX 30**    Memorandum of January 26, 2005 from defendant Ferdinand to defendant Hayes (Bates 0267);

**PX 31**    Memorandum of July 13, 2005 to Peter Uschakow regarding a complaint made by Mrs. Viola Young concerning Valerie's treatment at BDC (Bates 0003);

**PX 32**   Memorandum of November 5, 2004, renewed December 22, 2004 from defendant Ferdinand directed to all staff (Bates 0013);

**PX 33**   Neurology Consultation and Report dated April 26, 2005 (Bates 8134);

**PX 34**   Nursing Notes March 16, 2005 – June 19, 2005 (Bates 8342-8349);

**PX 35**   Occupational Therapy Consultation and Report dated April 21, 2005 (Bates 8177);

**PX 36**   Occupational Therapy Consultation and Report dated May 20, 2005 (Bates 8178)

**PX 37**   Occupational Therapy Note dated April 27, 2005 (Bates CQC197);

**PX 38**   Physical Therapy Consultation dated April 27, 2005 and report dated May 2, 2005 (Bates 8176);

**PX 39**   Physical Therapy Discharge Notification, October 1, 2003 (Bates 8723);

**PX 40**   Podiatry Consultation and Report dated May 11, 2005 (Bates 8179);

**PX 41**   Psychiatry Consultation and Report dated September 17, 2004 (Bates CQC138);

**PX 42**   Radiology Consultation and Report dated May 5, 2005 (Bates 8180-81);

**PX 43**   Report, Case Analysis and Death Investigation, New York State Commission on Quality of Care (Bates Nos. CQC6 - CQC10);

**PX 44**   Case Conference of April 20, 2005 (Bates 7743-44).

**PX 45**   Treatment Team (ITT) Notes November 1 - 5, 2004 (Bates 8147);

**PX 46**   Undated note produced pursuant to Subpoena by the New York State Commission on the Quality of Care documenting Mrs. Viola Young's complaint concerning the death of her daughter, Valerie (Bates CQC26);

Plaintiffs reserve the right, in the event that the Court rules in Plaintiffs' favor on any motions in limine, to request the exclusion or redaction of any information from any document to be offered at trial by either party in that pertains to any defense that the Court has ruled is not at issue in this trial.

Plaintiffs reserve the right to modify their exhibit or witness list pursuant to the Court's rulings on any motion in limine.

Plaintiffs further reserve the right to introduce the deposition testimony of witnesses during cross-examination of those witnesses, and to introduce or offer into evidence any other impeachment material as needed.

## VII.  DEFENDANT'S EXHIBITS

**DX A**    Plaintiff's Complaint;

**DX B**    Report of Death, dated June 21, 2005 (Bates 0081-0084);

**DX C**    Investigation report, dated June 24, 2005 (Bates 0087-0093);

**DX D**    Letter from Quality Commission to Judith Beer, dated November 5, 2005, in response to their investigation (Bates 0094);

**DX E**    Letter from Mark Rappaport to Peter Uschakow, dated October 24, 2005, with final agency determination (Bates 0095-0096);

**DX F**    Report of Autopsy, dated August 3, 2005 (Bates 0099-0102);

**DX G**    Mortality Review, dated July 26, 2005 (Bates 0110-0113);

**DX H**    Investigative Report for Incident of May 20, 2005, dated May 26, 2005 (Bates 0205-0209);

**DX I**    Investigative Reports for Incident of December 21, 2004, dated December 28, 2004, January 10 and 24, 2005 (Bates 0251-0260);

**DX J**    Special Case Conference Summary of Meeting for Incident of December 21, 2004, dated December 24, 2004 (Bates 0262);

**DX K**    Case Conference, dated April 20, 2005 (Bates 7743-7744);

**DX L**    Case Conference of November 5, 2004 (Bates 7783-7784)

**DX M**    Case Conference of December 17, 2004 (Bates 7781-7782);

**DX N**    Case Conference of December 24, 2004 (Bates 7779-7780):

**DX O**    Individualized Program Plan Review of January 12, 2005 (Bates 7787 - 7794);

**DX P**    Individualized Program Plan Annual of April 13, 2005 (Bates 7629-7682);

**DX Q**    Special Case Conference, dated April 20, 2005 (Bates 7743-7744);

**DX R**    Individual Program Plan Review Meeting, dated October 18, 2004;

**DX S**    Neurology Consultation and Report, dated April 26, 2005 (Bates 8134);

**DX T**    Interdisciplinary Treatment Team Notes, January 16 - June 19, 2005 (Bates 8152-8155, 8179-8192);

**DX U**    Medical Report, April 7, 2005 (Bates 8156-8157);

**DX V**    AIMS Scale, April 7, 2005 (Bates 8158-8159);

**DX W**  Medical Report for left foot drop, dated May 2, 2005 (Bates 8176);

**DX X**  Medical Report for helmet, dated April 27, 2005 (Bates 8177-8178);

**DX Y**  Radiology Consultation and Report, dated May 5, 2005 (Bates 8180-8181);

**DX Z**  Medication and Treatment Records, November 2004 to June 2005 (Bates 8449 - 8512);

**DX AA**  Medication Reviews, October 2004 to April 2005 (Bates 8685- 8687);

**DX AB**  Letter to Viola Young regarding medication, dated January 12, 2005 (Bates 8743-8746);

**DX AC**  Letter to Viola Young regarding medication, dated April 24, 2005 (Bates 8747-8746-8750);

**DX AD**  Clinical Nursing Notes, October 2004 to June 2005 (Bates 8341-8358);

**DX AE**  Log Book entries for December 2004 to June 2005 (Bates 9089-9155, 9917-10069);

**DX AF**  Defendants' expert Diane Sixsmith's expert and rebuttal reports;

**DX AG**  Plaintiffs' expert Richard Bindie's expert and rebuttal reports;

**DX AH**  Behavior Management Review Committee Addendum, Dated April 8, 2005 (Bates 8761-8765);

**DX AI**  Behavior Management Review Committee Addendum, Dated January 6, 2005 (Bates 8775-8777);

**DX AJ**  Evaluation Summary and Service Plan, dated May 2, 2005 (Bates 8691); and

**DX AK**  Clinical Nursing Notes from January 2004 to June 2005 (Bates 8341-8385).

Defendants reserve the right, in the event that the Court rules in defendants' favor on their motions in limine to limit the scope of the issues to be tried, to request the exclusion or re-daction of any information from any document to be offered at trial by either party that pertains to claims that the Court has ruled are not at issue in this trial.

Defendants also reserve the right to modify their exhibit or witness list pursuant to the Court's rulings on the motions in limine.

Defendants further reserve the right to introduce the deposition testimony of witnesses during cross-examination of those witnesses, and to introduce or offer into evidence any other impeachment material as needed.

## VIII.  STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

Plaintiffs object to the admission into evidence of the expert witness reports of the parties' retained experts.

## IX. PLAINTIFF'S WITNESS LIST

Arya, Suresh (Defendant)

Bindie, Richard, M.D. (Plaintiff's expert forensic pathologist)

Ferdinand, Kathleen (Defendant)

Hayes, Gloria (Defendant)

Lee, Loretta (Plaintiff, decedent's sister)

Milos, Jovan (Defendant)

Rappaport, Mark (Investigator, New York State Commission on the Quality of Care and Advocacy for Persons with Disabilities)

Uschakow, Peter (Defendant)

Williamson, Jan (Defendant)

Young, Sidney (Plaintiff, decedent's brother)

Young, Viola (Plaintiff, decedent's mother)

Plaintiffs reserve the right to call any of the Defendants' witnesses during their case in chief, and reserve the right to call rebuttal witnesses.

## X. DEFENDANT'S WITNESS LIST

1.  Peter Uschakow, BDDSO Director, retired (Defendant, he is familiar with the policies and practices of OMRDD with regard to medical care and treatment provided to decedent Valerie Young at BDDSO.);

2.  Jan Williamson, BDDSO Deputy Director Operations (Defendant, she is familiar with the policies and practices of OMRDD with regard to medical care and treatment provided to decedent Valerie Young at BDDSO.);

3.  Gloria Hayes, BDDSO Residential Unit Supervisor (Defendant, she is familiar with the medical care and treatment provided to decedent Valerie Young at BDDSO.);

4.  Kathleen Ferdinand, BDDSO Treatment Team Leader (Defendant, she is familiar with the medical care and treatment provided to decedent Valerie Young at BDDSO.);

5.  Dr. Jovan Milos, BDDSO Medical Doctor Jovan Milos (Defendant, he is familiar with the medical care and treatment provided to decedent Valerie Young at BDDSO.);

6.  Suresh Arya, HVDDSO Deputy Director Operations Suresh Arya (Defendant, he is familiar with the medical care and treatment provided to decedent Valerie Young at BDDSO.);

7.  Rappaport, Mark (Investigator, New York State Commission on the Quality of Care and Advocacy for Persons with Disabilities);

8.  Beer, Judith (BDDSO Quality Assurance Coordinator) and,

9.  Dr. Diane M. Sixsmith, M.D., M.P.H., FACEP (Defendants' medical expert).

Defendants reserve the right to call any of the Plaintiff's witnesses during their case in chief, and reserve the right to call rebuttal witnesses.

## XI.  RELIEF SOUGHT

Plaintiffs seeks general damages for pain and suffering) and hedonic losses for the Estate of

Young, and damages for loss of companionship and familial relations on behalf of plaintiffs Vi-

ola Young (mother), Loretta Lee (sister) and Sidney Young (brother).

//

TOTAL P.82

U.S.D.J.

7/2/08

Respectfully submitted by:

OFFICE OF ANDREW M. CUOMO, ATTORNEY
GENERAL OF THE STATE OF NEW YORK

John L. Velez
Edward Curtis
Assistant Attorneys General
120 Broadway, 24ᵗʰ Floor
New York, NY 10271-0332
Tel.: (212) 416-8164/8641
Counsel for Defendants

Dated: July 1, 2008
New York, New York

CATAFAGO LAW FIRM, PC

Jonathan Bauer, Esq.
Jacques Catafago, Esq.
Empire State Building
350 Fifth Avenue, Suite 4810
New York, NY 10118
Tel.: (212) 239-9669
Counsel for Plaintiffs

Dated: July 2, 2008
New York, New York

P.82

71    14:82  JUL-01-2008

# EXHIBIT D

1

COPY

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------------------X

5    Estate of VALERIE YOUNG, by VIOLA YOUNG, as
     Administratrix of the Estate of Valerie Young,
6    and in her personal capacity, SIDNEY YOUNG, and
     LORETTA YOUNG LEE,
7
                         Plaintiffs,
8
                    -against-                    Index No.
9                                                07CV6241

10   STATE OF NEW YORK OFFICE OF MENTAL RETARDATION
     AND DEVELOPMENTAL DISABILITIES, PETER USCHAKOW,
11   personally and in his official capacity, JAN
     WILLIAMSON, personally and in her official
12   capacity, SURESH ARYA, personally and in his
     official capacity, KATHLEEN FERDINAND, personally
13   and in her official capacity, GLORIA HAYES,
     personally and in her official capacity, DR.
14   MILOS, personally and in his official capacity,
                         Defendants.
15
     -------------------------------------------X
16

17

18              EXAMINATION BEFORE TRIAL of the

19   Plaintiff, VIOLA YOUNG, taken by the Defendant,

20   pursuant to Notice, held at the Office of the

21   Attorney General, 120 Broadway, New York, New

22   York  10271, on January 29, 2008, at 10:20 a.m.,

23   before a Notary Public of the State of New York.

24

25

```
                                                        4
 1

 2    VIOLA YOUNG,

 3         having been first duly sworn by a

 4         Notary Public of the State of New

 5         York, was examined and testified as

 6         follows:

 7

 8    EXAMINATION BY

 9    MR. VELEZ:

10         Q.    Please state your name for the

11    record.

12         A.    Viola Young.

13         Q.    What is your address?

14         A.    259 East 49th Street, Brooklyn, New

15    York  11203.

16         Q.    Good morning.

17         A.    Good morning.

18         Q.    As you know since you sat in the

19    depositions of your son and of your daughter --

20         A.    Yes.

21         Q.    -- that being Sidney Young and

22    Loretta Lee.  My name is Jose Velez.  I am an

23    assistant attorney general.  I represent the

24    defendants, the State of New York Office of

25    Mental Retardation and Developmental
```

5

1                        V, YOUNG

2     Disabilities, Brooklyn Developmental Disabilities

3     Service Office Director Peter Uschakow.   From

4     that same facility Deputy Director of Operations

5     Jan Williamson, Residential Unit Supervisor

6     Gloria Hayes.  Treatment Team Leader Kathleen

7     Ferdinand and Medical Doctor Dr. Jovan Milos, and

8     also, Hudson Valley Developmental Disability

9     Service Office Deputy Director of Operations

10    Suresh Arya in their official capacities  --

11            A.    That Hudson Valley, I never heard

12    of that name before.

13            Q.    -- in their official capacity and

14    individually.

15            A.    Okay.

16            Q.    What happened was Mr. Arya used to

17    work in the Brooklyn Developmental Center, but he

18    now works in the Hudson Valley.

19            A.    Okay.

20            Q.    This is how we will proceed.  I

21    will ask you some questions to find out your

22    background and about the facts giving rise to

23    this lawsuit.

24            If you do not hear a question, just

25    say so and I will repeat it.

6

1                           V, YOUNG

2                    If you do not understand a

3      question, say so and I will try to rephrase

4      it.

5                    Also, please wait until I have

6      finished asking each question before you answer

7      it.  Please answer all questions with a verbal

8      response so the Court Reporter can properly put

9      your answer in the transcript.

10           A.     No problem.

11           Q.     If you want to stop to use the

12     restroom, to stretch yourself to get some water,

13     say so and you will be permitted to do so.

14           A.     Okay.

15           Q.     Do you understand the instructions

16     I have just given you?

17           A.     Yes.

18           Q.     Are you currently on any

19     medications that will cause any problems with

20     answering any questions today?

21           A.     No.

22           Q.     Is there any reason why you cannot

23     be deposed today?

24           A.     Deposed?

25           Q.     Is there any reason why we can't do

```
                                                    7
 1                          V, YOUNG

 2     what we are doing today?

 3              A.   No.

 4              Q.   So there is no reason why you

 5     cannot have your deposition taken today?

 6              A.   No.

 7              Q.   How have you prepared for this

 8     deposition?

 9              A.   How have I been prepared?

10              Q.   Yes.

11              A.   I haven't prepared.

12              Q.   Did you meet with your attorneys?

13              A.   No, he called me and told me.

14              Q.   Who is he?

15              A.   Jonathan called and told me that we

16     are supposed to come here today.

17              Q.   Did you discuss with him at all

18     what was going to happened?

19              A.   No.

20              Q.   You didn't discuss the case with

21     him at that point?

22              A.   No.

23              Q.   Did you review any documents

24     related to this case?

25              A.   I have some.
```

8

1                          V, YOUNG

2           Q.    Do you have them with you?

3           A.    Yes.

4           Q.    Could I take a look at them?

5                 MR. KAISER:  Objection.  When I

6    object you can answer and you can respond to

7    Mr. Velez's questions or requests, but I am just

8    going to preserve a record.

9                 THE WITNESS:  Okay.

10          Q.    Are these the only documents that

11   you have related to this case?

12          A.    Yes.

13          Q.    Are you aware that we have produced

14   approximately ten thousand pages of documents to

15   your attorneys related to this lawsuit?

16          A.    No.

17          Q.    They haven't showed you any of

18   those documents?

19          A.    No.

20                MR. VELEZ:  So besides those

21   documents that you just showed me -- I guess for

22   the record, it is partially redacted letter to

23   Peter Uschakow dated October 24th from Mark

24   Rappaport, Quality Assurance Facility, from the

25   State of New York Quality of Care and Advocacy

```
                                                       9
 1                          V, YOUNG

 2      for persons with disabilities.  Also, from Mark

 3      Rappaport to Mr. Uschakow, another letter dated

 4      November 15th.  It is a one-page letter.  Another

 5      letter dated November 5, 2005, from Dr. Judith

 6      Beer, B-E-E-R, to Mark Rappaport.  It is a letter

 7      relating coming up with suggestions on dealing

 8      with individuals with DVT's.

 9              Q.    Besides looking at those documents,

10      did you do any other type of preparation for this

11      deposition?

12              A.    No.

13              Q.    Will you please state your full

14      name for the record?

15              A.    Viola Young.

16              Q.    What is your date and place of your

17      birth?

18              A.    4/27 -- oh, you want the date?

19              Q.    Well, date and place of birth?

20              A.    4/27/31.

21              Q.    Where were you born?

22              A.    North Carolina, Nashville.

23              Q.    Where?

24              A.    Nashville, North Carolina.

25              Q.    You have already stated your
```

```
                                                     10
 1                         V, YOUNG

 2      address for the record; is that correct?

 3              A.    Yes.

 4              Q.    What is your marital status?

 5              A.    I am a widow now.

 6              Q.    When were you married and where?

 7              A.    I was married December 26, 1947, in

 8      Nashville, North Carolina.

 9              Q.    What is the name of your husband?

10              A.    Sidney A. Young.

11              Q.    How many children do you have?

12              A.    Three.

13              Q.    Are you including Valerie in that

14      also?

15              A.    Yes.

16              Q.    Thank you.

17                    You mentioned that you are a widow,

18      when did your husband die?

19              A.    October 23, 2002.

20              Q.    What schools did you go to,

21      starting from high school?

22              A.    I went to school in North Carolina.

23              Q.    Did you finish high school there?

24              A.    Yes.

25              Q.    Did you go onto any college?
```

```
                                                    11
 1                          V, YOUNG

 2           A.    No.

 3           Q.    What jobs have you had since high

 4      school?

 5           A.    Well, when I first came to New

 6      York, I worked in some factories, then I did --

 7      my kids were Young, I did eight years as a school

 8      crossing guard.  I worked with the Department of

 9      Veterans Affair, VA Medical Center for 28 years.

10           Q.    What did you do there?

11           A.    Nursing assistant.

12           Q.    When did you stop working there?

13           A.    I retired in 1996.

14           Q.    Did you work at all when you were

15      in North Carolina?

16           A.    No.

17           Q.    The only employment has been here

18      in here for the jobs that you stated?

19           A.    Yes.

20           Q.    Were you providing any financial

21      support for Valerie Young?

22           A.    She was getting my husband's Social

23      Security.

24           Q.    SSI or Social Security?

25           A.    Whatever they call it.  Social
```

```
                                              12
 1                          V, YOUNG

 2     Security at BBC.

 3              Q.    When you say, "she was getting it,"

 4     what do you mean?

 5              A.    They sent a check there for her

 6     every month.

 7              Q.    Do you know how much the amount

 8     was?

 9              A.    I know one time I knew it was $925

10     a month.  I forget what year it was.  Every year

11     Social Security gives increases.  I don't know

12     what the last one was.

13              Q.    So you are saying that was from

14     your husband's Social Security benefits?

15              A.    Yes.

16              Q.    Did anyone else provide financial

17     assistance to her?

18              A.    The only thing I did, I bought most

19     of her clothes.  I always bought clothes for her.

20     I didn't like the clothes that they gave her.

21              Q.    Can you tell me a little bit about

22     your deceased husband.  You mentioned his name,

23     what age was he when he was passed away?

24              A.    He was born in 1925 so I think he

25     was 75 or 76, I think.
```

```
                                                    13
 1                              V, YOUNG
 2              Q.    He was living with you when he
 3    deceased?
 4              A.    Yes.
 5              Q.    What was his highest level of
 6    education?
 7              A.    He was in high school, I know that.
 8              Q.    But you are not sure whether he
 9    graduated from high school?
10              A.    I don't think he graduated from
11    high school.
12              Q.    What was his employer?  Who did he
13    work for?
14              A.    He retired from UPS.
15              Q.    How many years was he with UPS?
16              A.    Over 20 years.  Before that he was
17    a cab driver.
18              Q.    Your kids have followed in your
19    footsteps.  You spent over 20 years with the VA,
20    your husband with UPS; how many years did you say
21    he was with UPS?
22              A.    Over 20 years.
23              Q.    I think your daughters spent 30
24    years with Citibank and your son 20 years with
25    the Department of Corrections?
```

```
                                                    14
 1                          V, YOUNG

 2              A.    Yes.

 3              Q.    Let's talk a little bit about

 4     Valerie Young.

 5              A.    Okay.

 6              Q.    What was her date of birth?

 7              A.    August 6, 1955.

 8              Q.    How long has she lived in your

 9     household?

10              A.    Until she was 35 years old.

11              Q.    At that age was when she was

12     institutionalized to the Brooklyn Developmental

13     Center?

14              A.    Yes.

15              Q.    What were the reasons that she left

16     your household and went to Brooklyn Developmental

17     Center?

18              A.    Well, she had a behavior problem.

19     I think it was always her and I were home because

20     my husband always worked evenings.  It looked to

21     be when he retired, she just resented him being

22     home.  She just wanted -- she was accustomed to

23     her and I being home most of the time.  I know

24     she had behavior problem.

25              Q.    When you say behavior problems, can
```

15

1                          V, YOUNG

2      you be more specific?  What behaviors was she

3      engaging in?

4              A.    Boy, I know sometimes if my husband

5      would be sitting at the table she would walk in

6      and you know, hit him.  Usually when she would

7      get her monthly she would be a little agitated.

8      I was always giving her medication before that

9      time.

10             Q.    When you say "agitated," is that

11     also angry too?

12             A.    No.  You know, she couldn't express

13     herself, so I guess, she was in pain, and that

14     caused a lot of that behavior.  When you can't

15     express yourself and you have pain, see I was

16     mostly with her all the time and I could tell if

17     she wasn't feeling well.

18             Q.    So what you are describing physical

19     behavior, was it directly mostly at your husband,

20     her father?

21             A.    Valerie went out to a program.

22     Valerie started the pilot class at seven years

23     old.  She was with the HRC until she became 21.

24     Then after that, I think she went to that

25     workshop for a little while.

16
1                              V, YOUNG

2          Q.   Could I stop you?  These programs

3     you are describing she would go during the day --

4          A.   And come back home at night.

5          Q.   Continue.

6          A.   She went to Young Adult Institute

7     also.

8          Q.   How long did she stay there?

9          A.   She went a long time, she was

10    home -- she hadn't been out of the adult

11    institute before we had to have her moved.

12         Q.   Close to the age of 35?

13         A.   The older she got more agitated she

14    would get.

15         Q.   When she would get agitated would

16    be at your husband; would she also get agitated

17    at you?

18         A.   Sometimes.  She had a lot of

19    stripping and you know.

20         Q.   Then her siblings too?

21         A.   She was on medication.

22              MR. KAISER:  Objection to form.

23         A.   She would love to put things in the

24    drawers and just a lot of things she was doing.

25         Q.   This agitation, she would sometimes

17

1                          V, YOUNG

2       direct this to her siblings, her brother and her

3       sister; is that correct?

4              A.    At that time when they were home

5       you know, she was pretty calm.  She was going out

6       every day.  The older she got, you know, the more

7       aggressive she got.  She was hard to get dressed.

8       We would have a lot of problems to put the

9       clothes on.  She liked to strip a lot.

10             Q.    Just to be clear.  The more

11      aggressive she got, it was everybody who was in

12      the household.  It could have been the father,

13      the mother?

14             A.    Sometimes I used to go to work, she

15      would pull off the clothes.  And he would be

16      calling me she would pull off her clothes.

17      Things like that.

18             Q.    You were saying the more agitated

19      she got, so what happened the last years that she

20      was in the household.  You and your husband had

21      discussions about how it was becoming difficult

22      to manage her?

23             A.    Yes, it was getting difficult to

24      manage her.

25             Q.    Did anything in particular happened

18

1                              V, YOUNG

2      or was it just what was happening on a daily

3      basis?

4               A.    On a daily basis, things like that.

5               Q.    Who made the decision that maybe

6      you need to have her put in an institution?

7               A.    I had people come to help me get

8      her dressed.  I guess, she saw how we used to

9      struggle and trying to get her clothes on and

10     things like that.

11              Q.    Who were these people that came?

12              A.    I think they came from HRC.  I

13     can't remember.  I forgot.

14              Q.    It was either a state or city

15     agency?

16              A.    I know they were coming from an

17     agency, I guess, it was.

18              Q.    It wasn't friends?

19              A.    It wasn't friends.  It was someone

20     from there.

21              Q.    Was it hard for Valerie when she

22     was first removed from the house?

23              A.    Yes and me.

24              Q.    Did it take her a while to adopt to

25     her new --

19

1                              V, YOUNG

2              A.    Yes, it took her a while.

3              Q.    How long did it take?

4              A.    I guess, it took maybe months or a

5      year before she adjusted.  I used to bring her

6      home on weekends and she wouldn't want to go

7      back.

8              Q.    When was the last time that you

9      brought her home before June 19, 2005?

10             A.    The last time I brought Valerie

11     home, it was before my husband died.  I would --

12     let me see, I am trying to think.  Because when

13     he was okay and well, I would bring him, but when

14     I didn't have any help, it wasn't easy for me to

15     bring her home.

16             Q.    You testified earlier that your

17     husband passed away in 2002?

18             A.    Yes.

19             Q.    So you are saying the last time you

20     brought Valerie home would have been some time

21     before 2002?

22                   MR. KAISER:  Objection.

23             A.    I would want to bring her home, but

24     I would like someone to come with me, but they

25     always said they didn't have enough staff so

```
                                              20
  1                      V, YOUNG

  2    that's one reason I didn't bring her home that

  3    much.

  4          Q.    How about your son?  Couldn't he

  5    have helped you?

  6          A.    My kids work, I can't depend on

  7    them.  They live in Queens, I live in Brooklyn.

  8    They work all different days.

  9          Q.    Are you serving as the

 10    administrator of Valerie Young's estate?

 11          A.    Yes.

 12          Q.    Have you been issued letters of

 13    administration for the estate of Valerie Young?

 14          A.    What?

 15          Q.    Have you been issued letters of

 16    administration for the estate of Valerie Young?

 17          A.    What?

 18          Q.    Letters of administration.

 19          A.    Explain that.

 20          Q.    Wasn't there an order from April

 21    13, 2006, from the New York State Surrogates

 22    Court Kings County?

 23                MR. KAISER:  I am going to object.

 24          Q.    Did you get any order from the

 25    Surrogates Court regarding the estate of Valerie
```

```
                                      21
1                    V, YOUNG

2     Young?

3          A.    Yes, I guess.

4          Q.    Did you go to Surrogates Court to

5     be named the administrator of Valerie Young's

6     estate?

7                MR. KAISER:  Objection.

8          Q.    In Kings County in Brooklyn?

9          A.    I didn't go to Kings County, I

10    don't think.

11         Q.    But isn't your testimony you were

12    the administrator of Valerie Young's estate; is

13    that correct?

14         A.    Yes.

15         Q.    How did you become the

16    administrator of her estate?

17         A.    I am her parent.

18         Q.    I understand that.

19               Did you go anywhere?  Did an

20    attorney assist you --

21               MR. KAISER:  Objection.

22         Q.    -- with the process of being named

23    the administrator?

24         A.    I have to show you the papers.  I

25    am going to show you.
```

1                          V, YOUNG

2            Q.    Do you remember after Valerie

3    passed away that you had a lawyer help you with

4    being named the administrator of her estate?

5                  MR. KAISER:  Objection.

6            A.    I can't recall right now.  I can't

7    recall.

8            Q.    Ms. Young, why did you want to

9    become the administrator of Valerie Young's

10   estate?

11           A.    Why did I want to become?

12           Q.    Yes.

13           A.    Yes, because I am her parent.  I am

14   supposed to be the administrator of her estate.

15   Right?

16           Q.    But you didn't necessarily have to

17   handle her personal affairs after she passed

18   away?

19           A.    Yes, I always did that.  I always

20   did that.

21           Q.    Did anyone recommend that you

22   become the administrator of her estate?

23           A.    You know, I have to check my papers

24   because I am not sure.

25           Q.    Do you remember anyone telling you

23

```
 1                          V, YOUNG
 2    that you needed to become the administrator of
 3    her estate so you can file a lawsuit?
 4              MR. KAISER:  Objection.
 5         A.    Maybe I do have papers, I am not
 6    sure.
 7              MR. VELEZ:  Counsel, I request to
 8    the extent that she does have the papers that we
 9    be provided a copy of it.
10              THE WITNESS:  I have to check my
11    papers and see.
12              MR. VELEZ:  Counsel I will say more
13    than under advisement because the caption in this
14    lawsuit says, "Estate of Valerie Young by Viola
15    Young as administratix of the Estate of Valerie
16    Young."
17              So to the extent documents like
18    that haven't been produced I think we are
19    entitled to see them.
20              MR. KAISER:  You are making a
21    demand so I will check our file.
22         Q.    Did Valerie Young leave a will?
23    She didn't leave a will; right?
24              MR. KAISER:  Objection.
25         A.    No, she didn't leave a will.
```

```
                                                          24
 1                          V, YOUNG

 2          Q.    Now, what does her estate consist

 3    of that you went through the legal process of

 4    being named the administrator of her estate?

 5          A.    (No response).

 6          Q.    In other words, did she have any

 7    assets, did she own anything?

 8          A.    (No response).

 9          Q.    You need to give a verbal response.

10                MR. KAISER:   Objection.

11          A.    No, she didn't own anything.

12          Q.    Did she have any insurance

13    policies?

14          A.    (No response).

15          Q.    Were there any insurance policies?

16          A.    She had a small one.

17          Q.    When you say small, what was the

18    amount?

19          A.    Because they don't insure mentally

20    challenged.  No more than one thousand dollars.

21          Q.    Do you know what company that

22    policy was with?

23          A.    Roosevelt Savings Bank.

24          Q.    Any other possible assets, did she

25    have any IRAs'?
```

25

```
 1                              V, YOUNG

 2              A.    No.

 3              Q.    Were there any checking, saving

 4       accounts in her name?

 5              A.    No.

 6              Q.    Certificate of deposits?

 7              A.    No.

 8              Q.    Any property --

 9              A.    No.

10              Q.    -- in her name?

11              A.    No.

12              Q.    That she has rights to?

13              A.    No.

14              Q.    Now, the caption indicates that you

15       are the administratrix of her estate.  Has any

16       activity taken place regarding the estate of

17       Valerie Young that you are aware of, since you

18       are the administrator?

19                    MR. KAISER:  Objection.

20              A.    (No response).

21              Q.    For example, you mentioned there

22       was a small insurance policy no more than one

23       thousand I think you said.  What happened to the

24       proceeds?

25              A.    I used it when she died to bury
```

26

1                          V, YOUNG

2       her.

3              Q.    You were the beneficiary?

4              A.    Yes.

5              Q.    Were there any other monies

6       received by you besides that small insurance

7       policy?

8                    MR. KAISER:  Objection.

9              Q.    Any other money received by you

10      besides that insurance policy?

11             A.    Well, I received $2,235 from BBC.

12      That's all.

13             Q.    Why did you receive that money?

14             A.    For her burial.

15             Q.    Did she have an account with BBC

16      and they were returning the money?

17             A.    No.

18             Q.    They helped you out with the

19      burial?

20             A.    Yes, they did.

21                   MR. KAISER:  Objection to the last

22      question.

23             Q.    So besides the insurance policy

24      from Roosevelt Savings Bank and this money from

25      BBC, was there any money received by you?

27

```
 1                            V, YOUNG

 2           A.    No.

 3           Q.    Has anyone challenged you being the

 4      administrator of her estate?

 5           A.    No.

 6           Q.    Did Valerie have any debts from

 7      credit cards?

 8           A.    No.

 9           Q.    No creditors have sought any monies

10      from her estate?

11           A.    No.

12           Q.    She didn't owe a balance on any

13      credit cards or any loans?

14                 MR. KAISER:  Objection.

15           A.    No.

16           Q.    Are you aware of any money she

17      might have expected in the future, let's say from

18      an inheritance or a gift?

19           A.    No.

20           Q.    Did you incur any expenses, as a

21      result of Valerie Young's death?

22           A.    (No response).

23           Q.    In another words, hospital or

24      medical expenses?

25           A.    No, because she had Medicaid.
```

28

1                              V, YOUNG

2          Q.    How about the funeral expenses?

3          A.    I did that.  I took care of that

4     myself.

5          Q.    That is in addition to the money

6     that you received from BBC?

7          A.    Well, you want to see the bill.

8          Q.    No.  I am trying to get an idea of

9     her estate, what money came in, what money went

10    out.  That's the reason I am asking these

11    questions.  I don't need to see any bills.

12         A.    Well, she is buried in Pine Lawn so

13    those graves out there are over $4,000.  I have

14    four graves.  She is in one and my husband is in

15    one.  Then the other things that you have to pay

16    for.

17         Q.    So you had out of expenses?

18         A.    I had out of pocket expenses.

19         Q.    Did Social Security contribute any

20    money --

21         A.    No.

22         Q.    -- after she passed away?

23         A.    No.

24         Q.    Just like yesterday I cautioned

25    your son and daughter certain questions I need to

```
                                            30
 1                    V, YOUNG

 2    with the first one, when was it and what was the

 3    reason?

 4          A.    One reason was that I went shopping

 5    in Pathmark, they had a broken bottle on the

 6    floor, and I was pushing my cart and I fell and

 7    it did damage to my feet.

 8          Q.    This is related to a lawsuit that

 9    you brought?

10          A.    Yes, I had a lawsuit.

11          Q.    When did this happened?

12          A.    Oh, in the 80's.  It was a long

13    time ago.

14          Q.    You had your deposition taken in

15    the 80's; is that correct?

16          A.    Yes.

17          Q.    What was the second time?

18          A.    The second time, I went with the

19    staff for an apartment at Kingsbrook, and all day

20    -- they had these benches, they had benches, and

21    the bench -- in the evening when we were getting

22    ready to go back to BBC, one man came and sat on

23    that bench and I was sitting in the next row and

24    that bench fell over and broke right on my leg,

25    and I am a diabetic.
```

```
 1                          V, YOUNG

 2           Q.    When did that happened?

 3           A.    Oh, boy, I don't remember the year.

 4           Q.    Would it have been in the 80's

 5    still or in the '90's?

 6           A.    No, not in the 80's.  I am not

 7    sure.  It was maybe in 2000-- it was a long time

 8    ago.

 9           Q.    You said 2000?

10           A.    Maybe 2000, I am not for sure.

11           Q.    So that was a lawsuit that you

12    brought also?

13           A.    Yes, that was a lawsuit.

14           Q.    Have you ever sat in on a

15    deposition that was taken of another person?

16           A.    No.

17           Q.    Or yesterday?

18           A.    Yesterday.

19           Q.    Besides that, have you ever sat in

20    for anyone else?

21           A.    No.

22           Q.    Have you ever been a defendant in a

23    lawsuit, which means instead of you suing

24    someone, somebody was suing you?

25           A.    (No response).
```

```
                                                  32
 1                          V, YOUNG

 2            Q.    Besides this federal lawsuit, have

 3      you ever brought any other federal lawsuits?

 4            A.    No.

 5            Q.    Have you ever brought any state

 6      court lawsuits?

 7            A.    No.

 8            Q.    You just mentioned you brought two

 9      lawsuits?

10            A.    Oh, just those.

11            Q.    Who did you sue again in the first

12      lawsuit?

13            A.    It was Pathmark.

14            Q.    What was the result of that

15      lawsuit?

16            A.    It's been so long, I don't even

17      remember.

18            Q.    Did you settle?

19            A.    Yes, we settled.

20            Q.    How much did you settle?

21            A.    A few thousand dollars, I don't

22      remember.  I don't remember exactly.

23            Q.    When you say, "a few thousand

24      dollars," can you be a little bit more specific?

25            A.    Maybe I got about $13,000 or
```

```
                                             33
 1                         V, YOUNG
 2    something like that.  That is all I remember.
 3          Q.    The second lawsuit which you said
 4    related to the bench, who did you sue in that
 5    lawsuit?
 6          A.    Well, it had to be Kingsbrook
 7    because it happened there.
 8          Q.    What was the result of that
 9    lawsuit?
10          A.    I don't remember.
11          Q.    Was there a settlement?
12          A.    Yes, but I don't remember, it was a
13    long time ago.
14          Q.    You said around 2000.  About how
15    much money you received in that lawsuit?
16                MR. KAISER:  Objection.
17          A.    I can't remember the figure.  It
18    wasn't that much.  That is for sure.
19          Q.    Was it under $10,000?
20          A.    It was under $10,000.  I am not for
21    sure.
22          Q.    Did you have attorneys in both of
23    those cases?
24          A.    Yes.
25          Q.    Do you remember the name of the law
```

```
                                              34
 1                        V, YOUNG

 2    firms or the attorneys?

 3            A.    The first one was not far from

 4    here.  I think it was 150 something -- I know

 5    that came to my attorney's name, Annette Coleman,

 6    A-N-E-T-T-E.

 7            Q.    The second one?

 8            A.    Let me see, I don't remember the

 9    address, but it was somewhere -- I am not sure

10    what street it was on.  I don't remember.  I

11    don't remember the name.

12            Q.    Besides those two lawsuits,

13    obviously we have this lawsuit now that we are

14    talking about, have you brought any other

15    lawsuits against anybody, any individual or

16    corporation?

17            A.    No.

18            Q.    Now, you filed this lawsuit in the

19    matter of Young versus State of New York Office

20    of Mental Retardation and Developmental

21    Disabilities, et.al., in federal court.

22                 Why didn't you file a claim in the

23    court of claims, New York State Court of Claims?

24            MR. KAISER:  Objection.

25            A.    I have to ask my attorney about
```

35

1                          V, YOUNG

2     that.  I don't know.

3            Q.    When you say your attorney, you

4     mean your present attorneys?

5            A.    Yes.

6            Q.    Have any of the attorneys in the

7     law firm of Jacques Catafago ever done any work

8     for you besides this lawsuit?

9            A.    No.

10           Q.    That would include that law firm or

11    none of the attorneys have ever done any work for

12    you besides for this case; is that correct?

13                 MR. KAISER:  Objection.

14           A.    Right.

15           Q.    How did they became the lawyer in

16    this lawsuit for you?

17           A.    Well, let me see.  I talked to some

18    of the parents, and they came up with his name.

19           Q.    So when you say, "some of the

20    parents," I don't understand what you mean by

21    that?

22                 MR. KAISER:  Objection.

23           A.    I looked in the telephone book and

24    I come up with these names.

25           Q.    What do you mean you spoke to some

43

1                              V, YOUNG

2              A.    She would go in the morning and

3        come home around 3:00, 4:00.

4              Q.    Did she continue doing that until

5        she finally left your household?

6              A.    Yes, up until around that time.

7              Q.    We have been discussing about

8        Valerie's mental condition while she was with

9        you?  Once she became institutionalized at the

10       Brooklyn Developmental Center, how was her mental

11       condition at that point?  Did it stay the same,

12       did it get better or did it get worse?

13             A.    Oh, boy, it didn't change that

14       much.  You know, she would have good times and

15       bad times.  Sometimes she would be calm, you

16       know, we would try different medication, things

17       like that.

18             Q.    Her agitation and her

19       aggressiveness, did that stay the same, did it

20       get better, did it get worse?

21             A.    Sometimes it would get better,

22       sometimes it wasn't.

23             Q.    So she was approximately in the BBC

24       for about 14, 15 years?

25             A.    Yes.

53
1                          V, YOUNG

2              Q.    Then during the years, what else in

3       terms of medical problems did Valerie have?  What

4       medical problems was she diagnosed with?

5              A.    Valerie she had surgery one time it

6       was a like a lymph node.  They did surgery on

7       that.

8              Q.    What other medical problems did she

9       have as the years went by?

10             A.    I am not sure what it was.

11             Q.    Did you just say, "I am not sure

12      what it was?"  I am not sure that I heard what

13      you said?

14             A.    I am trying to think.

15             Q.    Why don't you do it this way.  You

16      were talking about her left arm, sometimes her

17      right arm.  You mentioned the lymph node, any

18      other parts of her body were causing her

19      problems?

20             A.    (No response).

21             Q.    Problems with her legs?

22             A.    Oh, yes.

23             Q.    When did she first start having

24      problems with her legs?

25             A.    One time Valerie was in the --

55
```
 1                          V, YOUNG
 2    like water pills, they didn't put those special
 3    stockings on her legs.  Like they didn't take her
 4    for a CAT scan or MRI.
 5              Q.    Are you saying you didn't agree
 6    with the medical treatment they were providing
 7    her?
 8                   MR. KAISER:  Objection.
 9              A.    No, I didn't agree with some of it.
10              Q.    Now, regarding her leg, did they
11    give you a diagnosis?  Did they tell you what
12    they thought the medical condition was?
13              A.    No, they didn't.  A lot of things
14    they didn't tell me.  Just like you said, it's
15    blacked out.  When I sent out for the
16    investigation I wanted to know why there is
17    certain things there that they don't want me to
18    see.
19                   MR. VELEZ:  I provided Counsel with
20    a copy of documents that are redacted, are not
21    blacked out so --
22                   MR. KAISER:  Objection.  Off the
23    record.
24                   (Whereupon, a discussion was
25    held off the record.)
```

56

1                        V, YOUNG

2            Q.    We were talking about Valerie's

3     medical condition while she was at BBC.  We were

4     focusing on her leg.  Now, I asked you if they

5     let you know what was wrong with her leg.  Did

6     they give you a diagnosis?  I just want to

7     clarify what your answer is, did they tell you

8     and you don't remember?

9            A.    I remember the last thing they told

10    me was that she had a dropped foot.  Yes, a

11    dropped foot and they were getting a brace and

12    they never did.

13           Q.    Did they explain to you what they

14    meant by dropped foot?

15           A.    No.

16           Q.    What else did they tell about her?

17           A.    All I know is she couldn't walk --

18    I mean she could walk.  They were sending her for

19    therapy.  You know, they let her sit on a

20    wheelchair too long and  they didn't let her

21    exercise.  The only time she walked was when she

22    went to therapy on Tuesday and Thursday.  The

23    therapist told me that she needed to be walked

24    around the area during the evening.  And they

25    didn't do that.

57

```
1                           V, YOUNG

2               Q.    Who told you that they don't walk

3       her around?

4               A.    I didn't say they didn't walk

5       around.  I said they should have walked her

6       around.  When I spoke to Dr. Milos, he said the

7       therapist walk her.  She only went to see the

8       therapist on Tuesday and Thursdays.  She needed

9       like on weekends to be walked around the room.

10      They didn't do it.  You sit down all day, you

11      have to walk around if your feet were swelling.

12              Q.    Maybe I misunderstood.  Are you

13      saying they didn't walk her around or I thought

14      somebody told you they didn't walk her around?

15              A.    I don't think they walked her

16      around.

17              Q.    That's your opinion then?

18              A.    (No response).

19              Q.    Did someone tell you that or are

20      you saying you don't think they walked her

21      around?

22              A.    I don't know if it was ordered.  It

23      should have been documented to do that.  Nobody

24      told me that there was an order for her to be

25      walked around the room.  You know, what you call
```

71

```
 1                              V, YOUNG
 2      going to lead to her dying.
 3                  MR. KAISER:  Objection.
 4           A.     Lead to her dying?
 5           Q.     When you saw the swelling in her
 6      legs, did you feel that this was a dangerous
 7      condition that might lead to her death?
 8                  MR. KAISER:  Objection.
 9           A.     I worked in a hospital, I know it
10      could lead to her death.  That is why I spoke to
11      Dr. Milos.  I would ask him what he was doing, he
12      said that they were elevating her legs.  That's
13      what he told me.
14           Q.     What did you discuss with
15      Dr. Milos?  When you said you spoke to him, what
16      exactly did you tell him?
17           A.     I even asked him what was he doing
18      for Valerie.  He said, he was elevating the legs,
19      he was going to get a brace for the dropped foot,
20      but he never did.
21           Q.     Your concern was why she didn't
22      have better movement in her leg; is that right?
23                  MR. KAISER:  Objection.
24           A.     (No response).
25           Q.     Isn't that why you were speaking to
```

72

```
 1                        V, YOUNG

 2     Dr. Milos because you wanted her to have better

 3     movement in her leg?

 4            A.    I wanted her to move around, I

 5     wanted her to walk.  You have to walk to keep the

 6     circulation going.

 7            Q.    Did you discuss that with

 8     Dr. Milos?  Did you express to him that you were

 9     concerned that she would have circulation

10     problem?

11            A.    He knew I was concerned about that.

12            Q.    Did you discuss with it with him?

13            A.    Yes, I always go in there talk to

14     him.

15            Q.    What did you tell him regarding

16     that?

17            A.    Because I would see her leg would

18     be swollen.  I don't know if he made appointments

19     or not.

20            Q.    What I am still trying to find out

21     from you is, did you feel by her having that

22     dropped foot, having the swelling in her legs,

23     did you think that was a condition that was going

24     to end up killing her?

25                        MR. KAISER:  Objection.
```

76
```
 1                         V, YOUNG

 2            A.    I told you I was concerned.

 3            Q.    You specifically knew ahead of time

 4       that she would have a blood clot --

 5                  MR. KAISER:  Objection.

 6            A.    I didn't know that she would have a

 7       blood clot.  How would I know?  I am not a

 8       doctor.  I didn't know that.  I am just a nurse's

 9       assistant.  I worked in oncology.  I see these

10       thing.  We had to make nurse's notes if we

11       observed something.

12            Q.    My question now is, do you think

13       any of the defendants knew that the swelling of

14       Valerie's leg would create a blood clot that

15       would kill her?

16                  MR. KAISER:  Objection.

17            A.    I can't tell you what they knew.

18       You keep on ask asking me the same question over

19       and over.

20            Q.    No.  I am asking you now about any

21       of the defendants.  My question is, I will repeat

22       it again, do you believe any of the defendants

23       when they knew that Valerie had the drooped foot

24       and the swelling that you mentioned, did any of

25       them knew that this was a condition that might
```

77

1                          V, YOUNG

2      lead to her death?

3                  MR. KAISER:  Objection.

4          A.    It could happened.

5          Q.    I am asking you, if you believe any

6      of the defendants thought that?

7          A.    Who are you calling defendants?

8          Q.    The defendants are Peter Uschakow,

9      Jan Williamson, Suresh Arya, Kathleen Ferdinand,

10     Gloria Hayes and Dr. Milos.

11                 My question is, do you believe that

12     any of these individuals thought when Valerie had

13     the dropped foot and the swelling that you

14     mentioned, that this would lead to a condition

15     that might kill her?

16         A.    I don't know what they thought.

17                 MR. KAISER:  Objection.

18         Q.    More specifically, do you believe

19     any of them thought that Valerie would end up

20     having a blood clot that would work its way up to

21     one of her organs and kill her because of her

22     dropped foot and the swelling in her leg?

23                 MR. KAISER:  Objection.

24         A.    I don't know what they thought.  I

25     can't speak for them.  They were there all the

78

1                              V, YOUNG

2      time.  I only visited.  I am sure the staff or

3      the nurses would make nurse's notes.  So there is

4      no reason why the doctor couldn't check the

5      nurse's notes, see when they give her showers in

6      the afternoon that her feet are swollen.

7              Q.    So just we are clear regarding the

8      defendants, again, that is Peter Uschakow, Jan

9      Williamson, Suresh Arya, Kathleen Ferdinand,

10     Gloria Hayes and Dr. Milos, do you believe that

11     any of them knew that Valerie had this

12     potentially serious condition that would kill her

13     and they just chose to ignore it?

14              MR. KAISER:  Objection.

15              A.    Dr. Milos is a doctor.  I am sure

16     it was in the nurse's notes.  He should have read

17     the nurse's notes and did something about it.

18              Q.    No.  My question is specifically,

19     do you think any of these defendants knew that

20     Valerie had a potentially dangerous condition

21     that was going to kill her and they chose to

22     ignore it?

23              MR. KAISER:  Objection.

24              A.    I can't tell you what they knew.  I

25     can't speak for them and say what they knew

```
                                                     79
 1                        V, YOUNG

 2     because I wasn't there.

 3              Q.    Let me rephrase the question this

 4     way.

 5                    MR. KAISER:  Listen to the

 6     question.

 7              Q.    Do you have any proof that any of

 8     these defendants knew that Valerie Young had a

 9     potentially dangerous, fatal problem and

10     deliberately chose to ignore it?

11                    MR. KAISER:  Objection.

12              A.    Yes.

13              Q.    What proof do you have?

14              A.    I don't have proof.

15                    MR. KAISER:  Objection.

16              A.    Say that again.

17              Q.    Do you have any proof that any of

18     these defendants knew that Valerie Young suffered

19     from a medical condition in particular related to

20     her leg that was potentially dangerous and fatal,

21     that might kill her that they knew this and chose

22     to ignore it, chose not to do anything about it?

23                    MR. KAISER:  Objection.

24              A.    Repeat that again.  Can you repeat

25     it?
```

```
                                                    80
 1                         V, YOUNG

 2                    MR. VELEZ:  Can you read it

 3       back.

 4                    (Whereupon, the referred to

 5       testimony was read back by the Reporter.)

 6            A.    They knew about her legs because

 7       I spoke to -- whenever I would speak to

 8       Ms. Ferdinand, she would always send me to

 9       Dr. Milos.

10            Q.    That is not my question.  I think

11       the medical records clearly indicate that they

12       knew about her leg.

13                    My question is, did any of these

14       defendants I am going to try to simplify as much

15       as I can, do you believe any of these defendants

16       because of her leg problems, the medical problems

17       related to her leg, did any of these defendants

18       knew that Valerie would suffer from a serious

19       medical condition that could even kill her that

20       they knew this and chose not to do anything about

21       it.  They just ignored it?

22                    MR. KAISER:  Objection.  I want to

23       interject here.  You are flipping back.  Does she

24       believe that or does she have proof.  Listen to

25       his question is one, do you believe that the
```

```
                                                    82
 1                         V, YOUNG

 2      are there all day.

 3               Q.    I am asking what proof do you have

 4      that any --

 5                    MR. KAISER:  Objection.

 6               Q.    -- that any of these defendants

 7      knew that she had a potentially fatal condition

 8      and they purposefully, deliberately chose to

 9      ignore it?

10               A.    I can't say they purposefully --

11                    MR. KAISER:  Objection.

12               A.    -- but they knew that she had a

13      condition that they had to take care of it and

14      they ignored it.

15               Q.    Let me ask you now, do you think

16      that they were negligent?

17               A.    Yes.

18                    MR. KAISER:  Objection.

19               Q.    Do you think that Dr. Milos since

20      he was her doctor, do you think he was negligent?

21                    MR. KAISER:  Objection.

22               A.    Yes.

23               Q.    Do you think that he didn't provide

24      her proper treatment?

25               A.    I do.
```

84

1                          V, YOUNG

2     been recorded and then Dr. Milos was supposed to

3     do a work up.

4          Q.    That also goes to the type of

5     treatment she was receiving or should have been

6     receiving, are you also saying that you don't

7     agree with the treatment that she received?

8                MR. KAISER:  Objection.

9          A.    I don't agree with the treatment

10    that she received because I don't see anything

11    that they did to correct it.  There was no tests.

12         Q.    That is just your opinion that

13    there was no tests; right?

14               MR. KAISER:  Objection.

15         A.    I wasn't told.

16         Q.    Did you ask if tests were done on

17    her?

18         A.    Usually if they were going to send

19    Valerie out for any tests, they would call and

20    tell me and they didn't.

21         Q.    Don't they have medical staff

22    there?

23               MR. KAISER:  Objection.

24         A.    They don't have CAT Scans, MRIs,

25    things like that.  They don't have that there.

98

```
 1                        V, YOUNG

 2              A.    I didn't say every time.  Most of

 3       the time I would see her around.

 4              Q.    That is correct.  You said most of

 5       the time.

 6              A.    Right.

 7              Q.    Did you ever speak with Gloria

 8       Hayes over the telephone also?

 9              A.    I have called a few times and she

10       would answer the phone.

11              Q.    You would call her also for the

12       same reason if you had any problems?

13              A.    If I had something to discuss, I

14       would call her too.

15              Q.    When you say something to

16       discuss --

17              A.    Anything concerning Valerie,

18       whatever it was, you know.

19              Q.    Now, Kathleen Ferdinand, you would

20       meet with her in person?

21              A.    Yes, I would always go in and said

22       hello to her sometimes.

23              Q.    When you say, "hello to her," go

24       into her office?

25              A.    Yes.
```

99

1                          V, YOUNG

2              Q.    You saw her most of the times when

3      you visited Valerie; is that correct?

4              A.    I didn't go inside every time I

5      went but I would see her sometimes.

6              Q.    You would call her if you had any

7      concerns regarding Valerie?

8              A.    Yes.

9              Q.    Do you remember if you called her

10     regarding your concerns of Valerie's dropped leg?

11             A.    I went in and spoken to her and she

12     is the one mostly would refer me to go in to see

13     Dr. Milos.

14             Q.    Why would she do that, because she

15     thought they were medical issues?

16                  MR. KAISER:   Objection.

17             A.    Yes, I am sure.

18             Q.    Do you remember discussing with her

19     any concerns about Valerie's swelling in her

20     legs?

21             A.    Yes, and she would send me to

22     Dr. Milos.

23             Q.    Did she attend the wake?

24             A.    Yes.

25             Q.    She did?

```
                                        100
 1                      V, YOUNG

 2          A.    Yes.

 3          Q.    You have testified you knew who

 4     Dr. Jovan Milos was?

 5          A.    Yes.

 6          Q.    Was he Valerie's treating doctor?

 7          A.    Yes.

 8          Q.    How long did you know him for?

 9          A.    I don't know how long.  He wasn't

10     there when Valerie first went there.

11          Q.    Do you remember when he first

12     became a doctor?

13          A.    I don't remember.  We had a female

14     doctor before.

15          Q.    Do you remember for how long he was

16     her doctor, for how many years?

17          A.    I don't remember the exact years,

18     but he's been her doctor ever since he was in

19     that building.

20          Q.    Was it for one year, two years,

21     three years, five years, do you remember?

22          A.    I don't remember the exact years.

23          Q.    You said you would speak to him

24     regarding Valerie's medical conditions or any

25     concerns that you would have?
```

```
                                              104
 1                      V, YOUNG
 2    regarding her treatment relating to her leg, that
 3    you could think of, that you haven't already
 4    said?
 5          A.    I can't think of anything right
 6    now.
 7          Q.    But you did discuss with him?
 8          A.    If I saw something that I didn't
 9    think it was right and she wasn't feeling well, I
10    would always go and speak to Dr. Milos about it.
11          Q.    You spoke to Dr. Milos about her
12    needing a wheelchair?  Did he explain why she
13    needed a wheelchair?
14                MR. KAISER:  Objection.
15          A.    He didn't explain.  I am sure that
16    the reason they put her in a wheelchair because
17    she couldn't walk like she was supposed to.  She
18    was always falling so they said.  I don't know.
19          Q.    Once she had the wheelchair, you
20    spoke to him about her not always being in the
21    wheelchair, that she would be given the
22    opportunity to walk around, to ambulate?  Did you
23    discuss that with him also?
24          A.    I told you that I spoke to
25    Dr. Milos and I told him, I spoke with the
```

105

1                              V, YOUNG

2      therapist and they told me, that she should be

3      walked not only when she comes to the therapist

4      but like in the evenings she should be walked

5      around.

6              Q.    When you told him that, what did he

7      say?

8              A.    He told me the therapist does that.

9      That is just what he said.

10             Q.    When Dr. Milos told you that the

11     therapist takes care of that, what did you

12     understand that he was telling you?

13                  MR. KAISER:  Objection.

14             A.    I guess, he was telling me that the

15     therapist needs to walk around.  He didn't say I

16     will make an order for the staff to walk her

17     around in the evening when she comes back from

18     the program.

19             Q.    Do you understand he was saying

20     that it's the therapist that is in charge or

21     making sure that Valerie Young gets to walk

22     around?

23                  MR. KAISER:  Objection.

24             A.    I am sure that he sent her, he had

25     to make an order for her to go to the therapist,

```
                                                    106
 1                          V, YOUNG

 2      it wasn't the therapist.  He had to write an

 3      order for that.

 4              Q.    But do you think he was also saying

 5      it was the therapist --

 6              A.    It seemed that way to me, when he

 7      said, "the therapist did that."

 8              Q.    The therapist was handling that

 9      part of it?

10              A.    That they walk her.

11              Q.    That she be walked?

12              A.    Yes.

13              Q.    How many times did she go to

14      physical therapy?

15              A.    Tuesday and Thursday.

16              Q.    How long was she there?

17              A.    I don't know.

18              Q.    Did you ever attend any of these

19      physical therapy sessions?

20              A.    No, I didn't go to the therapist

21      because I told you I was sick.

22              Q.    Did you know who Suresh Arya was

23      prior to June 19, 2005?

24              A.    Yes.

25              Q.    Had you met him prior to June 19,
```

                                                          114
1                          V, YOUNG

2      that it was done.

3           Q.    What about if it was the medical

4      staff's opinion, in particular, I guess,

5      Dr. Milos' medical opinion, that she did not need

6      to go out for those tests?  Would your answer

7      change in anyway?

8                MR. KAISER:  Objection.

9           A.    I don't understand the question.

10          Q.    You said she should have been sent

11     out for sonograms?  What about if Dr. Milos felt

12     she didn't need to be sent out to have the

13     sonograms and these other tests?  That the tests

14     he had done was sufficient, does that change your

15     answer that she was denied necessarily health and

16     related care?

17               MR. KAISER:  Objection.

18          A.    It doesn't change anything.

19          Q.    It is just you disagree with

20     whatever medical treatment Dr. Milos was giving

21     to your daughter?

22               MR. KAISER:  Objection.

23          A.    Repeat that.

24          Q.    Is it just the case that you

25     disagree with the medical treatment that

115

1                             V, YOUNG

2    Dr. Milos was giving your daughter?

3              A.    (No response).

4              Q.    You felt that he could have done

5    more than he did?

6                    MR. KAISER:  Objection.

7              A.    I felt that he could have done

8    more.

9              Q.    If he felt that he didn't need to

10   do more, then you just disagree with his medical

11   opinion?

12                   MR. KAISER:  Object.

13             A.    Yes, I disagree.

14             Q.    I paragraph 27, you state, "As a

15   result of the denial of health and related care,

16   Young was caused physical and emotional suffering

17   and pain by the defendants and ultimately died."

18                   So here you are saying because they

19   denied her the proper health and related care,

20   Valerie suffered physical and emotional pain due

21   to the fall of the defendants that lead her to

22   die.

23                   MR. KAISER:  Objection.

24             Q.    Do you understand what you are

25   saying here?

```
                                                  130
 1                        V, YOUNG

 2   would die from those reasons that you just gave?

 3                  MR. KAISER:  Objection.

 4           A.    Do I think that the defendants

 5   knew?

 6           Q.    That she might die from those

 7   reasons?

 8           A.    I cannot tell you what I think

 9   other people thought, I don't know.  I cannot

10   tell you what I think, what other people thought,

11   I can't tell you that.

12           Q.    I guess, we kind of went through

13   this before.

14                  Do you have any proof that any of

15   the defendants knew that she would suffer a blood

16   clot that would end up killing her because of her

17   leg problems?

18                  MR. KAISER:  Objection.

19           Q.    Do you have any proof that any of

20   the defendants knew that the condition that

21   Valerie suffered from her leg would lead her to

22   suffer a blood clot that would end up killing

23   her?

24                  MR. KAISER:  Objection.

25           A.    I can't answer that.  I don't know
```

131

1

2    what they knew about her medical conditions.

3         Q.    But as we sit here, you don't have

4    any proof that any of these defendants knew that

5    she was going to suffer from this condition and

6    chose to ignore it?

7         A.    I can't answer it.

8         Q.    When you spoke to Dr. Milos or

9    anyone else in the Brooklyn Developmental Center,

10   but probably with Dr. Milos regarding her leg

11   condition, did any of them mention to you that

12   she suffered from a condition called edema,

13   E-D-E-M-A?

14        A.    That is like swelling of the --

15        Q.    Yes.

16        A.    No.

17        Q.    They didn't mention to you the name

18   of the condition?

19        A.    No.

20        Q.    Are you aware that prior to

21   June 19, 2005, Valerie suffered from edema?

22        A.    Repeat that again.

23        Q.    Are you aware that prior to Valerie

24   dying, if she suffered from edema?

25        A.    I noticed the swelling in her feet.

145

1                              V, YOUNG

2                           CERTIFICATION

3

4

5        I, LYRA SELA, a Notary Public in and for the

6    State of New York, do hereby certify:

7        THAT the witness(es) whose testimony is

8    hereinbefore set forth, was duly sworn by me; and

9        THAT the within transcript is a true record

10   of the testimony given by said witness(es).

11       I further certify that I am not related,

12   either by blood or marriage, to any of the

13   parties to this action; and

14       THAT I am in no way interested in the

15   outcome of this matter.

16       IN WITNESS WHEREOF, I have hereunto set my

17   hand this 5th day of February 2008.

18

19   _____

                      LYRA SELA

20

21

22

23

24

25

# EXHIBIT E

1

**COPY**

```
 1

 2    UNITED STATES DISTRICT COURT

 3    SOUTHERN DISTRICT OF NEW YORK

 4    -------------------------------------------X

 5    Estate of VALERIE YOUNG, by VIOLA YOUNG, as
      Administratrix of the Estate of Valerie Young,
 6    and in her personal capacity, SIDNEY YOUNG, and
      LORETTA YOUNG LEE,
 7                         Plaintiffs,

 8            -against-                   Index No.
                                         07CV6241
 9    STATE OF NEW YORK OFFICE OF MENTAL RETARDATION
      AND DEVELOPMENTAL DISABILITIES, PETER USCHAKOW,
10    personally and in his official capacity, JAN
      WILLIAMSON, personally and in her official
11    capacity, SURESH ARYA, personally and in his
      official capacity, KATHLEEN FERDINAND, personally
12    and in her official capacity, GLORIA HAYES,
      personally and in her official capacity, DR.
13    MILOS, personally and in his official capacity,
                         Defendants.
14
      -------------------------------------------X
15

16            EXAMINATION BEFORE TRIAL of the

17    Plaintiff, LORETTA LEE, taken by the Defendant,

18    pursuant to Notice, held at the Office of the

19    Attorney General, 120 Broadway, New York, New

20    York  10271 on January 28, 2008, at 12:45 p.m.,

21    before a Notary Public of the State of New York.

22

23

24

25
```

```
                                                  11
 1                              L. LEE

 2       she went to the development center.

 3              Q.    What is her age when she was

 4       removed from the household?

 5              A.    She was about 30, about 30 I

 6       believe.  Around 30 I believe.

 7              Q.    What were the reasons that she was

 8       removed from the household and institutionalized?

 9              A.    Her behavior problem.

10              Q.    Can you elaborate when you say

11       behavior problems, what do you mean?

12              A.    She was very aggressive.  She was

13       aggressive at times.

14              Q.    Was she aggressive with you?

15              A.    No, she was not.

16              Q.    Why is that?

17              A.    No.  Ret, R-E-T, she called me Ret.

18              Q.    Was she aggressive with your

19       brother?

20              A.    No, no.

21              Q.    Was she aggressive with your

22       mother?

23              A.    Only when she wanted her way, yes.

24              Q.    How about your father?

25              A.    The same thing, when she wanted her
```

29
1                          L. LEE

2            A.    Because I work during the week and

3    I always made it my business to at least visit

4    her once a month.

5            Q.    You said you visited her on a

6    Saturday?

7            A.    Yes, that is right.

8            Q.    Do you work on Saturday?

9            A.    I work Monday to Friday.

10           Q.    Did Valerie know who you were when

11   you visited her?

12           A.    Yes, she did.

13           Q.    I want to show you a copy of the

14   complaint that's been filed in this lawsuit.

15           A.    Okay.

16           Q.    Okay.

17                 Why don't you look through all the

18   pages to make sure what is on each page.

19           A.    Okay.

20           Q.    When you visited Valerie at the

21   Brooklyn Development Center, what would she be

22   doing?

23           A.    She would be sitting down.

24   Sometimes she would be walking around.  Mostly

25   she would be sitting.

                                                        40
    1                          L. LEE

    2          Q.    What problem are you referring to?

    3                MR. KAISER:  Objection.

    4          A.    She was hopping around.  Somebody

    5    had to help her.  She couldn't walk.

    6          Q.    You are referring to the problem

    7    relating to her gait because she would have

    8    problems walking because of one of her legs?

    9          A.    Yes.  Her leg would swell.

   10          Q.    Why did you sue Brooklyn  `

   11    Developmental Disabilities Service Office,

   12    Medical Doctor Jovan Milos, M-I-L-O-S?

   13                MR. KAISER:  Objection.

   14          A.    Because he should have sent her out

   15    for treatment in the beginning to see what was

   16    causing.

   17          Q.    You mentioned all the other

   18    defendants, you mentioned negligence.  Now,

   19    since, he is a doctor, do you feel also medical

   20    practice is that what you are saying?

   21                MR. KAISER:  Objection.

   22          Q.    Is it just negligence as a doctor?

   23          A.    He did not do his job like he was

   24    supposed to have done.  He didn't look into the

   25    situation and sent her out.

```
                                          52
 1                        L. LEE

 2     to this?

 3                MR. KAISER:  Objection.

 4          A.   Oh, yes.

 5          Q.   What did your mother communicate to

 6     the hospital regarding Valerie's leg?

 7                MR. KAISER:  Objection.

 8          A.   She would ask them, "Why is Valerie

 9     walking like this?"

10          Q.   You know this because your mother

11     would tell you?

12          A.   Yes, and I was there at times when

13     she would ask.

14          Q.   What would be the response that she

15     got?

16          A.   They always told mommy that it was

17     her dropped foot.

18          Q.   So is it fair to say you and your

19     mother were concerned with her gait, the way she

20     was walking?  You wanted to know what was wrong

21     with her leg that lead her to walk like that?

22          A.   Yes.

23          Q.   Prior to June 19, 2005, you weren't

24     concerned that her gait or the problem with her

25     leg was going to lead to have her blood clot that
```

42

1                         L. LEE

2      that circle around and they all should have been

3      aware of what was going on with Valerie.

4            Q.    So I am clear.  You seem like you

5      are sure of what was going on with Valerie, but

6      they weren't.  What do you mean they should have

7      been aware of what was going on with Valerie?

8            A.    Because you could see Valerie was

9      having a problem, we saw it and she was there.

10           Q.    What kind of problem she was

11     having?

12           A.    She was limping.  She was having

13     problems walking.  They all saw it.  They were

14     there.  We came to visit.  She was with them all

15     the time.

16           Q.    Do you think they knew what the

17     problem was and they decided to ignore it?

18                 MR. KAISER:  Objection.

19           A.    I don't think they knew what the

20     problem was.  They did not send her out to find

21     out what the problem was.

22           Q.    That is why you feel they are

23     negligent?

24           A.    That is right.

25                 MR. KAISER:  Objection.

```
                                                    53
 1                         L. LEE

 2    was going to kill her?

 3                   MR. KAISER:  Objection.

 4          A.    Nobody knew that.

 5          Q.    When you say, "nobody knew that,"

 6    you are not just including yourself, you are

 7    saying even the defendants, correct?

 8                   MR. KAISER:  Objection.

 9          A.    Well, I did not know it.  I don't

10    believe they knew it either.

11          Q.    Now, the blood clot that traveled

12    to Valerie's lung and killed her, do you think

13    any of the defendants were directly involved with

14    that?

15          A.    Directly?

16          Q.    Yes.

17          A.    No.

18          Q.    How were they involved?

19                   MR. KAISER:  Objection.

20          A.    By not sending her out, to see what

21    was going on.  If they had sent Valerie out like

22    I said, if they had sent Valerie out to the

23    hospital for tests, they would have picked up on

24    that.

25          Q.    That is your opinion, a medical
```

```
                                              65
 1                      L. LEE
                    CERTIFICATION
 2

 3          I, LYRA SELA, a Notary Public in and for

 4     the State of New York, do hereby certify:

 5          THAT the witness(es) whose testimony is

 6     hereinbefore set forth, was duly sworn by me; and

 7          THAT the within transcript is a true record

 8     of the testimony given by said witness(es).

 9          I further certify that I am not related,

10     either by blood or marriage, to any of the

11     parties to this action; and

12          THAT I am in no way interested in the

13     outcome of this matter.

14          IN WITNESS WHEREOF, I

15     have hereunto set my hand this 1st day of

16     February 2008.

17

18     _____
                        LYRA SELA
19

20

21

22

23

24

25
```