# EXHIBIT F

**COPY**

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4          -------------------------------------------X

5          Estate of VALERIE YOUNG, by VIOLA YOUNG, as
           Administratrix of the Estate of Valerie Young,
6          and in her personal capacity, SIDNEY YOUNG, and
           LORETTA YOUNG LEE,
7                                    Plaintiffs,

8                        -against-                    Index No.
                                                      07CV6241
9          STATE OF NEW YORK OFFICE OF MENTAL RETARDATION
           AND DEVELOPMENTAL DISABILITIES, PETER USCHAKOW,
10         personally and in his official capacity, JAN
           WILLIAMSON, personally and in her official
11         capacity, SURESH ARYA, personally and in his
           official capacity, KATHLEEN FERDINAND, personally
12         and in her official capacity, GLORIA HAYES,
           personally and in her official capacity, DR.
13         MILOS, personally and in his official capacity,
                                    Defendants.
14
           -------------------------------------------X
15

16                    EXAMINATION BEFORE TRIAL of the

17         Plaintiff, SIDNEY YOUNG, taken by the Defendant,

18         pursuant to Notice, held at the Office of the

19         Attorney General, 120 Broadway, New York, New

20         York  10271, on January 28, 2008, at 11:20 a.m.,

21         before a Notary Public of the State of New York.

22

23

24

25

```
                                                   13
 1                           S. YOUNG

 2    clothes, paying her medical bills.  You are

 3    saying your mother paid for all of that?

 4            A.    My mother and father.

 5                  MR. KAISER:  Objection.

 6            Q.    Tell me about Valerie Young.  What

 7    was her date of birth?

 8            A.    August 6th, 1955.

 9            Q.    How long did she live in the

10    household with you?

11            A.    Until 1990.

12            Q.    What happened after 1990?

13            A.    She went to the development center.

14            Q.    Do you know what age she was when

15    she was removed from the household?

16            A.    About 36, I think.  She was about

17    36.

18            Q.    Do you know the reasons why she was

19    removed at that point?

20            A.    At that point they were getting

21    kind of old.  She was getting out of hand.

22            Q.    You are saying --

23            A.    You know, parents get older -- they

24    couldn't, you know, it was hard.

25            Q.    When you say, "it was hard," what
```

14

```
 1                         S. YOUNG

 2    do you mean?

 3              A.    I guess, when they were younger,

 4    they thought it was easier, but as they started

 5    getting older, the older she got, the more

 6    violent she got.

 7              Q.    Was she violent towards you?

 8              A.    Not that much.  I was her little

 9    brother.

10              Q.    How about your sister?

11              A.    Not too much.

12              Q.    Was she violent towards your

13    parents?

14              A.    Off and on.

15              Q.    Was your understanding that is the

16    main reason she was institutionalized because it

17    was getting harder to control her?

18              A.    Right.

19              Q.    When she was removed from your

20    house, do you know where she went to first?

21              A.    Yes.

22              Q.    Where?

23              A.    Brooklyn Developmental Center.

24              Q.    Brooklyn Developmental Center?

25              A.    Yes.
```

```
 1                         S. YOUNG

 2              MR. KAISER:  Objection.

 3         A.    One to three years before.

 4         Q.    When did she start demonstrating

 5    this aggressive behavior?

 6              MR. KAISER:  Objection.

 7         A.    It was on and off throughout her

 8    whole lifetime.

 9         Q.    Do you know what medications were

10    prescribed for her?

11              MR. KAISER:  Objection.

12              MR. VELEZ:  Counsel, what is the

13    basis of your objection?

14              MR. KAISER:  As to form and asking

15    him for medical opinion that he probably doesn't

16    even know.

17              MR. VELEZ:  He is bringing a

18    lawsuit.

19              MR. KAISER:  He shouldn't have to

20    know what prescriptions she was prescribed.

21              MR. VELEZ:  I am not asking he

22    has to know.

23              MR. KAISER:  I have a right to

24    object to the form.

25              MR. VELEZ:  I am entitled to find
```

# EXHIBIT G

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
Estate of VALERIE YOUNG, by VIOLA YOUNG,
as Administratrix of the Estate of
Valerie Young, and in her personal
capacity, SIDNEY YOUNG, and LORETTA
YOUNG LEE,

                    Plaintiffs,

                                Index No.:
            vs.                 07CV6241
STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, PETER USCHAKOW,
personally and in his official
capacity, JAN WILLIAMSON, personally
and in her official capacity, SURESH
ARYA, personally and in his official
capacity, KATHLEEN FERDINAND,
personally and in her official
capacity, GLORIA HAYES, personally and
in her official capacity, DR. MILOS,
personally and in his official capacity,

                    Defendants.
----------------------------------------X
                    April 11, 2008
                    10:06 a.m.


        Examination before trial of PETER
ALEXANDER USCHAKOW, held at the offices
of The Catafago Law Firm, P.C., 350 Fifth
Avenue, New York, New York, pursuant to
Notice, before Wendy D. Boskind, a
Registered Professional Reporter and
Notary Public of the State of New York.

34

                        Uschakow

1

2    coordinator of quality assurance as well

3    as the deputy for operations for the

4    follow-up.

5         Q.    And who were those

6    individuals that you shared it with?

7              Was it Judith Beer?

8         A.    I don't remember if it was

9    Judith Beer or Rick Lippel.

10        Q.    And who was the other

11   individual?

12        A.    Suresh Arya or Jan

13   Williamson.

14        Q.    Incidentally, you would

15   have -- during the time period of January

16   2005 until Valerie's death, you were --

17   you would have leadership team meetings

18   on a weekly basis; is that correct?

19        A.    I had the executive cabinet

20   meetings.

21        Q.    So who participated in the

22   executive cabinet meetings?

23        A.    The deputy director for

24   community services, the deputy director

25   for operations -- uh -- the affirmative

35

Uschakow

1    action officer, the coordinator of

2    quality assurance, the director of

3    personnel, and on and off the business

4    office.

5         Q.    And what were the purposes of

6    those weekly executive committee team

7    meetings?

8         A.    For me to share with them

9    information that had come out of central

10   office that may impact on their certain

11   operational areas of the facility budget,

12   any new guidelines from the oversight --

13   federal oversight entities.

14        Q.    At these meetings, were any

15   desired changes in policies and

16   procedures ever discussed?

17        A.    Not that I remember.

18        Q.    And who chaired the meetings?

19   Was it you or --

20        A.    Yes, I would send out an

21   agenda and ask for agenda items.

22        Q.    Did there ever come a time

23   that you disagreed with any of the

24   statements that are set forth in the

36

1                          Uschakow

2       official State finding that is Williamson

3       Exhibit 3?

4              A.     For those recommendations

5       that are specific to medical sciences or

6       physical therapy, I do not feel qualified

7       to agree or disagree.  I would give that

8       over to, again, the deputy for operations

9       and quality assurance coordinator, to

10      meet with their experts to decide whether

11      or not to honor the recommendations,

12      implement the recommendations, or for

13      whatever reason to reject the

14      recommendations.

15             Q.     And who had the ultimate

16      responsibility, at BDC, to respond to

17      this letter addressed to you?

18             A.     Me.

19             Q.     Did you respond directly to

20      this letter addressed to you?

21             A.     I don't remember.

22             Q.     In the official State BDC

23      finding, it says, and I quote:   "I

24      suspect that Ms. Young may have spent

25      extended periods of time in her

37

1                    Uschakow

2   wheelchair", period closed quote.  I'm

3   reading from the first page of that

4   exhibit.

5              Did you ever do anything, as

6   director at BDC, to investigate whether

7   or not that was an accurate statement of

8   fact?

9         A.    I do recall seeing Valerie

10  Young ambulate with assistance after the

11  telephone call from Mrs. Viola.

12        Q.    I understand, but you can't

13  tell me what decade that was in.

14        A.    No.

15        Q.    So I'm asking you whether or

16  not, after you got this official State

17  finding, in October of 2005, where it is

18  said:  "I suspect that Ms. Young may have

19  spent extended periods of time in her

20  wheelchair", whether or not you did

21  anything to investigate the accuracy or

22  inaccuracy of that statement of fact.

23        A.    I, as a director, do not do

24  investigations.

25        Q.    Who would have --

54

1                    Uschakow

2          Q.   So in some instances, and

3     without recalling the specifics, you do

4     recall that physicians at BDC would issue

5     standing orders to have patients walk,

6     patients who are in a wheelchair.

7          A.   Yes.

8          Q.   Do you know whether or not

9     Dr. Milos, or anyone else at BDC, did so

10    for Valerie Young?

11         A.   I do not know.

12         Q.   Can you tell me any reason at

13    all why there wouldn't have been a

14    standing order for Valerie Young, as

15    opposed to the other patients that you

16    saw.

17         A.   Again, not being a medical

18    professional or a physical therapist or

19    an occupational physical therapist, I

20    cannot answer that.

21         Q.   Can you tell me what

22    criteria, if any, there would be for a

23    physician under your charge, as director,

24    to determine if a particular patient

25    should get an order to walk to avoid this

56

1                      Uschakow

2          Q.    Can you tell me whether or

3    not Dr. Milos, or any other physician at

4    BDC, ever considered using elastic

5    stockings for Valerie Young prior to her

6    death?

7          A.    I could not answer that.

8          Q.    Did you ever speak to Dr.

9    Milos, or did he ever speak to you, about

10   Valerie Young's death?

11         A.    No, not that I remember.

12         Q.    Did anyone at BDC, following

13   Valerie Young's death, make any attempt

14   to determine approximately how much

15   walking she was given or allowed to do

16   prior to her death?

17         A.    I do not know.

18         Q.    Okay.

19              (Deposition Exhibit

20         Plaintiffs' Ferdinand 22, QCC Form

21         100 report of death, Bates stamped

22         CQC 38 through 41, previously

23         marked for identification.)

24         Q.    I want to show you what was

25   previously marked as Ferdinand Exhibit

67

1                    Uschakow

2          Q.    Is that right?

3                MR. VELEZ:  You have already

4          asked this.

5          Q.    Do you know if Ms. Beer sent

6    anything to Mr. Rappaport?  She writes

7    here that she would be happy to forward

8    the procedures upon their completion,

9    that's November 5, 2005, do you know if

10   she ever sent anything to him?

11         A.    I do not know.

12         Q.    Do you know if she, or anyone

13   else at BDC, ever developed these

14   procedures?

15         A.    I do not know.

16         Q.    And in connection with the

17   development of procedures following

18   recommendations from a State agency

19   concerning the death of a BDC patient,

20   would you review those procedures at any

21   point in your role as director?

22         A.    I --

23         Q.    If, in fact, the procedures

24   were developed.

25         A.    I would review some.

68

1                    Uschakow

2              Certainly, those that are

3    very discipline-specific, I would not

4    necessarily review them.

5         Q.    Who would make the

6    determination as to whether or not you

7    would review a policy and procedure that

8    was implemented following the State

9    agency finding?

10        A.    If there were concerns of the

11   discipline coordinator, their

12   supervisors, or deputy level.

13        Q.    So they would make the

14   determination?

15        A.    Or ask for my review, yes.

16        Q.    And no one ever told you

17   anything about the preparation of

18   procedures in accordance with this

19   letter; right?

20        A.    Not that I remember.

21        Q.    Okay.  Can you think of any

22   reason at all why, if there were such

23   procedures, they wouldn't have been

24   produced in this case, as part of the

25   discovery?

25

1                    Uschakow

2          Q.    Do you recall having a

3    discussion about the treatment and care

4    of Valerie Young with anyone at BDC prior

5    to her death?

6          A.    I do recall relaying to the

7    deputy director concerns about reduced

8    ambulation on the part of Valerie Young

9    after a phone call by Mrs. Viola Young.

10         Q.    And when you said you recall

11   a discussion with the deputy director of

12   operations, are you referring to Arya or

13   Jan Williamson?

14         A.    I am not sure which one it

15   was.

16         Q.    Can you describe, in greater

17   detail, the substance of your

18   conversation with the deputy director at

19   that time?

20         A.    That Viola Young -- Mrs.

21   Viola Young, had called me to air her

22   concern about Valerie's reduced walking

23   ability, and I shared exactly that with

24   the deputy for follow-up with the

25   treatment team.

26

1               Uschakow

2          Q.    And did anyone report back to

3    you, after you shared that with your

4    deputy director?

5          A.    I do not recall.

6          Q.    Do you recall you following

7    up with anyone to determine what had

8    happened after you had spoken to the

9    deputy director?

10         A.    I do recall, after the phone

11   conversation, seeing Valerie in Building

12   5 being assisted to walk.

13         Q.    That wasn't my question.  We

14   will get to that in a second.

15              My question is, did you

16   follow up with anyone.

17         A.    No.

18              MR. VELEZ:  Counsel, that can

19         be construed as "follow-up",

20         because --

21              MR. CATAFAGO:  Okay, so let's

22         go there.

23         Q.    When you saw her in Building

24   5, was it happenstance viewing or were

25   you specifically going to see whether or

27

```
1                    Uschakow
2    not anything had been done following your
3    discussion with the deputy director?
4         A.    I periodically make rounds of
5    all of the program areas, and happened to
6    see Valerie.
7         Q.    And you saw her being
8    assisted with someone?
9         A.    Yes.
10        Q.    Do you know who was assisting
11   her?
12        A.    No.
13        Q.    Was it one person or more
14   than one?
15        A.    I remember one person.
16        Q.    Was she using a wheelchair at
17   the time?
18        A.    No.
19        Q.    Was the wheelchair beside her
20   at the time?
21        A.    I don't recall seeing it.
22        Q.    Did you ever see Valerie
23   Young in a wheelchair at all?
24        A.    Yes.
25        Q.    How many times?
```

28

1                    Uschakow

2          A.    I couldn't tell you.

3          Q.    Did you see her -- withdrawn.

4                You made -- you would make

5    rounds periodically or was it regular

6    that you would make rounds?

7          A.    I don't understand the

8    question.

9          Q.    Well, when you were director

10   at BDC, how often would you walk around

11   to look at the patients?

12         A.    It varies, it varies on the

13   pressures of the office.

14         Q.    Approximately how many times,

15   if you can approximate, did you actually

16   see Valerie Young?

17              MR. VELEZ:  During what time?

18              MR. CATAFAGO:  The time that

19         she was there.

20         Q.    Once a week?

21         A.    As a direct-- since my

22   arrival there?

23         Q.    Well, since your arrival

24   there, since you were deputy director.

25         A.    No way I could count.

73

Uschakow

1       looking into the existence of those

2

3       documents.

4              MR. CATAFAGO:  Thank you,

5       that's fine.

6              I have no questions.

7              MR. VELEZ:  I have a few

8       questions.

9              MR. CATAFAGO:  If it's going

10      to be more than a few, then we're

11      going to cut the transcript, and

12      you'll pay for it.

13             MR. VELEZ:  Fine, fine.

14             (Time noted:  11:35 a.m.)

15  BY MR. VELEZ:

16      Q.    You testified that you saw

17  Valerie Young ambulate with assistance of

18  staff.  When was the last time that you

19  remember seeing that?

20             MR. CATAFAGO:  Objection.

21      A.    It would -- it was after the

22  telephone call from Mrs. Viola Young,

23  where she aired her concerns about

24  Valerie's reduced ability to walk

25  independently.

74

Uschakow

1

2          Q.   Now, so we're clear on the

3     time frame, because counsel tried to make

4     it seem it could have been a decade or

5     so --

6               MR. CATAFAGO:  Let's not do

7          that.

8               MR. VELEZ:  Let's not do

9          that?

10              MR. CATAFAGO:  Let's not talk

11         about counsel.

12              MR. VELEZ:  You said --

13              MR. CATAFAGO:  After you made

14         a point --

15              MR. VELEZ:  Okay.

16              MR. CATAFAGO:  You narrow it

17         down, it's from 2001.

18              MR. VELEZ:  Okay, but you did

19         state it could have been a decade

20         ago.

21         Q.   If I were to advise you that

22    Viola Young testified under oath, during

23    her deposition, that she called you

24    sometime in April/May 2005 to express her

25    concern about Valerie Young's ambulation,

75

1                    Uschakow

2    would that refresh your recollection as

3    to when you then observed Valerie Young

4    ambulating with assistance of staff?

5          A.    I can categorically state

6    that it was after her telephone

7    conversation.

8          Q.    So if your telephone

9    conversation with her occurred in April

10   of 2005 or May of 2005, it would have

11   been after that.

12         A.    That's correct.

13         Q.    Now, you were shown

14   Williamson Exhibit 10.

15               Can you look at the last

16   page, under Recommendations.

17         A.    (Pause.)

18         Q.    Number 2, in particular.

19         A.    (Pause.)

20               Okay.

21         Q.    You were asked if were you

22   aware if any instructions were given for

23   Valerie Young to use elastic stockings.

24   Do you remember being asked that

25   question?

79

1

2                  C E R T I F I C A T E

3

STATE OF NEW YORK )

4                           : ss.

COUNTY OF NEW YORK)

5

6           I, WENDY D. BOSKIND, an RPR
            and Notary Public within and for

7           the State of New York, do hereby

8           certify:

9               That PETER ALEXANDER

10          USCHAKOW, the witness whose

11          examination before trial is

12          hereinbefore set forth, was duly

13          sworn by me, and that such deposition

14          is a true and accurate record of the

15          testimony given by the witness.

16              I further certify that I am

17          not related to any of the parties to

18          this action by blood or marriage, and

19          that I am in no way interested in the

20          outcome of this matter.

21              IN WITNESS WHEREOF, I have

22          hereunto set my hand this _22nd_ day

23          of __APRIL____, 2008.

24

25                  _Wendy D. Boskind_

# EXHIBIT H

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
Estate of VALERIE YOUNG, by VIOLA YOUNG,
as Administratrix of the Estate of
Valerie Young, and in her personal
capacity, SIDNEY YOUNG, and LORETTA
YOUNG LEE,

                  Plaintiffs,

                        Index No.:
        vs.            07CV6241

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, PETER USCHAKOW,
personally and in his official
capacity, JAN WILLIAMSON, personally
and in her official capacity, SURESH
ARYA, personally and in his official
capacity, KATHLEEN FERDINAND,
personally and in her official
capacity, GLORIA HAYES, personally and
in her official capacity, DR. MILOS,
personally and in his official capacity,

                  Defendants.
----------------------------------------X
                  April 8, 2008
                  9:59 a.m.

      Examination before trial of SURESH
ARYA, held at the offices of The Catafago
Law Firm, P.C., 350 Fifth Avenue, New
York, New York, pursuant to Notice,
before Wendy D. Boskind, a Registered
Professional Reporter and Notary Public
of the State of New York.

```
 1                    Arya
 2    behavior issues, any other problems like
 3    person has a -- if there were any
 4    complaints.
 5               I was not directly involved
 6    on day-to-day operations.
 7        Q.    Were you aware of any
 8    behavioral issues or complaints involving
 9    Valerie Young?
10        A.    Yes.
11        Q.    When did you first become
12    aware of that?
13        A.    I don't remember exactly.
14               While I was there, a number
15    couple of times Mrs. Young was concerned,
16    she wanted to increase the medications,
17    but the medical staff did not feel
18    appropriate.  So we had a meeting of all
19    the physicians in the development center,
20    all the psychiatrists, with Mrs. Young,
21    and she was explained what the situation
22    was, she agreed with the treatment plan,
23    and then it was implemented.
24               MR. VELEZ:  And, just so
25          we're clear, when you say "Mrs.
```

12

                        Arya

1

2    the meetings?

3        A.    Like I said to you, most of

4    the doctors, psychiatrists, Valerie's

5    treatment team members, and also Mrs.

6    Young, and that's the mother.

7        Q.    Again, with Exhibit 2 in

8    front of you, as deputy director of

9    operations, overseeing the business

10   office, what exactly did you do,

11   overseeing the business office?

12       A.    The business officer who is

13   in charge of business office, and he

14   reported to me to discuss --

15       Q.    I'm sorry, who was that?

16       A.    That was Tom McNamara.

17       Q.    Okay, Tom NcNamara.  And who

18   at -- which team leader reported to you

19   regarding Valerie Young?

20       A.    That was Kathy Ferdinand.

21       Q.    Kathy Ferdinand.  Have you

22   spoken to Kathy Ferdinand at all since

23   leaving BDC in 2004?

24       A.    Relating to?

25       Q.    Anything.

13

                        Arya

1

2          A.    I met her -- the director was

3    retiring, and when I saw her I just said

4    hello.

5          Q.    I'm sorry?

6          A.    I just said hello to her,

7    just like greeting anyone else.

8          Q.    Since leaving BDC in

9    September 2004, have you spoken to anyone

10   about Valerie Young?

11         A.    No.

12         Q.    Do you recall what

13   medications Valerie Young was prescribed?

14         A.    No.

15         Q.    Do you recall what side

16   effects, if any, the medications --

17         A.    No.

18         Q.    -- prescribed had on her?

19         A.    I don't know.

20         Q.    Who's responsibility was it,

21   if you know, to monitor those things?

22         A.    Uh --

23         Q.    While you were deputy

24   director of operations.

25         A.    The medical person, the

31

1                    Arya

2          Q.    So your testimony is she

3    never complained to you.

4          A.    Not about the physical

5    therapy or anything else.

6          Q.    Did she complained to you --

7    according to your own testimony, did she

8    complain to you regarding anything --

9          A.    Yes, she complained about her

10   behavior.   That was basically about her

11   behavior.

12         Q.    What did she say about her

13   behavior?

14         A.    She was unmanageable,

15   uncontrollable.   She wanted to give her

16   more psychotropic medication, and the

17   physicians did not feel, because of

18   medical reasons and other things,

19   appropriate.   But that's why we called

20   for a special meeting.

21         Q.    I see.

22         A.    All the medical staff and

23   nurses and her whole treatment team and

24   psychiatrists explained to her, and she

25   was very pleased with the outcome of the

32

1                    Arya

2    meeting at that time.

3          Q.    During your tenure, was

4    Valerie getting physical therapy?

5          A.    I will not recall that case

6    by case every case.

7          Q.    Do you recall anything at all

8    as to whether or not she ever got

9    physical therapy?

10         A.    I cannot.  I cannot.

11              (Deposition Exhibit

12         Plaintiffs' Arya 5, document, part

13         of the policy and procedure manual,

14         Bates stamped D 1176, marked for

15         identification, as of this date.)

16         Q.    I want to show you what's

17   been marked as Exhibit 5.  It was Bates

18   stamped D 1176.

19              Do you recognize that as part

20   of the policy and procedure --

21         A.    Yes.

22         Q.    -- manual?

23         A.    Yes, mm-hmm.

24              MR. VELEZ:  You need to say

25         "Yes" or "No".

41

```
 1                          Arya

 2   as deputy director.

 3          A.    My staff, the whole team, the

 4   deputy director, physician.

 5          Q.    My question is, was it part

 6   of your job.

 7          A.    Yes, it was.

 8          Q.    Do you know if Valerie Young

 9   was fully ambulatory when she was under

10   the care of BDC, while you were deputy

11   director?

12          A.    Yes.

13          Q.    She was?

14          A.    She was ambulatory at times.

15   She used to be unsteady on her feet, but

16   she used to walk around, yes.

17          Q.    She used to walk around.

18          A.    Yes.

19          Q.    Did you ever see her be very

20   sedated?

21                In other words, unable to

22   stay on her feet.

23          A.    Not really, I have not seen

24   her.

25                In fact, like I said to you
```

42

                        Arya

1

2    before, the mother wanted her heavily

3    sedated and the team was not in favor of

4    it.

5        Q.    I see.  Did the mother say

6    why she wanted her heavily sedated?

7        A.    Because her behavior was so

8    bad, she used to -- (indicating) -- flail

9    her hands, she was not standing in one

10   place.

11            Sometimes -- it was lot of

12   behavior issues.

13       Q.    If there was a behavior issue

14   involved --

15       A.    It was psychiatric condition,

16   not behavior, it was psychiatric

17   condition, but because of the medical

18   reason, sometimes you cannot give

19   medications.

20       Q.    Are you aware of the

21   occurrence reports on a minor?

22       A.    Yes, mm-hmm.

23       Q.    Do you know whether or not

24   the behavior that the mother was

25   complaining about was such that as to

88

1

2            C E R T I F I C A T E

3

STATE OF NEW YORK )

4                      : ss.

COUNTY OF NEW YORK)

5

           I, WENDY D. BOSKIND, an RPR

6      and Notary Public within and for

7      the State of New York, do hereby

8      certify:

9           That SURESH ARYA, the

10     witness whose examination before

11     trial is hereinbefore set forth, was

12     duly sworn by me, and that such

13     deposition is a true and accurate

14     record of the testimony given by the

15     witness.

16           I further certify that I am

17     not related to any of the parties to

18     this action by blood or marriage, and

19     that I am in no way interested in the

20     outcome of this matter.

21           IN WITNESS WHEREOF, I have

22     hereunto set my hand this _23rd_ day

23     of ___A/ril_____, 2008.

24

25                    _Wendy D. Boskind_

VERITEXT REPORTING COMPANY

# EXHIBIT I

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
Estate of VALERIE YOUNG, by VIOLA YOUNG,
as Administratrix of the Estate of
Valerie Young, and in her personal
capacity, SIDNEY YOUNG, and LORETTA
YOUNG LEE,

                              Plaintiffs,

                                          Index No.:
                    vs.              07CV6241

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, PETER USCHAKOW,
personally and in his official
capacity, JAN WILLIAMSON, personally
and in her official capacity, SURESH
ARYA, personally and in his official
capacity, KATHLEEN FERDINAND,
personally and in her official
capacity, GLORIA HAYES, personally and
in her official capacity, DR. MILOS,
personally and in his official capacity,

                              Defendants.
------------------------------------------X
                    April 10, 2008
                    10:09 a.m.


         Examination before trial of JAN
WILLIAMSON, held at the offices of The
Catafago Law Firm, P.C., 350 Fifth
Avenue, New York, New York, pursuant to
Notice, before Wendy D. Boskind, a
Registered Professional Reporter and
Notary Public of the State of New York.

25

```
 1              Williamson
 2    Q.      January of 2008.
 3    A.      Yes.
 4    Q.      Okay.
 5            (Deposition Exhibit
 6    Plaintiffs' Arya 2, organizational
 7    chart of BDC, Bates stamped D 1150,
 8    previously marked for
 9    identification.)
10    Q.      I want to show you this
11  document, which previously was marked as
12  Exhibit 2 during Mr. Arya's deposition.
13    A.      Mm-hmm.
14    Q.      It's Bates stamped D 1150.
15            I'm going to ask you whether
16  or not this organizational chart of BDC
17  accurately reflects your responsibilities
18  as deputy director of operations.
19    A.      At the time that I was the
20  acting deputy director, yes.
21    Q.      When -- how, if at all, did
22  those responsibilities change?
23    A.      Uh --
24    Q.      Since that time.
25    A.      Since that time -- uh, the
```

38

1                      Williamson

2      considered --

3           A.    I don't --

4           Q.    -- by Dr. Milos or any other

5      member of the team?

6                 MR. VELEZ:  Objection.

7                 You can answer.

8           A.    I wouldn't know.

9           Q.    Did you interview members of

10     the team as part of the investigation?

11          A.    No.

12          Q.    Did you speak to members of

13     the team at the meeting?

14          A.    This meeting, (indicating)?

15          Q.    Yes.

16          A.    No, not individually.

17          Q.    Did you ask any questions at

18     the meeting?

19          A.    Um -- probably, because there

20     are diagnoses here that I am not familiar

21     with, so just for clarification.

22          Q.    Anything else?

23          A.    No.

24          Q.    Did you ever review -- as

25     part of your job at BDC, as acting and

41

1                    Williamson

2          A.      Not that I recall.

3          Q.      Did Dr. Milos ever say

4    anything to you about the wheelchair?

5          A.      I would have spoken with

6    Kathy Ferdinand.

7          Q.      And what was -- if you know,

8    what was the purpose of her communicating

9    with you?

10         A.      There was a concern raised by

11   the treatment team that Valerie was at

12   risk of falling, having to do with her

13   dropped foot, and she also displayed

14   behaviors where she would attempt to

15   strike out both with hands and legs, so

16   you couple that with the unsteadiness, we

17   had great concerns about her going any

18   distance while walking.  So, the

19   treatment team was recommending that she

20   use a wheelchair for transport to go from

21   her residential unit to where her day

22   treatment program would be.  It was in a

23   separate building.  And I supported that

24   and ensured that a wheelchair was

25   available for that purpose.

44

1                    Williamson

2        Q.      -- or....

3                Did you have the authority

4    and responsibility of okaying or denying

5    that request, for a wheelchair?

6        A.      No, that wouldn't -- that's a

7    treatment team decision.

8        Q.      So what was the purpose in

9    contacting -- if you know.

10       A.      Well, first of all, to make

11   me aware that there was a medical concern

12   going on --

13       Q.      Right.

14       A.      -- and my responsibility was

15   to ensure that a wheelchair would be made

16   available for her as needed.

17       Q.      So your responsibility was to

18   procure the wheelchair, not to prescribe

19   it.

20       A.      Correct.

21       Q.      Were there any guidelines in

22   effect as to when a wheelchair would be

23   procured for a consumer or a patient at

24   BDC?

25       A.      No.

45

1                    Williamson

2          Q.    Okay.

3          A.    It's an on as-needed basis.

4          Q.    As deputy director of

5    operations, from September 2004 through

6    June 30th, 2005, did you ever review any

7    of the records pertaining to the

8    treatment and care of Valerie Young?

9          A.    No.

10         Q.    Did you ever ask to review

11   any of those records?

12         A.    No.

13         Q.    Did you ever speak to Peter

14   Uschakow about Valerie Young, or he to

15   you?

16         A.    Wow --

17         Q.    If you know.

18         A.    I don't remember.

19         Q.    Did you ever speak to any

20   member of Valerie's family?

21         A.    No -- um -- you know what?  I

22   don't remember if I spoke to her mom or

23   not on the phone.

24         Q.    Did you ever -- while you

25   were deputy director of operations, from

46

Williamson

1

2   September 2004 through June 2005, did you

3   ever observe anyone walking Valerie,

4   assisting her in walking?

5        A.   Yes.

6        Q.   How many times,

7   approximately?

8        A.   Ah -- a number, but I can't

9   put a number to it, because I didn't work

10  directly with her.

11       Q.   Approximately -- more than

12  five?

13       A.   Oh, yeah.

14       Q.   More than ten?

15       A.   I would say.

16       Q.   I'm saying for the time

17  period September --

18       A.   Sure, sure -- we're talking a

19  number of months here -- probably 30, 40

20  times.

21       Q.   And would -- and during those

22  times when you saw people walking her,

23  was it one person or more than one person

24  that was assisting her?

25       A.   Most times it was one person,

47

Williamson

1

2   but a second would be nearby.

3        Q.    Did you ever come to know

4   that she had received physical therapy at

5   the facility?

6        A.    Um -- at the mortality

7   review.

8        Q.    That's the first time you

9   learned about it?

10       A.    Yes.

11       Q.    As part of your working at

12  BDC, did you ever go to the facility

13  where physical therapy was offered to

14  patients?

15       A.    Physical therapy takes place

16  in our facility --

17       Q.    Right.

18       A.    -- so --

19       Q.    Is it at a particular

20  location of the facility?

21       A.    Yes, it is.

22       Q.    Did you ever go there?

23       A.    Yes, I have.

24       Q.    Did you ever see Valerie

25  there?

106

1

2                    C E R T I F I C A T E

3

STATE OF NEW YORK )

4                         : ss.

COUNTY OF NEW YORK)

5

6              I, WENDY D. BOSKIND, an RPR
         and Notary Public within and for

7        the State of New York, do hereby

8        certify:

9              That JAN WILLIAMSON, the

10       witness whose examination before

11       trial is hereinbefore set forth, was

12       duly sworn by me, and that such

13       deposition is a true and accurate

14       record of the testimony given by the

15       witness.

16              I further certify that I am

17       not related to any of the parties to

18       this action by blood or marriage, and

19       that I am in no way interested in the

20       outcome of this matter.

21              IN WITNESS WHEREOF, I have

22       hereunto set my hand this *22nd* day

23       of ___*April*____, 2008.

24

25                    __*Wendy D. Boskind*__

# EXHIBIT J

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ----------------------------------------X
   Estate of VALERIE YOUNG, by VIOLA YOUNG,
4  as Administratrix of the Estate of
   Valerie Young, and in her personal
5  capacity, SIDNEY YOUNG, and LORETTA
   YOUNG LEE,
6                        Plaintiffs,
                                    Index No.:
7            vs.              07CV6241
8  STATE OF NEW YORK OFFICE OF MENTAL
   RETARDATION AND DEVELOPMENTAL
9  DISABILITIES, PETER USCHAKOW,
   personally and in his official
10 capacity, JAN WILLIAMSON, personally
   and in her official capacity, SURESH
11 ARYA, personally and in his official
   capacity, KATHLEEN FERDINAND,
12 personally and in her official
   capacity, GLORIA HAYES, personally and
13 in her official capacity, DR. MILOS,
   personally and in his official capacity,
14
                        Defendants.
15 ----------------------------------------X
                    April 7, 2008
16                   10:11 a.m.
17
18        Examination before trial of KATHLEEN
19 A. FERDINAND, held at the offices of The
20 Catafago Law Firm, P.C., 350 Fifth Avenue,
21 New York, New York, pursuant to Notice,
22 before Wendy D. Boskind, a Registered
23 Professional Reporter and Notary Public
24 of the State of New York.
25

34

1                    Ferdinand

2    of test that could be done for blood

3    clots.

4         Q.    And whose job was it who had

5    control of whether or not to administer

6    that test while you were treatment team

7    leader?

8         A.    I guess it would have been

9    the doctor.

10        Q.    And the doctor was Dr. Milos?

11        A.    Yes.

12        Q.    Do you know what, if

13   anything, he said regarding the decision

14   not to administer the test?

15        A.    It wasn't a decision not to

16   administer a test, because we didn't know

17   that she had a blood clot, and there was

18   no indication that she had a blood clot.

19        Q.    And how -- withdrawn.

20              When did you -- did you ever

21   learn that she was in -- confined to a

22   wheelchair?

23        A.    She wasn't confined to a

24   wheelchair.

25        Q.    Was she using a wheelchair at

35

1                    Ferdinand

2    the time --

3         A.    She was using a wheelchair

4    for transport.

5         Q.    Only for transport.

6         A.    To transport to and from

7    program.

8         Q.    Was she using a wheelchair

9    for any other reason?

10        A.    No.

11        Q.    Did you ever see anyone walk

12   with her?

13        A.    Yes.

14        Q.    Assist her walking?

15        A.    Yes, staff would have to

16   assist her in walking.

17        Q.    Did you ever personally

18   observe her --

19        A.    Yes.

20        Q.    Which staff members did you

21   personally observe walking her?

22        A.    Oh, God, you're asking me to

23   remember --

24        Q.    Yes.

25        A.    I can't remember -- I don't

38

Ferdinand

1
2          speculating, only --
3                  MR. CATAFAGO:  Okay.
4          Q.    Tell me what you know, and if
5     you don't --
6          A.    Well, you know, I make
7     rounds, I would see her particularly in
8     the morning time, when the consumers
9     would go to program, I would see people
10    assist her.
11         Q.    How many different people?
12         A.    One, sometimes two.
13         Q.    How often, in the six months
14    prior to her death, did you observe
15    someone assist her?
16         A.    You asked me that before, and
17    I told you I don't know exactly.
18                MR. CATAFAGO:  Let's have
19            these documents marked.  This will
20            be the witness's name Exhibit 1,
21            it's Bates stamped CQC 202,
22                (Deposition Exhibit
23            Plaintiffs' Ferdinand 1, document,
24            which looks like an adaptive
25            equipment work order, Bates stamped

1              Ferdinand
2              THE WITNESS:   Why would I
3         keep a copy?
4         Q.    I'm sorry?
5         A.    (Laughing.)
6         Q.    Did you ever discuss
7    Valerie's treatment and care with any
8    member of her family?
9         A.    Ms. Young would come in
10   periodically and sit and talk --
11             MR. VELEZ:   Can you clarify
12        who you mean by "Ms. Young"?
13        A.    Ms. Viola Young, who is
14   Valerie's mother.
15        Q.    And do you recall any
16   specific conversation you had with her,
17   regarding her daughter?
18        A.    Ms. Young would come in
19   sometimes and we would have various
20   conversations, sometimes about her
21   daughter, sometimes not about her
22   daughter.
23        Q.    And what, if anything, do you
24   recall discussing about her daughter
25   with --

45

1                    Ferdinand

2        A.    I don't know.  Ms. Young was

3   always -- Valerie was somewhat -- was,

4   behaviorally, very challenging.  And

5   there were times that it was very

6   difficult to get Valerie stabilized.  So,

7   a lot of times Ms. Young would be

8   concerned about medication -- well, maybe

9   she's getting too much medication, maybe

10  she's not getting enough medication.  And

11  those were generally the conversations

12  Ms. Young would approach me with.

13              And when we did have those

14  conversations, I generally would tell her

15  how Valerie was doing, and then if she

16  had any other questions, refer her to the

17  doctor.

18        Q.    And that was Dr. Milos?

19        A.    Yes.

20        Q.    And when she -- did you ever

21  discuss with Valerie's mom your

22  understanding, if any, of the medications

23  or did you just simply refer her to the

24  doctor?

25        A.    I would not discuss -- since

49

1                    Ferdinand

2    records somewhere.

3         Q.    Were any instructions given

4    to team members as to how often to use

5    the wheelchair for Valerie?

6         A.    Yes.  The wheelchair was to

7    be used for transport.

8         Q.    Only for transport?

9         A.    Yeah, basically that.

10         Q.    Were you aware of any order

11    or directive indicating that it could be

12    used for any other reason?

13         A.    No.

14         Q.    Were you ever aware of any

15    back problems that Valerie had?

16         A.    No.

17         Q.    Were you ever aware of any

18    swelling of her feet or legs?

19         A.    No.

20         Q.    Did anyone else act as

21    treatment team leader for Valerie, other

22    than yourself?

23         A.    During the time she's been at

24    OMRDD?

25         Q.    Yes.

51

1                    Ferdinand

2          A.     Probably 50-something

3    patients.

4          Q.     And how many different team

5    members were there in your team in which

6    you were team leader while you were in

7    charge of the treatment of Valerie Young?

8          A.     We had the doctor, we have a

9    whole -- an entire interdisciplinary

10   team.  We had the doctor, nurses, direct

11   care, speech, OT, PT -- um -- who did I

12   leave out -- recreation -- um -- of

13   course the psychiatrist that we would

14   consult with.  We shared a psychiatrist.

15         Q.     Physical therapist?

16         A.     Yeah, I said PT.

17         Q.     "PT", physical therapist?

18         A.     Yeah.

19         Q.     Anybody else?

20         A.     Who am I forgetting -- no, I

21   guess that's probably it.

22         Q.     Did the medication that

23   Valerie was prescribed sedate her to the

24   point that she couldn't walk?

25         A.     No.

52

                    Ferdinand

1

2        Q.    Did it affect her ability to

3   walk at all?

4        A.    Well, she was having problems

5   walking, because she was falling a lot.

6        Q.    I'm asking -- yeah -- the

7   medication.

8        A.    Let me finish.

9              She was having problems

10  walking, and that's why the wheelchair

11  had gotten ordered, because she was

12  falling so much, and I had so many

13  incidents with her falling that I was

14  concerned that she was going to fall and

15  hit her head, and really hurt herself.

16       Q.    And --

17       A.    Now, I don't believe it was

18  medication, I believe it was something

19  else, but I'm a layperson, I don't know,

20  (gesturing).

21       Q.    Was a mat ever used for her?

22       A.    I don't remember, to tell you

23  the truth.

24       Q.    Are there instances where a

25  mat is not permitted for a patient?

74

1                        Ferdinand

2    (indicating)?

3          A.    I see it, yes, I do.

4          Q.    What was your understanding

5    of, quote, "wheelchair for all mobility

6    needs"?

7          A.    Okay, right now?  At that

8    point -- basically, was for her being

9    transported to and from program.

10         Q.    Was "all mobility" -- the

11   term "all mobility needs" anything in

12   addition to or on top of transportation?

13         A.    No.

14         Q.    Okay.

15         A.    No, absolutely not.

16         Q.    Did you have anything to add

17   on this, (indicating)?

18         A.    No.

19         Q.    Because Mr. Velez is right, I

20   tend to do that, and I want you to have

21   the ability to say whatever you need to

22   on these documents?

23              MR. CATAFAGO:  So let's have

24         this document marked as Ferdinand

25         Exhibit 9, Bates stamped Young 108,

80

Ferdinand

1

2      Q.    In this Special incident

3   review committee report, it is indicated,

4   and I quote: "It was also noted that,

5   fearing she might fall, staff may not

6   have encouraged Ms. Young to walk",

7   period, closed quote.

8            Do you agree with that, that

9   the staff didn't encourage her to walk,

10   prior to her death?

11      A.    I don't necessarily agree

12   with that, no.

13      Q.    And what about the sentence

14   that reads:  "Ms. Young had a history of

15   pitting edema", do you know what that

16   means?

17      A.    Well, I know what "edema" is,

18   it's swelling.

19      Q.    Do you know if she had a

20   history of pitting edema?

21      A.    I have no idea.

22      Q.    And it says --

23      A.    I don't know what "pitting

24   edema" is, by the way.

25      Q.    At the time of her death,

81

1                    Ferdinand

2    June 19th, 2005, was Ms. Young

3    ambulatory?

4         A.    Was she -- she could walk,

5    yes.

6         Q.    Did anyone ever consider

7    using elastic stockings for her?

8         A.    I really don't know that.

9               That would have been ordered

10   by the doctor.

11        Q.    Was that ever discussed with

12   you, as --

13        A.    No.

14        Q.    -- treatment team leader?

15        A.    It wasn't -- I was not aware

16   that she had pitting edema, to tell you

17   the truth.

18        Q.    And --

19        A.    I don't remember it being

20   discussed.

21        Q.    Going back, how often in June

22   of 2005 did you observe staff walking

23   with Ms. Young?

24        A.    You really expect me to

25   remember that?

104

1                    Ferdinand

2    believe, that she found it when she was

3    braiding -- doing her hair.

4         Q.    And there was no --

5    ultimately, there was insufficient

6    evidence to support any allegation of

7    neglect?

8         A.    I think that's --

9         Q.    I'm reading from 0208.

10        A.    Yeah, I think that was the

11   final finding.

12        Q.    And in the conclusions, 0208,

13   0209, this is as of May 26, 2005 --

14        A.    Mm-hmm.

15        Q.    -- it says, and I quote:

16   "Ms. Young was unstable at that time and,

17   although she can ambulate independently,

18   she required the use of a wheelchair".

19             Was that something that you

20   were aware of at the time?

21        A.    Where are you reading now?

22        Q.    0208 to 0209.

23        A.    (Pause.)

24             Okay.  And I see it's in

25   writing, so I guess that's what was going

105

                        Ferdinand

1.

2   on at the time.

3        Q.    And what about the next page,

4   0210, what is -- that's the -- this is

5   attendees at the meeting regarding the

6   incident; right?

7        A.    Right.

8        Q.    And you were there?

9        A.    Yes, I was there.

10       Q.    And ultimately, although Ms.

11  Daly was returned to work assignment,

12  there was a finding, was there not, that

13  the other direct care worker, Toni,

14  T-O-N-I, McNeil, had failed to properly

15  supervise her attending -- assigned

16  supervisory duties.

17            I'm reading from 0209.

18       A.    (Pause.)

19            Yes.

20       Q.    And do you recognize the --

21  that portion of the document which is

22  Bates stamped 0212?

23       A.    0212 -- (pause).

24       Q.    Was that something you

25  prepared?

146

1                  Ferdinand

2   tolerated"?  Did you agree with that?

3       A.    Yeah, I guess there is no

4   reason not to agree with it.

5       Q.    Do you know whether Dr. Milos

6   ever considered the use of elastic

7   stockings for Valerie Young?

8            MR. VELEZ:  Objection.

9       A.    Well --

10            MR. VELEZ:  But you can

11       answer.

12       A.    Well, Valerie wasn't non-

13   ambulatory, so I don't know whether he

14   ever ordered stockings for her or not, I

15   don't --

16       Q.    Did he or anyone else ever

17   discuss with you the use, or potential

18   use, of elastic stockings for Valerie

19   Young?

20       A.    No.

21       Q.    Did he or anyone else at

22   OMRDD ever discuss with you, or you with

23   them, the need to walk Valerie Young when

24   she had the wheelchair?

25       A.    No, because she was walking.

147

1                    Ferdinand

2    She was walking at times.  She wasn't

3    just sitting in the wheelchair all the

4    time.

5           Q.    How many times a day was she

6    walked?

7           A.    How many times a day was she

8    walked?  She was periodically walked.

9    She would walk in program.

10                Again, the wheelchair was

11   basically used for transport.

12          Q.    Well, how many minutes or

13   hours a day would she walk typically --

14          A.    I don't know.

15          Q.    -- in May of 2005?

16          A.    I can't tell you how many

17   times.

18          Q.    Can you tell me in any of the

19   months preceding her death --

20          A.    I have no idea.  I can't

21   remember.

22          Q.    That's fair.

23                MR. CATAFAGO:  Let's have

24          this two-page document, Bates

25          stamped Young 0013 and Young 0266,

182

1                        Ferdinand

2          Q.    That's my question.

3          A.    I don't know.

4          Q.    Now, was there anything that

5     you felt and believed should have been

6     done with Valerie as a result of her

7     being in a wheelchair, whether walking

8     her, giving her stockings, (indicating),

9     massaging her feet, doing anything at all

10    because she was in a wheelchair.

11         A.    The wheelchair was just used

12    for transport.

13         Q.    That was your understanding.

14         A.    That's right.

15         Q.    And how many minutes or hours

16    a day was it used for?

17         A.    It should have been used to

18    take her to program and to bring her back

19    from program.

20         Q.    And for no other purpose.

21         A.    No.

22         Q.    Is that correct?

23         A.    It depends upon what time you

24    are talking about, and I would have to

25    refer to the record to let you know the

183

1                    Ferdinand

2   specifics.

3        Q.    And, rather than showing you

4   10,000 documents, I am asking for your --

5        A.    Well --

6        Q.    -- recollection whether or

7   not you are aware of Valerie using a

8   wheelchair for any reason, any purpose,

9   other than transport while she was under

10  your care.

11       A.    No.

12             Given the time frame that

13  you're talking about, you're talking

14  about directly before her death?

15       Q.    I'm talking about while she

16  was under your care, ma'am.

17       A.    Well, that was for some --

18  10,000 years, and I don't remember.

19       Q.    Was it for 10,000?  It wasn't

20  10,000.

21       A.    It wasn't 10,000 years, but

22  you're talking about three or four or

23  five years back.

24             I can't remember yesterday,

25  so I can't definitely remember five years

217

1                    Ferdinand

2         Q.    -- or her inability to walk,

3    or whatever, was --

4              MR. VELEZ:   Let him finish.

5         Q.    -- caused in part by the

6    psychotropic medication?

7         A.    No.

8         Q.    Did you ever make any kind of

9    observation that she had an unsteady

10   gait?

11        A.    She definitely had an

12   unsteady gait.

13        Q.    Was there a discussion with

14   the doctor about it?

15        A.    It was discussed at meetings.

16        Q.    And what did the doctor say?

17        A.    You know what?   Right now, I

18   really can't remember.

19        Q.    And --

20        A.    Just that she had a dropped

21   foot, whatever that meant.

22        Q.    Was there a medical order

23   issued for the wheelchair?

24        A.    There would have had to have

25   been, yes.

218

Ferdinand

1

2      Q.     And what was your

3   understanding, that she would have to use

4   the wheelchair for transport?

5      A.     Yes.

6      Q.     What about for any other

7   purpose?

8      A.     Um -- they may have used it

9   if she was having a hard time going out

10  to clinics, also.

11     Q.     Who made the order for the

12  wheelchair?

13     A.     The doctor would have had to

14  make the order for the wheelchair.

15     Q.     Was there a standing order or

16  was it --

17     A.     No, we don't do a standing

18  order, not unless the consumer is totally

19  non-ambulatory is there any standing

20  order for a wheelchair.

21     Q.     So there was no standing

22  order in this case for the wheelchair.

23     A.     No, it wouldn't have been a

24  standing order.

25     Q.     Can you -- I mean, the

222

1                      Ferdinand

2    wheelchair"?

3          Q.    Yes.

4          A.    For a wheelchair?

5          Q.    Yes.

6          A.    No.

7          Q.    Take a look at the -- if

8    there was a change in the wheelchair

9    requirement, would there have to be a

10   medical order issued?

11         A.    We could change it via a team

12   meeting.

13         Q.    Would that have to be

14   recorded somewhere?

15         A.    Yeah. It would be probably

16   recorded either in a quarterly or a

17   special meeting.

18         Q.    Was there ever any discussion

19   with staff as to the length of time or

20   the amount of time that Valerie should be

21   walked without the wheelchair?

22         A.    What are you talking about?

23         Q.    I'm talking about in the five

24   months before her death.

25         A.    Again, the wheelchair was

223

1                    Ferdinand

2    used for transport in those days.

3         Q.    Only for transport.

4         A.    Transport to and from

5    program.

6         Q.    Take a look at 8055.

7         A.    Because you have me looking

8    at a document that's 2004.

9         Q.    That's right.

10        A.    Okay, but you're talking

11   about 2005 now, just a minute ago.

12        Q.    That's correct.

13        A.    Okay, so you're trying to mix

14   me up.

15        Q.    Not at all.

16        A.    (Laughing.)

17        Q.    The record will indicate

18   you're laughing, so I assume you get what

19   I'm trying to determine here.

20              If you're confused at any

21   time, let me know.

22        A.    No -- well, I'm just asking,

23   because you have me looking at a 2004

24   document, and then you throw in something

25   about 2005.

227

1                          Ferdinand

2      each discipline discuss their findings

3      and recommendations, and then there's a

4      team discussion.  So my job, as the team

5      leader, is to make sure all the team

6      consensus really gets into the minutes.

7              Q.    Did you believe that as of

8      that time, in April 2004, that Valerie

9      was fully ambulatory?

10             A.    Yes, I do.  If the wheelchair

11     was discontinued.

12             Q.    Did there come a time when

13     you believed that she was no longer fully

14     ambulatory?

15             A.    Uh -- there must -- yes,

16     there must -- well, when she was falling

17     a lot.

18             Q.    When was that?  When did you

19     come to believe that she was no longer

20     fully ambulatory?

21             A.    She was ambulatory, but she

22     was falling a lot.

23             Q.    Well, take a look at --

24             A.    That's why I said, she was

25     ambulatory but she had been falling an

228

1                    Ferdinand

2    awful lot.

3          Q.    Would you describe it --

4          A.    And that was the concern when

5    she was last put on the wheelchair, why

6    she was given the wheelchair for

7    transport, because she was falling a lot

8    and injuring herself, and we were

9    concerned that she was going to get

10   seriously injured, like a head injury.

11         Q.    And what about when she

12   wasn't being transported?

13         A.    What do you mean?

14         Q.    Did she stay in the

15   wheelchair so as to avoid a fall?

16         A.    She wasn't in the wheelchair

17   all the time.

18         Q.    Where would she sit?

19         A.    She would sit in a regular

20   chair, staff would sometimes walk around

21   with her --

22         Q.    Would that be --

23         A.    -- when she would allow them

24   to walk her.

25         Q.    Would that --

230

1                       Ferdinand

2          A.     It says -- under where?

3          Q.     "Stress."

4                 MR. VELEZ:   (Indicating.)

5          A.     Right.  It says "fully

6    ambulatory", but it also says at the top

7    that she "continues to require close

8    supervision when walking to and from

9    facilities, social events, due to her

10   non-compliant behavior".

11         Q.     Right.  What was your

12   understanding of "fully ambulatory"?

13         A.     She was able to walk.

14         Q.     And what is "has full ROM in

15   all her extremities"?  "ROM", what does

16   that mean?

17         A.     Range of motion.

18         Q.     And was it your understanding

19   that she could walk with assistance at

20   that time?

21         A.     Yes.

22                (Deposition Exhibit

23         Plaintiffs' Milos 2, document,

24         which looks like an IPP review

25         reading on July 20th, 2004, Bates

238

1                    Ferdinand

2     coordinator, who is recording the

3     meeting, would record anything that was

4     going on with physical therapy in that

5     area.

6              Q.    Did Valerie Young ever

7     receive physical therapy at any point in

8     2004?

9              A.    Didn't we just -- I don't

10    remember.

11             Q.    Did she receive physical

12    therapy at any point in 2005?

13             A.    I don't remember.

14             Q.    Did you ever correct this --

15             A.    In 2005, she did get physical

16    therapy.

17             Q.    When in 2005 did she get

18    physical therapy?

19             A.    I don't know.

20                   I don't have the whole record

21    in front of me.

22             Q.    Well, what you have in front

23    of you, ma'am, indicates that your team

24    recommends integration of the following

25    services.

258

1                  Ferdinand

2          MR. VELEZ:   (Indicating), two

3      more pages.

4          Q.    "Sensory slash motor", Roman

5   numeral IV, the first full sentence, and

6   I quote:  "Valerie is a verbal ambulatory

7   (with left foot drop and high stepping

8   gait), woman who has full range of motion

9   in upper and lower extremities".

10              Would you agree that that

11  accurately described Valerie in April

12  2005 --

13         A.    Yes.

14         Q.    -- when she went under

15  medication?

16         A.    No.

17              I mean, that accurately

18  described her --

19         Q.    Okay.

20         A.    -- at that point.

21         Q.    And can you tell me whether

22  if and to what extent you observed --

23  personally observed any effect that the

24  medication had on her ambulatory and

25  range of motion?

260

1                      Ferdinand

2    the effect that the medication was having

3    on her, in terms of state of sedation --

4         A.    I don't know.

5         Q.    -- or just lethargy or

6    dizziness?

7         A.    First of all, if any consumer

8    would be sitting and -- (indicating),

9    like that, I would be very concerned that

10   they are overmedicated.  I didn't see

11   that in Valerie.

12              Valerie --

13              MR. VELEZ:  Just let the

14         record reflect that you indicated

15         like with the eyes closed, the head

16         nodding.

17         Q.    Is that what you were

18   indicating?  Because I would rather adopt

19   your description.

20         A.    (Laughing), okay.

21              MR. VELEZ:  Well, she said

22         "like", but she didn't explain.

23              MR. CATAFAGO:  Now she's

24         laughing.

25         A.    No -- well, no.  If I saw --

261

1              Ferdinand

2              MR. CATAFAGO:  Counsel is

3         smiling.

4              Could you please just let the

5         record reflect what it's going to

6         reflect.

7         A.    Okay, I will state it.  Okay?

8              MR. VELEZ:  She didn't

9         explain what "like" was.

10             THE WITNESS:  Okay.

11        A.    If I saw any consumer whose

12   eyes were closed and were drooping down,

13   I would be very very concerned as to what

14   was going on with that consumer.  I

15   did -- I never saw Valerie in that

16   manner.  Valerie was, at times, extremely

17   aggressive and unmanageable, and I never

18   saw her sitting -- very, very rarely was

19   Valerie sitting quietly.

20        Q.    Did you observe her being

21   unmanageable and in the way you have just

22   described at any point in 2005?

23        A.    Yes.

24        Q.    At any point after April

25   13th, 2005.

282

1                    Ferdinand

2      this already.

3            Q.    Does Dr. Milos get a copy of

4      the report?

5            A.    He -- part of his report is

6      in there.

7            Q.    But in terms of the

8      ultimate --

9            A.    Team recommendation?

10           Q.    Yes.

11           A.    He sits there on the meeting.

12           Q.    Does he get the written

13     report after the meeting?

14           A.    No, but he sits in on the

15     meeting.

16           Q.    Got it.

17                 MR. CATAFAGO:  I have no

18           other questions.

19                 Thank you.

20                 MR. VELEZ:  I just have one

21           question.

22     BY MR. VELEZ:

23           Q.    During the hours that she was

24     awake, if Valerie Young wasn't on her

25     feet, she would be sitting down; correct?

284

1                    Ferdinand

2         Q.    So would it have been

3    inappropriate for Valerie to sit in the

4    wheelchair instead of a regular chair?

5              MR. CATAFAGO:  Objection to

6         the form of the question.

7         Q.    You can answer.

8         A.    Um -- yes and no.

9              Generally, she probably

10   should have sat in a regular chair.  But

11   if Valerie went to sit in a wheelchair,

12   rather than the staff trying to fuss with

13   Valerie, to get her out, and having an

14   incident as a result of it, they may have

15   left her in the regular chair -- in the

16   wheelchair.

17              MR. VELEZ:  Okay, no further

18         questions.

19              (Time noted:  3:30 p.m.)

20

21

22

23

24

25

# EXHIBIT K

ORIGINAL

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
Estate of VALERIE YOUNG, by VIOLA
YOUNG, as Administratrix of the
Estate of Valerie Young, and LORETTA
YOUNG LEE,

                              Plaintiffs,

            -against-

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, PETER USCHAKOW,
personally and in his official
capacity, JAN WILLIAMSON, personally
and in her official capacity, SURESH
ARYA, personally and in his individual
capacity, KATHLEEN FERDINAND,
personally and in her official
capacity, GLORIA HAYES, personally
and in her official capacity,
DR. MILOS, personally and in his
official capacity,

                              Defendants.

- - - - - - - - - - - - - - - - - - - -x

                    75 Morton Street
                    New York, New York
                    April 18, 2008
                    10:25 A.M.

1                    **GLORIA HAYES**

2    direct care supervisors, I would supervise

3    them.

4         Q.   Would that be the only time that

5    you would be supervising the direct care

6    workers?

7         A.   No.  If they need training.  Or

8    if they needed -- if there was a memo that

9    had to be given out to them, or if I went

10   to a meeting, then, if I was expected to

11   speak with all the direct care workers, I

12   would do that.

13        Q.   With regard to Valerie Young, did

14   there come a time that you learned that

15   she had suffered from a deep vein

16   thrombosis?

17        A.   Yes.

18        Q.   What you did you learn that?

19        A.   I don't recall.

20        Q.   How did you learn that?

21        A.   From Dr. Milos.

22        Q.   Was that before or after she had

23   died?

24        A.   After.

25        Q.   Did Dr. Milos, or anyone else,

28

1                    GLORIA HAYES
2        A.   No.
3        Q.   Was it within six months of her
4   death?
5        A.   I'm sure it was.  I don't recall.
6        Q.   Do you recall if it was within
7   three months of her death; if you recall?
8        A.   I don't recall.
9        Q.   With regard to the unit that you
10  were the unit supervisor for,
11  approximately how many patients are within
12  that unit?
13       A.   Now or at that time?
14       Q.   Now.
15       A.   Approximately... maybe 49 to 50.
16       Q.   What about now?
17       A.   That's it.
18       Q.   What about at the time?
19       A.   At the time, it was probably, I
20  think, it was about 60, 70, I'm not sure.
21       Q.   You were the only unit
22  supervisor --
23       A.   Yes.
24       Q.   -- for that unit?
25            How long did you have that

1                    GLORIA HAYES

2       communicated to you?

3            A.    From my team leader with a team

4       meeting.

5            Q.    Are you aware of any special

6       precautions that were ever discussed with

7       you regard to Valerie Young prior to her

8       death?

9            A.    I recall her having to be

10      transported in a wheelchair.  But she was

11      being ambulated when she wasn't being

12      transported, or when she didn't have to

13      use the wheelchair for any special

14      reasons.

15           Q.    Would you say Valerie Young was

16      fully ambulatory, somewhat ambulatory, or

17      not all ambulatory in the month before her

18      death?

19           A.    In the month before... I don't

20      know the time, but she was fully

21      ambulatory.  And then she needed a

22      wheelchair.  I don't know how long before

23      her death it was, I don't remember, but

24      she needed a wheelchair for transport.

25           Q.    Do you remember if she received

40

GLORIA HAYES

1

2    any physical therapy in the year before

3    her death?

4         A.   She received physical therapy,

5    yes.

6         Q.   When was the last time, if you

7    know, that she received physical therapy?

8         A.   I don't remember.

9         Q.   Can you tell us if it was more or

10   less than three months before her death,

11   if you can?

12        A.   I believe it was less than three

13   months before her death.

14        Q.   How do you know she received

15   physical therapy?

16        A.   Because any time something was

17   going to be done, we have a team meeting.

18        Q.   Other than the fact that it may

19   have been discussed or was discussed at a

20   team meeting, do you have any personal

21   knowledge of her receiving physical

22   therapy?

23        A.   Yes.  She would be taken to PT.

24        Q.   You know she would have been

25   taken --

44

1                    GLORIA HAYES

2        Q.   Do you recall any other

3    discussions that any team members had in

4    your presence regarding the side effects

5    of the medication that was being

6    administered to Valerie Young was having?

7        A.   No.

8        Q.   Was she unsteady on her feet in

9    the months before her death?

10       A.   Yes.

11       Q.   Was she able to ambulate without

12   assistance?

13       A.   She would ambulate with

14   assistance, but sometimes she would jump

15   up and ambulate on her own, and she was

16   unsteady.

17       Q.   How many people would assist her

18   when she needed to ambulate?

19       A.   Most of the time, just one

20   person.

21       Q.   I am going to show you what has

22   been marked as Hayes Exhibit C, Bates

23   stamped Young 7743 through 7744.  Please

24   tell me if you recognize that document.

25       A.   Okay.

1                      **GLORIA HAYES**

2    quote:  Wheelchair for all mobility needs,

3    do you know if, as a result of that

4    recommendation, the mode of treatment was

5    changed in any way, or shape, or form at

6    any time from the date of this document,

7    April 20, 2005, until the death of Valerie

8    Young?

9        A.   I don't know if it changed.  I

10   don't believe so.

11       Q.   What is your understanding of

12   that recommendation, quote:  Wheelchair

13   for all mobility needs?

14       A.   My understanding is, when she

15   needed to be moved from one area to the

16   other, that they should use the chair, the

17   wheelchair.  When she needed to be

18   transported to program, or PT, or OT, they

19   needed to use the wheelchair.

20            But she wasn't -- she had

21   mobility -- she was out of the chair

22   sometimes, and she would sit in one of the

23   living room area chairs.

24       Q.   Looking at Exhibit C, there is

25   nothing -- there's no recommendation as to

49

GLORIA HAYES

1

2      A.    I'm trying to think if it was her

3  at that time... I think she came in 2005.

4      Q.    How many different wing leaders

5  have there been on the wing since 2003?

6      A.    Oh, gosh, let me see.  We have on

7  the day shift at least since Valerie's

8  death or before --

9      Q.    Since 2003?

10      A.    Since 2003 it was one, two,

11  three... approximately four.

12      Q.    That's four for the day shift?

13      A.    Day shift.

14      Q.    What about the night shift?

15      A.    Night shift, three.

16      Q.    Who was the night shift wing

17  leader at the time of Valerie's death?

18      A.    Toni McNeil.

19      Q.    Now, you were not on site at the

20  time of her death?

21      A.    Right.

22      Q.    You were at home?

23      A.    Yes.

24      Q.    Were you on call at all?

25      A.    They called the team leader.

52

1                    GLORIA HAYES

2    the night before.

3         Q.   Do you know how much movement out

4    of her wheelchair she had in the six hours

5    before her death, if any?

6              MR. VELEZ:  Objection.

7         A.   I can't tell you how much

8    movement she had.

9         Q.   Because you weren't there?

10        A.   Because I wasn't there.

11        Q.   What about in the 12 hours before

12   her death, if you remember?

13        A.   The only way I can answer that is

14   if I knew the day of week she died.  And I

15   don't recall that day right now.

16        Q.   She died on June 19, 2005.  I

17   don't know the date, but we can get it.

18              It was a Sunday.

19        A.   Okay, that's my day off.

20        Q.   So you weren't there at all; you

21   weren't there at all on Sunday?

22        A.   (Indicating.)

23        Q.   Did you ever see anything or hear

24   anything as to her physical activity, as

25   to how much movement she had, through

54

GLORIA HAYES

1
2   you know.  But they would do the same
3   things, like walk her around, and so she
4   would ambulate.
5       Q.   Are you done?
6       A.   Yes.
7       Q.   You don't recall who told you
8   this?
9       A.   I don't recall.
10      Q.   Can you recall when you were told
11  this, whether it was before or after her
12  death that you were told this?
13      A.   It was after.
14      Q.   After?
15      A.   Yes.
16      Q.   Okay.
17           Were you ever made aware of the
18  official state findings regarding
19  Valerie's death?
20      A.   No.
21      Q.   Were you ever made aware of the
22  suspicion that she hadn't been ambulated
23  and hadn't been moved around prior to her
24  death?
25           MR. VELEZ:  Objection.  Give a

61

                        GLORIA HAYES

1

2      A.    I wasn't there in January.

3      Q.    This is January 2003 and you had

4  not yet joined BDC --

5      A.    No.

6      Q.    -- as a Residential Unit

7  Supervisor; is that correct?

8      A.    Right.

9      Q.    Incidentally, how many different

10 wheelchairs did you see Valerie use?

11     A.    There was only one assigned to

12 her.

13            There were times that she would

14 actually try to get into the wheelchair

15 herself.

16     Q.    In the time from 2003 until her

17 death, you remember only one wheelchair?

18          MR. VELEZ:  One type of

19     wheelchair or her using a wheelchair

20     once?

21          MR. CATAFAGO:  Her using only

22     one, one type of wheelchair, one

23     specific wheelchair.

24     A.    There are so many of them.  There

25 are so many different chairs... I don't

GLORIA HAYES

1                        

2   Valerie's ability to walk, was that

3   discussed at the meeting?

4       A.   Repeat that, please.

5          MR. CATAFAGO:  Please read that

6      back.

7         (The requested portion of the

8      record was read.)

9         MR. CATAFAGO:  Mr. Velez, don't

10     do that.

11        Let me withdraw the question.

12      Q.   As of April 13, 2005, was Valerie

13   Young fully ambulatory with good range of

14   motion in her extremities?

15      A.   As of April 13th... I don't

16   remember exactly when during that time,

17   but Valerie could ambulate.  She was given

18   the chair at certain points for

19   transporting her around the wing to and

20   from program or whatever, but staff would

21   walk her.  She sometimes -- many times --

22   she would get up by herself.

23      Q.   Was she fully ambulatory around

24   April 13th --

25      A.   I can't recall the date.

```
 1                  GLORIA HAYES
 2        Q.   Take a look at the document Bates
 3   stamped 7653 and tell me if you recognize
 4   it.  It's a summary --
 5        A.   No.
 6        Q.   Have you ever seen that document
 7   before?  I am just going to ask you one
 8   question about it.
 9        A.   No.  I have never seen it.
10        Q.   Did Valerie Young, as of
11   April 13, 2005, have any apparent major
12   physical limitations?
13        A.   According to this, she had no
14   apparent major physical limitations.
15        Q.   Did she -- to your perception and
16   observation -- did she have any apparent
17   major physical limitations?
18        A.   The problem is I can't remember
19   the dates.  But this says so, you know...
20   I don't remember the date of that.
21        Q.   Let me see if I can refresh your
22   recollection.  That document is dated --
23   in connection with the April 13th annual
24   report -- April 13, 2005 -- but on
25   April 20, 2005, in Exhibit C that you have
```

151

1              GLORIA HAYES

2         MR. CATAFAGO: Counsel, I am not

3    trying to mislead the witness.

4    Q.   I'm only asking:  Does reading

5  this document refresh your recollection as

6  to your information and knowledge, as of

7  April 13th, 2005, with respect to what, if

8  any, apparent physical limitations the

9  decedent had, and what her ambulatory

10  status was, if any?  Does that refresh

11  your recollection?

12    A.   I recall being at this meeting on

13  April 20, 2005.  What was said in the

14  meeting, I don't recall unless I read it.

15    Q.   Take a look at the document and

16  tell me whether reading that refreshes

17  your recollection as to Valerie's physical

18  limitations and ambulatory status on

19  April 13, 2005 from reading Exhibit C.

20         (Witness complies.)

21    A.   Okay.  This document is saying

22  she has unsteadiness.  She was falling.

23         (Indicating).

24         This one is saying she has no

25  apparent major physical limitations.  The

153

GLORIA HAYES

1
2      "fully ambulatory"?  Have you
3      established the meaning of that term?
4      Q.   Do you know what that term means?
5      A.   Can you tell me your definition?
6      Q.   It's not my knowledge I'm
7  concerned about.  It was used at the
8  meeting, and it's used in the IDT report.
9      A.   Because this is saying she is
10  fully ambulatory.
11      Q.   Right.
12      A.   Okay.
13      Q.   I'm asking:  Do you agree?
14      A.   I will tell what I feel.  I feel
15  you can be fully ambulatory and still, you
16  know, you are walking, but you might be
17  unsteady.  That's how I feel.
18      Q.   I'm showing you a document marked
19  at Kathleen Ferdinand's deposition.  It is
20  Bates stamped CQC 197, and it's marked as
21  Exhibit 3.  It's an occupational therapy
22  note dated April 27, 2005 relating to
23  Valerie Young.
24          Have you seen this document
25  before?

160

GLORIA HAYES

1

2      A.    Yes.

3      Q.    Do you know if that was done?

4      A.    Yes.

5      Q.    Who was responsible for making

6   such entries?

7      A.    Direct care staff.

8      Q.    Who was supervising them?

9      A.    The wing leader.

10      Q.    Do you know of any record at all

11   of her being moved, or of her receiving

12   leg elevation, or any kind of ambulation

13   in the hours before her death?

14      A.    Well, I know she was being

15   ambulated because I have seen it myself.

16      Q.    Except you weren't there.

17      A.    I wasn't there in the hours

18   before she passed.

19      Q.    You testified that you had Sunday

20   off --

21      A.    I wasn't there in the hours

22   before she died.

23      Q.    Let me finish the question.

24      A.    I'm sorry.

25      Q.    In fact you weren't there Sunday,

168

GLORIA HAYES

Q.   Did you discuss Valerie Young's

care and treatment with Kathleen Ferdinand

or with Dr. Milos outside of the meetings?

A.   Yes.

Q.   What did you discuss with

Ms. Ferdinand?

A.   Outside the meetings, we would

discuss how to write up a memo for staff

or something pertaining to that.

Q.   Did you ever observe Valerie

Young, in 2005, sitting in a wheelchair

when she wasn't being transported?

A.   No.  But I have seen when she

would get into a wheelchair herself.

Q.   Would staff ever put her in a

wheelchair if she wasn't being taken from

one place to another?

A.   Staff was good with Valerie.

They would do what they were instructed to

with Valerie.  She would sometimes go and

get into the wheelchair, and they would

have a hard time trying to take her out.

Q.   When would she want to be in the

wheelchair?

169

1                    GLORIA HAYES

2        A.    Sometimes she would get in by

3    herself.  She go from the sofa and climb

4    into the wheelchair, you know, because

5    staff would be ambulating her around the

6    wing, you know, and I saw that a lot.

7        Q.    Did they have a hard time with

8    her ambulating?

9        A.    At times.

10       Q.    What kind of a hard time?

11       A.    Like sometimes she would lean

12   over on them.

13       Q.    Would she stumble sometimes?

14       A.    Are you asking if I saw her

15   stumble while they were holding her?

16       Q.    Would you see her lean if more

17   than one person would hold her?

18       A.    Well, usually one person -- two

19   people would help her when they would take

20   her to the bathroom, in and out of the

21   bathroom.  And sometimes she would lean.

22       Q.    Have you ever discussed Valerie

23   Young's care and treatment with Jan

24   Williamson?

25       A.    No.

171

1                  GLORIA HAYES

2  particular day when she would call.

3       Q.   Did she ever express concern

4  about her medications?

5       A.   Not to me.

6       Q.   Do you know if she expressed that

7  concern to anyone?

8       A.   I don't know.

9       Q.   Did you ever discuss Valerie

10  Young's treatment and care with Miranda

11  Wallace?

12       A.   Yes.

13       Q.   Tell me what that discussion was.

14       A.   I told her to make sure the

15  consumer was being ambulated, and make

16  sure that two people would assist her when

17  she was on the evening shift.  I told her

18  about staff, to make sure there were two

19  people who would take her to and from the

20  bathroom.  Plus I told her to make sure

21  and get everyone to sign the in-service

22  training paper on her.

23       Q.   Anything else?

24       A.   Whatever else was necessary for a

25  particular time.  I don't remember

175

                    GLORIA HAYES

1  responsibilities that the Residential Unit

2  Supervisor has.

3          I would like you to tell me this:

4  How did you assign and schedule staff

5  members to perform direct care and

6  supervision and training of consumers?

7      A.   How did I do that?  I would have

8  meetings.  I would send out memos.  I

9  would have in-service training.

10     Q.   How often were those meetings

11  held?

12     A.   I have meetings with the

13  supervisors once a month.  And they have

14  meetings with their direct care staff.

15  And periodically I have meetings with the

16  whole direct care staff.  And with the

17  supervisors.  I wouldn't do it like every

18  month.  I would do it like every three

19  months or so.  I just do that

20  periodically.

21     Q.   Do you recall any meeting at

22  which -- formal meeting -- at which the

23  ambulatory needs of Valerie Young were

24  discussed?

176

GLORIA HAYES

1

2    A.    Do I recall any, yes.  I have

3    been to meetings about that when it was

4    time for her to ambulate.  I would have

5    meetings with the supervisors.  They in

6    turn would have a meeting with the direct

7    care staff.

8    Q.    What did you say about ambulating

9    her?

10    A.    When the time came, that she

11    should be -- when she was using the

12    wheelchair -- it was only for transporting

13    her; that she needed to be ambulated.  I

14    would have a meeting so they would make

15    sure that it would be done.  Consistently.

16    I would tell the supervisors and they'd

17    tell the direct care staff.

18    Q.    Did you prepare any memos, any

19    written memos, to reflect that?

20    A.    I don't know.  I have to look and

21    see if there was a formal meeting.

22        MR. CATAFAGO:  To the extent

23        those documents haven't been

24        provided --

25        MR. VELEZ:  Everything been

CERTIFICATION

I,    GRETCHEN A. MILTON, a Notary
Public for and within the State of New
York, do hereby certify:

That the witness whose testimony as
herein set forth, was duly sworn by me;
and that the within transcript is a true
record of the testimony given by said
witness.

I further certify that I am not
related to any of the parties to this
action by blood or marriage, and that I am
in no way interested in the outcome of
this matter.

IN WITNESS WHEREOF, I have hereunto
set my hand this 30th day of April, 2008.


_____

GRETCHEN A. MILTON

# EXHIBIT L

1

1

2 UNITED STATES DISTRICT COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 - - - - - - - - - - - - - - - - - - - - - -x

5 ESTATE OF VALERIE YOUNG, by VIOLA
  YOUNG, as Administratrix of the

6 Estate of Valerie Young, and in her
  personal capacity, SIDNEY YOUNG,

7 and LORETTA YOUNG LEE,

8                           Plaintiffs,

9           -against-

10 STATE OF NEW YORK OFFICE OF MENTAL
   RETARDATION AND DEVELOPMENTAL

11 DISABILITIES, PETER USCHAKOW,
   personally and in his official

12 capacity, JAN WILLIAMSON, personally
   and in her official capacity, SURESH

13 ARYA, personally and in his
   individual capacity, KATHLEEN

14 FERDINAND, personally and in her
   official capacity, GLORIA HAYES,

15 personally and in her official
   capacity, DR. MILOS, personally and

16 in his official capacity;

17

                          Defendants.

18 - - - - - - - - - - - - - - - - - - - - - -x

19                   350 Fifth Avenue
                     New York, New York

20
                     March 27, 2008

21                   10:25 A.M.

22

23

24

25

18

1                    JOVAN MILOS, M.D.

2    specialist different than those of medical

3    doctors?

4        A.    They are no different.

5        Q.    With regard to the BDC residents

6    under your care, those 55 to 70 residents,

7    are you familiar with a patient by the

8    name of Valerie Young?

9        A.    Yes, I am familiar.

10       Q.    When did you first see Valerie

11   Young?

12       A.    I think it was around

13   January 2002.

14       Q.    Is it correct that she was one of

15   the 55 to 70 residents at BDC under your

16   care as a medical specialist?

17       A.    Yes.

18       Q.    Was there anyone --

19             MR. CATAFAGO:  Withdrawn.

20       Q.    During the time that Valerie

21   Young was under your care, did you report

22   to anyone at BDC?

23       A.    I don't understand the question.

24       Q.    With regard to the medical

25   services and care you provided for Valerie

39

JOVAN MILOS, M.D.

1

2      A.    Yes.

3      Q.    Were you concerned at all about

4   the side effects of the medications that

5   were prescribed to Valerie Young at any

6   time?

7           MR. VELEZ:  Objection.  That is

8       very broad.

9           If you can answer, go ahead.

10     Q.    I am asking from your own

11   recollection.

12     A.    I think in consideration of all

13   the -- any time I prescribe a medication I

14   look into the possible side effects and

15   interactions.

16     Q.    Do you remember what the specific

17   side effects, if any, or interactions,

18   were that you were most concerned about in

19   connection with Valerie Young?

20     A.    No.

21     Q.    Did you ever discuss the use of a

22   wheelchair for Valerie Young with anyone?

23     A.    Yes.

24     Q.    Who did you discuss that subject

25   with?

41

JOVAN MILOS, M.D.

1

2  to issue a wheelchair, to give Valerie a

3  wheelchair, to transfer her from one

4  building to the other building.

5      Q.   Who was it prescribed by?

6      A.   It was discussed with the team.

7      Q.   Who made the ultimate decision to

8  put her in a wheelchair?

9      A.   It was the entire team --

10      Q.   Who was the person in charge of

11  the team?  Who was the team leader?

12      A.   Kathleen Ferdinand.

13      Q.   Do you specifically recall

14  discussions about a wheelchair for Valerie

15  Young with Kathleen Ferdinand?

16      A.   We discussed it as a team.

17      Q.   How many times did you discuss

18  with the team the use of a wheelchair for

19  Valerie Young?

20      A.   I don't remember.

21      Q.   Did you ever discuss anything

22  else with Kathleen Ferdinand, other than

23  the wheelchair, relating to Valerie Young?

24      A.   We had team meetings about

25  Valerie.

59

1                    JOVAN MILOS, M.D.

2        Q.    As of the date of this team

3   meeting, as indicated on the first page of

4   Exhibit 2, of July 20, 2004, had Valerie

5   Young been placed in a wheelchair?

6        A.    I don't recall.

7        Q.    Do you remember when she was

8   placed in a wheelchair?

9        A.    She was not placed in a

10  wheelchair.  A wheelchair was ordered to

11  transport her from one buildings to

12  another.

13       Q.    Do you recall when that

14  wheelchair was ordered?

15       A.    I would have to look in the

16  records.

17       Q.    You have no independent

18  recollection?

19       A.    No.

20       Q.    In this first page of Exhibit 2,

21  it says under:  Involvement of mother,

22  "very involved."

23            What is your understanding of the

24  level of contact Viola Young had, or what

25  was the purpose of including that?

88

1                    JOVAN MILOS, M.D.

2         Q.    Do you recall what, if anything,

3    you said at the meeting?

4         A.    Repeat that.

5         Q.    Do you recall what you said, if

6    anything, at the meeting?

7         A.    I don't remember.

8         Q.    Do you remember what, if

9    anything, anyone said at the meeting?

10        A.    I don't recall specifically.

11        Q.    The summary of the meeting is

12   signed by Kathleen Ferdinand, is that

13   correct, as team leader?

14        A.    It looks like that.

15        Q.    You agreed to these

16   recommendations?

17        A.    (Indicating.)

18        Q.    You agreed with the first

19   recommendation of a wheelchair for all

20   mobility purpose needs; do you see that?

21        A.    That is something all team

22   members agreed to.  That's per this paper,

23   yes.

24        Q.    Was that ever reassessed or

25   reevaluated at any time from April 20,

89

```
1              JOVAN MILOS, M.D.
2    2005 until Valerie's death?
3         A.   I don't know.
4         Q.   I am sorry?
5         A.   I'm not aware of that.  I have to
6    look at the record.
7         Q.   Do you remember specifically ever
8    reevaluating the need to place her in a
9    wheelchair for all her mobility needs at
10   any time from the time of this memo,
11   April 20, 2005, until date of her death?
12        A.   What's the question?
13             MR. CATAFAGO:  Please read that
14        back.
15             (The requested portion of the
16        record was read.)
17        A.   I do not recall.
18        Q.   Do you recall if any team member
19   advised you of any attempt to reevaluate
20   this recommendation at any time from
21   April 20, 2005 until the time of her
22   death?
23        A.   I don't recall that.
24        Q.   How many different wheelchairs
25   were used to place Valerie in for all
```

JOVAN MILOS, M.D.

2  mobility needs?

3      A.   I don't know that.  I do not

4  know.

5      Q.   Was it more than one wheelchair?

6      A.   I do not know that.

7      Q.   Did you ever personally observe

8  anyone providing physical therapy to

9  Valerie Young after April 20, 2005?

10     A.   Physical therapy was provided by

11 the physical therapy department.

12     Q.   Did you see anyone --

13     A.   I do not go there.

14     Q.   Did anyone ever tell you or show

15 you any document that reflected that she

16 was receiving any physical therapy at all

17 at any time after April 20, 2005?

18     A.   It should be there.

19     Q.   I am asking if you --

20     A.   I did not know that.

21          MR. VELEZ:  Counsel, please let

22     him finish the answer.

23          MR. CATAFAGO:  He did.

24          MR. VELEZ:  Did you finish?

25          THE WITNESS:  I don't know what

140

JOVAN MILOS, M.D.

1

2   status in the three months before her

3   death?

4       A.   She was stable, yes, stable for

5   Valerie Young.

6       Q.   You also wrote that there was no

7   agitation, no SIB, or aggression observed.

8            What is "SIB"?

9       A.   Self-injurious behavior.

10      Q.   Was that accurate when you wrote

11  that?

12      A.   It was accurate.

13      Q.   You also wrote in the column

14  below that, referring to the decedent,

15  that she utilized a wheelchair for

16  transportation to and from program and

17  ambulated with assistance in the

18  residential unit?

19      A.   Yes.

20      Q.   What did you mean by:  "Ambulated

21  with assistance in the residential unit"?

22      A.   I meant she was helped by staff.

23      Q.   She would walk with the staff?

24      A.   Yes.

25      Q.   How many times did you see her do

141

JOVAN MILOS, M.D.

1

2    that?

3        A.    When I was making rounds in the

4    morning and in the afternoon, I saw, on

5    several occasions, her doing that.

6        Q.    On April 20, 2005, the special

7    case conference that you attended and

8    signed off on indicated a recommendation

9    that she use a wheelchair for all

10   mobility.

11           MR. VELEZ:   Where are you

12       referring to?

13           MR. CATAFAGO:   I am looking at

14       Exhibit 5.

15       Q.    For all mobility needs, and I'm

16   quoting directly from the second page of

17   Exhibit 5.

18           Do you see that?

19       A.    Yes.

20       Q.    What was the intent there with

21   respect to all mobility needs?   What is

22   intended by that term?

23       A.    My interpretation of that is it

24   is to be used just for transfer from, for

25   transfer from building to building.

145

JOVAN MILOS, M.D.

1

2     A.    Again I am the physician.  I am

3  present five days a week, eight hours a

4  day, and I was seeing Valerie, Ms. Young.

5     Q.    How often would you see Valerie

6  Young on a daily basis?

7     A.    At least twice in the morning and

8  afternoon.  I would say that she was

9  stable compared to her past behavior.

10     Q.    You didn't say that in your

11  report.

12           Is there any reason you didn't

13  say that in your report?

14     A.    It might be an omission.

15     Q.    It may be an omission?

16     A.    Yes.

17           MR. CATAFAGO:  I want to have

18        this marked and then have you take a

19        look at it.

20           This is Plaintiff's Exhibit 11.

21           (The document entitled,

22        "Referral," Bates No. CQC95 was hereby

23        marked as Plaintiff's Exhibit 11 for

24        identification, as of this date.)

25           MR. VELEZ:  Counselor, the report

149

1          JOVAN MILOS, M.D.

2     Q.   Do you know if it occurred?

3     A.   I was not physically present when

4  they did it.

5     Q.   Did anyone tell you that it was

6  done?

7     A.   I don't recall that.

8     Q.   Do you know who would have been

9  in charge of providing that physical

10 therapy treatment that you prescribed for

11 Valerie Young twice a week?

12    A.   Physical therapy.

13    Q.   Do you know the name of the

14 physical therapist, of that individual, or

15 those individuals, as of May 2, 2005 until

16 Ms. Young passed away on June 19, 2005?

17    A.   I do not know which physical

18 therapist was assigned to her.

19    Q.   Do you know if anyone was

20 assigned?

21    A.   Somebody was assigned.

22    Q.   But you don't know the person's

23 name?

24    A.   No.

25    Q.   When was the last time you saw

147

2       Q.    What is this document?

3       A.    That's a referral for physical

4    therapy.

5       Q.    Is this a referral for physical

6    therapy that you prescribed for Valerie

7    Young; right?

8       A.    Yes.  And also a request for the

9    ankle/foot orthosis.

10      Q.    Is this a request for physical

11   therapy that you handwrote; right?

12      A.    Yes.

13      Q.    So the top part of the document

14   bears your handwriting and is signed --

15      A.    Yes.

16      Q.    What is the date of that

17   handwriting?

18      A.    April 27th.

19      Q.    Year?

20      A.    2005.

21      Q.    What did you write under:

22   "Present Medical Concerns"?

23      A.    Left foot drop.  Please evaluate

24   for physical therapy, range of motion, to

25   prevent fixed constrictures.  Also

166

```
1              JOVAN MILOS, M.D.

2        Q.   I'm showing you now Exhibit 11.

3   Exhibit 11 refers to physical therapy

4   because of left foot drop; dated April 27,

5   2005.

6              Would there have been any reason

7   for you not to give a referral as soon as

8   you were aware of the problem?

9        A.   I made a referral when I was

10  aware of the problem.  I made a referral

11  to two neurologists to find the cause of

12  problem, to find treatment.

13             The physical therapy was just to

14  prevent constrictures and to provide the

15  splinting for the orthosis.

16             MR. CATAFAGO:  This will be

17        Plaintiff's Exhibit 14.  It is Bates

18        No. CQC138.

19             (The Referral document Bates

20        No. CQC138 was hereby marked as

21        Plaintiff's Exhibit 14 for

22        identification, as of this date.)

23        Q.   Do you recognize the handwriting

24  on this document?

25        A.   What is the question?
```

177

## CERTIFICATION

I, GRETCHEN A. MILTON, a Notary
Public for and within the State of New
York, do hereby certify:

That the witness whose testimony as
herein set forth, was duly sworn by me;
and that the within transcript is a true
record of the testimony given by said
witness.

I further certify that I am not
related to any of the parties to this
action by blood or marriage, and that I am
in no way interested in the outcome of
this matter.

IN WITNESS WHEREOF, I have hereunto
set my hand this 10th day of April, 2008.


_____

GRETCHEN A. MILTON