UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X

Estate of VALERIE YOUNG by VIOLA YOUNG, :
as Administratrix of the Estate of
Valerie Young, and in her personal      :  **DECLARATION OF**
capacity, SIDNEY YOUNG, and LORETTA        **PETER A. USCHAKOW**
YOUNG LEE,                              :

        Plaintiffs,         :  07-CV-6241
                               (LAK)(DCF)
                            :  ECF Case
    -against-
                                    :
STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL           :
DISABILITIES, PETER USCHAKOW,
personally and in his official capacity,:
JAN WILLIAMSON, personally and in her
official capacity, SURESH ARYA,         :
personally and in his official capacity,
KATHLEEN FERDINAND, personally and in   :
her official capacity, GLORIA HAYES,
personally and in her official capacity,:
DR. MILOS, personally and in his
official capacity,                      :

        Defendants.         :

------------------------------------------X

    PETER A. USCHAKOW, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

    1.   I was employed by the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD") at the Brooklyn Developmental Disabilities Services Office ("BDDSO" or "BDC") since 1991 and I was the Director from 2000 until my retirement in 2008. From 1972 to 1991, I was employed by the OMRDD and the New York State Office of Mental Health ("OMH") at several facilities in lower New York State. I am a Defendant in

this action.

2.  I am familiar with the matters set forth herein based on my personal knowledge and on information and belief, the bases for which are my communications with employees at OMRDD and the New York state Office of the Attorney General ("OAG"), my review of documents maintained by BDC, as well as Plaintiffs' Complaint. I submit this Declaration in support of Defendants' Motion for Summary Judgment in this action to dismiss Plaintiffs Viola Young, Loretta Lee Young and Sidney Young's Complaint.

**The Office of Mental Retardation and Developmental Disabilities**

3.  The State of New York and its local governments have a responsibility for the comprehensively planned provision of services including care, treatment, habilitation and rehabilitation of their citizens with mental retardation and developmental disabilities and for the prevention and early detection of mental retardation and developmental disabilities. OMRDD became an independent agency when legislation reorganizing the Department of Mental Hygiene became effective on April 1, 1978.

4.  The mission of OMRDD is:

   a.  To develop a comprehensive, integrated system of services which has as its primary purposes the promotion and attainment of independence, inclusion, individuality and productivity for persons with mental retardation and developmental disabilities;

    b.    To serve the full range of needs of persons with mental retardation and developmental disabilities by expanding the number and types of community based services and developing new methods of service delivery;

    c.    To improve the equity, effectiveness and efficiency of services for persons with mental retardation and developmental disabilities by serving persons in the community as well as those in developmental centers, and by establishing accountability for carrying out the policies of the state with regard to such persons; and

    d.    To develop programs to further the prevention and early detection of mental retardation and developmental disabilities.

5.    OMRDD operates thirteen Developmental Disabilities Services Offices (DDSOs) responsible for providing such programs in one or more counties. These offices seek to provide specially designed person-centered assistance to each individual with developmental disabilities as requested by that person or by his or her family. In partnership with individuals, families, staff, private providers and local governments, these offices seek to improve the quality of life of individuals through provision of cognitive habilitation, behavioral health interventions, support, training in activities of daily living, cost-effective housing, employment and family support services.

6.    OMRDD provides care, treatment, and services to many persons with severe disabilities. OMRDD staff are trained to identify abilities in even the most severely disabled consumer

that can be encouraged and strengthened to improve that consumer's quality of life.

7.  In order to provide appropriate services to its consumers, OMRDD engages in "Person-Centered Planning." Person-Centered Planning is a process that focuses on the capabilities and strengths of an individual in order to create a vision for a desirable future. It focuses on each person's gifts, talents, and skills, not on deficits and deficiencies. Person-Centered Planning involves much more than the development of a written plan; it is an ongoing process that enables lifelong growth and development.

8.  Person-Centered Planning brings together a diverse group of people who know and are committed to the individual with the disability. This group joins together with that person to take action so that changes will be accomplished through recognition of and value for the goals and desires he or she has. There is respect for the person as an individual with expectations that the person will be viewed and included as a valued member in the community.

9.  As part of OMRDD's comprehensive, integrated system of services for persons with mental retardation and developmental disabilities, New York State relies on a partnership between the public and private sectors, in order to best meet the needs of its citizens with developmental disabilities. The needs of

individuals with mental retardation and developmental disabilities are met through active participation from parents, advocates, friends and others, including not-for-profit providers. Voluntary provider agencies are located throughout the State of New York, and run programs for people with mental retardation and developmental disabilities that are authorized or certified by the State.

### Services Offered by Brooklyn Developmental Center

10. Some persons with severe or profound mental retardation require more services than voluntary provider agencies can provide. For those persons, OMRDD operates residential treatment facilities. One of these facilities is BDC.

11. The individuals whom BDC serves are referred to as consumers and have a primary qualifying diagnosis of mental retardation and/or a developmental disability. To qualify for placement at BDC, actual assignment of a diagnosis with psychometric testing must be performed on the potential consumer by age twenty-two. Additionally, the potential consumer must have severe adaptive behavior deficits involving communication, community living, maladaptive behaviors, and activities of daily living.

12. Currently, BDC serves about 300 consumers. This number has been decreasing over many years, as OMRDD places less impaired and/or better psychiatrically compensated consumers in

supervised residences in the community, while retaining institutions such as BDC for consumers who most need that level of care.

### BDC's Campus and Supervision

13. BDC's campus is made up of five buildings. Three of those buildings are residential buildings. The residential buildings are divided into two units, one unit on each floor. Each floor is divided into four wings. Consumers are housed in the wings, and each wing is a organized as a basic treatment unit through which consumers receive rehabilitation and the other care and treatment they need, depending on each consumer's degree of cognitive disability, physical abilities, behavioral disability, sex, and other factors. Each of BDC's wings has 24-hour supervision, but BDC itself has an open campus. Each building has its own entrance.

14. Each wing is assigned a Wing Leader who supervises the Developmental Aides. The Wing Leader and Developmental Aides are supervised by a Resident Unit Supervisor ("RUS"), or on the weekends, evenings and holiday shifts, by a Shift Supervisor. The RUS and Shift Supervisors are supervised by the Treatment Team Leader assigned to each unit/floor.

15. Each residential unit at BDC has an interdisciplinary treatment team ("ITT"), which would include a psychiatrist/ psychologist, medical providers, social worker, and other staff

6

who provide services to consumers such as, physical therapy and occupational therapy. Each ITT has a Treatment Team Leader whose job it is to make sure that consumers are receiving their services, and that they are safe and protected. Treatment Team Leaders have both administrative and program and responsibilities in connection with accomplishing the goals of the ITT. This position includes the oversight, evaluation and discipline of direct care staff.

16. Kathleen Ferdinand was the Treatment Team Leader for Ms. Young from approximately May 2001 to the date of her death in June 2005. During that time, Ms. Young lived in Building 3, Unit 1. There were approximately 50 other consumers on Unit 3-1. Ms Ferdinand supervised approximately 80 staff members during this time.

### Care and Treatment of BDC Consumers

17. BDC provides care to its residents twenty-four hours a day, seven days a week.

18. Most care and treatment provided to BDC consumers is supervised by Qualified Mental Retardation Professionals ("QMRP"). A QMRP has at least one year's experience in providing services to persons with developmental disabilities and is qualified as either an applied behavioral sciences specialist, human services practitioner, psychologist, registered or licensed practical nurse or social worker. Physicians are not considered

QMRP.

19. The ITT prepares an Individualized Program Plan ("IPP") for each consumer, which contains the information from the annual assessments of the various clinical disciplines. These assessments are the basis for developing a program to address the consumer's needs. The psychologist will assess the consumer's behavior over the past year and prepare a behavior management plan to address problematic behaviors. Similarly, the psychiatrist will perform an annual psychiatric evaluation and assessment and may recommend psychotropic medications to treat the consumer's mental illness.

20. The IPP is also reviewed by the ITT on an annual and quarterly basis. A consumer's guardians are invited to attend the IPP meetings. Ms. Young's guardian, Viola Young, attended her IPP meetings.

21. On a routine basis, the ITT records its notes in the consumer's Developmental Plan ("DVP"). Each consumer has a Developmental Plan in a binder which contains all of the consumer's treatment and care records in one comprehensive binder. The most recent active documentation is temporarily filed in the nurses office pending further action, if necessary, after which it is filed in the DVP.

22. For example, a consumer's DVP includes a copy of his IPP, ITT notes, behavior management program, consultations,

medication request reports, lab reports, pharmacy, charts, dental, dietary, leisure time notes, recreation, occupational therapy, psychology, physical therapy, and social worker notes.

23. Direct care is provided by Developmental Aides, sometimes referred to as "direct care staff." Direct care staff take care of consumers by providing the services as identified and accepted in their IPP. For example, direct care staff supervise consumers on the living unit, escort consumers off the living unit, transport consumers to and from their programs, the dining hall, the hospital, to clinical appointments, and on recreational trips or activities. They assist consumers with their activities of daily living, such as toileting and bathing, intervene in altercations between consumers, and calm consumers in the event of a behavioral emergency with verbal and physical calming techniques, and data collection.

24. Developmental Aides receive both classroom and on-the-job training, in areas such as bathing the residents, brushing their teeth, feeding them, and other so-called activities of daily living. Developmental Aides are also trained in Strategies for Crisis Intervention and Prevention, OMRDD's approved program for training direct care staff in the development of skills for crisis intervention and prevention. This program trains staff in methods of assisting and teaching individuals to maintain self-control and preventing crises,

including the use of verbal prompts and physical calming techniques.

## My Responsibilities as Director of BDC

25. As the Director of BDC, I supervised the Deputy Director of Operations, the Director of Institutional Human Resources, the Safety Department, the Director of Quality Assurance, and the Affirmative Action Officer. I managed a $60 million budget, was responsible for regulatory compliance with conditions of participation in the Medicaid Program, as surveyed by the Department of Health in state-operated programs. I also coordinated development of effective operational policies and procedures, established working relationships with local community leaders, legal entities, unions, coordinated activities with the nonprofit service delivery sector, and participated on local councils and local government committees.

26. As the Director of BDC, I was generally responsible for overseeing the daily operations of the entire facility. As part of this oversight, I made periodic rounds of BDC to review all of the program activities attended by consumers, but was not involved directly in the treatment and care of consumers.

27. As Director, I reviewed incident reports that were prepared by staff and committee meeting minutes for these incidents. I also reviewed the final investigation summary concerning incidents, which I generally initialed after I made

sure that it met my standard for quality. I also spoke to staff members about incidents involving consumers. Sometimes I learned of consumer issues through conversations with their relatives.

28. After learning of any consumer issues that required follow-up, I did not personally conduct any investigations. I delegated it to the appropriate BDC staff members to determine what corrective measures that they deemed necessary.

29. Although I do not recall any instance in which I specifically discussed Ms. Young's care and treatment with BDC staff members, I do recall relaying to the deputy director her mother's concerns about Ms. Young's reduced walking ability that she spoke to me about in a telephone call which I believe occurred during the Spring of 2005. I expected the Deputy Director to speak to the treatment team to follow-up on Mrs. Young's concern.

30. After this telephone call, I saw Ms. Young walking with the assistance of BDC staff members during my periodic rounds. Although Ms. Young was gait-impaired, she was able to ambulate with assistance. During the months before her death on June 19, 2005, I observed Ms. Young walking as often as I saw her in a wheelchair.

31. Although I was never personally involved in any of the matters about which Plaintiff Viola Young complained, I expected that her concerns would be addressed by BDC staff members

11

appropriately, professionally, and correctly in a manner which insured the safe treatment of Ms. Young and the preservation of her rights. Indeed, once I received the official State finding related to the death of Ms. Young for those recommendations that were specific to medical sciences, physical therapy or occupational therapy, I did not feel qualified to agree or disagree. I delegated the recommendations to the deputy for operations and the quality assurance coordinator, to meet with their experts to decide whether or not to implement or reject the recommendations.

32. I was not made aware of the matters about which Plaintiffs complain related to Ms. Young's reduced walking ability that required her use of a wheelchair for transportation, because these are matters that I would not be made aware of by the BDC treatment team. Although I observed Ms. Young at times to be in a wheelchair, I was not involved in the April 2005 decision to place her in a wheelchair for transportation purposes, as that decision would have been made by the treatment team. I was also not involved in the decision and was not aware that Ms. Young was receiving physical therapy prior to her death, because the specifics of her program - or that of other consumers - was not something that I would have been usually made aware of in the performance of my duties as Director. I was not involved in any decision to place Ms. Young on fifteen minute checks which

required entries in Special Observation Logs, nor did I destroy any of these logs or direct anyone to do so.

33. At no time prior to her death on June 19, 2005, was I aware that Ms. Young or any consumer at BDC had been diagnosed with deep vein thrombosis ("DVT"), nor was I made aware that Ms. Young was in danger of suffering from DVT due lack of mobility.

34. Accordingly, I respectfully request that this Court grant summary judgment, dismissing the Complaint in its entirety against me.

Dated: Brooklyn, New York
       July 21, 2008

_____
PETER A. USCHAKOW