```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X

Estate of VALERIE YOUNG by VIOLA YOUNG,    :
as Administratrix of the Estate of
Valerie Young, and in her personal         :   DECLARATION OF
capacity, SIDNEY YOUNG, and LORETTA            KATHLEEN FERDINAND
YOUNG LEE,                                 :

                       Plaintiffs,         :   07-CV-6241
                                               (LAK)(DCF)
                                           :   ECF Case

           -against-                       :

STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL              :
DISABILITIES, PETER USCHAKOW,
personally and in his official capacity,   :
JAN WILLIAMSON, personally and in her
official capacity, SURESH ARYA,            :
personally and in his official capacity,
KATHLEEN FERDINAND, personally and in      :
her official capacity, GLORIA HAYES,
personally and in her official capacity,   :
DR. MILOS, personally and in his
official capacity,                         :

                       Defendants.         :

--------------------------------------X
```

KATHLEEN FERDINAND, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. I have been employed by the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD") at the Brooklyn Developmental Disabilities Services Office ("BDDS" or "BDC") as a Treatment Team Leader since 1994. From 1974 to 1994, I was employed by the New York State Office of Mental Health ("OMH") at the Kingsboro Psychiatric Center as a social worker and social worker supervisor before becoming a treatment

team leader starting in 1985. During that period, I also was employed one year with OMH's Manhattan Psychiatric Center as a treatment team leader. I am a Defendant in this action.

2. I am familiar with the matters set forth herein based on my personal knowledge and on information and belief, the bases for which are my communications with employees at OMRDD and the New York State Office of the Attorney General ("OAG"), my review of documents maintained by BDC, as well as Plaintiffs' Complaint. I submit this Declaration in support of Defendants' Motion for Summary Judgment in this action to dismiss Plaintiffs Viola Young, Loretta Lee Young and Sidney Young's Complaint.

### Brooklyn Developmental Center

3. BDC's campus is made up of three residential buildings which are divided into wings. Consumers are housed in the wings, which are organized as basic treatment units through which consumers receive care and treatment they need.

4. There is 24-hour supervision in each wing. Each wing is assigned a Wing Leader who supervises the Developmental Aides. The Developmental Aides are the direct care workers who provide the actual care to the consumers, including helping them develop their skills to the best of their ability. The Wing Leader and Developmental Aides are supervised by a Resident Unit Supervisor ("RUS"), or on the weekends, evenings and holiday shifts, by a Shift Supervisor. The RUS and Shift Supervisors are supervised

by the Treatment Team Leader assigned to that building.

5. BDC provides care to its residents twenty-four hours a day, seven days a week. Most care and treatment provided to BDC consumers is supervised by Qualified Mental Retardation Professionals ("QMRP"). A QMRP has at least one year's experience in providing services to persons with developmental disabilities and is qualified as either an applied behavioral sciences specialist, human services practitioner, psychologist, registered or licensed practical nurse or social worker. Physicians are not considered QMRP.

### Interdisciplinary Treatment Team

6. Each residential building has an interdisciplinary treatment team ("ITT"), which would include a psychiatrist, psychologist, medical providers, social worker, and other staff who provide services direct care, recreation, speech, physical therapy and occupational therapy to consumers. The consumer's guardian and/or family members are also consulted by the ITT, attend ITT meetings and authorize treatment and care decisions.

7. Each ITT has a Treatment Team Leader whose job it is to make sure that consumers are receiving their services, and that they are safe and protected. As a Treatment Team Leader, I have both administrative and program and responsibilities in connection with accomplishing the goals of the ITT. I make sure consumer's plans and programs are implemented and coordinate

clinical programs with activities on the residential unit. My position also includes the oversight, training, evaluation and discipline of the direct care staff.

8.   I was the Treatment Team Leader for Valerie Young from approximately May 2001 to the date of her death in June 2005. During that time, Ms. Young lived in Building 3, Unit 1. There were approximately 50 other consumers on Unit 3-1. I supervised approximately 80 staff members during this time. The staff to consumer ratio on this unit was four to one. Gloria Hayes was the RUS. I report directly to the Deputy Director of Operations who is presently Jan Williamson.

9.   The ITT prepares an Individualized Program Plan ("IPP") for each consumer, which contains the information from the annual assessments of the various clinical disciplines. These assessments are the basis for developing a program to addresses the consumer's needs. The psychologist will assess the consumer's behavior over the past year and prepare a behavior management plan to address problematic behaviors. Similarly, the psychiatrist will perform an annual psychiatric evaluation and assessment and may recommend psychotropic medications to treat the consumer's mental illness.

10.   As part of BDC's interdisciplinary team approach, the ITT reviews the IPP on an annual and quarterly basis. The ITT has quarterly meetings concerning each consumer, an annual re-

evaluation of that consumer's progress, and other meetings on an as-needed basis, including on a daily basis. A consumer's guardians are invited to attend the IPP meetings. Ms. Young's guardian, Viola Young, attended her IPP meetings. Also, as part of our informed consent process, we send written requests for consent from the family on matters related to the consumer's treatment. For example, if the consumer needed to be sent to an outside provider for a medical consultation or regarding the prescription of medications.

11. On a routine basis, the ITT records its notes in the consumer's Developmental Plan ("DVP"). The Developmental Plan is kept in a binder and contains all of the consumer's treatment and care records. For example, a consumer's DVP includes a copy of her IPP, ITT notes, behavior management program, consultations, medication request reports, lab reports, pharmacy, charts, program plans, dental, dietary, leisure time notes, recreation, occupational therapy, psychology, physical therapy, and social worker notes.

12. Direct care is provided by Developmental Aides, sometimes referred to as "direct care staff." Direct care staff take care of consumers by providing the services as prescribed in their IPP. For example, direct care staff supervise consumers on the living unit, escort consumers off the living unit, transport consumers to and from their programs, the dining hall, the

hospital, to clinical appointments, and on recreational trips or activities. They assist consumers with their activities of daily living, such as toilet use and bathing, intervene in altercations between consumers, and calm consumers in the event of a behavioral emergency with verbal and physical calming techniques.

13. Developmental Aides receive both classroom and on-the-job training, in areas such as bathing the residents, brushing their teeth, feeding them, and other so-called activities of daily living. Developmental Aides are also trained in Strategies for Crisis Intervention and Prevention, OMRDD's approved program for training direct care staff in the development of skills for crisis intervention and prevention. This program trains staff in methods of assisting and teaching individuals to maintain self-control and preventing crises, including the use of verbal prompts and physical calming techniques.

### Care and Treatment of Valerie Young

14. My responsibilities as the Treatment Team Leader include giving the RUS instructions regarding the care of consumers, including Ms. Young while she was at BDC. Prior to her death, I recall telling RUS Hayes to make sure that Ms. Young was ambulated with one or two of the staff walking with her. I also recall telling her that at times they would have to elevate Ms. Young's legs. The purpose of these directions were to assist

Ms. Young with her walking because she was not steady on her feet and with her leg swelling. At no time prior to her death on June 19, 2005, was I aware that Ms. Young or any consumer at BDC had been diagnosed with deep vein thrombosis ("DVT") or that she had a blood clot, nor was I made aware that Ms. Young was in danger of suffering from DVT due lack of mobility. Based on what we knew at that time, everything was done that we thought needed to be done for her.

15. During the first few months of 2005, Ms. Young fell frequently. I was concerned that she was going to fall and hit her head. I observed Ms. Young on a daily basis and never saw her with her eyes closed or drooping down because of her medications. There was no indication that the medication that was prescribed to Ms. Young overmedicated or sedated her to the point that she could not walk during this time.

16. Starting around April 2005, although she was fully ambulatory, Ms. Young needed a wheelchair to be transported from one area to another in the facility. Ms. Young would be periodically walked around because she was able to ambulate with the assistance of just one staff member with another staff nearby should further assistance be needed. I personally observed her several times being assisted by one or two staff with her walking, particularly in the morning when the consumers go to program. I also observed her walking around on her own with a

staff member close by.

17. On April 20, 2005, the ITT held a special meeting to discuss the difficulty Ms. Young experienced while walking and the several falls she had taken. During this meeting, her doctor recommended an adjustment to Ms. Young's medications and directed that she be re-evaluated by the physical therapy department. RUS Hayes, who was also a member of the treatment team, then had meetings with the wing supervisors regarding Ms. Young's difficulty walking. The wing supervisors would, in turn, meet with the direct care staff to discuss Ms. Young's situation. During these meetings RUS Hayes would emphasize that the wheelchair was to be used solely to transport Ms. Young and that she needed to be ambulated.

18. Even when she was not being walked, Ms. Young was usually not sitting quietly because she was unmanageable or otherwise acting out, including being extremely aggressive at times. I never saw Ms. Young confined to a wheelchair because she could walk up until the date of her death on June 19, 2005. However, if she wanted to sit in her wheelchair rather than on a regular chair, the staff may have permitted it rather than create an incident as a result of it.

19. When I made rounds on the wing, typically two to three times a day, I observed Ms. Young being walked with the

assistance of staff. I was also told by staff that they periodically walked her around. There were times that Ms. Young was difficult and would not allow staff to walk her around. I also observed staff elevating Ms. Young's leg when she was on the Wing and the program area. During the beginning of May 2005, Ms. Young also started to receive physical therapy twice a week to assist her with her unsteady walking.

20. I periodically discussed Ms. Young's treatment and care with her mother. I would tell her generally how her daughter was doing, and then if she had any further questions, referred her to Ms. Young's medical doctor, Dr. Jovan Milos. Ms. Young's mother also called for special meetings with the ITT because she was concerned with Ms. Young's aggressive behavior. She complained to the ITT that Ms. Young was unmanageable, uncontrollable. She wanted to increase the psychotropic medications that Ms. Young was receiving, but the medical staff did not think it was appropriate to do so.

21. As the Treatment Team Leader, I was not involved in the medical treatment decisions plaintiffs complain of in their Complaint. Matters related to the medical treatment of consumers were left for the physician to determine, as all decisions related to the medical treatment and care of the consumer are part of the medical professional practice. I observed Ms. Young's treating physician, Dr. Milos, visit the

consumers in the Wing in which Ms. Young resided. The building in which the Wing was located also had two nurses that were stationed there for each shift.

### Logs Maintained at BDC

22. As part of its care and treatment of consumers, BDC maintains logs for each wing of each residential building. These Wing Logs provide a summary of the activities of the consumers and staff on a particular Wing for each shift, twenty-four hours a day, seven days a week.

23. BDC also maintains a Core Log that summarizes the activities of supervisors on each of three shifts for their respective units, comprised of now three wings, and may note events on more than one wing of a building. They reflect the rounds that are made during each shift and may state, for example, the time Ms. Young or other consumers fell asleep on a particular night, or document an injury that occurred.

24. BDC also maintains Special Observation Logs, which sometimes we establish for consumers who have had some type of difficulty, such as falling frequently. They are summaries by staff observing a consumer in a manner designated by that consumer's ITT. The level of supervision utilized depends on the degree of the problem. These logs are kept in composition notebooks with the assigned staff member for each shift. When one book is completed, they should be placed in the storage area

on that wing.

25. In November 2004, the ITT placed Ms. Young on fifteen minute checks that required direct service staff to watch her closely to prevent her from falling and having an accident. This would have required entries in Special Observation Logs in composition notebooks. The purpose of this type of observation is to provide additional supervision for consumers as deemed necessary by the ITT. Ms. Young was placed on 15 minute checks at that time because of an unexplained injury. From my review of records of Ms. Young's Individualized Program Plan ("IPP"), it appears that she was on fifteen minute checks until her death in June 2005.

26. On December 21, 2004, following an incident, I learned that log entries had not been made for that date. The staff members who failed to make these entries were counseled following an investigation of the incident, and I reissued to the staff my memorandum in which I instructed them to observe Ms. Young every fifteen minutes and make entries in the log book that had been provided. Staff was also counseled for their failure to make entries on previous occasions.

27. I have conducted a thorough search of the unit where Ms. Young lived, the record room and any other place where I thought the Special Observation Logs might be. I have also directed my residential supervisor to conduct another search of

our storage area for the 15 minute log book. I further asked the client coordinator and mid-level supervisor to conduct searches as well. Notwithstanding these diligent efforts, the Special Observation Logs have not been found. I did not destroy the Special Observation Logs nor did I direct anyone to do so.

28. Accordingly, I respectfully request that this Court grant defendant summary judgment, dismissing the Complaint in its entirety.

Dated: Brooklyn, New York
       July 24, 2008

                                        KATHLEEN FERDINAND