```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X

Estate of VALERIE YOUNG by VIOLA YOUNG,    :
as Administratrix of the Estate of
Valerie Young, and in her personal         :   DECLARATION OF
capacity, SIDNEY YOUNG, and LORETTA            DR. JOVAN MILOS
YOUNG LEE,                                 :

                    Plaintiffs,            :   07-CV-6241
                                               (LAK)(DCF)
                                           :   ECF Case
          -against-
                                           :
STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL              :
DISABILITIES, PETER USCHAKOW,
personally and in his official capacity,   :
JAN WILLIAMSON, personally and in her
official capacity, SURESH ARYA,            :
personally and in his official capacity,
KATHLEEN FERDINAND, personally and in      :
her official capacity, GLORIA HAYES,
personally and in her official capacity,   :
DR. MILOS, personally and in his
official capacity,                         :

                    Defendants.            :

-------------------------------------------X
```

JOVAN MILOS, M.D., pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. I have been a physician licensed to practice medicine in the State of New York since July 2000 and I am Board Certified in the field of Internal Medicine. I submit this Declaration in support of Defendants' Motion for Summary Judgment in this action to dismiss Plaintiffs Viola Young, Loretta Lee Young and Sidney Young's Complaint.

2.    I am familiar with the matters set forth herein based on my personal knowledge and on information and belief, the bases for which are my communications with employees at the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD") and the New York State Office of the Attorney General ("OAG"), my review of decedent Valerie Young's clinical records maintained by the Brooklyn Developmental Disabilities Services Office ("BDDS" or "BDC"), and Plaintiffs' Complaint. Annexed to this declaration under Exhibit Tabs A to J are true and correct copies of records maintained by the BDC.

3.    Since September 14, 2000, I have been a Medical Specialist for the OMRDD at BDC providing medical care for between 55 to 70 consumers. Prior to this position, I was a resident at Kings Brook Jewish Medical Center from July 1, 1997 to June 30, 2000.

### Care and Treatment Provided to BDC Consumers

4.    BDC is a residential treatment facility operated by OMRDD for persons with severe or profound mental retardation, which currently serves about 300 consumers who have a primary diagnosis of mental retardation or a developmental disability and have severe disabilities, or a profound lack of skills, that affect their ability to communicate or live in the community.

5. Although BDC is not a hospital, its staff includes psychiatrists, psychologists, physicians, nurses, dentists, social workers, physical and occupational therapists. There are presently five medical doctors at BDC, including myself, responsible for the day-to-day care of the consumers. Medical services are available to every BDC consumer. If a consumer requires special attention, he or she is referred to a medical specialist outside the facility.

6. My immediate supervisors are the Deputy Director of Operations and the Director. However, I do not report to them regularly regarding medical issues, although I may bring specific issues to their attention. For example, during 2003, when Ms. Young was being seen by an outside psychiatrist at Maimonides Hospital's psychiatric clinic, I had concerns regarding the effect of one of the psychotropic medications that were being prescribed for her. I spoke with Suresh Arya, who was then the Deputy Director of Operations, regarding my concerns and we decided to obtain opinions from two neurologists, one of whom was an outside consultant.

7. BDC provides care to its residents twenty-four hours a day, seven days a week. Each consumer has an interdisciplinary treatment team ("ITT") comprised of a psychiatrist and/or psychologist, medical providers, social worker and other staff who provide direct care, recreation, speech, physical therapy and

occupational therapy. I report to other members of the consumer's ITT. I also discuss medical issues with the other staff physicians on an as needed basis, as well as with the Director of Quality Assurance.

8. The ITT prepares an Individualized Program Plan ("IPP") for each consumer, which contains information from the annual assessments of the various clinical disciplines. These assessments are the basis for developing a program to address the consumer's needs. The psychologist will assess the consumer's behavior over the past year and prepare a behavior management plan to address problematic behaviors. Similarly, the psychiatrist will perform an annual psychiatric evaluation and assessment and may recommend psychotropic medications to treat the consumer's mental illness. The physician will conduct a medical examination and assess the consumer's medical conditions in order to address them by treatment.

9. As part of BDC's interdisciplinary team approach, the ITT reviews the IPP on an annual and quarterly basis, and also meets on an as needed basis. A consumer's guardian and/or family is invited to participate in the IPP meetings. Ms. Young's mother was present at most of these meetings during the time that I was Ms. Young's physician. As part of BDC's informed consent process, the ITT sends written requests to a consumer's family and/or guardian for consent for matters related to the consumer's

care and treatment. Over the years, I had multiple conversations with Ms. Young's mother, Viola Young, regarding ongoing issues related to Ms. Young's treatment and care.

10. On a routine basis, the ITT records its notes in the consumer's Developmental Plan ("DVP") which contains all of the consumer's treatment and care records. At the time of her death on June 19, 2005, MS. Young's DVP consisted of over 10,000 pages of documents.

### Plaintiffs' Complaint

11. Plaintiffs allege that on June 19, 2005, Ms. Young died from a pulmonary embolism caused by deep vein thrombosis as the result of inactivity.

12. Plaintiffs allege that during the last months of her life, Ms. Young was largely confined to a wheelchair or was otherwise maintained without mobility as a result of sedative medication and untreated and/or inadequately treated insomnia, untreated and/or inadequately treated back pain and untreated and/or inadequately treated drop foot.

13. Plaintiffs allege that Ms. Young was denied necessary health and related care by OMRDD and the individual defendants, which caused her physical and emotional suffering and pain, and ultimately death because defendants allegedly failed to provide medical treatment meeting minimum professional standards.

**Ms. Young's Medical and Mental Health Treatment and Care**

14.  Ms. Young was a 49-year old woman who had resided at the BDC since 1990. She first came under my medical care during January 2002. She had a history of profound mental retardation, seizure disorder, schizoaffective disorder, tardive dyskinesia, constipation, right brachial plexopathy, and left foot drop due to mononeuropathy.

15.  I observed Ms. Young twice a day during the weekdays when I made my morning and afternoon rounds in the residential unit. I also saw her in the BDC clinic for her medical conditions, including injuries related to falls. If Ms. Young required medical treatment, she either received it at BDC or was referred for outside treatment. Ms. Young's medications were reviewed on a regular basis, including during her quarterly and annual reviews.

16.  Ms. Young had a generally stable health status. She had a history of seizure disorder, which was well controlled with medication. She also suffered from a neurological condition that affected her gait and caused her left foot drop for which she saw a neurologist yearly or as needed. She had bilateral feet edema or swelling that was managed with leg elevation. She further suffered from constipation with a history of severe impaction, for which she received medication.

17. In November 2004, the ITT placed Ms. Young on fifteen minute checks that required direct service staff to watch her closely to prevent her from falling. This would have required entries in Special Observation Logs in composition notebooks. The purpose of this type of observation is to provide additional supervision for consumers as deemed necessary by the ITT. Ms. Young was placed on 15 minute checks at that time because of an unexplained injury. See Special Case Conference Summary of Meeting (Bates 7783 - 7784), dated November 3, 2004, annexed under Exhibit Tab A; see also Individual Program Plan Review Meeting (Bates 7787 - 7794), dated January 12, 2005, annexed under Exhibit Tab B. I understand that the Special Observation Logs cannot be found. I did not destroy the Special Observation Logs nor did I direct anyone to do so.

18. On April 7, 2005, Ms. Young was seen for her yearly neurology evaluation. Chronic gait disorder was noted with left foot drop and high steppage gait.

19. On April 13, 2005, the ITT met for Ms. Young's annual review. During this meeting, we reviewed her physical development and health status in detail. Her health status was stable at that time, with the primary concerns being behavior status and psychotropic medication regimen  See, e.g., Annual CFA Team Meeting Discussion (Bates 7629 - 7682), dated April 13, 2005, annexed under Exhibit Tab C.

20. During April 20, 2005, the ITT had a Special Case Conference due to Ms. Young's frequent falls. The most recent fall had been on April 15, 2005 in the morning, when she fell down in the shower sustaining a laceration 2.5 cm long over the left eyelid. During this meeting, I stated that I believed that the most recent falls were contributed to medications which are sedating, and the left foot drop which was more pronounced. I also stated that when Ms. Young did not sleep the night before, her unsteadiness was more pronounced. See Special Case Conference Summary of Meeting (Bates 7743 - 7744), dated April 20, 2005, annexed under Exhibit Tab D.

21. During the meeting, we also discussed that although Ms. Young had shown improved behavioral response over the couple of months prior to her annual review, during the preceding year she had frequent episodes of agitation, aggressive behavior and behavioral decompensation that required psychiatric hospitalization and frequent adjustment of her psychotropic medications. Id.

22. Ms. Young's medication regimen was adjusted, because it contributed to her recent falls. I recommended a reduction in the Zyprexa dose on April 20, 2005. Id.

23. The ITT also recommended at the Special Case Conference that Ms. Young be issued a wheelchair to be used to transport her between buildings, to out-of-facility appointments and outings into the community. Id. Ms. Young attended programs from 9:00 a.m. to 3:00 p.m., and because of the foot drop condition she had developed, it was difficult for her to walk from the building she resided to the building where she had her programs. The wheelchair was issued to Ms. Young on April 27, 2005. See Emergency Adaptive Equipment Shop Work Request, dated April 26, 2005, annexed under Exhibit Tab E.

24. At the ITT's request, Ms. Young was also measured and issued a protective Danmar halo helmet to protect her haed in case of a fall. Id. The ITT also recommended sending Ms. Young to physical therapy, with an evaluation for possible orthosis (plastic splint to provide support) for the left foot. Id.

25. On April 27, 2005, I referred her for a physical therapy evaluation. On May 2, 2005 she was evaluated and scheduled for physical therapy two times per week to assist her with walking. At physical therapy, she received mat exercises, ambulation exercise, and range of motion exercises for both the upper and lower extremities. See physical therapy referral (Bates CQC95), dated April 27, 2005, and Report (Bates CQC95), dated May 2, 2005, annexed under Exhibit Tab F.

26.  During the evaluation, the physical therapist found that Ms. Young could stand up from the edge of a table with minimal to moderate physical assistance and was able to maintain standing without assistance for two minutes.  Inside the parallel bars, she could stand up independently and could maintain standing holding onto the bars.  She was able to walk with moderate assistance for fifty feet.  Outside the parallel bars she was able to walk for 100 feet needing two staff to walk with her since she had a tendency to lean to the staff, and also lean forward during the course of walking.  Minimal left foot drop was observed during her walking.  Id.

27.  After Ms. Young began physical therapy, when I made my morning and afternoon rounds in the residential unit, I continued to see her walking, but now with the assistance of staff.  Up until the time of her death, she was ambulatory with assistance.

28.  On May 2, 2005, Ms. Young also had X-rays of the lumbar spine  to evaluate her gait disturbance and foot drop, both of which were negative.  See Radiology Report Bates CQC92 - CQC93), dated May 5, 2005, annexed under Exhibit Tab G.  An EMG had been scheduled for June 30, 2005 to also evaluate her gait disturbance and foot drop.  See Progress Notes (Bates 0124, 8188), dated May 26 and 27, 2005, annexed under Exhibit Tab H.

29. On May 27, 2005, I noted that Ms. Young had bilateral ankle edema (swelling), but no calf tenderness and a negative Homann's sign (a physical examination test for deep vein thrombosis). Her edema was assumed to be positional (i.e., her legs in a prolonged dependent position) and leg elevation during rest periods was recommended. Id.

30. I continued to be Ms. Young's treating physician at BDC until the time of her death.

31. On June 19, 2005, Ms. Young collapsed in the shower. At that time because it was Sunday, my scheduled day off, I was not at the BDC. Resuscitative efforts were instituted by BDC staff including CPR, intravenous dextrose, and oxygen. After CPR was administered, she became responsive and was agitated. On the arrival of the paramedics, Ms. Young was given intravenous atropine and was intubated for ventilatory support. She was transported to the hospital where she was pronounced dead shortly thereafter.

32. According to the autopsy report that I reviewed, the cause of Ms. Young's death was pulmonary embolism due to deep vein thrombosis of the lower extremities due to inactivity due to seizure disorder of undetermined etiology. Her manner of death was stated as caused by natural causes. See Report of Autopsy Bates 0099 - 0104), dated June 20, 2005, annexed under Exhibit Tab I.

33. On July 26, 2005, BDC's Mortality Review Committee members, consisting of the Quality Assurance Coordinator, six physicians, three psychiatrists, a neurologist and the Deputy Director of Operations, discussed this case. The members noted that Ms. Young's medication regimen appeared appropriate and would not have predisposed her to a pulmonary embolism. The issue of her history of mild pitting edema was also discussed and it was noted that in the past, diagnostic testing had not revealed reasons for concern. The most recent episode of edema was reviewed. I noted that the bilateral pitting ankle edema she had was an unlikely sign for DVT, because she had no calf tenderness and a negative Homann's sign. Ms. Young's edema was assumed to be positional leg elevation during rest periods had been recommended. See Mortality Review - Valerie Young (Bates 0111 - 0113), dated July 26, 2005, annexed under Exhibit Tab J.

34. The Mortality Review Committee members also noted that Ms. Young was ambulatory but using a wheelchair for transport because of foot drop and gait instability. It was also discussed, however, that staff who monitored her may not have encouraged her to walk around because of fear of her falling. It was further discussed if the use of anti-coagulants would have helpful and whether elastic stockings could have been used. Id. However, the use of anti-coagulants would have been too risky for her, especially as a consumer prone to falls. Likewise, the use

12

of elastic stockings can increase the risk for blood clots because they roll down and squeeze the leg, further preventing circulation.

35. As one of Ms. Young's care providers, I never reached the medical conclusion that she was suffering from DVT. In my opinion, with a reasonable degree of clinical certainty, I could not have reasonably anticipated that Ms. Young would develop DVT and a fatal pulmonary embolism, because she had none of the accepted risk factors or symptoms that are recognized to increase the likelihood of a diagnosis of DVT. These factors or symptoms are active cancer, recently bedridden for major surgery, unilateral calf or leg edema, paralysis or a leg cast in the recent past, localized calf tenderness, and collateral superficial veins.

36. Ms. Young also continued to receive physical therapy, continued to ambulate with assistance of BDC staff, and appeared to remain completely asymptomatic for the three weeks preceding her death. Therefore, I had no reason to change her medication or recommend other changes to her care and treatment.

37. Accordingly, it was my medical opinion that the oversight, monitoring, evaluation, and treatment of Ms. Young was thorough and according to the accepted standard of care.

Dated: Brooklyn, New York
July 23, 2008

                                                                                 JOVAN MILOS, M.D.