1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - - - -x

5    ESTATE OF VALERIE YOUNG, by VIOLA
     YOUNG, as Administratrix of the
6    Estate of Valerie Young, and in her
     personal capacity, SIDNEY YOUNG,
7    and LORETTA YOUNG LEE,

8                              Plaintiffs,

9            -against-

10   STATE OF NEW YORK OFFICE OF MENTAL
     RETARDATION AND DEVELOPMENTAL
11   DISABILITIES, PETER USCHAKOW,
     personally and in his official
12   capacity, JAN WILLIAMSON, personally
     and in her official capacity, SURESH
13   ARYA, personally and in his
     individual capacity, KATHLEEN
14   FERDINAND, personally and in her
     official capacity, GLORIA HAYES,
15   personally and in her official
     capacity, DR. MILOS, personally and
16   in his official capacity;

17
                              Defendants.
18   - - - - - - - - - - - - - - - - - - - -x

19                350 Fifth Avenue
                  New York, New York
20
                  March 27, 2008
21                10:25 A.M.

22

23

24

25

1

2      DEPOSITION of JOVAN MILOS, M.D., one

3  of the Defendants in the above-entitled

4  action, held at the above time and place,

5  taken before Gretchen A. Milton, a

6  Shorthand Reporter and Notary Public of

7  the State of New York, pursuant to the

8  Federal Rules of Civil Procedure, Notice

9  and stipulations between Counsel.

10

11

12        *     *     *

13

14

15  APPEARANCES:

16

      CATAFAGO LAW FIRM, P.C.
17         Attorneys for Plaintiffs
         350 Fifth Avenue
18         New York, New York 10118

19    BY:  JACQUES CATAFAGO, ESQ.

20

21    STATE OF NEW YORK
    OFFICE OF THE ATTORNEY GENERAL
22    ANDREW M. CUOMO
         Attorneys for Defendants
23         120 Broadway
         New York, New York 10271-0332
24

      BY:  JOSE L. VELEZ, ESQ.
25

3

1

2   APPEARANCES:
    (Continued)
3
        STATE OF NEW YORK
4       OFFICE OF MENTAL RETARDATION AND
        DEVELOPMENTAL DISABILITIES
5           Attorneys for Defendants
            75 Morton Street
6           New York, New York 10014

7       BY:  PATRICIA DELORY PAWLOWSKI, ESQ.

8

9

10                *     *     *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

18

```
1              JOVAN MILOS, M.D.
2    specialist different than those of medical
3    doctors?
4        A.   They are no different.
5        Q.   With regard to the BDC residents
6    under your care, those 55 to 70 residents,
7    are you familiar with a patient by the
8    name of Valerie Young?
9        A.   Yes, I am familiar.
10       Q.   When did you first see Valerie
11   Young?
12       A.   I think it was around
13   January 2002.
14       Q.   Is it correct that she was one of
15   the 55 to 70 residents at BDC under your
16   care as a medical specialist?
17       A.   Yes.
18       Q.   Was there anyone --
19            MR. CATAFAGO:  Withdrawn.
20       Q.   During the time that Valerie
21   Young was under your care, did you report
22   to anyone at BDC?
23       A.   I don't understand the question.
24       Q.   With regard to the medical
25   services and care you provided for Valerie
```

19

1              JOVAN MILOS, M.D.

2    Young, did you have someone you reported

3    to?

4        A.   Administration.

5        Q.   Who in the administration?

6        A.   I mean we did have a medical

7    director.  There was no medical specialist

8    on a higher position then me.  But the

9    report -- I mean -- I report -- I reported

10   to the deputy director and the director as

11   needed.

12       Q.   Is that Peter Uschakow and Suresh

13   Arya?

14       A.   Yes.

15       Q.   And how often would you report to

16   them with regard to the medical care that

17   you provided to Valerie Young?

18       A.   Only as needed.

19       Q.   Who makes the determination as to

20   whether it was needed, to report to your

21   superiors?

22       A.   Actually I didn't, I have no need

23   to report.

24       Q.   Is it correct that, from

25   January 2002 until her death in 2005, you

20

```
 1              JOVAN MILOS, M.D.

 2    never reported to any of your superiors

 3    about your medical care of Valerie Young?

 4              MR. VELEZ:  Objection.  That's

 5        not his testimony.

 6              You can answer.

 7        Q.  You can answer the question.

 8        A.  I would report to the team.

 9        Q.  You would report to the team?

10        A.  Yes.

11        Q.  Who was the team?

12        A.  The team was the medical

13    specialist and other specialists that were

14    involved in the care of Valerie Young.

15        Q.  You testified that there were

16    other medical specialists at BDC at the

17    same time as you?

18        A.  Yes.

19        Q.  Did they also get involved in the

20    medical care of Valerie Young at the same

21    time you did?

22        A.  Yes.

23        Q.  What are their names, if you

24    know?

25        A.  Yes.  It was the psychiatrist.
```

50

1          JOVAN MILOS, M.D.

2     Q.   With regard to the third

3 recommendation, the potential side

4 effects, behavioral status, to be

5 monitored closely if medication changes

6 are made, what was your understanding as

7 to the potential side effects which are

8 being referenced there?

9     A.   I would say it was for the

10 complete medication regimen at the time.

11     Q.   You can't just say "the complete

12 medication regimen at the time."  I need

13 to know what other medications she was

14 getting at that time.

15          What about the psychotropic

16 medications that are discussed on the

17 second page of Exhibit 1?

18     A.   It says:  Reduce Trilofam,

19 T-R-I-L-O-F-A-M, from 32 milligrams to 24

20 milligrams daily.

21     Q.   The side effects of Trilofam are

22 falling and steadiness and dizziness;

23 right?

24          MR. VELEZ:  Objection.

25     Q.   Is that correct, sir?

51

```
1              JOVAN MILOS, M.D.
2         MR. VELEZ:  Objection to the
3    form.  Is there any foundation for
4    that?
5         MR. CATAFAGO:  Yes.  I am asking
6    whether that's the case.
7    Q.   It says right there that
8    falling/unsteadiness can be a side effect.
9         Did you agree with that in this
10   document that you signed?
11   A.   Yes.
12   Q.   Were there side effects that you
13   are aware of -- just looking at the
14   document -- with regard to the medications
15   that are set forth here?  What about the
16   Ambien?
17   A.   I don't understand the question.
18   Q.   Is there anything else that you
19   were concerned about?
20   A.   At that moment, no.
21        MR. CATAFAGO:  This is
22   Plaintiff's Exhibit 2.  It's Bates
23   stamped Young7695 through 7701.
24        (The document entitled,
25   "Individual Progress Plan Review
```

1           JOVAN MILOS, M.D.

2    was weekend or... and I was not there on a

3    Sunday.

4        Q.   If you would look at the report

5    now marked as Exhibit 10, Bates No. CQC40,

6    you have the date of death as June 19,

7    2005, and the time as 9:32 p.m.

8        A.   Yes.

9        Q.   Did you learn about it that

10   evening or the next morning?

11       A.   The next morning.

12       Q.   Who specifically told you that

13   she had died?

14       A.   I don't know.  My routine is to

15   go first to my office, leave the things

16   that I brought with me, go to the nursing

17   station, go to the logbook, see what

18   happened last night.  And this is a very

19   significant event, so as soon as I

20   entered, I know what happened; that this

21   is what happened.  This has happened.

22           And who actually told me, with

23   whom I have that conversation, I don't

24   recall at this moment.

25       Q.   Did you speak to anyone about

126

1              JOVAN MILOS, M.D.

2      Q.   How big is that book in

3  connection with Valerie Young?

4      A.   It's mostly the dates for that

5  last one, one and a half years.

6      Q.   Is there one DVP book for each

7  consumer?

8      A.   Each consumer has a separate

9  book.

10          MR. CATAFAGO:  I don't know if

11      that was produced.

12          MR. VELEZ:  He was referring to

13      the medical records, at least as I

14      understand it, when he testified

15      earlier today as to where progress

16      notes are kept, the medical records.

17      He said there was a DVP, and I don't

18      know what that stands for, but it

19      basically is where the records are

20      kept.

21          MR. CATAFAGO:  You have produced

22      that?

23          MR. PAWLOWSKI:  That's all this.

24      Q.   With regard to the documents that

25  you reviewed, did you make a list in order

130

1                JOVAN MILOS, M.D.

2        A.    That's the major ones.

3        Q.    What about the next medication

4   that was prescribed to the decedent as of

5   the time of her death?

6        A.    Klonopin is an anxiolytic to

7   release anxiety.  It's an antianxiety

8   medication.  Half milligram at bedtime.

9   It's pretty much a low dose.  It's also to

10  help with sleep.

11       Q.    What side effects, if any, are

12  you aware of in connection with that

13  medication?

14       A.    Sedation.

15       Q.    Anything else?

16       A.    A potential for low blood

17  pressure.

18       Q.    Is that all?

19       A.    There are others.

20       Q.    What else are you aware of?

21             MR. VELEZ:  If you know.

22       A.    Mostly concerning sedation.

23       Q.    Were you aware or concerned with

24  any other side effects with respect to

25  that medication --

131

```
 1              JOVAN MILOS, M.D.
 2      A.   That has the potential for
 3   addiction.
 4      Q.   Anything else?
 5      A.   These are the main ones.
 6      Q.   Anything else?
 7      A.   No.
 8      Q.   What about the next medication
 9   that was prescribed to the decedent at the
10   time of her death, what's that?
11      A.   Remeron.
12      Q.   What is that prescribed for?
13      A.   It's an antidepressant.  But also
14   it has sedating qualities, and that's the
15   reason it was given at bedtime.  Also to
16   help with sleep.
17      Q.   What side effects were you aware
18   of and concerned in connection with that
19   medication?
20      A.   Sedation, low blood pressure...
21   those are the major ones.
22      Q.   Anything else?
23      A.   There are a number of others.
24      Q.   Can you identify them for the
25   record, the side effects you were aware
```

1                   JOVAN MILOS, M.D.

2     evaluate for splinting.

3          Q.   What happened after you gave this

4     referral?

5          A.   Valerie Young was seen by the

6     physical therapy department.  They did the

7     evaluation and enclosed recommendations.

8          Q.   What were the recommendations?

9          A.   That Ms. Young be scheduled for

10    physical therapy two times per week, to

11    receive mat exercises, ambulation

12    exercise, range of motion exercises to

13    both upper and lower extremities.

14                Ms. Young will be scheduled to

15    see orthopedist on his next visit to BDC

16    for evaluation of left foot orthosis

17    follow-up.

18         Q.   About six weeks before she passed

19    away, as noted in the report, the physical

20    therapist scheduled Ms. Young for physical

21    therapy treatments twice a week?

22         A.   Yes.

23         Q.   Do you know if that occurred?

24         A.   There is no reason to believe it

25    did not occur.

149

1          JOVAN MILOS, M.D.

2      Q.   Do you know if it occurred?

3      A.   I was not physically present when

4  they did it.

5      Q.   Did anyone tell you that it was

6  done?

7      A.   I don't recall that.

8      Q.   Do you know who would have been

9  in charge of providing that physical

10  therapy treatment that you prescribed for

11  Valerie Young twice a week?

12      A.   Physical therapy.

13      Q.   Do you know the name of the

14  physical therapist, of that individual, or

15  those individuals, as of May 2, 2005 until

16  Ms. Young passed away on June 19, 2005?

17      A.   I do not know which physical

18  therapist was assigned to her.

19      Q.   Do you know if anyone was

20  assigned?

21      A.   Somebody was assigned.

22      Q.   But you don't know the person's

23  name?

24      A.   No.

25      Q.   When was the last time you saw

154

1          JOVAN MILOS, M.D.

2    not my job to go there --

3      Q.   Did you speak to anyone about her

4    need for physical therapy at any time

5    after May 2, 2005?

6      A.   I sent the request for physical

7    therapy.  I sent the request for physical

8    therapy on --

9      Q.   Please listen to the question.

10      A.   -- on April 27, 2005.

11      Q.   My question is:  After May 2,

12    2005, when the report came in scheduling

13    her for physical therapy twice a week, did

14    you speak to anyone about her need for

15    physical therapy?

16      A.   I don't recall that.

17      Q.   Did you ever observe her

18    receiving physical therapy?

19      A.   Again, it's done in the physical

20    therapy department.  I don't go there.  I

21    go not often there.  Maybe a few times a

22    year.

23      Q.   Is the answer no?

24      A.   The answer is no.  I have no

25    reason to doubt --

155

```
1              JOVAN MILOS, M.D.
2      Q.   I'm not asking for what you have
3  reason to doubt.  I am asking for what you
4  observed and what you spoke about.
5              MR. CATAFAGO:  Let's have a
6      document dated July 26, 2005, Bates
7      stamped Young0111-Young0113, marked as
8      Exhibit 12.
9              (The document entitled,
10     "Mortality Review - Valerie Young,"
11     dated 7/26/05, Bates
12     No. Young0011-0113 was hereby marked
13     as Plaintiff's Exhibit 12 for
14     identification, as of this date.)
15     A.   I'm aware of this document.
16     Q.   Did you attend a mortality review
17  or meeting in which this document as
18  prepared?
19     A.   Yes.
20     Q.   Was it prepared at the meeting
21  or --
22     A.   Subsequent.
23     Q.   -- to the meeting?
24          Which one of you prepared the
25  actual document?
```

157

1              JOVAN MILOS, M.D.

2    at the meeting?

3         A.   Most likely.

4         Q.   Were notes taken by anyone?

5         A.   I don't know.

6         Q.   Was the meeting video-taped or

7    tape-recorded?

8         A.   No.

9         Q.   Did you take notes?

10        A.   No.

11             MR. CATAFAGO:  Counsel, with

12        respect to anybody who took notes at

13        this meeting who was present at the

14        meeting at their facility, is that all

15        part of production?

16             MR. VELEZ:  I will say again that

17        we have produced all documents related

18        to this case.

19             MR. CATAFAGO:  Off the record.

20             (Discussion held off the record.)

21        Q.   Did you believe, after you

22    learned that Valerie Young had passed

23    away, that physical therapy twice a week

24    was sufficient for her needs?

25        A.   Yes.