```
 1
 2     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 3     -----------------------------------------X
       Estate of VALERIE YOUNG, by VIOLA YOUNG,
 4     as Administratrix of the Estate of
       Valerie Young, and in her personal
 5     capacity, SIDNEY YOUNG, and LORETTA
       YOUNG LEE,
 6                         Plaintiffs,
                                         Index No.:
 7            vs.                        07CV6241

 8     STATE OF NEW YORK OFFICE OF MENTAL
       RETARDATION AND DEVELOPMENTAL
 9     DISABILITIES, PETER USCHAKOW,
       personally and in his official
10     capacity, JAN WILLIAMSON, personally
       and in her official capacity, SURESH
11     ARYA, personally and in his official
       capacity, KATHLEEN FERDINAND,
12     personally and in her official
       capacity, GLORIA HAYES, personally and
13     in her official capacity, DR. MILOS,
       personally and in his official capacity,
14
                           Defendants.
15     -----------------------------------------X

16                         April 11, 2008
                           10:06 a.m.
17

18          Examination before trial of PETER

19     ALEXANDER USCHAKOW, held at the offices

20     of The Catafago Law Firm, P.C., 350 Fifth

21     Avenue, New York, New York, pursuant to

22     Notice, before Wendy D. Boskind, a

23     Registered Professional Reporter and

24     Notary Public of the State of New York.

25
```

```
 1
 2      A P P E A R A N C E S:
 3
 4      THE CATAFAGO LAW FIRM, P.C.
 5      Attorneys for Plaintiffs
 6           Empire State Building
 7           350 Fifth Avenue
 8           New York, New York 10118
 9      BY:  JACQUES CATAFAGO, ESQ.
10           JCatafago@catafagolaw.com
11
12      STATE OF NEW YORK
13      OFFICE OF THE ATTORNEY GENERAL
14      ANDREW M. CUOMO
15      Attorneys for Defendants
16           120 Broadway
17           New York, New York 10271-0332
18      BY:  JOSE L. VELEZ, ESQ.
19           Jose.Velez@oag.state.ny.us
20
21      ALSO PRESENT:
22           PATRICIA PAWLOWSKI, ESQ.
23           Counsel's Office
24           Office of Mental Retardation
25            and Developmental Disabilities
```

21

```
 1                    Uschakow
 2       A.    There are --
 3             MR. VELEZ:  Objection, it's
 4       varying.
 5       Q.    Well, if you could tell me.
 6             If it's too voluminous to
 7  state on the record, then let me know
 8  that, also, because then my next question
 9  is going to be how did you ensure
10  compliance.  Did you have a manual?  Is
11  there some other way?  Right now the
12  question on the table, and we can go
13  back, is, what are those requirements
14  that you had to ensure compliance with.
15       A.    There are a certain number of
16  conditions of participation in the
17  Medicaid program.  Those conditions of
18  participations are further delineated
19  into standards.
20             Yes, I have the condition --
21  I'm sorry -- the 483 regs. in my office.
22       Q.    So 483 regs.
23       A.    I think it is.
24       Q.    You had it physically in your
25  office?
```

22

```
 1                    Uschakow
 2        A.    Physically in my office.
 3        Q.    And that's what you would
 4   refer to, to ensure compliance?
 5        A.    That's what I would refer to
 6   if I needed to enlighten myself in
 7   greater detail what the definition of
 8   "compliance".  To ensure compliance, I
 9   delegated to my experts on my staff.
10        Q.    And, ultimately, you had the
11   ultimate directorial supervision over
12   those experts; right?
13        A.    Not all of them.
14        Q.    Which didn't you directly --
15   which weren't you directly in charge of?
16        A.    I was not in charge of the
17   discipline coordinators.
18        Q.    Well, the discipline
19   coordinators reported to the deputy
20   director of operations --
21        A.    That's correct.
22        Q.    -- who reported to you.
23        A.    That's correct.
24        Q.    And, by "discipline
25   coordinators", you're referring to field
```

23

```
 1                    Uschakow
 2     of disciplines, like doctors, and so
 3     forth.
 4            A.    I am specifically talking
 5     about physical therapy, occupational
 6     therapy, nursing, speech pathology,
 7     recreation, day treatment programming.
 8            Q.    To your knowledge, did
 9     Valerie Young ever receive physical
10     therapy while under the care of BDC?
11            A.    Yes.
12            Q.    When?
13            A.    I don't understand, "when"?
14            Q.    I'm asking for a temporal
15     time reference to your response.
16                  You said "yes", she received
17     care, and my question is when did she
18     receive --
19            A.    When did she receive the
20     care?
21            Q.    Yes.
22            A.    I don't recall the exact
23     dates.
24            Q.    Do you recall the year or
25     years?
```

```
1                    Uschakow
2         Q.   Do you recall having a
3    discussion about the treatment and care
4    of Valerie Young with anyone at BDC prior
5    to her death?
6         A.   I do recall relaying to the
7    deputy director concerns about reduced
8    ambulation on the part of Valerie Young
9    after a phone call by Mrs. Viola Young.
10        Q.   And when you said you recall
11   a discussion with the deputy director of
12   operations, are you referring to Arya or
13   Jan Williamson?
14        A.   I am not sure which one it
15   was.
16        Q.   Can you describe, in greater
17   detail, the substance of your
18   conversation with the deputy director at
19   that time?
20        A.   That Viola Young -- Mrs.
21   Viola Young, had called me to air her
22   concern about Valerie's reduced walking
23   ability, and I shared exactly that with
24   the deputy for follow-up with the
25   treatment team.
```

1              Uschakow
2      Q.   And did anyone report back to
3  you, after you shared that with your
4  deputy director?
5      A.   I do not recall.
6      Q.   Do you recall you following
7  up with anyone to determine what had
8  happened after you had spoken to the
9  deputy director?
10     A.   I do recall, after the phone
11 conversation, seeing Valerie in Building
12 5 being assisted to walk.
13     Q.   That wasn't my question.  We
14 will get to that in a second.
15          My question is, did you
16 follow up with anyone.
17     A.   No.
18          MR. VELEZ:  Counsel, that can
19     be construed as "follow-up",
20     because --
21          MR. CATAFAGO:  Okay, so let's
22     go there.
23     Q.   When you saw her in Building
24 5, was it happenstance viewing or were
25 you specifically going to see whether or

```
1                    Uschakow
2     not anything had been done following your
3     discussion with the deputy director?
4          A.    I periodically make rounds of
5     all of the program areas, and happened to
6     see Valerie.
7          Q.    And you saw her being
8     assisted with someone?
9          A.    Yes.
10         Q.    Do you know who was assisting
11    her?
12         A.    No.
13         Q.    Was it one person or more
14    than one?
15         A.    I remember one person.
16         Q.    Was she using a wheelchair at
17    the time?
18         A.    No.
19         Q.    Was the wheelchair beside her
20    at the time?
21         A.    I don't recall seeing it.
22         Q.    Did you ever see Valerie
23    Young in a wheelchair at all?
24         A.    Yes.
25         Q.    How many times?
```

28

```
1                     Uschakow
2          A.   I couldn't tell you.
3          Q.   Did you see her -- withdrawn.
4               You made -- you would make
5    rounds periodically or was it regular
6    that you would make rounds?
7          A.   I don't understand the
8    question.
9          Q.   Well, when you were director
10   at BDC, how often would you walk around
11   to look at the patients?
12         A.   It varies, it varies on the
13   pressures of the office.
14         Q.   Approximately how many times,
15   if you can approximate, did you actually
16   see Valerie Young?
17              MR. VELEZ:  During what time?
18              MR. CATAFAGO:  The time that
19         she was there.
20         Q.   Once a week?
21         A.   As a direct-- since my
22   arrival there?
23         Q.   Well, since your arrival
24   there, since you were deputy director.
25         A.   No way I could count.
```