1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      ----------------------------------------X
       Estate of VALERIE YOUNG, by VIOLA YOUNG,
4      as Administratrix of the Estate of
       Valerie Young, and in her personal
5      capacity, SIDNEY YOUNG, and LORETTA
       YOUNG LEE,
6                         Plaintiffs,
                                   Index No.:
7           vs.                    07CV6241

8      STATE OF NEW YORK OFFICE OF MENTAL
       RETARDATION AND DEVELOPMENTAL
9      DISABILITIES, PETER USCHAKOW,
       personally and in his official
10     capacity, JAN WILLIAMSON, personally
       and in her official capacity, SURESH
11     ARYA, personally and in his official
       capacity, KATHLEEN FERDINAND,
12     personally and in her official
       capacity, GLORIA HAYES, personally and
13     in her official capacity, DR. MILOS,
       personally and in his official capacity,
14
                          Defendants.
15     ----------------------------------------X

16                      April 10, 2008
                        10:09 a.m.
17

18          Examination before trial of JAN

19     WILLIAMSON, held at the offices of The

20     Catafago Law Firm, P.C., 350 Fifth

21     Avenue, New York, New York, pursuant to

22     Notice, before Wendy D. Boskind, a

23     Registered Professional Reporter and

24     Notary Public of the State of New York.

25

```
 1

 2      A P P E A R A N C E S:

 3

 4      THE CATAFAGO LAW FIRM, P.C.

 5      Attorneys for Plaintiffs

 6           Empire State Building

 7           350 Fifth Avenue

 8           New York, New York 10118

 9      BY:  JACQUES CATAFAGO, ESQ.

10           JCatafago@catafagolaw.com

11

12      STATE OF NEW YORK

13      OFFICE OF THE ATTORNEY GENERAL

14      ANDREW M. CUOMO

15      Attorneys for Defendants

16           120 Broadway

17           New York, New York 10271-0332

18      BY:  JOSE L. VELEZ, ESQ.

19           Jose.Velez@oag.state.ny.us

20

21      ALSO PRESENT:

22           PATRICIA PAWLOWSKI, ESQ.

23           Counsel's Office

24           Office of Mental Retardation

25            and Developmental Disabilities
```

1              Williamson

2    committee.

3         Q.    And what is that, the

4    forensics advisory committee?

5         A.    We have a number of

6    individuals who are remanded to our

7    facilities through the court system, most

8    of them 730.40's or 730.50's.

9         Q.    Involuntary --

10        A.    Correct.  So my

11   responsibility would be to ensure that

12   orders of retention were renewed in a

13   timely fashion, that we were in

14   compliance with everything the courts

15   wanted, all that goes along with that

16   status.

17        Q.    And what is the risk

18   management committee?

19        A.    Those individuals who are

20   either 730.50 or 40, or present with

21   high-risk behaviors.  Before we will

22   endorse their ability to go out into the

23   community, on trips or home visits, we do

24   prepare a very extensive plan of

25   protective oversight which gets reviewed

1              Williamson

2    by the risk management committee, and I

3    am the chairperson of that committee.

4         Q.   Was that done, to your

5    knowledge, for Valerie Young?

6         A.   No.

7         Q.   And she wasn't involved in

8    any aspect of your work in the forensics

9    advisory committee, either.

10        A.   No.

11        Q.   Is that correct?

12        A.   Yes.

13        Q.   And what is the special

14   incident committee?

15        A.   There are categories of

16   incidents within OMRDD.  Two of them are

17   what's called "reportable" and "serious

18   reportable" incidents, which get

19   thoroughly investigated.  After the

20   investigation, the special incident

21   review committee will review them, its

22   content, findings, and its

23   recommendations, and we determine whether

24   or not we concur with the findings and

25   recommendations or if we feel that

1                Williamson

2        Q.    And was there any indication

3    that she appeared heavily sedated? That

4    you saw.

5        A.    Not that I recall.

6        Q.    Did you personally observe

7    her in a wheelchair ever?

8        A.    I had seen her being

9    transported in a wheelchair, yes.

10        Q.    What about sitting in a

11    wheelchair and not being transported?

12        A.    No, I don't remember.

13        Q.    Was it your understanding,

14    based on your discussion with treatment

15    team leader Kathy Ferdinand, that the

16    wheelchair was to be used only for

17    transportation purposes?

18        A.    Our discussion was she needed

19    it for transport for her safety.

20    That -- yeah, I mean, it was for that

21    purpose.

22        Q.    Did anyone ever tell you that

23    the wheelchair would be used for shower

24    purposes --

25        A.    No.

```
 1                   Williamson

 2    involved in the treatment of Valerie?

 3         A.    It's possible he was the

 4    psychiatrist at the time --

 5         Q.    Yes.

 6         A.    -- but not her primary care

 7    physician.

 8         Q.    Right, but the others were

 9    not.

10         A.    And Dr. Capati may have seen

11    her, if she was taking seizure

12    medication.

13         Q.    Were you ever advised, as

14    acting national deputy director of

15    operations, as to the medications that

16    were prescribed to Valerie?

17         A.    No.

18               (Deposition Exhibit

19               Plaintiffs' Williamson 2, policy on

20               reporting deaths that was in effect

21               at the time of Valerie's death,

22               Bates stamped D 1562 and 1563,

23               marked for identification, as of

24               this date.)

25         Q.    Let me show you what's been
```

```
 1                 Williamson

 2     marked as Williamson Exhibit 2, Bates

 3     stamped D 1562 and 1563.  And I'm going

 4     to ask you to review this document, and

 5     tell me if you know what it is.

 6          A.    (Pause.)

 7                Yes, I am familiar with this.

 8          Q.    What is it?

 9          A.    It's the policy on reporting

10     deaths.

11          Q.    This was in effect at the

12     time of Valerie's death?

13          A.    Correct.

14                (Pause in proceedings.)

15          Q.    I just want to go back for a

16     second to Exhibit 10, Williamson Exhibit

17     10.

18                Take a look at the second

19     page, CQC 31.  And in this mortality

20     review report, it says, and I quote --

21                MR. VELEZ:  The third page;

22          right?

23                MR. CATAFAGO:  Yes, it's the

24          third page, CQC 31.

25          Q.    -- "It was discussed that
```