COPY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

Estate of VALERIE YOUNG, by VIOLA YOUNG, as Administratrix of the Estate of Valerie Young, and in her personal capacity, SIDNEY YOUNG, and LORETTA YOUNG LEE,

Plaintiffs,

-against- Index No. 07CV6241

STATE OF NEW YORK OFFICE OF MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES, PETER USCHAKOW, personally and in his official capacity, JAN WILLIAMSON, personally and in her official capacity, SURESH ARYA, personally and in his official capacity, KATHLEEN FERDINAND, personally and in her official capacity, GLORIA HAYES, personally and in her official capacity, DR. MILOS, personally and in his official capacity,

Defendants.

-----------------------------------------X

EXAMINATION BEFORE TRIAL of the Plaintiff, LORETTA LEE, taken by the Defendant, pursuant to Notice, held at the Office of the Attorney General, 120 Broadway, New York, New York 10271 on January 28, 2008, at 12:45 p.m., before a Notary Public of the State of New York.

A. Because I work during the week and I always made it my business to at least visit her once a month.

Q. You said you visited her on a Saturday?

A. Yes, that is right.

Q. Do you work on Saturday?

A. I work Monday to Friday.

Q. Did Valerie know who you were when you visited her?

A. Yes, she did.

Q. I want to show you a copy of the complaint that's been filed in this lawsuit.

A. Okay.

Q. Okay.

Why don't you look through all the pages to make sure what is on each page.

A. Okay.

Q. When you visited Valerie at the Brooklyn Development Center, what would she be doing?

A. She would be sitting down. Sometimes she would be walking around. Mostly she would be sitting.

Q. Again, I apologize certain questions I am going to ask you --

A. I understand.

Q. How did Valerie Young die? What is your understanding of how she died?

MR. KAISER: Objection.

A. Valerie died from some type of a blood clot. If it had been treated, she would have not passed away.

Q. Now, do you think that any of the defendants knew prior to her death that she had a blood clot that would kill her?

MR. KAISER: Objection.

A. I don't know, no.

Q. Just so we are clear, do you think any of the defendants knew prior to her dying that she had this blood clot that was going to kill her?

MR. KAISER: Objection.

A. No.

Q. Now, prior to June 19, 2005, were you aware that Valerie suffered from blood clots?

A. No.

Q. Were you aware that she suffered

from any medical condition that might lead to blood clots?

MR. KAISER: Objection.

A. No.

Q. Just so we are clear, prior to June 19, 2005, did you believe that Valerie Young was in danger of suffering a blood clot due to any medical condition that she had?

MR. KAISER: Objection.

A. No.

Q. If you would have known you would have communicated that to somebody?

A. Correct.

MR. KAISER: Objection.

Q. You would have spoken to your mom as you testified or you would have spoken directly to somebody at Brooklyn Developmental Center, correct?

MR. KAISER: Objection.

A. Yes.

Q. You would have requested for action to be taken if you thought this was going to happen?

MR. KAISER: Objection.

A. Exactly.

Q. Prior to June 15, 2005 -- let me take a step back.

Do you think that any of the defendants knew that she had a medical condition that would lead to a blood clot that could kill her that they would have communicated to anyone else in the Brooklyn Developmental Center that this needs to be taken care of.

MR. KAISER: Objection.

A. I think they would have taken care of it if they knew.

Q. If they knew?

A. If they knew.

Q. Just so we are clear, if you would have known she had a medical condition that would have lead to a blood clot that could ultimately killed her, you would have communicated that to the Brooklyn Developmental Center staff, correct?

A. Yes.

MR. KAISER: Objection.

Q. It is also your testimony that you believe if any of the defendants knew that Valerie had a medical condition that would lead

to a blood clot that they too would have communicated to someone in the hospital treatment team to get it corrected?

MR. KAISER: Objection.

A. Yes.

Q. This goes back to then why you are saying they were negligent. Because if they knew what was going on, you feel they would have done something about it because it is your thinking or your opinion that since they were negligent, they didn't even reach that point?

MR. KAISER: Objection.

A. What I feel is since Valerie had that problem that she was having, if they had sent her out when she first started this, that they would have caught that blood clot, okay.

Q. Are you aware what medical treatment she was receiving during that time?

A. No, I was not aware of any medical treatment. No, I was not.

Q. You are not saying that she was not getting any medical treatment, is just that you weren't aware of what medical treatment she was receiving?

MR. KAISER: Objection.

A. Right.

Q. When you say, "they should have sent her out," are you saying she should have been evaluated to see what the problem with her leg was?

MR. KAISER: Objection.

A. Yes.

Q. If they did evaluate her and didn't find anything, would that be something that would make you feel better?

MR. KAISER: Objection.

A. Yes, if they had sent her out and they would have find out, that would have been a feeling.

MR. KAISER: Objection.

Q. When you say, sent her out --

A. Sent her out to a hospital for tests.

MR. KAISER: Objection.

A. For tests.

Q. Do you know Brooklyn Developmental Center had medical staff in the center, correct, they had treating doctors there?

A. Yes, they do. I am aware of, yes. But for the length of time that Valerie was having these problems, she should have been sent out to a hospital for tests like MRIs to see what was wrong with her leg. That was not done.

Q. So is it fair to say you disagree with the medical treatment that they provided her by not sending her outside?

MR. KAISER: Objection.

A. I agree.

Q. If it was their opinion, that they didn't have to sent her out to an outside hospital because they did sufficient tests in the Brooklyn Developmental Center to see what her problem was --

MR. KAISER: Objection.

Q. -- how would you characterize that as disagreeing with their medical opinion or negligent or both?

A. Yes, both.

MR. KAISER: Objection.

A. Both.

Q. Just so we are clear, you are disagreeing with their medical opinion regarding

whether she needed to be sent out?

A. Yes.

Q. You think they were negligent for not sending her out?

MR. KAISER: Objection.

A. Yes.

Q. Prior to June 19, 2005, do you think Valerie Young tried to communicate, I know verbally she was very limited, do you think she tried to communicate to you or anyone else in your family that she felt she had a serious problems with her legs?

A. No.

Q. So what you are saying is, she did not communicate any fear that she had regarding her leg to you or to your mother?

A. No, she could not do that.

Q. Just so I am clear, prior to June 19, 2005, did you contact any of the defendants to communicate to them that you feared for Valerie Young's health related to her suffering to her medical condition to her leg?

MR. KAISER: Objection.

A. I did not personally, my mother.

Q. You are saying your mother communicated to the staff at Brooklyn Developmental Center that she was concerned about the medical condition related?

A. Yes.

Q. What did she communicate to them?

MR. KAISER: Objection.

A. She would ask them, "Why is Valerie limping like that? What is wrong with her leg?" And like I said before, they would tell her she had a dropped foot. That was their diagnosis.

Q. You think that problem with the dropped foot is the reason why she ended up having her blood clot that killed her?

MR. KAISER: Objection.

A. Yes.

Q. Why did you think that?

A. I feel that way it was a blood clot, the type of blood clot that Valerie died from is a type that it travels in your body, if it goes undetected, it will kill you just like that.

Q. You are saying you feel that way, you haven't had a medical doctor tell you that

her dropped foot was the reason why she had the clot that killed her?

MR. KAISER: Objection.

A. No.

Q. You said your mother communicated to the Brooklyn Developmental Center, so what did she communicate to them?

MR. KAISER: Objection.

A. My mother was always going there, she was always interacting with the staff members that you named, always because she was always going there on the weekdays and the weekends as well.

Q. Just for the record, the records do indicate your mother did visit Valorie on a very regular basis and was a very, very caring mother.

A. Yes, she was.

Q. But unfortunately these are the same records that don't seem to indicate that there was visits from other members of the family.

A. They have them when I did sign them. They did have them.

Q. Your testimony is you did sign in

to this?

MR. KAISER: Objection.

A. Oh, yes.

Q. What did your mother communicate to the hospital regarding Valerie's leg?

MR. KAISER: Objection.

A. She would ask them, "Why is Valerie walking like this?"

Q. You know this because your mother would tell you?

A. Yes, and I was there at times when she would ask.

Q. What would be the response that she got?

A. They always told mommy that it was her dropped foot.

Q. So is it fair to say you and your mother were concerned with her gait, the way she was walking? You wanted to know what was wrong with her leg that lead her to walk like that?

A. Yes.

Q. Prior to June 19, 2005, you weren't concerned that her gait or the problem with her leg was going to lead to have her blood clot that

was going to kill her?

MR. KAISER: Objection.

A. Nobody knew that.

Q. When you say, "nobody knew that," you are not just including yourself, you are saying even the defendants, correct?

MR. KAISER: Objection.

A. Well, I did not know it. I don't believe they knew it either.

Q. Now, the blood clot that traveled to Valerie's lung and killed her, do you think any of the defendants were directly involved with that?

A. Directly?

Q. Yes.

A. No.

Q. How were they involved?

MR. KAISER: Objection.

A. By not sending her out, to see what was going on. If they had sent Valerie out like I said, if they had sent Valerie out to the hospital for tests, they would have picked up on that.

Q. That is your opinion, a medical

doctor hasn't told you that?

A. That is my opinion.

Q. Do you think that any of the defendants took any action that facilitated the incident, in another words, that created or lead to the incident of the blood clot that developed on Valerie's legs and worked its way up on the lungs?

MR. KAISER: Objection.

A. I don't know.

Q. When you say, you don't know, how could they have created or facilitated something like that to happened?

MR. KAISER: Objection.

A. Well, they did not know that it would have lead to that.

Q. Do you think that they failed to take any action that could have stopped the incident again, the incident being the blood clot developing and working its way up to Valerie's lungs?

MR. KAISER: Objection.

A. Yes.

Q. You already testified that they

could have referred her to an outside hospital, anything else besides that that you feel in terms of action that they could have taken?

MR. KAISER: Object.

A. That is what I feel they could have done, send her out for more advance medical tests.

Q. When did you first learn about the incident or the events of June 19, 2005? In other words, where were you when it occurred?

MR. KAISER: Objection to the form.

A. I was home. I had just gotten home because my mother -- I had taken her to the hospital. I came home. She called me. She told me that she had called the Brooklyn Developmental Center, which she always does on Sunday, to see how Valerie was doing. She said, that they told her that they were rushing her to the hospital. Mommy asked me to go back to the hospital, Brookdale, that is where they were taking her. I went there and she had passed on her way there.

Q. So you found out from your mother that there was a problem?

A. Yes.

Q. That you needed to go to Brookdale Hospital?

A. She told me, "Loretta, please go there and see what is wrong." She was in the hospital for her heart.

Q. When you arrived there, who was there?

A. My husband was there and my brother was there.

Q. You said, your husband was there?

A. Yes.

Q. Your brother being Sidney?

A. Yes.

Q. Who else was there?

A. The employees from Brooklyn Developmental Center who came with her in the ambulance.

Q. Did you speak to any of them?

MR. KAISER: Objection to form.

A. I asked them, I forgot, I don't know her name. But the one that came with Valerie, I asked her what happened and they said, that she just fell when they were giving her a shower. That was all because I broke down

because I didn't believe what was happening.

Q. After you spoke to your mother, did you contact anyone to let them know what happened to Valerie?

A. After I had finally got myself together to go in there in the room where they had her, we all got together and we went to Long Island College Hospital where mommy was to tell her that it was true.

Q. So you were able to see her that same day, your mother and let her know what happened?

A. They let us go up that night because it was late and after hours.

Q. Do you remember what you discussed that day with your mother?

A. After I found out that Valerie had passed?

Q. Yes.

A. Somebody had a cell phone, I remember mommy asking me, "What happened, what happened, is it true, is it true, is Valerie okay, was Valerie okay? "

I told her that Valerie had passed.

I was afraid for mommy because mommy was in the hospital for her own condition.

Q. Are you okay?

A. (No response).

MR. KAISER: Why don't we give her five minutes.

(Whereupon, a short recess was taken.)

Q. You were testifying that you discussed what happened to Valerie with your family and with the Brooklyn Developmental staff that was there? Who else did you discuss it with?

A. Just mommy. Like I said, we asked whoever was at staff, why her leg was like that. Why she was tripping all the time too.

Q. Now, after June 19, 2005, did you try to contact any of the defendants to discuss what happened?

A. No.

Q. Why not?

A. My mother. Again, mommy was the leader. She was the one that always took care of those things.