IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ESTATE OF VALERIE YOUNG, et. al.                    ECF Case

                    plaintiffs,                     Case No.: 04-CV-04159 (AKH)

        against

                                                    **RESPONSE TO DEFENDANTS'**
STATE OF NEW YORK OFFICE OF MENTAL                  **STATEMENT OF MATERIAL**
RETARDATION AND DEVELOPMENTAL                       **FACTS PURSUANT TO LOCAL**
DISABILITIES, et al.,                               **CIVIL RULE 56.1**

                    defendants.

        Plaintiffs, by their attorneys, JONATHAN BAUER, Esq. and the CATAFAGO LAW FIRM,

PC, hereby submit this response to the statement of material facts submitted by the defendants

and their statement of additional material facts as to which plaintiff contends there exists a genu-

ine issue to be tried  pursuant to Rule 56.1 of the Local Civil Rules of the Southern District of

New York.

**A.    PRELIMINARY STATEMENT**

        Certain of the defendants' allegations of Material Fact, specified in the denials and objec-

tions below, rely upon determinations of the credibility of and/or state of mind of witnesses

and/or parties and are thus not appropriate or admissible for consideration on a motion for sum-

mary judgment. See, Fed.R.Civ.P. Rule 56, Advisory Committee Notes to the 1963 Amendments;

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255.

        All admissions and/or statements that allegations are not disputed made herein are made for

the purposes of this motion only. See Southern District Local Civil Rule 56.1(c).

**B.    RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT**

**Parties**

1.    Plaintiffs, Viola Young, Loretta Young Lee and Sidney Young's decedent, Valerie Young, was a 49-year old woman who had resided at the BDC since 1990.  Ms. Young was institutionalized at age 35 at BDC due to behavior problems, including increasingly aggressive behavior. Deposition Transcript of Viola Young, taken January 29, 2008 ("Viola Young Dep. Tr."), at p. 14, ln. 8 - p. 18, ln. 10, annexed to Declaration of Jose L. Velez, dated August 1, 2008 ("Velez Decl."), under Exhibit Tab D; Deposition Transcript of Loretta Young Lee, taken January 28, 2008 ("Loretta Young Dep. Tr."), at p. 11, lns. 3-13, annexed to Velez Decl. under Exhibit Tab E; Deposition Transcript of Sidney Young, taken January 28, 2008 ("Sidney Young Dep. Tr."), at p. 13, ln. 14 - p. 14, ln. 18, p. 25, lns. 4-8, annexed to Velez Decl. under Exhibit Tab F.

2.    Ms. Young had a history of profound mental retardation, seizure disorder, schizoaffective disorder, tardive dyskinesia, constipation, right brachial plexopathy, bilateral feet edema, and left foot drop due to mononeuropathy.  Declaration of Jovan Milos, M.D., dated July 23, 2008 ("Milos Decl."), at ¶ 14.

3.    Defendant Peter Uschakow was employed at the BDC since 1991 and was the Director from 2000 until his retirement from state service in 2008.  From 1972 to 1991, he was employed by the OMRDD and the New York State Office of Mental Health ("OMH") at several facilities in lower New York State. Declaration of Peter A. Uschakow, dated July 21, 2008 ("Uschakow Decl."), at ¶ 1.

4.    Defendant Suresh Arya has been employed since September 2004 at OMRDD's Hudson Valley Developmental Disabilities Services Office ("HVDDS" or "HVDC") as Deputy Director of Operations. Prior to that he was employed at BDC from July 2000 to September

2004, also as Deputy Director of Operations. At BDC he reported directly to the Director. Declaration of Suresh Arya, dated July 15, 2008 ("Arya Decl."), at ¶ 1.

5.     Defendant Jan Williamson has been employed by the BDC as Deputy Director of Operations since September 2004, initially in the capacity of Acting Director before being permanently appointed late 2005 or early 2006 as permanent Deputy Director. She reports directly to the Director of BDC. Prior to that, from 1992 to 2001, she was a Social Worker II at another OMRDD developmental center. From 2001 to September 2004, she was a Treatment Team Leader at BDC's Day Treatment program. Declaration of Jan Williamson, dated July 17, 2008 ("Williamson Decl."), at ¶ 1.

6.     Defendant Kathleen Ferdinand has been employed by the BDC as a Treatment Team Leader since 1994. Prior to that, from 1974 to 1994, she was employed by the New York State Office of Mental Health ("OMH") at the Kingsboro Psychiatric Center as a social worker and social worker supervisor before becoming a treatment team leader there starting in 1985. She also was employed one year with OMH's Manhattan Psychiatric Center as a treatment team leader. Declaration of Kathleen Ferdinand, dated July 24, 2008 ("Ferdinand Decl."), at ¶ 1.

7.     Defendant Gloria Hayes has been employed by the BDC as a Residential Unit Supervisor since 2003. She is a member of the Treatment Team and her immediate supervisor is Treatment Team Leader Kathleen Ferdinand. She was previously employed at the BDC as a Wing Leader from 1984 to 1997, and a Developmental Aide from 1980 to 1984. Declaration of Gloria Hayes, dated July 18, 2008 ("Hayes Decl."), at ¶ 1.

8.     Defendant Dr. Jovan Milos is a physician licensed to practice medicine in the State of New York since July 2000 and is Board Certified in the field of Internal Medicine. Milos Decl. at ¶ 1. Since September 14, 2000, he has been a Medical Specialist for the OMRDD at BDC pro-

viding medical care for between 55 to 70 consumers. Prior to this position, he was a resident at

Kings Brook Jewish Medical Center from July 1, 1997 to June 30, 2000. Id. at ¶ 3. His immedi-

ate supervisors are the BDC Deputy Director of Operations and the BDC Director.  Id. at ¶ 6

**Response**

Plaintiffs do not dispute allegations of ¶¶ 1-8 for the purposes of this motion only. Southern

District Local Civil Rule 56.1(c).

**The Office of Mental Retardation and Developmental Disabilities**

9.     The OMRDD is the State agency responsible for providing services to persons with

mental retardation and developmental disabilities. OMRDD tries to the extent possible to provide

such services in the community, but some of the persons it serves require residential care.  These

services include rehabilitation and habilitation to its consumers.  Uschakow Decl. at ¶¶ 3, 4.

10.     OMRDD operates thirteen Developmental Disabilities Services Offices ("DDSOs")

responsible for providing programs in one or more counties.  The DDSO seeks to provide spe-

cially designed person-centered assistance to each individual with developmental disabilities.

The DDSO seeks to improve the quality of life of individuals through the provision of cognitive

habilitation, behavioral health interventions, support, training in activities of daily living, cost-

effective housing, employment and family support services.  BDC is the DDSO for Kings

County, New York.  Id. at ¶ 5.

11.     OMRDD provides care, treatment, and services to many persons with severe disabili-

ties. OMRDD staff are trained to identify abilities in even the most severely disabled consumer

that can be encouraged and strengthened to improve that consumer's quality of life.  Id. at ¶ 6.

12.    In order to provide appropriate services to its consumers, OMRDD engages in "Person-Centered Planning." Person-Centered Planning is a process that focuses on the capabilities and strengths of an individual, not on deficits and deficiencies. Id. at ¶ 7.

13.    As part of OMRDD's comprehensive, integrated system of services for persons with mental retardation and developmental disabilities, the needs of individuals with mental retardation and developmental disabilities are met through active participation from parents, advocates, friends and others, including not-for-profit providers. Id. at ¶ 9.

**Response**

Plaintiffs do not dispute the allegations of ¶¶ 9-13 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

### Services Offered by Brooklyn Developmental Center

14.    BDC is a residential treatment facility operated by OMRDD for persons with severe or profound mental retardation.  It serves individuals who have a primary diagnosis of mental retardation or a severe developmental disability, or a profound lack of skills that affect their ability to communicate or live in the community.  Uschakow Decl. at ¶ 10; Milos Decl. at ¶ 4.

**Response**

Plaintiff does not dispute this allegation for the purposes of this motion only **except** that BDC also provides services to persons subjected to involuntary civil commitment pursuant to NY CPL §§ 740.40 and 730.50. **Exhibit 25** Williamson Deposition at p. 18.

15.    To qualify for placement at BDC, actual assignment of a diagnosis with psychometric testing must be performed on the potential consumer by age twenty-two.  Additionally, the potential consumer must have severe adaptive behavior deficits involving communication, community living, maladaptive behaviors, and activities of daily living.  Uschakow Decl. at ¶ 11.

**Response**

Plaintiffs do not dispute this allegation for the purpose of this motion only, **except** as to persons involuntarily committed pursuant to the New York Criminal Procedure Law.

16.   Although BDC is not a hospital, its staff includes psychiatrists, psychologists, physicians, nurses, dentists, social workers, physical and occupational therapists. There are presently five medical doctors at BDC who are responsible for the day-to-day medical care of the consumers.  If a consumer requires special attention, he or she is referred to a medical specialist outside the facility.  Milos Decl. at ¶ 5.

17.   Currently, BDC serves about 300 consumers. This number has been decreasing over many years, as OMRDD places less impaired and/or better psychiatrically compensated consumers in supervised residences in the community, while retaining institutions such as BDC for consumers who most need that level of care. Uschakow Decl. at ¶ 12; Milos Decl. at ¶ 4.

**Response**

Plaintiffs do not dispute the allegations of ¶¶ 16-17 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

### BDC's Campus and Supervision

18.   BDC's campus is made up of five buildings. Three of those buildings are residential buildings. The residential buildings are divided into two units, one unit on each floor.  Each floor is divided into four wings. Consumers are housed in the wings, and each wing is organized as a basic treatment unit through which consumers receive rehabilitation and the other care and treatment they need. Each of BDC's wings has 24-hour supervision.  Uschakow Decl. at ¶ 13; Ferdinand Decl. at ¶¶ 3, 4.

19.    Each wing is assigned a Wing Leader who supervises the Developmental Aides who provide direct care. The Wing Leader and Developmental Aides are supervised by a Resident Unit Supervisor ("RUS"), or on the weekends, evenings and holiday shifts, by a Shift Supervisor. The RUS and Shift Supervisors are supervised by the Treatment Team Leader assigned to that building. Uschakow Decl. at ¶ 14; Ferdinand Decl. at ¶ 4.

20.    Each consumer in a residential unit at BDC has an Interdisciplinary Treatment Team ("ITT") comprised of a psychiatrist and/or psychologist, medical providers, social worker and other staff who provide direct care, recreation, speech, physical therapy and occupational ther-apy. Uschakow Decl. at ¶ 15; Williamson Decl. at ¶ 4; Ferdinand Decl. at ¶ 6.

**Response**

Plaintiffs do not dispute the allegations of ¶¶ 18-20 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

21.    The medical provider reports to other members of the consumer's ITT.  He also dis-cusses medical issues with the other staff physicians on an as needed basis, as well as with the Director of Quality Assurance.  Uschakow Decl. at ¶ 15; Williamson Decl. at ¶ 4; Ferdinand Decl. at ¶ 6; Milos Decl. at ¶ 7.

**Response**

Admit the allegation of ¶21 **except that** the physicians also report to their direct supervi-sion, the Director and/or Deputy Director. **Exhibit 22** Milos Deposition at p. 19; Moving Papers, Milos Decl. at ¶6

22.    The Deputy Director of Operations oversees the discipline coordinators for each of the speciality [sic] areas, including psychiatry and medicine. She holds monthly meetings with

them related to the general operation of their departments or more frequently if there is a special concern. Williamson Decl. at ¶ 6.

**Response**

Plaintiffs **deny** that the responsibilities of the Deputy Director for Operations are limited as set forth in the allegation of ¶22. *E.g.* **Exhibit 43** BDC Policy and Procedure Manual, including by example but not by limitation to: Bates D1153 (Deputy Director shall direct appropriate staff to develop manuals defining objectives and procedures specific to their areas), D1176 (Deputy Director responsible for administration and coordination of services for all residential units and program in the Developmental Center), Bates D1293 (Deputy Director required to achieve physical standards applicable to Intermediate Care Facilities/Mental Retardation), D1452 (allo-cates staff for Special Observation), D1520 (Develops procedures for obtaining medical specialist consultations), D1605 (nursing administrators report all pertinent matters to Deputy Director), D1562 (in the case of a death, assumes custody of "all records and information on consumer" see also **Exhibit 25** Williamson deposition at pp. 52-53), D1177-8 (responsible to en-sure continuous staff coverage); **Exhibit 19** Arya Deposition[1] at pp. 51-53, nursing administrators report pertinent matters to Deputy Director two to three times each day regarding patient care matters and resource needs, such as staffing or consultants), **Exhibit 22**, Milos Deposition at 19 (deputy director and director supervision physicians), Milos Declaration at ¶6.

23.    The Deputy Director of Operations has no personal involvement in the care and medical treatment provided to consumers.   Id.

---

[1] Suresh Arya was also produced by defendants in his official capacity as Deputy Director and as a Rule 30(b)(6) witness for defendant OMRDD. See **Exhibit 19** Deposition at pp. 5-6.

**Response**

**Denied**. A Deputy Director may have personal involvement as supervisor as a matter of law within the meaning of 42 USC §1983 in actions arising under the Fourteenth Amendment, *E.g. Johnson v. Newburgh Enlarged School District*, 239 F.3d 246, 254 (2d Cir. 2001) (setting forth standards for personal involvement by a supervisory official) *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1066 (2d Cir. 1989) (direct participation not necessary to establish personal involvement).

Defendant Deputy Director Williamson was aware of and acted with disregard for the fact that Valerie was sedentary and therefore at risk of DVT. *E.g.* **Exhibit 7** Case Conference of April 20, 2005 (Valerie to <u>continue</u> use of wheelchair for <u>all mobility</u> purposes); **Exhibit 40** Special Observation Log pages for June 19, 2005 from 3:00 pm through 9:30 pm (Valerie sitting throughout that time until she died); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (Valerie was lethargic and sliding forwards in a folding wheelchair and a <u>new</u> wheelchair was issued with a high padded back and calf support among other features); **Exhibit 9** Physical Therapy Report May 2, 2005 indicating that Valerie is unable to walk without staff assistance; **Exhibit 53** Progress Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie, no indication that she was walking independently); **Exhibit 53** at Bates 8188, Dr. Milos Progress Note of May 28, 2005, finding "Venous insufficiency positional (<u>sitting in wheelchair</u>" (emphasis added); **Exhibit 38** Core Office Log Book March 21 – June 16, 2005 (no indication that staff were walking Valerie and especially at Bates 9947, direction that Valerie "is to remain in wheelchair at all times" as of April 20); **Exhibit 42**, Wing Log March 18 through June 23, 2005 (no indication that staff were walking Valerie and especially at Bates 10020, direction that Valerie "is to be in wheelchair at all times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19,

2005 (no documentation of staff walking Valerie and noting she was using a wheelchair, Bates 8345 May 16, 2005 entry); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the log-books at the nursing station every day when he comes to BDC); **Exhibit 1** February 3, 2005 Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2** April 27, 2005 Emergency Adaptive Equipment Work Request for issuance of the new wheelchair (see **Exhibit 51** Occupational Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042) noting that Valerie is now utilizing a wheelchair for transport until further notice (Bates 8047); **Exhibit 33** Annual IPP of April 13, 2005 (7681) noting that Valerie is to use a wheelchair when she is unsteady (7629), for mobility and transportation (7633); **Exhibit 28** Viola Young Deposition at pp. 54:20, 56:20, 58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff to walk her regularly, recounting communication with defendant Milos); **Exhibit 26** Loretta Lee Deposition at 30:11-13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney Young Deposition at 41:17-22, 49:10-12, 50:13-15 (Valerie just sitting);  Defendants admit spoliation of the Special Observation Logs (15 minutes checks) that detailed Valerie's level of activity during 2005 (*e.g.*, **Exhibit 40**, extant log pages), **see:** Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand Decl. at ¶27; Hayes Decl. at ¶10; Milos Decl. at ¶17 (all admitting that Special Observation Logs are no longer extant, consistent with spoliation of those clinical records).

Defendant Williamson has admitted that she made numerous observations of Valerie and therefore was aware of, and acted with disregard for the fact that Valerie was frequently sedated and drowsy in the mornings due to lack of sleep and medication side effects, and she suffered from back pain. *E.g.*, **Exhibit 11** Radiology Consult and Report of May 2, 2005 (seen for pain,

finding degeneration of spine, report initialed by Dr. Milos); **Exhibit 38** Core Office Log Book for March 21 through June 14, 2005 documenting lack of sleep at Bates 9920, 9922, 9927, 9932, 9933, 9938, 9940, 9961, 9963, 9974, 9963, 9972, 9923, 9924, 9937, 9942, 9957, 9958, 9960 and 9975; **Exhibit 42** Wing Log Book for March 18 through June 23, 2005 documenting lack of sleep at Bates 1006, 9979, 9981, 9983, 9986, 9987, 9988, 9991, 9993, 9994, 9996, 9998, 9999, 10002, 10005, 10006, 10007, 10008, 10009, 10010, 10012, 10013, 10014, 10017, 10018, 10019, 10019, 10023, 10025, 10027, 10029, 10031, 10031, 10032, 10033, 10034, 10034, 10034, 10035, 10036, 10038, 10041, 10042, 10043, 10043, 10044, 10045, 10046, 10047, 10049, 10050, 10051, 10053, 10054, 10055, 10056, 10056, 10057, 10058, 10058, 10059, 10060, 10062, 10064, 10065, 10067, and 10068; **Exhibit 53** Progress Notes at Bates 8186 (Milos April 20, 2005 entry noting sedation in morning hours), **Exhibit 7** April 20, 2005 Case Conference, recording physician's opinion that "falls are contributed to medications which are sedating" and observing that "when Valerie does not sleep the night before, her unsteadiness is more pronounced." (Bates 0010); **Exhibit 33** Annual IPP April 13, 2005 at Bates 7630 under the heading "Sleep Habits" documenting bouts of insomnia, Valerie is up at night fairly often, contributing to the morning "grogginess that has been noted." (Defendants Milos and Ferdinand in attendance, see Bates 7681); **Exhibit 50** Nursing Notes March 16 through June 19, 2005 at Bates 8349 (March 22 Note documenting that Valerie "did not sleep for the entire night"), Bates 8347 (March 29 Note documenting that Valerie "did not sleep all night"); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (stating that "Valerie arrived lethargic and was sliding forwards in the folding wheelchair."); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC). Sedation and lethargy were long-standing issues about which therefore defendants were aware of long before the conditions lead to Valerie's

death, *e.g.* **Exhibit 31** Incident Report of June 24, 2003 (Valerie found in wheelchair unable to stand up, sliding on to the floor); **Exhibit 5** Case Conference July 14, 2004 (Valerie observed to be unsteady and not sleeping at night, altering medication). This was a long-standing issue about which defendants were aware since at least September 2004, see **Exhibit 10** Psychiatry Consultation September 17, 2004 (observing Valerie "appears increasingly sedated, sleeping most of the time").

24.    Each ITT has a Treatment Team Leader.  Treatment Team Leaders have both administrative and program responsibilities in connection with accomplishing the goals of the ITT, including the oversight, evaluation and discipline of direct care staff.  Uschakow Decl. at ¶ 15; Williamson Decl. at ¶¶ 4, 5; Ferdinand Decl. at ¶ 7.

25.    Treatment Team Leaders report to the Deputy Director of Operations to discuss issues related to general operations, but do not discuss patient issues unless there is some unusual situation such as behavior problems.  Williamson Decl. at ¶ 5.

**<u>Response</u>**

Plaintiffs do not deny the allegations of ¶¶ 24-25 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

Care and Treatment of BDC Consumers

26.    BDC provides care to its residents twenty-four hours a day, seven days a week. Uschakow Decl. at ¶ 17; Williamson Decl. at ¶ 6; Ferdinand Decl. at ¶ 5; Milos Decl. at ¶ 7.

27.    Most care and treatment provided to BDC consumers is supervised by Qualified Mental Retardation Professionals ("QMRP").  A QMRP has at least one year's experience in providing services to persons with developmental disabilities and is qualified as either an applied behavioral sciences specialist, human services practitioner, psychologist, registered or licensed

practical nurse or social worker. Physicians are not considered QMRP.  Uschakow Decl. at ¶ 18; Ferdinand Decl. at ¶ 5.

28.    Matters related to the medical treatment of consumers are for the physician to determine, because all decisions related to medical treatment and care of the consumer are considered part of the medical professional practice. Arya Decl. at ¶ 5; Ferdinand Decl. at ¶ 20; Hayes Decl. at ¶ 8

29.    The ITT prepares an Individualized Program Plan ("IPP") for each consumer, which contains information from the annual assessments of the various clinical disciplines.  These assessments are the basis for developing a program to address the consumer's needs.  The psychologist assesses the consumer's behavior over the past year and prepares a behavior management plan to address problematic behaviors.  Similarly the psychiatrist performs an annual psychiatric evaluation and assessment and may recommend psychotropic medications to treat the consumer's mental illness.  Uschakow Decl. at ¶ 19; Ferdinand Decl. at ¶ 9; Milos Decl. at ¶ 8.

30.    As part of BDC's interdisciplinary team approach, the ITT reviews the IPP on an annual and quarterly basis, and also meets on an as needed basis.  A consumer's guardian and/or family is invited to participate in the IPP meetings.  Ms. Young's mother was present at most of these meetings during the time that Dr. Milos was Ms. Young's physician.  Uschakow Decl. at ¶ 20; Ferdinand Decl. at ¶¶ 6, 10; Milos Decl. at ¶ 9.

31.    As part of BDC's informed consent process, the ITT sends written requests to a consumer's family and/or guardian for consent on matters related to the consumer's care and treatment. Williamson Decl. at ¶ 4; Ferdinand Decl. at ¶¶ 6, 10, 20; Milos Decl. at ¶ 9.

**Response**

Plaintiffs do not deny the allegations of ¶¶ 26-31 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

32.    Each consumer has a Developmental Plan ("DVP") that contains all of the consumer's treatment and care records in one comprehensive binder. On a routine basis, the ITT records its notes in the DVP. The most recent active documentation is temporarily filed in the nurses office pending further action, if necessary, after which it is filed in the DVP. Uschakow Decl. at ¶ 21; Ferdinand Decl. at ¶ 11; Milos Decl. at ¶ 10.

**Response**

Plaintiffs do not dispute the allegations of ¶32 for the purposes of this motion only.

33.    A consumer's DVP includes a copy of her IPP, ITT notes, behavior management program, consultations, medication request reports, lab reports, pharmacy, charts, dental, dietary, leisure time notes, recreation, occupational therapy, psychology, physical therapy, and social worker notes. Uschakow Decl. at ¶ 22; Ferdinand Decl. at ¶ 11; Milos Decl. at ¶ 10.

**Response**

**Denied**. The DVP record contains the items enumerated in the DVP Record Table of Contents. **Exhibit 29**, DVP record table of contents.

34.    Direct care is provided by Developmental Aides, sometimes referred to as "direct care staff." Direct care staff provide the services as identified in consumers' IPPs.  For example, direct care staff supervise consumers on the living unit, escort consumers off the living unit, transport consumers to and from their programs, the dining hall, the hospital, to clinical appointments, and on recreational trips or activities.  They assist consumers with their activities of daily living, such as toileting and bathing, intervene in altercations between consumers, and calm

consumers in the event of a behavioral emergency with verbal and physical calming techniques, and data collection. Uschakow Decl. at ¶ 23; Ferdinand Decl. at ¶ 12.

35.    Developmental Aides receive both classroom and on-the-job training in areas such as bathing consumers, brushing their teeth, feeding them, and other activities of daily living.  They are also trained in Strategies for Crisis Intervention and Prevention, OMRDD's approved program for training direct care staff in the development of skills for crisis intervention and prevention.  This program trains staff in methods of assisting and teaching individuals to maintain self-control and crisis prevention, including the use of verbal prompts and physical calming techniques.  Uschakow Decl. at ¶ 24; Ferdinand Decl. at ¶ 13.

### Response

Plaintiffs do not deny the allegations of ¶¶ 34-35 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

### Defendants' Role in Ms. Young's Care and Medical Treatment

Peter Uschakow

36.    As the Director of BDC, Peter Uschakow supervised the Deputy Director of Operations, the Director of Institutional Human Resources, the Safety Department, the Director of Quality Assurance, and the Affirmative Action Officer.  Uschakow Decl. at ¶ 25.

37.    Mr. Uschakow was generally responsible for overseeing the daily operations of BDC, which included making periodic rounds of all of the program activities attended by consumers, but he was not involved directly in the treatment and care of consumers.  Uschakow Decl. at ¶ 26; Deposition Transcript of Peter Ushakow, taken on April 11, 2008 ("Uschakow Dep. Tr."), at p. 35, ln. 23 - p. 36, ln. 14, p. 54, ln. 8 - p. 56, ln. 11, p. 67, ln. 16 - p. 68, ln. 20, annexed to Velez Decl. under Exhibit Tab G.

**Response**

**Admit** the allegations of ¶¶ 36-37, **except that** Peter Uschakow was also responsible to en-sure compliance by BDC, its staff and its programs with the conditions of participation in the Medicaid program, including those set forth by the so-called "483 regs" (42 CFR Part 483). **Exhibit 24** Uschakow Deposition (April 11, 2008) at pp. 21-22; see also **Exhibit 43** BDC Policy and Procedure Manual, at Bates D1151 ¶A(1) (requiring, inter alia, that policies and procedures at BDC meet the requirements of the Federal Medicaid Conditions of Participation), Bates D1155 (requiring the director to develop and update policies and procedures with the appropriate deputy). Defendant Uschakow also had the responsibility to ensure adherence to laws, regula-tions, contracts and management directives. **Exhibit 43** at Bates D1157; **Exhibit 23** Uschakow Deposition (October 30, 2007) at pp. 24 and 30 (regarding Bates D1157 and affirming that as director, defendant Uschakow has the ultimate responsibility to ensure compliance).

38.     Although Mr. Uschakow does not recall any instance in which he specifically dis-cussed Ms. Young's care and treatment with BDC staff members, he recalls telling the Deputy Director about a telephone call he received from Ms. Young's mother during the Spring of 2005 regarding Ms. Young's worsening gait. Mr. Uschakow expected the Deputy Director to speak to the Treatment Team to follow-up on Mrs. Young's concern.  Uschakow Decl. at ¶ 29; Ushcakow Dep. Tr. at p. 25, ln. 2 - p. 26, ln. 2.

**Response**

Plaintiffs do not deny the allegations of ¶38 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

39.     After the telephone call with Ms. Young's mother, Mr. Uschakow saw Ms. Young walking with the assistance of BDC staff members during his periodic rounds.  Uschakow Decl.

at ¶ 30; Ushcakow Dep. Tr. at p. 26, lns. 6-12, p. 26, ln. 23 - p. 27, ln. 15, p. 37, lns. 5-11, p. 73, ln. 16  -p. 75, ln. 12.

**Response**

    **Denied**. Defendant Uschakow was aware of, and acted with disregard for the fact that Valerie was sedentary and therefore at risk of DVT. *E.g*. **Exhibit 7** Case Conference of April 20, 2005 (Valerie to <u>continue</u> use of wheelchair for <u>all mobility</u> purposes); **Exhibit 40** Special Observation Log pages for June 19, 2005 from 3:00 pm through 9:30 pm (Valerie sitting throughout that time until she died); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (Valerie was lethargic and sliding forwards in a folding wheelchair and a <u>new</u> wheelchair was issued with a high padded back and calf support among other features); **Exhibit 9** Physical Therapy Report May 2, 2005 indicating that Valerie is unable to walk without staff assistance; **Exhibit 53** Progress Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie, no indication that she was walking independently); **Exhibit 53** at Bates 8188, Dr. Milos Progress Note of May 28, 2005, finding "Venous insufficiency positional (<u>sitting in wheelchair</u>" (emphasis added); **Exhibit 38** Core Office Log Book March 21 – June 16, 2005 (no indication that staff were walking Valerie and especially at Bates 9947, direction that Valerie "is to remain in wheelchair at all times" as of April 20); **Exhibit 42**, Wing Log March 18 through June 23, 2005 (no indication that staff were walking Valerie and especially at Bates 10020, direction that Valerie "is to be in wheelchair at all times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19, 2005 (no documentation of staff walking Valerie and noting she was using a wheelchair, Bates 8345 May 16, 2005 entry); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC); **Exhibit 1** February 3, 2005 Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2Exhibit 1** April 27, 2005 Emergency

Adaptive Equipment Work Request for issuance of the new wheelchair (see **Exhibit 51** Occupa-

tional Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042) noting that Valerie

is now utilizing a wheelchair for transport until further notice (Bates 8047); **Exhibit 33** Annual

IPP of April 13, 2005 (7681) noting that Valerie is to use a wheelchair when she is unsteady

(7629), for mobility and transportation (7633); **Exhibit 28** Viola Young Deposition at pp. 54:20,

56:20, 58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff

to walk her regularly, recounting communication with defendant Milos); **Exhibit 26** Loretta Lee

Deposition at 30:11-13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney Young Deposition at

41:17-22, 49:10-12, 50:13-15 (Valerie just sitting);  Defendants admit spoliation of the Special

Observation Logs (15 minutes checks) that detailed Valerie's level of activity during 2005 (*e.g.*,

**Exhibit 40**, extant log pages), **see:** Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as

Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand

Decl. at ¶27; Hayes Decl. at ¶10; Milos Decl. at ¶17 (all admitting that Special Observation Logs

are no longer extant, consistent with spoliation).

40.    Mr. Uschakow was not involved in the November 2004 decision to place Ms. Young

on fifteen minute checks which required entries in Special Observation Logs.  Uschakow Decl. at

¶ 32.

### Response

**Denied**. A Deputy Director may have personal involvement as supervisor as a matter of law

within the meaning of 42 USC §1983 in actions arising under the Fourteenth Amendment, *E.g.*

*Johnson v. Newburgh Enlarged School District*, 239 F.3d 246, 254 (2d Cir. 2001) (setting forth

standards for personal involvement by a supervisory official) *Al-Jundi v. Estate of Rockefeller*,

885 F.2d 1060, 1066 (2d Cir. 1989) (direct participation not necessary to establish personal in-

volvement) The director and/or deputy director are advised of the need for establishing special observation. **Exhibit 43** BDC Policy and Procedure Manual at D1275. The Director is responsible to ensure that the facility standards, including those mandated by the Conditions of Participation in Medicare and Medicaid (Section 483 Regulations) are complied with. **Exhibit 24** Uschakow Deposition (April 11, 2008) at pp. 21-22; see also **Exhibit 43** BDC Policy and Procedure Manual, at Bates D1151 ¶A(1) (requiring, inter alia, that policies and procedures at BDC meet the requirements of the Federal Medicaid Conditions of Participation), Bates D1155 (requiring the director to develop and update policies and procedures with the appropriate deputy). Defendant Uschakow also had the responsibility to ensure adherence to laws, regulations, contracts and management directives. **Exhibit 43** at Bates D1157; **Exhibit 23** Uschakow Deposition (October 30, 2007) at pp. 24 and 30 (regarding Bates D1157 and affirming that as director, defendant Uschakow has the ultimate responsibility to ensure compliance).

<u>Suresh Arya</u>

41.    As the Deputy Director of BDC, Suresh Arya oversaw the business office, discipline coordinators, residential services, housekeeping, maintenance and the power plant.  Arya Decl. at ¶ 3. He had no personal involvement in the treatment and care provided to consumers, including Ms. Young. Id. at ¶ 4.

**Response**

**Objection**. A Deputy Director may have personal involvement as supervisor as a matter of law within the meaning of 42 USC §1983 in actions arising under the Fourteenth Amendment, *E.g. Johnson v. Newburgh Enlarged School District*, 239 F.3d 246, 254 (2d Cir. 2001) (setting forth standards for personal involvement by a supervisory official) *Al-Jundi v. Estate of Rockefel-*

*ler*, 885 F.2d 1060, 1066 (2d Cir. 1989) (direct participation not necessary to establish personal involvement).

42.    At the time Mr. Arya left BDC in September 2004, Ms. Young was able to walk around the facility although she was unsteady on her feet. Id. at ¶ 6; see also Deposition Transcript of Suresh Arya, taken on April 8, 2008 ("Arya Dep. Tr."),  p. 41, lns. 8-18, p. 13, lns. 8-11, annexed to Velez Decl. under Exhibit Tab H.

43.    Since leaving BDC in September 2004, Mr. Arya was not made aware of the matters about which Plaintiffs complain related to Ms. Young's reduced walking ability, which  required her to be placed on fifteen minute checks, the use of a wheelchair for transportation, and the prescription for physical therapy. Id.

**Response**

Plaintiffs do not dispute the allegation that Arya was not made aware of matters concerning Valerie that occurred after he left employment at BDC for the purposes of this motion; but **deny** that Valerie was placed on 15 minutes checks because of reduced walking ability. Valerie was placed on 15 minute checks because of unexplained injuries, *e.g.* **Exhibit 6** Case Conference of November 5, 2004.

44.    Mr. Arya was not involved in the November 2004 decision to place Ms. Young on fifteen minute checks which required entries in Special Observation Logs.  Arya Decl. at ¶ 6. Mr. Arya was no longer at BDC when these decisions occurred. Arya Decl. at ¶ 6.

**Response**

Plaintiffs do not deny the allegations of ¶45 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

Jan Williamson

45.    As the Deputy Director of Operations of BDC, Jan Williamson oversees the business office, discipline coordinators, residential services, housekeeping, maintenance and the power plant. Her responsibilities include overall supervision of residential units at BDC, including the treatment team leaders, as well as the day treatment on campus program. The day treatment program serves all consumers in residence at BDC. Williamson Decl. at ¶ 3.

### Response

Plaintiffs **deny** that the responsibilities of Defendant Williamson are limited as set forth in the allegation of ¶45. *E.g.* **Exhibit 43** BDC Policy and Procedure Manual, including by example but not by limitation to: Bates D1153 (Deputy Director shall direct appropriate staff to develop manuals defining objectives and procedures specific to their areas), D1176 (Deputy Director responsible for administration and coordination of services for all residential units and program in the Developmental Center), Bates D1293 (Deputy Director required to achieve physical standards applicable to Intermediate Care Facilities/Mental Retardation), D1452 (allocates staff for Special Observation), D1520 (Develops procedures for obtaining medical specialist consultations), D1605 (nursing administrators report all pertinent matters to Deputy Director), D1562 (in the case of a death, assumes custody of "all records and information on consumer" see also **Exhibit 25** Williamson deposition at pp. 52-53), D1177-8 (responsible to ensure continuous staff coverage); **Exhibit 19** Arya Deposition[2] at pp. 51-53, nursing administrators report pertinent matters to Deputy Director two to three times each day regarding patient care matters and resource needs, such as staffing or consultants), **Exhibit 22**, Milos Deposition at 19 (deputy director and director supervision physicians), Milos Declaration at ¶6.

---

[2] Suresh Arya was also produced by defendants in his official capacity as Deputy Director and as a Rule 30(b)(6) witness for defendant OMRDD. See **Exhibit 19** Deposition at pp. 5-6.

46.    At the time that Ms. Williamson assumed her duties as Acting Deputy Director in September 2004, Ms. Young was able to walk around the facility even though she was unsteady on her feet. Williamson Decl. at ¶ 8.

**Response**

Plaintiffs do not deny the allegations of ¶¶ 46 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

47.    During the period of September 2004 through June 2005, Ms. Williamson did not re-view any documents relating to Ms. Young's care and medical treatment prior to her death, nor did she attend any team meeting involving any conference about her. Williamson Decl. at ¶¶ 8, 9; Deposition Transcript of Jan Williamson, taken on April 10, 2008 ("Williamson Dep. Tr."), at p. 25, lns. 6-21, p.38, ln. 24 - p. 41, ln. 25, p. 45, lns. 4-12, p. 44, lns. 2-20, annexed to Velez Decl. under Exhibit Tab I.

**Response**

**Denied**. Defendant Williamson was at the minimum (a) involved in the decision to place Valerie under special observation (15 minute checks), see **Exhibit 43** BDC Policy and Procedure Manual at Bates 1452 (Staff allocation and/or adjustment for the purposes of special observation are a responsibility of the Deputy Director), Bates 1453 (recommendations for observation are received and considered by the Director and/or Deputy Director) and (b) Defendant Williamson was by defendants' admission involved with obtaining the wheelchair(s) for Valerie, see Defen-dants Rule 56.1 Statement at ¶49.

48.    Ms. Williamson had a few telephone conversations with Kathleen Ferdinand about Ms. Young's continued agitation and aggression, dropped foot, unsteadiness on her feet, and the

Treatment Team's April 2005 agreement that Ms. Young needed a wheelchair to transport her safely around the facility. Id.

**Response**

**Deny** that the Treatment Team agreed that Valerie needed a wheelchair to transport her safely around the facility. The Treatment Team determined that <u>Valerie required a wheelchair for all mobility needs</u>. **Exhibit 7** at Bates 7744 (April 20, 2005 Case Conference).

49. Ms. Williamson's responsibility was not to medically prescribe the wheelchair, but to obtain a wheelchair for Ms. Young for the stated purpose. Id.

**Response**

Plaintiffs do not deny the allegations of ¶49, **except deny** that the stated purpose was "a wheelchair to transport her safely around the facility" (¶48). The Treatment Team determined that <u>Valerie required a wheelchair for all mobility needs</u>. **Exhibit 7** at Bates 7744 (April 20, 2005 Case Conference).

50. Ms. Williamson observed Ms. Young anywhere from two to twenty times a week while making her rounds around the facility. During these observations, it did not appear to her that Ms. Young was heavily sedated. Williamson Decl. at ¶ 10; Williamson Dep. Tr. at p.45, ln. 24 p.47, ln. 10.

**Response**

**Denied**. Defendant Williamson has admitted that she made numerous observations of Valerie and therefore was aware of, and acted with disregard for the fact that Valerie was frequently sedated and drowsy, especially in the mornings due to lack of sleep and medication side effects, and she suffered from back pain. *E.g.*, **Exhibit 11** Radiology Consult and Report of May 2, 2005 (seen for pain, finding degeneration of spine, report initialed by Dr. Milos); **Exhibit 38** Core Of-

fice Log Book for March 21 through June 14, 2005 documenting lack of sleep at Bates 9920, 9922, 9927, 9932, 9933, 9938, 9940, 9961, 9963, 9974, 9963, 9972, 9923, 9924, 9937, 9942, 9957, 9958, 9960 and 9975; **Exhibit 42** Wing Log Book for March 18 through June 23, 2005 documenting lack of sleep at Bates 1006, 9979, 9981, 9983, 9986, 9987, 9988, 9991, 9993, 9994, 9996, 9998, 9999, 10002, 10005, 10006, 10007, 10008, 10009, 10010, 10012, 10013, 10014, 10017, 10018, 10019, 10019, 10023, 10025, 10027, 10029, 10031, 10031, 10032, 10033, 10034, 10034, 10034, 10035, 10036, 10038, 10041, 10042, 10043, 10043, 10044, 10045, 10046, 10047, 10049, 10050, 10051, 10053, 10054, 10055, 10056, 10056, 10057, 10058, 10058, 10059, 10060, 10062, 10064, 10065, 10067, and 10068; **Exhibit 53** Progress Notes at Bates 8186 (Milos April 20, 2005 entry noting sedation in morning hours), **Exhibit 7** April 20, 2005 Case Conference, recording physician's opinion that "falls are contributed to medications which are sedating" and observing that "when Valerie does not sleep the night before, her unsteadiness is more pronounced." (Bates 0010); **Exhibit 33** Annual IPP April 13, 2005 at Bates 7630 under the heading "Sleep Habits" documenting bouts of insomnia, Valerie is up at night fairly often, contributing to the morning "grogginess that has been noted." (Defendants Milos and Ferdinand in attendance, see Bates 7681); **Exhibit 50** Nursing Notes March 16 through June 19, 2005 at Bates 8349 (March 22 Note documenting that Valerie "did not sleep for the entire night"), Bates 8347 (March 29 Note documenting that Valerie "did not sleep all night"); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (stating that "Valerie arrived lethargic and was sliding forwards in the folding wheelchair."); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the log-books at the nursing station every day when he comes to BDC). Sedation and lethargy were long-standing issues about which therefore defendants were aware of long before the conditions lead to Valerie's death, *e.g.* **Exhibit 31** Incident Report of June 24, 2003 (Valerie found in

wheelchair unable to stand up, sliding on to the floor); **Exhibit 5** Case Conference July 14, 2004 (Valerie observed to be unsteady and not sleeping at night, altering medication). This was a long-standing issue about which defendants were aware since at least September 2004, see **Exhibit 10** Psychiatry Consultation September 17, 2004 (observing Valerie "appears increasingly sedated, sleeping most of the time").

51.    After the wheelchair was issued, Williamson also observed Ms. Young walking with assistance by staff anywhere from thirty to forty times.  Most of the time, she was assisted by one person, but a second person would be nearby. She observed Ms. Young being transported in a wheelchair, but never saw her in a wheelchair for any other purpose. Id.

**Response**

**Denied**. Jan Williamson testified that she observed Valerie transported in a wheelchair and testified that she <u>could not remember</u> whether or not she observed Valerie sitting in a wheelchair and other than for transportation. **Exhibit 25** Williamson Deposition at p. 43:6-12.

**Denied**. Defendant Williamson has admitted that she made numerous observations of Valerie and therefore was aware of, and acted with disregard for the fact that Valerie was sedentary and therefore at risk of DVT. *E.g.* **Exhibit 7** Case Conference of April 20, 2005 (Valerie to continue use of wheelchair for all mobility purposes); **Exhibit 40** Special Observation Log pages for June 19, 2005 from 3:00 pm through 9:30 pm (Valerie sitting throughout that time until she died); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (Valerie was lethargic and sliding forwards in a folding wheelchair and a new wheelchair was issued with a high padded back and calf support among other features); **Exhibit 9** Physical Therapy Report May 2, 2005 indicating that Valerie is unable to walk without staff assistance; **Exhibit 53** Progress Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie, no indication that she was walking independ-

ently); **Exhibit 53** at Bates 8188, Dr. Milos Progress Note of May 28, 2005, finding "Venous insufficiency positional (<u>sitting in wheelchair</u>" (emphasis added); **Exhibit 38** Core Office Log Book March 21 – June 16, 2005 (no indication that staff were walking Valerie and especially at Bates 9947, direction that Valerie "is to remain in wheelchair at all times" as of April 20);

**Exhibit 42**, Wing Log March 18 through June 23, 2005 (no indication that staff were walking Valerie and especially at Bates 10020, direction that Valerie "is to be in wheelchair at all times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19, 2005 (no documentation of staff walking Valerie and noting she was using a wheelchair, Bates 8345 May 16, 2005 entry);

**Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC); **Exhibit 1** February 3, 2005 Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2** April 27, 2005 Emergency Adaptive Equipment Work Request for issuance of the new wheelchair (<u>see</u> **Exhibit 51** Occupational Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042) noting that Valerie is now utilizing a wheelchair for transport until further notice (Bates 8047); **Exhibit 33** Annual IPP of April 13, 2005 (7681) noting that Valerie is to use a wheelchair when she is unsteady (7629), for mobility and transportation (7633); **Exhibit 28** Viola Young Deposition at pp. 54:20, 56:20, 58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff to walk her regularly, recounting communication with defendant Milos); **Exhibit 26** Loretta Lee Deposition at 30:11-13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney Young Deposition at 41:17-22, 49:10-12, 50:13-15 (Valerie just sitting);  Defendants admit spoliation of the Special Observation Logs (15 minutes checks) that detailed Valerie's level of activity during 2005 (*e.g.*, **Exhibit 40**, extant log pages), **<u>see</u>:** Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand

Decl. at ¶27; Hayes Decl. at ¶10; Milos Decl. at ¶17 (consistent with spoliation of the Special Observation Logs).

52.    Ms. Williamson was not involved in the November 2004 decision to place Ms. Young on fifteen minute checks which required entries in Special Observation Logs. Williamson Decl. at ¶ 8.

**Response**

**Denied**. A Deputy Director may have personal involvement as supervisor as a matter of law within the meaning of 42 USC §1983 in actions arising under the Fourteenth Amendment, *E.g. Johnson v. Newburgh Enlarged School District*, 239 F.3d 246, 254 (2d Cir. 2001) (setting forth standards for personal involvement by a supervisory official) *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1066 (2d Cir. 1989) (direct participation not necessary to establish personal involvement). See **Exhibit 43** BDC Policy and Procedure Manual at Bates 1452 (Staff allocation and/or adjustment for the purposes of special observation are a responsibility of the Deputy Director), Bates 1453 (recommendations for observation are received and considered by the Director and/or Deputy Director).

Kathleen Ferdinand

53.    Kathleen Ferdinand was the Treatment Team Leader for Ms. Young from approximately May 2001 to the date of her death in June 2005.  During that time, Ms. Young lived in Building 3, Unit 1. There were approximately 50 other consumers on Unit 3-1.  Ms Ferdinand supervised approximately 80 staff members during this time.  The staff to consumer ratio on this Unit was four to one.  Uschakow Decl. at ¶ 16; Williamson Decl. at ¶ 5; Ferdinand Decl. at ¶ 8.

54.    As a Treatment Team Leader, Ms. Ferdinand has both administrative and program and responsibilities in connection with accomplishing the goals of the ITT.  She makes sure consum-

ers' plans and programs are implemented and coordinates clinical programs with activities on the residential unit. Her position also includes the oversight, training, evaluation and discipline of the direct care staff. Ferdinand Decl. at ¶ 7.

55.     Ms. Ferdinand's responsibilities as the Treatment Team Leader include instructing the RUS regarding the care of consumers, including Ms. Young.  Ferdinand Decl. at ¶ 14.

56.     Over the years, Ms. Ferdinand had periodic conversations with Ms. Young's mother, Viola Young, regarding ongoing issues related to Ms. Young's treatment and care. Ferdinand Decl. at ¶¶ 6, 10, 20.

57.     During her discussions with Ms. Young's mother, Ms. Ferdinand would tell her generally how her daughter was doing. If she had any further questions, Ms. Ferdinand referred her to Ms. Young's medical doctor, Dr. Jovan Milos. Ferdinand Decl. at ¶ 20; Viola Young Dep. Tr. at p. 79, ln. 17 - p. 80, ln. 9, p. 98, ln. 19 - p. 99, ln. 22; p. 100, ln. 3 - p. 106, ln. 7.

58.     Prior to 2005, Ms. Young's mother had called for a couple of special meetings because she was concerned with Ms. Young's aggressive behavior.  Mrs. Young complained that Ms. Young was unmanageable, uncontrollable.  She wanted to increase the psychotropic medications that Ms. Young was receiving. It is Mr. Arya's understanding that Ms. Young's doctors did not think it was appropriate to increase these medications.  Arya Decl. at ¶ 5; Ferdinand Decl. at ¶ 20; Hayes Decl. at ¶ 8; Arya Dep. Tr. at p. 10, ln. 7 - p. 12, ln. 6; p. 31, ln. 6 - p. 32, ln. 2; p. 41, ln. 19 - p. 42, ln. 19; Deposition of Kathleen Ferdinand, taken on April 7, 2008 ("Ferdinand Dep. Tr."), at p. 44, ln. 23 - p. 45, ln. 17, annexed to Velez Decl. under Exhibit Tab J.

**Response**

Plaintiffs do not dispute the allegations of ¶¶ 53-58 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

59.     During an April 20, 2005 Special Meeting held by the ITT to discuss the difficulty Ms. Young experienced while walking and the several falls she had taken, the doctor recommended that Ms. Young be issued a wheelchair to be used solely to transport her. He also directed that she be re-evaluated by the physical therapy department.  At this time Ms. Ferdinand advised RUS Hayes to make sure that Ms. Young was ambulated with one or two of the staff walking with her.  Ms. Ferdinand also told Ms. Hayes that at times they would have to elevate Ms. Young's legs.  The purpose of these instructions was to assist Ms. Young with her walking since she was not steady on her feet and because her legs swelled.  Ferdinand Decl. at ¶¶ 14, 16, 17; see also Ferdinand Dep. Tr. at p. 34, ln. 19 - p. 35, ln. 10, p. 49, lns. 3-13, p. 74, lns. 4-15, p. 182, ln. 4 - p. 183, ln. 11, p. 217, ln. 22 - p. 218, ln. 10, p. 222, ln. 18 - p. 223, ln. 5, p. 223, ln. 12 - p. 228, ln. 24, p. 282, ln. 23 - p. 284, ln. 16, annexed to Velez Decl. under Exhibit Tab J.

**Response**

**Denied**. The doctor "… recommended the *continued use* of a wheelchair until a) PT can evaluate Valerie, b) the helmet is obtained, c) medications are reduced and d) nerve conduction studies are performed (Exhibit 7 at Bates 7744, emphasis original). The Team conference recommended a "Wheelchair for <u>all</u> mobility needs" (Id., emphasis added). **Object** to statements purportedly made but not documented in the conference minutes.

60.     Ms. Ferdinand made rounds on the Wing two to three times a day, and observed Ms. Young being walked with the assistance of staff. She was able to ambulate with the assistance of just one staff member with another staff nearby should further assistance be needed.  Ferdinand Decl. at ¶¶ 16, 19; Ferdinand Dep. Tr at p. 35, ln. 11 - p. 38, ln. 17, p. 80, ln. 25 - p. 81, ln. 5, p. 104, ln.12 - p. 105, ln. 2, p. 146, ln. 21 - p. 147, ln. 11, p. 227, ln. 12 - p. 230, ln. 21, p. 238, lns. 11-16.

**Response**

**Denied**. Defendant Ferdinand has admitted frequent observations of Valerie and was there-fore aware of and acted with disregard for the fact that Valerie was sedentary and consequently at risk of DVT. *E.g.* **Exhibit 7** Case Conference of April 20, 2005 (Valerie to <u>continue</u> use of wheelchair for <u>all mobility</u> purposes); **Exhibit 40** Special Observation Log pages for June 19, 2005 from 3:00 pm through 9:30 pm (Valerie sitting throughout that time until she died); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (Valerie was lethargic and sliding forwards in a folding wheelchair and a <u>new</u> wheelchair was issued with a high padded back and calf support among other features); **Exhibit 9** Physical Therapy Report May 2, 2005 indicating that Valerie is unable to walk without staff assistance; **Exhibit 53** Progress Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie, no indication that she was walking independently); **Exhibit 53** at Bates 8188, Dr. Milos Progress Note of May 28, 2005, finding "Venous insufficiency positional (<u>sitting in wheelchair</u>" (emphasis added); **Exhibit 38** Core Office Log Book March 21 – June 16, 2005 (no indication that staff were walking Valerie and especially at Bates 9947, di-rection that Valerie "is to remain in wheelchair at all times" as of April 20); **Exhibit 42**, Wing Log March 18 through June 23, 2005 (no indication that staff were walking Valerie and espe-cially at Bates 10020, direction that Valerie "is to be in wheelchair at all times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19, 2005 (no documentation of staff walking Valerie and noting she was using a wheelchair, Bates 8345 May 16, 2005 entry); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC); **Exhibit 1** February 3, 2005 Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2** April 27, 2005 Emergency Adaptive Equipment Work Request for issuance of the new wheelchair (<u>see</u> **Exhibit 51** Occupational Therapy Note); **Exhibit 32** An-

nual IPP of April 21, 2004 (Bates 8042) noting that Valerie is now utilizing a wheelchair for

transport until further notice (Bates 8047); **Exhibit 33** Annual IPP of April 13, 2005 (7681) not-

ing that Valerie is to use a wheelchair when she is unsteady (7629), for mobility and

transportation (7633); **Exhibit 28** Viola Young Deposition at pp. 54:20, 56:20, 58:8-17, 60:22-

24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff to walk her regularly,

recounting communication with defendant Milos); **Exhibit 26** Loretta Lee Deposition at 30:11-

13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney Young Deposition at 41:17-22, 49:10-12,

50:13-15 (Valerie just sitting);  Defendants admit spoliation of the Special Observation Logs (15

minutes checks) that detailed Valerie's level of activity during 2005 (*e.g.*, **Exhibit 40**, extant log

pages), <u>**see**</u>**:** Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as Document 26;

Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand Decl. at ¶27; Hayes

Decl. at ¶10; Milos Decl. at ¶17 (consistent with spoliation of the Special Observation Logs).

61.    As the Treatment Team Leader, Ms. Ferdinand was not involved in Ms. Young's

medical treatment decisions, because they were left for the physician to determine with the con-

sent of Ms. Young's mother.  Ferdinand Decl. at ¶¶ 6, 10, 20, 21.

**<u>Response</u>**

**Denied**. Defendant Ferdinand countersigned directives involving medical treatment. For

example and not by limitation, <u>see</u> **Exhibit 7** (April 20, 2005 Case Conference, altering medica-

tions, among other changes to treatment).

<u>Gloria Hayes</u>

62.    Gloria Hayes was the Residential Unit Supervisor for Ms. Young from 2003 to the

date of her death. Ms. Hayes directly supervised eleven Wing Leaders, and indirectly supervised

all direct care workers and developmental aides.  Hayes Decl. at ¶ 3.

63.    As a Residential Unit Supervisor, Ms. Hayes' responsibilities include assigning and scheduling staff members to perform the actual direct care to consumers, the supervision and training of consumers, distributing policy and procedure memos or information obtained during a meeting, and providing in-house training to these staff on matters related to their care of the consumers.  Hayes Decl. at ¶ 3.

**Response**

Plaintiffs do not deny the allegations of ¶¶ 62-63 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

64.    Ms. Hayes attended meetings with the Treatment Team regarding Ms. Young's frequent falls related to her difficulty walking and her need to use a wheelchair starting around April 2005. She would then meet with the Wing Supervisors who would, in turn, meet with the direct care staff. Hayes Decl. at ¶¶ 4 - 6; Deposition Transcript of Gloria Hayes, taken on April 18, 2008 ("Hayes Dep. Tr."), at p. 26, ln. 25 - p. 28, ln. 8, p. 171, lns. 9-25, p. 175, ln. 22 - p. 176, ln. 17, annexed to Velez Decl. under Exhibit Tab K.

**Response**

**Denied**. Defendant Hayes attended Team Meeting prior to April 2005 where Valerie's apparent need to use a wheelchair was discussed. *E.g.* **Exhibit 32** Individualized Program Plan Meeting, Annual of April 21, 2004 at Bates 8042 (attendance sheet showing that Hayes was present) and Bates 8047 (including reference to Valerie using the wheelchair).

65.    During these meetings it was emphasized that the wheelchair was to be used only for transporting Ms. Young and that she needed to be ambulated with one or two of the staff walking with her. Ms. Hayes consistently reminded the supervisors of this and they would then remind the direct care staff. Id.

**Response**

**Denied**. Defendant Hayes could not possibly have instructed direct care staff that the wheelchair was to be used only for transporting Ms. Young. The Team determined that the wheelchair was to be used for "all mobility needs" (**Exhibit 7** Case Conference April 20, 2005), the Core Office log documents that Valerie "is to remain in wheelchair at all times" (**Exhibit 38**, Core Office Log at 9947) and the Wing Log documents that Valerie "is to be in wheelchair at all times" (**Exhibit 42**, Wing Log at Bates 10020).

**Denied**. Defendant Hayes could not possibly have instructed direct care staff that Valerie was to be "ambulated" regularly; Valerie was maintained sedentary. *E.g.* **Exhibit 7** Case Conference of April 20, 2005 (Valerie to <u>continue</u> use of wheelchair for <u>all mobility</u> purposes); **Exhibit 40** Special Observation Log pages for June 19, 2005 from 3:00 pm through 9:30 pm (Valerie sitting throughout that time until she died); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (Valerie was lethargic and sliding forwards in a folding wheelchair and a <u>new</u> wheelchair was issued with a high padded back and calf support among other features); **Exhibit 9** Physical Therapy Report May 2, 2005 indicating that Valerie is unable to walk without staff assistance; **Exhibit 53** Progress Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie, no indication that she was walking independently); **Exhibit 53** at Bates 8188, Dr. Milos Progress Note of May 28, 2005, finding "Venous insufficiency positional (<u>sitting in wheelchair</u>" (emphasis added); **Exhibit 38** Core Office Log Book March 21 – June 16, 2005 (no indication that staff were walking Valerie and especially at Bates 9947, direction that Valerie "is to remain in wheelchair at all times" as of April 20); **Exhibit 42**, Wing Log March 18 through June 23, 2005 (no indication that staff were walking Valerie and especially at Bates 10020, direction that Valerie "is to be in wheelchair at all times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19,

2005 (no documentation of staff walking Valerie and noting she was using a wheelchair, Bates

8345 May 16, 2005 entry); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the log-

books at the nursing station every day when he comes to BDC); **Exhibit 1** February 3, 2005

Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2** April 27,

2005 Emergency Adaptive Equipment Work Request for issuance of the new wheelchair (see

**Exhibit 51** Occupational Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042)

noting that Valerie is now utilizing a wheelchair for transport until further notice (Bates 8047);

**Exhibit 33** Annual IPP of April 13, 2005 (7681) noting that Valerie is to use a wheelchair when

she is unsteady (7629), for mobility and transportation (7633); **Exhibit 28** Viola Young Deposi-

tion at pp. 54:20, 56:20, 58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and

no order for staff to walk her regularly, recounting communication with defendant Milos);

**Exhibit 26** Loretta Lee Deposition at 30:11-13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney

Young Deposition at 41:17-22, 49:10-12, 50:13-15 (Valerie just sitting);  Defendants admit spo-

liation of the Special Observation Logs (15 minutes checks) that detailed Valerie's level of

activity during 2005 (*e.g.*, **Exhibit 40**, extant log pages), **see:** Jose L. Velez, Esq. May 30, 2008

Declaration at ¶9, filed as Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson

Decl. at ¶8; Ferdinand Decl. at ¶27; Hayes Decl. at ¶10; Milos Decl. at ¶17 (all evidencing spo-

liation of the Special Observation Logs).

66.    Ms. Hayes recalls telling staff that at times they would have to elevate Ms. Young's

legs. The purpose of these directions was to assist Ms. Young because she was not steady on her

feet and her legs would sometimes swell.  There was also in-service training to the direct care

staff about one to two staff assisting Ms. Young with her ambulation with two staff assisting her.

Id.

67.    Ms. Hayes never saw Ms. Young confined to a wheelchair.  When she made rounds on the Wing, she observed Ms. Young walking with the assistance of staff.  She was also told by staff that they walked Ms. Young around, or that Ms. Young would sometimes get up herself and walk around. Hayes Decl. at ¶ 7; Hayes Dep. Tr at p. 39, ln. 5 - p. 40, ln. 23, p. 44, lns. 8-20, 46, lns. 11-23, p. 52, ln. 23 - p. 54, ln.4, p. 61, lns. 9-15, p. 148, lns. 12-22, p. 149, lns. 10-14, p. 151, ln. 15 - p. 153, ln. 17, p. 160, lns. 10-15, p. 168, ln. 11 - p. 169, ln. 21.

**Response**

**Objection** to so much of this allegation that recounts what defendant Hayes was  purportedly told by others as inadmissible hearsay.

**Denied**. Defendant Hayes was aware of and acted with disregard for the fact that Valerie was sedentary and therefore at risk of DVT. *E.g.* **Exhibit 7** Case Conference of April 20, 2005 (Valerie to <u>continue</u> use of wheelchair for <u>all mobility</u> purposes); **Exhibit 40** Special Observation Log pages for June 19, 2005 from 3:00 pm through 9:30 pm (Valerie sitting throughout that time until she died); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (Valerie was lethargic and sliding forwards in a folding wheelchair and a <u>new</u> wheelchair was issued with a high padded back and calf support among other features); **Exhibit 9** Physical Therapy Report May 2, 2005 indicating that Valerie is unable to walk without staff assistance; **Exhibit 53** Progress Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie, no indication that she was walking independently); **Exhibit 53** at Bates 8188, Dr. Milos Progress Note of May 28, 2005, finding "Venous insufficiency positional (<u>sitting in wheelchair</u>" (emphasis added); **Exhibit 38** Core Office Log Book March 21 – June 16, 2005 (no indication that staff were walking Valerie and especially at Bates 9947, direction that Valerie "is to remain in wheelchair at all times" as of April 20); **Exhibit 42**, Wing Log March 18 through June 23, 2005 (no indication that staff were

walking Valerie and especially at Bates 10020, direction that Valerie "is to be in wheelchair at all times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19, 2005 (no documentation of staff walking Valerie and noting she was using a wheelchair, Bates 8345 May 16, 2005 entry); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC); **Exhibit 1** February 3, 2005 Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2** April 27, 2005 Emergency Adaptive Equipment Work Request for issuance of the new wheelchair (see **Exhibit 51** Occupational Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042) noting that Valerie is now utilizing a wheelchair for transport until further notice (Bates 8047); **Exhibit 33** Annual IPP of April 13, 2005 (7681) noting that Valerie is to use a wheelchair when she is unsteady (7629), for mobility and transportation (7633); **Exhibit 28** Viola Young Deposition at pp. 54:20, 56:20, 58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff to walk her regularly, recounting communication with defendant Milos); **Exhibit 26** Loretta Lee Deposition at 30:11-13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney Young Deposition at 41:17-22, 49:10-12, 50:13-15 (Valerie just sitting);  Defendants admit spoliation of the Special Observation Logs (15 minutes checks) that detailed Valerie's level of activity during 2005 (*e.g.*, **Exhibit 40**, extant log pages), **see:** Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand Decl. at ¶27; Hayes Decl. at ¶10; Milos Decl. at ¶17 (consistent with spoliation of the Special Observation Logs). Furthermore, Defendant Hayes has admitted that she made numerous observations of Valerie and therefore was aware of, and acted with disregard for the fact that Valerie was frequently sedated and drowsy, especially in the mornings due to lack of sleep and medication side effects, and she suffered from back pain. *E.g.*, **Exhibit 11** Radiology Consult and

Report of May 2, 2005 (seen for pain, finding degeneration of spine, report initialed by Dr. Milos); **Exhibit 38** Core Office Log Book for March 21 through June 14, 2005 documenting lack of sleep at Bates 9920, 9922, 9927, 9932, 9933, 9938, 9940, 9961, 9963, 9974, 9963, 9972, 9923, 9924, 9937, 9942, 9957, 9958, 9960 and 9975; **Exhibit 42** Wing Log Book for March 18 through June 23, 2005 documenting lack of sleep at Bates 1006, 9979, 9981, 9983, 9986, 9987, 9988, 9991, 9993, 9994, 9996, 9998, 9999, 10002, 10005, 10006, 10007, 10008, 10009, 10010, 10012, 10013, 10014, 10017, 10018, 10019, 10019, 10023, 10025, 10027, 10029, 10031, 10031, 10032, 10033, 10034, 10034, 10034, 10035, 10036, 10038, 10041, 10042, 10043, 10043, 10044, 10045, 10046, 10047, 10049, 10050, 10051, 10053, 10054, 10055, 10056, 10056, 10057, 10058, 10058, 10059, 10060, 10062, 10064, 10065, 10067, and 10068; **Exhibit 53** Progress Notes at Bates 8186 (Milos April 20, 2005 entry noting sedation in morning hours), **Exhibit 7** April 20, 2005 Case Conference, recording physician's opinion that "falls are contributed to medications which are sedating" and observing that "when Valerie does not sleep the night before, her unsteadiness is more pronounced." (Bates 0010); **Exhibit 33** Annual IPP April 13, 2005 at Bates 7630 under the heading "Sleep Habits" documenting bouts of insomnia, Valerie is up at night fairly often, contributing to the morning "grogginess that has been noted." (Defendants Milos and Ferdinand in attendance, see Bates 7681); **Exhibit 50** Nursing Notes March 16 through June 19, 2005 at Bates 8349 (March 22 Note documenting that Valerie "did not sleep for the entire night"), Bates 8347 (March 29 Note documenting that Valerie "did not sleep all night"); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (stating that "Valerie arrived lethargic and was sliding forwards in the folding wheelchair."); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC). Sedation and lethargy were long-standing issues about which therefore defendants were aware of long before the condi-

tions lead to Valerie's death, *e.g.* **Exhibit 31** Incident Report of June 24, 2003 (Valerie found in wheelchair unable to stand up, sliding on to the floor); **Exhibit 5** Case Conference July 14, 2004 (Valerie observed to be unsteady and not sleeping at night, altering medication). This was a long-standing issue about which defendants were aware since at least September 2004, <u>see</u> **Exhibit 10** Psychiatry Consultation September 17, 2004 (observing Valerie "appears increasingly sedated, sleeping most of the time").

68.    Ms. Hayes also observed staff elevating Ms. Young's leg when she was on the Wing and the program area and was told that this was also being done at other times.  Id.

**Response**

**Objection** to so much of this allegation that recounts what defendant Hayes was  purportedly told by others as inadmissible hearsay.

Plaintiff does not dispute the allegations of ¶68 to the extent that they reflect actual observations (personal knowledge) of defendant Hayes, for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

69.    As the Residential Unit Supervisor, Ms. Hayes was not involved in Ms. Young's medical treatment decisions, because they were left for the physician to determine the appropriate course of action. Hayes Decl. at ¶ 9.

**Response**

Plaintiffs do not dispute the allegation in ¶69 that defendant Hayes did not make medical decisions, for the purposes of this motion only.

<u>Dr. Jovan Milos</u>

70.    Dr. Milos was Ms. Young's treating physician from January 2002 until the time of her death in June 2005. Milos Decl. at ¶¶ 14, 30; Deposition Transcript of Jovan Milos, taken on

March 27, 2008 ("Milos Dep. Tr."), at p. 18, lns. 5-17, annexed to Velez Decl. Under Exhibit Tab L.

71.    At the time of her death on June 19, 2005, Ms. Young's DVP consisted of over 10,000 pages of documents. Milos Decl. at ¶ 10.

**Response**

Objection. Defendants have admitted to spoliation of documents that are a part of the decedent's clinical records, (Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand Decl. at ¶27; Hayes Decl. at ¶10; Milos Decl. at ¶17) according no determination of the extent of Valerie's DVP is possible.

72.    Dr. Milos observed Ms. Young twice a day during the weekdays when he made his morning and afternoon rounds in the residential unit.  He also saw her in the BDC clinic for her medical conditions, including injuries related to falls.  If Ms. Young required medical treatment, she either received it at BDC or was referred for outside treatment.  Ms. Young's medications were reviewed on a regular basis, including during her quarterly and annual reviews.  Milos Decl. at ¶ 15; Milos Dep. Tr. at p. 145, lns. 2-9.

73.    Over the years, Dr. Milos had multiple conversations with Ms. Young's mother regarding ongoing issues related to Ms. Young's treatment and care.  Williamson Decl. at ¶ 4; Milos Decl. at ¶ 9. Viola Young did not hesitate to voice her opinion if she did not agree with some of the medical treatment that was being provided by BDC to Ms. Young.  Viola Dep. Tr. at p. 55, lns. 5-9; p. 84, lns. 4-25; p.114, ln. 24 - p. 115, ln. 13.

**Response**

Plaintiffs do not deny the allegations of ¶¶ 68-73 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

**Ms. Young's Medical and Mental Health Treatment and Care**

74.    Ms. Young had a generally stable medical health status. She had a history of seizure disorder, which was well controlled with medication. She also suffered from a neurological condition that affected her gait and caused her left foot drop for which she saw a neurologist yearly or as needed. She had bilateral feet edema or swelling that was managed with leg elevation.  She further suffered from constipation with a history of severe impaction, for which she received medication. Milos Decl. at ¶ 16.

75.    Ms. Young's mental condition at BDC would go back and forth between better and worse, prompting the ITT, including her mother, Viola Young, to try different medication. Viola Young Dep. Tr. at p. 43, lns. 7-25.

76.    In November 2004, the ITT placed Ms. Young on fifteen minute checks that required direct service staff to watch her closely to prevent her from falling.  Staff was required to make entries concerning these checks in Special Observation Logs kept in composition notebooks. The purpose of this type of observation is to provide additional supervision for consumers as deemed necessary by the ITT. Ms. Young was placed on 15-minute checks at that time because of an unexplained injury. Ferdinand Declaration at ¶ 20; Hayes Decl. at ¶ 10; Milos Decl. at ¶ 17. See Special Case Conference Summary of Meeting (Bates 7783 - 7784), dated November 3, 2004, annexed to Milos Decl. under Exhibit Tab A; see also Individual Program Plan Review Meeting (Bates 7787 - 7794), dated January 12, 2005, annexed to the Milos Decl. under Exhibit Tab B.

**Response**

Plaintiffs do not dispute the allegations of ¶76 for the purposes of this motion only, **except deny** that Valerie was placed under Special Observation to prevent her from falling. Valerie was placed under Special Observation because of unexplained injuries. **Exhibit 6** Case Conference of November 5, 2004.

77.    The 15- minute checks were not intended to monitor Ms. Young for the risk of DVT by reason of inactivity. Rather, the stated purpose of this type of observation is to provide a heightened level of supervision for consumers who present a danger to the physical well being of themselves or others.  The staff was to monitor Ms. Young's activity to prevent her from incurring any further injuries due to her unstable gait, because she was observed with unexplained injuries. Ferdinand Decl. at ¶ 25.

**Response**

Plaintiffs do not dispute the allegations of ¶77 for the purposes of this motion only, **except deny** the suggestion that Valerie was placed under Special Observation to prevent injuries from her alleged unstable "gait". Valerie was placed under Special Observation because of unexplained injuries. **Exhibit 6** Case Conference of November 5, 2004.

78.    Defendants understand that the Special Observation Logs cannot be found. None of the defendants destroyed the Special Observation Logs nor did they direct anyone to do so. Uschakow Decl. at ¶ 32; Arya Decl. at ¶ 6; Williamson Decl. at ¶ 8; Ferdinand Decl. at ¶ 27; Hayes Decl. at ¶ 10; Milos Decl. at ¶ 17.

**Response**

**Denied**. The manner of spoliation is consistent with willful destruction and/or grossly reckless loss of documents because the defendants have failed to provide any evidence of the chain of

custody of the spoliated documents, notwithstanding the facts that the documents necessarily existed in July 2005 (**Exhibit 40** log pages with fax cover dated July 28, 2005 and **Exhibit 41** log page with fax transmittal confirmation dated July 28, 2005); that the logs were transferred to BDC administrative offices (see Donna Limiti Declaration filed as Document 28 at ¶6) and were in the custody of defendant Williamson (see **Exhibit 43** at Bates 1562, requiring that upon death all records and information be boxed and brought to the office of the Deputy Director for Operations); the numerous misrepresentations that all documents were produced to plaintiff, e.g. **Exhibit 22** Jovan Milos Deposition at page 157, **Exhibit 20** Kathleen Ferdinand Deposition at page 189, **Exhibit 19** Suresh Arya Deposition at pp. 75 and 80, **Exhibit 21**, Gloria Hayes Deposition at pages 163-167, Declaration of Jose L. Velez, dated March 17, 2008 at ¶5 previously filed with this Court and docketed as Document 17; all of which is consistent with a willful or grossly reckless destruction of documents.

79.    During the first few months of 2005, Ms. Young fell frequently.  Ms. Ferdinand was concerned that Ms. Young was going to fall and hit her head.  She observed Ms. Young on a daily basis and never saw her with her eyes closed or drooping because of her medications.  There was no indication that Ms. Young was overmedicated or sedated her to the point that she could not walk during this time.  Ferdinand Decl. at ¶ 15; Ferdinand Dep. Tr. at p. 51, ln. 22 - p. 52, ln. 20, p. 258, ln. 21 - p. 260, ln. 11, p. 261, lns. 11-19; Hayes Decl. at ¶ 5.

**Response**

**Denied**. Defendant Ferdinand admits that she observed Valerie. Therefore she was aware that Valerie was often groggy, sleepy and/or sedated and that Valerie was not obtaining full nights of sleep. *E.g.*, **Exhibit 11** Radiology Consult and Report of May 2, 2005 (seen for pain, finding degeneration of spine, report initialed by Dr. Milos); **Exhibit 38** Core Office Log Book

for March 21 through June 14, 2005 documenting lack of sleep at Bates 9920, 9922, 9927, 9932, 9933, 9938, 9940, 9961, 9963, 9974, 9963, 9972, 9923, 9924, 9937, 9942, 9957, 9958, 9960 and 9975; **Exhibit 42** Wing Log Book for March 18 through June 23, 2005 documenting lack of sleep at Bates 1006, 9979, 9981, 9983, 9986, 9987, 9988, 9991, 9993, 9994, 9996, 9998, 9999, 10002, 10005, 10006, 10007, 10008, 10009, 10010, 10012, 10013, 10014, 10017, 10018, 10019, 10019, 10023, 10025, 10027, 10029, 10031, 10031, 10032, 10033, 10034, 10034, 10034, 10035, 10036, 10038, 10041, 10042, 10043, 10043, 10044, 10045, 10046, 10047, 10049, 10050, 10051, 10053, 10054, 10055, 10056, 10056, 10057, 10058, 10058, 10059, 10060, 10062, 10064, 10065, 10067, and 10068; **Exhibit 53** Progress Notes at Bates 8186 (Milos April 20, 2005 entry noting sedation in morning hours), **Exhibit 7** April 20, 2005 Case Conference, recording physician's opinion that "falls are contributed to medications which are sedating" and observing that "when Valerie does not sleep the night before, her unsteadiness is more pronounced." (Bates 0010);

**Exhibit 33** Annual IPP April 13, 2005 at Bates 7630 under the heading "Sleep Habits" documenting bouts of insomnia, Valerie is up at night fairly often, contributing to the morning "grogginess that has been noted." (Defendants Milos and Ferdinand in attendance, see Bates 7681); **Exhibit 50** Nursing Notes March 16 through June 19, 2005 at Bates 8349 (March 22 Note documenting that Valerie "did not sleep for the entire night"), Bates 8347 (March 29 Note documenting that Valerie "did not sleep all night"); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (stating that "Valerie arrived lethargic and was sliding forwards in the folding wheelchair."); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC). Sedation and lethargy were long-standing issues about which therefore defendants were aware of long before the conditions lead to Valerie's death, *e.g.* **Exhibit 31** Incident Report of June 24, 2003 (Valerie found in wheelchair unable to

stand up, sliding on to the floor); **Exhibit 5** Case Conference July 14, 2004 (Valerie observed to be unsteady and not sleeping at night, altering medication). This was a long-standing issue about which defendants were aware since at least September 2004, see **Exhibit 10** Psychiatry Consultation September 17, 2004 (finding Valerie "appears increasingly sedated, sleeping most of the time").

80.    On April 7, 2005, Ms. Young was seen for her yearly neurology evaluation.  Chronic gait disorder was noted with left foot drop and high steppage gait. Milos Decl. at ¶ 18.

81.    On April 13, 2005, the ITT met for Ms. Young's annual review.  Ms. Young's mother was invited to the meeting, but she did not attend.  During this meeting, the ITT reviewed Ms. Young's physical development and health status in detail.  Her health status was stable at that time.  However, there was concern about Ms. Young's behavior status and psychotropic medication regimen.  Milos Decl. at ¶ 19. See, e.g., Annual CFA Team Meeting Discussion (Bates 7629 7682), dated April 13, 2005, annexed to the Milos Decl. under Exhibit Tab C.

82.    On April 20, 2005, the ITT had a Special Case Conference concerning Ms. Young's falls. The most recent fall had been on April 15, 2005 in the morning, when she fell down in the shower sustaining a laceration 2.5 cm long over the left eyelid. During this meeting, Dr. Milos stated that he believed that the most recent falls were contributed to by medications that are sedating, and the left foot drop which was more pronounced. He also stated that when Ms. Young did not sleep during the night, her unsteadiness was more pronounced the following day. Milos Decl. at ¶ 20; Ferdinand Decl. at ¶ 17; Hayes Decl. at ¶ 5. See Special Case Conference Summary of Meeting (Bates 7743 - 7744), dated April 20, 2005, annexed to the Milos Decl. under Exhibit Tab D.

83.     During the April 20, 2005 Special Conference, the ITT also discussed that while Ms. Young's behavior had improved during the couple of months prior to her annual review, during the preceding year she had frequent episodes of agitation, aggressive behavior and behavioral decompensation that required psychiatric hospitalization and frequent adjustment of her psychotropic medications.  Milos Decl. at ¶ 21.

84.     Therefore, Dr. Milos recommended a reduction in the Zyprexa dose.  Ms. Young's medication regimen was adjusted accordingly.  Milos Decl. at ¶ 22; Ferdinand Decl. at ¶ 17.

85.     The ITT also recommended at the Special Case Conference that a wheelchair be issued to Ms. Young to transport her between buildings, to out-of-facility appointments and outings into the community.  Ferdinand Decl. at ¶¶ 16, 17; Hayes Decl. at ¶ 5; Milos Decl. at ¶ 23; Milos Dep. Tr. at p. 39, ln. 21 - p. 41, ln. 16, p. 59, lns. 7-12, p. 88, ln. 18 - p. 89, ln. 3, p. 140, ln. 13 - p. 141, ln. 25. The wheelchair was issued to Ms. Young on April 27, 2005.  See Emergency Adaptive Equipment Shop Work Request, dated April 26, 2005, annexed to the Milos Decl. under Exhibit Tab E.

**Response**

**Denied**. The ITT at the April 20, 2005 Case Conference recommended use of the wheelchair for <u>all</u> mobility needs. They did not recommend issuance of a wheelchair; Valerie was already using a wheelchair. The "physician recommended the *continued use* of a wheelchair" (emphasis original). **Exhibit 7** Bates 0010.

86.     Ms. Young attended programs from 9:00 a.m. to 3:00 p.m., and because of the foot drop condition she had developed, it was difficult for her to walk from the building she resided to the building where she had her programs. Milos Decl. at ¶ 23.

**Response**

Plaintiffs do not deny the allegations of ¶86 for the purposes of this motion, **except deny** that the sole reason why it was difficult for Valerie to walk was because of a "foot drop condition." Valerie was frequently sedated and drowsy in the mornings due to lack of sleep and medication side effects, and she suffered from back pain; facts that the defendants were aware of. *E.g.*, **Exhibit 11** Radiology Consult and Report of May 2, 2005 (seen for pain, finding degeneration of spine, report initialed by Dr. Milos); **Exhibit 38** Core Office Log Book for March 21 through June 14, 2005 documenting lack of sleep at Bates 9920, 9922, 9927, 9932, 9933, 9938, 9940, 9961, 9963, 9974, 9963, 9972, 9923, 9924, 9937, 9942, 9957, 9958, 9960 and 9975; **Exhibit 42** Wing Log Book for March 18 through June 23, 2005 documenting lack of sleep at Bates 1006, 9979, 9981, 9983, 9986, 9987, 9988, 9991, 9993, 9994, 9996, 9998, 9999, 10002, 10005, 10006, 10007, 10008, 10009, 10010, 10012, 10013, 10014, 10017, 10018, 10019, 10019, 10023, 10025, 10027, 10029, 10031, 10031, 10032, 10033, 10034, 10034, 10034, 10035, 10036, 10038, 10041, 10042, 10043, 10043, 10044, 10045, 10046, 10047, 10049, 10050, 10051, 10053, 10054, 10055, 10056, 10056, 10057, 10058, 10058, 10059, 10060, 10062, 10064, 10065, 10067, and 10068; **Exhibit 53** Progress Notes at Bates 8186 (Milos April 20, 2005 entry noting sedation in morning hours), **Exhibit 7** April 20, 2005 Case Conference, recording physician's opinion that "falls are contributed to medications which are sedating" and observing that "when Valerie does not sleep the night before, her unsteadiness is more pronounced." (Bates 0010); **Exhibit 33** Annual IPP April 13, 2005 at Bates 7630 under the heading "Sleep Habits" documenting bouts of insomnia, Valerie is up at night fairly often, contributing to the morning "grogginess that has been noted." (Defendants Milos and Ferdinand in attendance, see Bates 7681); **Exhibit 50** Nursing Notes March 16 through June 19, 2005 at Bates 8349 (March 22 Note documenting that

Valerie "did not sleep for the entire night"), Bates 8347 (March 29 Note documenting that Valerie "did not sleep all night"); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (stating that "Valerie arrived lethargic and was sliding forwards in the folding wheelchair."); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC). Sedation and lethargy were long-standing issues about which therefore defendants were aware of long before the conditions lead to Valerie's death, *e.g.* **Exhibit 31** Incident Report of June 24, 2003 (Valerie found in wheelchair unable to stand up, sliding on to the floor); **Exhibit 5** Case Conference July 14, 2004 (Valerie observed to be unsteady and not sleeping at night, altering medication). This was a long-standing issue about which defendants were aware since at least September 2004, see **Exhibit 10** Psychiatry Consultation September 17, 2004 (finding Valerie "appears increasingly sedated, sleeping most of the time").

87.    At the ITT's request, Ms. Young was also measured and issued a protective Danmar halo helmet to protect her head in case of a fall. Milos Decl. at ¶ 24.

88. The ITT also recommended sending Ms. Young to physical therapy, with an evaluation for possible orthosis (plastic splint to provide support) for the left foot. Dr. Milos referred Ms. Young for a physical therapy evaluation on or about April 27, 2005.  Milos Decl. at ¶ 24; Milos Dep. Tr. at p. 90, lns. 7-18, p. 147, ln. 2 - p. 149, ln. 154, p. 166, lns. 2-15.

**<u>Response</u>**

Plaintiffs do not deny the allegations of ¶¶87-88 for the purposes of this motion only. Southern District Local Civil Rule 56.1(c).

89.    On May 2, 2005, Ms. Young was evaluated and scheduled for physical therapy two times per week to assist her with walking. She attended twice a week on Tuesdays and Thursdays. At physical therapy, Ms. Young received mat exercises, ambulation exercise, and range of

motion exercises for both the upper and lower extremities.  Milos Decl. at ¶ 25; Viola Young

Dep. Tr. at p. 56, ln. 13 - p. 57, ln. 18, p. 104, ln. 19 - p. 105, ln. 5, p. 106, lns. 13-21; See physi-

cal therapy referral (Bates CQC95), dated April 27, 2005, and Report (Bates CQC95), dated May

2, 2005, annexed to the Milos Decl. under Exhibit Tab F.

**Response**

**Admit** <u>only</u> that Valerie was evaluated by a physical therapist as memorialized in the

Physical Therapy Consultation and Report, **Exhibit 9** (Bates 8076, also, CQC95).

**Objection** to the allegation that Valerie actually attended physical therapy and the descrip-

tion of what occurred during the alleged physical therapy session(s). The allegation is based upon

inadmissible hearsay. Dr. Milos had no personal knowledge of, never observed and was never

present during any physical therapy session, did not witness the occurrence of any physical ther-

apy session and does not have personal knowledge within the meaning of Fed. R. Civ. P. Rule 56.

**Exhibit 22**, Milos Deposition at 148:18 – 149:24 and 154:17 – 155:4. Viola Young was not pre-

sent at and did not observe any physical therapy session. <u>See</u> **Exhibit 28**, Viola Young

Deposition at p. 106:18 – 20; **Exhibit 14**, Declaration of Viola Young at ¶2.

90.    During the evaluation, the physical therapist found that Ms. Young could stand up

from the edge of a table with minimal to moderate physical assistance and was able to maintain

standing without assistance for two minutes.  Inside the parallel bars, she could stand up inde-

pendently and could maintain standing holding onto the bars.  She was able to walk with

moderate assistance for fifty feet. Outside the parallel bars she was able to walk for 100 feet with

two staff to walk with her since she had a tendency to lean to the staff, and also lean forward dur-

ing the course of walking. Minimal left foot drop was observed during her walking.  Milos Decl.

at ¶ 26.

**Response**

**Objection**. The allegation is based upon inadmissible hearsay. Dr. Milos had no personal knowledge of, never observed and was not present during the physical therapy consultation, did not witness the occurrence of the physical therapy consultation and does not have personal knowledge within the meaning of Fed. R. Civ. P. Rule 56.

Without waiving this objection, **denied** to the extent that this allegation incorrectly and inaccurately paraphrases the report made by the BDC physical therapist, which document speaks for itself. See **Exhibit 9** Physical Therapy Consult (April 27, 2005) and report (May 2, 2005).

91.    On May 2, 2005, Ms. Young also had X-rays of the lumbar spine  to evaluate her gait disturbance and foot drop, both of which were negative. Milos Decl. at ¶ 28. See Radiology Report Bates CQC92 - CQC93), dated May 5, 2005, annexed to the Milos Decl. under Exhibit Tab G.

**Response**

**Denied**. On May 2, 2005, Valerie had a complete lumbar sacral X-Ray because of **pain**, not "to evaluate her gait disturbance and foot drop." The radiologist found narrowing, sclerosis and degenerative changes, among other things; and recommended a CT or MR if pain persists.

**Exhibit 11** Radiology Consult and Report, CQC92-93 (also, Milos Ex. G), excerpted below (with emphasis added):

REASON FOR EXAM:  Pain.

FINDINGS:  Radiographic examination of the lumbosacral spine was performed in AP, lateral, and coned-down views.

There is narrowing and sclerosis with bridging osteophytosis noted at the L5-S1 level with mild osteophytosis seen at the other lumbar levels.  The other intervertebral disc spaces appear well maintained.  The foramina appear patent. Sclerosis is noted at the facet joint especially noted at the L5-S1 level.  There is no evidence of fracture or dislocation.

IMPRESSION:  Degenerative changes specifically noted at the L5-S1 level.  No fracture or dislocation.  If pain persists, we would recommend CT or MR.

92.    An EMG had been scheduled for June 30, 2005 to also evaluate her gait disturbance and foot drop. Milos Decl. at ¶ 28. See Progress Notes (Bates 0124, 8188), dated May 26 and 27, 2005, annexed to the Milos Decl. under Exhibit Tab H.

93.    On May 27, 2005, Dr. Milos noted that Ms. Young had bilateral ankle edema (swelling), but no calf tenderness and a negative Homann's sign (a physical examination test for deep vein thrombosis). Her edema was assumed to be positional (i.e., her legs in a prolonged dependent position) and leg elevation during rest periods was recommended. Milos Decl. at ¶ 29.

**Response**

**Denied**. Dr. Milos did not did not conclude "Her edema was assumed to be positional (i.e., her legs in a prolonged dependent position)" – Dr. Milos concluded "Venous insufficiency positional (sitting in wheelchair)." See **Exhibit 53**, Progress Notes of May 28, 2005 (Bates 8188), and excerpted below in relevant part:



94.    After Ms. Young began physical therapy in May of 2005, Dr. Milos continued to see her walking during his rounds with the assistance of staff. Up until the time of her death, she was ambulatory with assistance. Milos Decl. at ¶ 27; Milos Dep. Tr. at p. 140, ln. 13 - p. 141.

**Response**

**Denied**. Dr. Milos has admitted that he observed Valerie regularly and frequently and was therefore was aware of and acted with disregard for the fact that Valerie was sedentary and therefore at risk of DVT. *E.g.* **Exhibit 7** Case Conference of April 20, 2005 (Valerie to underline continue use of wheelchair for all mobility purposes); **Exhibit 40** Special Observation Log pages for June 19,

2005 from 3:00 pm through 9:30 pm (Valerie sitting throughout that time until she died); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (Valerie was lethargic and sliding forwards in a folding wheelchair and a <u>new</u> wheelchair was issued with a high padded back and calf support among other features); **Exhibit 9** Physical Therapy Report May 2, 2005 indicating that Valerie is unable to walk without staff assistance; **Exhibit 53** Progress Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie, no indication that she was walking independently); **Exhibit 53** at Bates 8188, Dr. Milos Progress Note of May 28, 2005, finding "Venous insufficiency positional (<u>sitting in wheelchair</u>" (emphasis added); **Exhibit 38** Core Office Log Book March 21 – June 16, 2005 (no indication that staff were walking Valerie and especially at Bates 9947, direction that Valerie "is to remain in wheelchair at all times" as of April 20); **Exhibit 42**, Wing Log March 18 through June 23, 2005 (no indication that staff were walking Valerie and especially at Bates 10020, direction that Valerie "is to be in wheelchair at all times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19, 2005 (no documentation of staff walking Valerie and noting she was using a wheelchair, Bates 8345 May 16, 2005 entry); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC); **Exhibit 1** February 3, 2005 Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2** April 27, 2005 Emergency Adaptive Equipment Work Request for issuance of the new wheelchair (<u>see</u> **Exhibit 51** Occupational Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042) noting that Valerie is now utilizing a wheelchair for transport until further notice (Bates 8047); **Exhibit 33** Annual IPP of April 13, 2005 (7681) noting that Valerie is to use a wheelchair when she is unsteady (7629), for mobility and transportation (7633); **Exhibit 28** Viola Young Deposition at pp. 54:20, 56:20, 58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff to walk her regularly,

recounting communication with defendant Milos); **Exhibit 26** Loretta Lee Deposition at 30:11-13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney Young Deposition at 41:17-22, 49:10-12, 50:13-15 (Valerie just sitting);  Defendants admit spoliation of the Special Observation Logs (15 minutes checks) that detailed Valerie's level of activity during 2005 (*e.g.*, **Exhibit 40**, extant log pages), **see:** Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand Decl. at ¶27; Hayes Decl. at ¶10; Milos Decl. at ¶17 (consistent with spoliation of the Special Observation Logs).

95.    Plaintiffs observed that Ms. Young was ambulatory prior to her death, although they were concerned about her gait, i.e., limping and swelling, related to her foot drop for which she was receiving physical therapy twice a week. See Deposition Transcript of Viola Young ("Viola Young Dep. Tr."), taken on January 29, 2008, at p. 53, ln. 21 - p. 56, ln. 25, annexed to Velez Decl. under Exhibit Tab D; Deposition Transcript of Loretta Young Lee ("Loretta Young Dep. Tr."), taken on January 28, 2008, at p. 29, lns. 20-25, p. 40, lns. 2-9, p. 42, lns. 10-15, p. 52, lns. 5-22,  annexed to Velez Decl. under Exhibit Tab E.

**Response**

**Denied**. Counsel utterly mischaracterizes the plaintiffs' testimony. See also, **Exhibit 13** Declaration of Loretta Lee and **Exhibit 14** Declaration of Mrs. Viola Young, submitted herewith.

96.    On June 19, 2005, Ms. Young collapsed in the shower.  None of the defendants were at the BDC, because it was a Sunday, a scheduled day off. Resuscitative efforts were instituted by BDC staff including CPR, intravenous dextrose, and oxygen.  After CPR was administered, she became responsive and was agitated.  On the arrival of the paramedics, Ms. Young was given intravenous atropine and was intubated for ventilatory support. She was transported to the hospital where she was pronounced dead shortly thereafter. Milos Decl. at ¶ 31.

**Response**

**Objection**. Lack of personal knowledge. Dr. Milos was not present at BDC on June 19, 2005 (Milos Decl. at ¶31), did not observe any of the events he purports to describe and his statement as applied to this allegation is not otherwise admissible within the meaning of Fed.R.Civ.P. Rule 56. See Southern District Local Civil Rule 56.1(d); *Beyah v. Coughlin*, 789 F.2d 986, 989-90 (2d Cir. 1986).

97.    According to the autopsy report that Dr. Milos reviewed, the cause of Ms. Young's death was pulmonary embolism due to deep vein thrombosis of the lower extremities due to in-activity due to seizure disorder of undetermined etiology.  Her manner of death was stated as caused by natural causes. Milos Decl. at ¶ 32. See Report of Autopsy Bates 0099 - 0104), dated June 20, 2005, annexed to the Milos Decl. under Exhibit Tab I.

98.    On July 26, 2005, BDC's Mortality Review Committee members, consisting of the Quality Assurance Coordinator, six physicians, three psychiatrists, a neurologist and the Deputy Director of Operations, discussed this case. The members noted that Ms. Young's medication regimen appeared appropriate and would not have predisposed her to a pulmonary embolism. The issue of her history of mild pitting edema was also discussed and it was noted that in the past, diagnostic testing had not revealed reasons for concern. The most recent episode of edema was reviewed. Dr. Milos noted that the bilateral pitting ankle edema she had was an unlikely sign for DVT, because she had no calf tenderness and a negative Homann's sign.  Ms. Young's edema was assumed to be positional leg elevation during rest periods had been recommended.  Milos Decl. at ¶ 33. See Mortality Review - Valerie Young (Bates 0111 - 0113), dated July 26, 2005, annexed under Exhibit Tab J.

**Response**

**Deny** that "her edema was assumed to be positional" – Dr. Milos concluded "Venous insuf-

ficiency positional (sitting in wheelchair)" (**Exhibit 53** at Bates 8188, Progress Notes of May 28,

2005); which the Mortality Review Committee characterized "Positional venostatis [sic] was as-

sumed" (**Exhibit 48** at Bates 0112).

**Denied**. The Mortality Review Committee was aware of, and ignored the fact that Valerie

was sedentary and therefore at risk of DVT. *E.g.* **Exhibit 7** Case Conference of April 20, 2005

(Valerie to <u>continue</u> use of wheelchair for <u>all mobility</u> purposes); **Exhibit 40** Special Observation

Log pages for June 19, 2005 from 3:00 pm through 9:30 pm (Valerie sitting throughout that time

until she died); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (Valerie was lethargic

and sliding forwards in a folding wheelchair and a <u>new</u> wheelchair was issued with a high pad-

ded back and calf support among other features); **Exhibit 9** Physical Therapy Report May 2,

2005 indicating that Valerie is unable to walk without staff assistance; **Exhibit 53** Progress

Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie, no indication that she was

walking independently); **Exhibit 53** at Bates 8188, Dr. Milos Progress Note of May 28, 2005,

finding "Venous insufficiency positional (<u>sitting in wheelchair</u>" (emphasis added); **Exhibit 38**

Core Office Log Book March 21 – June 16, 2005 (no indication that staff were walking Valerie

and especially at Bates 9947, direction that Valerie "is to remain in wheelchair at all times" as of

April 20); **Exhibit 42**, Wing Log March 18 through June 23, 2005 (no indication that staff were

walking Valerie and especially at Bates 10020, direction that Valerie "is to be in wheelchair at all

times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19, 2005 (no documentation

of staff walking Valerie and noting she was using a wheelchair, Bates 8345 May 16, 2005 entry);

**Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station

every day when he comes to BDC); **Exhibit 1** February 3, 2005 Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2** April 27, 2005 Emergency Adaptive Equipment Work Request for issuance of the new wheelchair (see **Exhibit 51** Occupational Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042) noting that Valerie is now utilizing a wheelchair for transport until further notice (Bates 8047); **Exhibit 33** Annual IPP of April 13, 2005 (7681) noting that Valerie is to use a wheelchair when she is unsteady (7629), for mobility and transportation (7633); **Exhibit 28** Viola Young Deposition at pp. 54:20, 56:20, 58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff to walk her regularly, recounting communication with defendant Milos); **Exhibit 26** Loretta Lee Deposition at 30:11-13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney Young Deposition at 41:17-22, 49:10-12, 50:13-15 (Valerie just sitting); Defendants admit spoliation of the Special Observation Logs (15 minutes checks) that detailed Valerie's level of activity during 2005 (*e.g.*, **Exhibit 40**, extant log pages), **see:** Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand Decl. at ¶27; Hayes Decl. at ¶10; Milos Decl. at ¶17 (all admitting that Special Observation Logs are no longer extant).

99.    The Mortality Review Committee members also noted that Ms. Young was ambulatory but used a wheelchair for transport because of foot drop and gait instability. It was also discussed that staff who monitored her may not have encouraged her to walk around because of fear of her falling. It was further discussed whether the use of anti-coagulants would have helpful and whether elastic stockings could have been used. Milos Decl. at ¶ 34.

100.    In Dr. Milos' opinion, that the use of anti-coagulants would have been too risky for Ms. Young, because she was prone to falls. Likewise, the use of elastic stockings could have in-

creased the risk for blood clots because the stockings roll down and squeeze the leg, further preventing circulation. Milos Decl. at ¶ 34.

101. As Ms. Young's medical care provider, Dr. Milos never reached the medical conclusion that she was suffering from DVT. In his opinion, with a reasonable degree of clinical certainty, Ms Young had none of the accepted risk factors or symptoms that are recognized to increase the likelihood of a diagnosis of DVT. These factors or symptoms are active cancer, recently bedridden for major surgery, unilateral calf or leg edema, paralysis or a leg cast in the recent past, localized calf tenderness, and collateral superficial veins. Milos Decl. at ¶ 35.

**Response**

**Denied**. Persons who are sedentary are at risk of DVT. *E.g.*, **Exhibit 34** October 24, 2005 Letter and Final Agency Determination, N.Y. State Commission on the Quality of Care.

**Denied**. Defendant Milos was aware of, and acted with disregard for the fact that Valerie was sedentary and therefore at risk of DVT. *E.g.* **Exhibit 7** Case Conference of April 20, 2005 (Valerie to continue use of wheelchair for all mobility purposes); **Exhibit 40** Special Observation Log pages for June 19, 2005 from 3:00 pm through 9:30 pm (Valerie sitting throughout that time until she died); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (Valerie was lethargic and sliding forwards in a folding wheelchair and a new wheelchair was issued with a high padded back and calf support among other features); **Exhibit 9** Physical Therapy Report May 2, 2005 indicating that Valerie is unable to walk without staff assistance; **Exhibit 53** Progress Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie, no indication that she was walking independently); **Exhibit 53** at Bates 8188, Dr. Milos Progress Note of May 28, 2005, finding "Venous insufficiency positional (sitting in wheelchair" (emphasis added); **Exhibit 38** Core Office Log Book March 21 – June 16, 2005 (no indication that staff were walking Valerie

and especially at Bates 9947, direction that Valerie "is to remain in wheelchair at all times" as of

April 20); **Exhibit 42**, Wing Log March 18 through June 23, 2005 (no indication that staff were

walking Valerie and especially at Bates 10020, direction that Valerie "is to be in wheelchair at all

times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19, 2005 (no documentation

of staff walking Valerie and noting she was using a wheelchair, Bates 8345 May 16, 2005 entry);

**Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station

every day when he comes to BDC); **Exhibit 1** February 3, 2005 Adaptive Equipment Work Re-

quest, apparently for repair of wheelchair; **Exhibit 2** April 27, 2005 Emergency Adaptive

Equipment Work Request for issuance of the new wheelchair (see **Exhibit 51** Occupational

Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042) noting that Valerie is now

utilizing a wheelchair for transport until further notice (Bates 8047); **Exhibit 33** Annual IPP of

April 13, 2005 (7681) noting that Valerie is to use a wheelchair when she is unsteady (7629), for

mobility and transportation (7633); **Exhibit 28** Viola Young Deposition at pp. 54:20, 56:20,

58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff to walk

her regularly, recounting communication with defendant Milos); **Exhibit 26** Loretta Lee Deposi-

tion at 30:11-13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney Young Deposition at 41:17-

22, 49:10-12, 50:13-15 (Valerie just sitting);  Defendants admit spoliation of the Special Obser-

vation Logs (15 minutes checks) that detailed Valerie's level of activity during 2005 (*e.g.*,

**Exhibit 40**, extant log pages), **see:** Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as

Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand

Decl. at ¶27; Hayes Decl. at ¶10; Milos Decl. at ¶17 (all admitting that Special Observation Logs

are no longer extant, consistent with spoliation).

102.  Ms. Young also continued to receive physical therapy, continued to ambulate with as-

sistance of BDC staff, and appeared to remain completely asymptomatic for the three weeks

preceding her death. Therefore, Dr. Milos had no reason to change her medication at that time or

recommend other changes to her care and treatment.  Milos Decl. at ¶ 36.

**Response**

**Objection**. Defendant Milos has no personal knowledge of whether or to what extent Vale-

rie received physical therapy and his statement is thus inadmissible.

Without waiving this objection, **deny** that Valerie continued to "ambulate" with the assis-

tance of staff; Valerie was sedentary. *E.g.* **Exhibit 14** Viola Young Declaration; **Exhibit 13**

Loretta Lee Declaration; **Exhibit 7** Case Conference of April 20, 2005 (Valerie to <u>continue</u> use of

wheelchair for <u>all mobility</u> purposes); **Exhibit 40** Special Observation Log pages for June 19,

2005 from 3:00 pm through 9:30 pm (Valerie sitting throughout that time until she died); **Exhibit**

**51** Occupational Therapy Note of April 27, 2005 (Valerie was lethargic and sliding forwards in a

folding wheelchair and a <u>new</u> wheelchair was issued with a high padded back and calf support

among other features); **Exhibit 9** Physical Therapy Report May 2, 2005 indicating that Valerie is

unable to walk without staff assistance; **Exhibit 53** Progress Notes, March 14, 2005 – June 19,

2005 (no direction to walk Valerie, no indication that she was walking independently); **Exhibit**

**53** at Bates 8188, Dr. Milos Progress Note of May 28, 2005, finding "Venous insufficiency

positional (<u>sitting in wheelchair</u>" (emphasis added); **Exhibit 38** Core Office Log Book March 21

– June 16, 2005 (no indication that staff were walking Valerie and especially at Bates 9947, di-

rection that Valerie "is to remain in wheelchair at all times" as of April 20); **Exhibit 42**, Wing

Log March 18 through June 23, 2005 (no indication that staff were walking Valerie and espe-

cially at Bates 10020, direction that Valerie "is to be in wheelchair at all times" as of April 20);

**Exhibit 50** Nursing Notes March 16 – June 19, 2005 (no documentation of staff walking Valerie and noting she was using a wheelchair, Bates 8345 May 16, 2005 entry); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC); **Exhibit 1** February 3, 2005 Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2** April 27, 2005 Emergency Adaptive Equipment Work Request for issuance of the new wheelchair (<u>see</u> **Exhibit 51** Occupational Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042) noting that Valerie is now utilizing a wheelchair for transport until further notice (Bates 8047); **Exhibit 33** Annual IPP of April 13, 2005 (7681) noting that Valerie is to use a wheelchair when she is unsteady (7629), for mobility and transportation (7633); **Exhibit 28** Viola Young Deposition at pp. 54:20, 56:20, 58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff to walk her regularly, recounting communication with defendant Milos); **Exhibit 26** Loretta Lee Deposition at 30:11-13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney Young Deposition at 41:17-22, 49:10-12, 50:13-15 (Valerie just sitting);  Defendants admit spoliation of the Special Observation Logs (15 minutes checks) that detailed Valerie's level of activity during 2005 (*e.g.*, **Exhibit 40**, extant log pages), <u>**see:**</u> Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand Decl. at ¶27; Hayes Decl. at ¶10; Milos Decl. at ¶17 (all admitting that Special Observation Logs are no longer extant, consistent with spoliation).

103.   It is Dr. Milos' medical opinion that the oversight, monitoring, evaluation, and treatment of Ms. Young was thorough and according to the accepted standard of care.  Milos Decl. at ¶ 37.

104.   It is the opinion of defendants' expert in emergency medicine, Dr. Diane M. Sixsmith, that Ms. Young's medical care providers could not have reasonably anticipated that she would develop DVT and a fatal pulmonary embolism because Ms. Young had none of the currently accepted risk factors or symptoms that are recognized to increase the likelihood of a diagnosis of DVT. Ms. Young also continued to receive physical therapy, continued to ambulate with assistance of BDC staff, and appeared to remain completely asymptomatic for the three weeks preceding her death. Accordingly, in Dr. Sixsmith's opinion, the oversight, monitoring, evaluation, and treatment of Ms. Young by BDC staff was thorough and according to the accepted standard of care. See Defendants' Expert Witness Report of Diane M. Sixsmith, M.D., M.P.H., FACEP, dated February 26, 2008, attached under Exhibit Tab A to the Declaration of Dr. Diane M. Sixsmith ("Sixsmith Decl."), dated July 21, 2008, at p. 2.

**Response**

**Denied**. The Sixsmith Report and Declaration are predicated on false assumptions, most prominently, the assumptions that Valerie was both ambulatory and that BDC staff were walking her regularly. These assumptions are false, Valerie was neither ambulatory nor was she walked regularly by staff. See **Exhibit 7** Case Conference of April 20, 2005 (Valerie to continue use of wheelchair for all mobility purposes); **Exhibit 40** Special Observation Log pages for June 19, 2005 from 3:00 pm through 9:30 pm (Valerie sitting throughout that time until she died); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (Valerie was lethargic and sliding forwards in a folding wheelchair and a new wheelchair was issued with a high padded back and calf support among other features); **Exhibit 9** Physical Therapy Report May 2, 2005 indicating that Valerie is unable to walk without staff assistance; **Exhibit 53** Progress Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie, no indication that she was walking independently); **Exhibit**

**53** at Bates 8188, Dr. Milos Progress Note of May 28, 2005, finding "Venous insufficiency positional (<u>sitting in wheelchair</u>" (emphasis added); **Exhibit 38** Core Office Log Book March 21 – June 16, 2005 (no indication that staff were walking Valerie and especially at Bates 9947, direction that Valerie "is to remain in wheelchair at all times" as of April 20); **Exhibit 42**, Wing Log March 18 through June 23, 2005 (no indication that staff were walking Valerie and especially at Bates 10020, direction that Valerie "is to be in wheelchair at all times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19, 2005 (no documentation of staff walking Valerie and noting she was using a wheelchair, Bates 8345 May 16, 2005 entry); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC); **Exhibit 1** February 3, 2005 Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2** April 27, 2005 Emergency Adaptive Equipment Work Request for issuance of the new wheelchair (<u>see</u> **Exhibit 51** Occupational Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042) noting that Valerie is now utilizing a wheelchair for transport until further notice (Bates 8047); **Exhibit 33** Annual IPP of April 13, 2005 (7681) noting that Valerie is to use a wheelchair when she is unsteady (7629), for mobility and transportation (7633); **Exhibit 28** Viola Young Deposition at pp. 54:20, 56:20, 58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff to walk her regularly, recounting communication with defendant Milos); **Exhibit 26** Loretta Lee Deposition at 30:11-13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney Young Deposition at 41:17-22, 49:10-12, 50:13-15 (Valerie just sitting);  Defendants admit spoliation of the Special Observation Logs (15 minutes checks) that detailed Valerie's level of activity during 2005 (*e.g.*, **Exhibit 40**, extant log pages), **see:** Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand Decl. at ¶27; Hayes

Decl. at ¶10; Milos Decl. at ¶17 (consistent with spoliation of the Special Observation Logs);

**Exhibit 13** Declaration of Loretta Lee and **Exhibit 14** Declaration of Mrs. Viola Young.

The Sixsmith report also fails to take into account the fact that Valerie was suffering from

back pain, was frequently groggy, sedated and was failing to attain a complete night's sleep for a

protracted period of time (the last three months of her life). See **Exhibit 11** Radiology Consult

and Report of May 2, 2005 (seen for pain, finding degeneration of spine, report initialed by Dr.

Milos); **Exhibit 38** Core Office Log Book for March 21 through June 14, 2005 documenting lack

of sleep at Bates 9920, 9922, 9927, 9932, 9933, 9938, 9940, 9961, 9963, 9974, 9963, 9972,

9923, 9924, 9937, 9942, 9957, 9958, 9960 and 9975; **Exhibit 42** Wing Log Book for March 18

through June 23, 2005 documenting lack of sleep at Bates 1006, 9979, 9981, 9983, 9986, 9987,

9988, 9991, 9993, 9994, 9996, 9998, 9999, 10002, 10005, 10006, 10007, 10008, 10009, 10010,

10012, 10013, 10014, 10017, 10018, 10019, 10019, 10023, 10025, 10027, 10029, 10031, 10031,

10032, 10033, 10034, 10034, 10034, 10035, 10036, 10038, 10041, 10042, 10043, 10043, 10044,

10045, 10046, 10047, 10049, 10050, 10051, 10053, 10054, 10055, 10056, 10056, 10057, 10058,

10058, 10059, 10060, 10062, 10064, 10065, 10067, and 10068; **Exhibit 53** Progress Notes at

Bates 8186 (Milos April 20, 2005 entry noting sedation in morning hours), **Exhibit 7** April 20,

2005 Case Conference, recording physician's opinion that "falls are contributed to medications

which are sedating" and observing that "when Valerie does not sleep the night before, her un-

steadiness is more pronounced." (Bates 0010); **Exhibit 33** Annual IPP April 13, 2005 at Bates

7630 under the heading "Sleep Habits" documenting bouts of insomnia, Valerie is up at night

fairly often, contributing to the morning "grogginess that has been noted." (Defendants Milos

and Ferdinand in attendance, see Bates 7681); **Exhibit 50** Nursing Notes March 16 through June

19, 2005 at Bates 8349 (March 22 Note documenting that Valerie "did not sleep for the entire

night"), Bates 8347 (March 29 Note documenting that Valerie "did not sleep all night"); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (stating that "Valerie arrived lethargic and was sliding forwards in the folding wheelchair."); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC). Sedation and lethargy were long-standing issues about which therefore defendants were aware of long before the conditions lead to Valerie's death, *e.g.* **Exhibit 31** Incident Report of June 24, 2003 (Valerie found in wheelchair unable to stand up, sliding on to the floor); **Exhibit 5** Case Conference July 14, 2004 (Valerie observed to be unsteady and not sleeping at night, altering medication). This was a long-standing issue about which defendants were aware since at least September 2004, see **Exhibit 10** Psychiatry Consultation September 17, 2004 (finding Valerie "appears increasingly sedated, sleeping most of the time").

The Sixsmith report and Declaration are also contradicted by the Opinion Letter of Richard Bindie, MD, forensic pathologist (**Exhibit 30**), the findings and determination of the New York State Commission on the Quality of Care (**Exhibit 34**), the official determination of the New York City Office of the Medical Examiner (**Exhibit 4**) and cause of death as certified by the New York State Department of Health (**Exhibit 12**).

105. It is the opinion of plaintiffs' expert in forensic pathology, Dr. Richard P. Bindie, that "DVT is frequently asymptomatic or the symptoms are not classical. The first sign of DVT can be pulmonary emboli or sudden death." See Plaintiffs' Expert Witness Report of M.D., Forensic Pathologist, dated April 25, 2008, attached under Exhibit Tab B to the Sixsmith Declaration, at p. 2.

**Response**

**Denied**. This is a deliberately deceptive and misleading fragmentary quotation from Dr. Bindie's opinion letter finding that because DVT is difficult to detect and predict, prophylactic measures must be taken in the case of persons at risk, such as Valerie Young. We respectfully refer this Court to the actual opinion letter submitted herewith as **Exhibit 30**.

106.   At no time prior to her death on June 19, 2005, were any of the defendants aware that Ms. Young had any of the symptoms of or had been diagnosed with deep vein thrombosis ("DVT"), nor were they made aware that Ms. Young was in danger of suffering from DVT due lack of mobility.  Uschakow Decl. at ¶ 33; Arya Decl. at ¶ 6; Williamson Decl. ¶ 9; Ferdinand Decl. at ¶ 14; Hayes Decl. at ¶ 4; Milos Decl. at ¶ 35.

**Response**

**Denied**. Defendants were aware of and acted with disregard for the fact that Valerie was confined to her wheelchair or otherwise sedentary and thus at risk for DVT. *E.g.* **Exhibit 7** Case Conference of April 20, 2005 (Valerie to <u>continue</u> use of wheelchair for <u>all mobility</u> purposes); **Exhibit 40** Special Observation Log pages for June 19, 2005 from 3:00 pm through 9:30 pm (Valerie sitting throughout that time until she died); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (Valerie was lethargic and sliding forwards in a folding wheelchair and a <u>new</u> wheelchair was issued with a high padded back and calf support among other features); **Exhibit 9** Physical Therapy Report May 2, 2005 indicating that Valerie is unable to walk without staff assistance; **Exhibit 53** Progress Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie, no indication that she was walking independently); **Exhibit 53** at Bates 8188, Dr. Milos Progress Note of May 28, 2005, finding "Venous insufficiency positional (<u>sitting in wheelchair</u>" (emphasis added); **Exhibit 38** Core Office Log Book March 21 – June 16, 2005 (no indication

that staff were walking Valerie and especially at Bates 9947, direction that Valerie "is to remain in wheelchair at all times" as of April 20); **Exhibit 42**, Wing Log March 18 through June 23, 2005 (no indication that staff were walking Valerie and especially at Bates 10020, direction that Valerie "is to be in wheelchair at all times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19, 2005 (no documentation of staff walking Valerie and noting she was using a wheelchair, Bates 8345 May 16, 2005 entry); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC); **Exhibit 1** February 3, 2005 Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2** April 27, 2005 Emergency Adaptive Equipment Work Request for issuance of the new wheelchair (see **Exhibit 51** Occupational Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042) noting that Valerie is now utilizing a wheelchair for transport until further notice (Bates 8047); **Exhibit 33** Annual IPP of April 13, 2005 (7681) noting that Valerie is to use a wheelchair when she is unsteady (7629), for mobility and transportation (7633); **Exhibit 28** Viola Young Deposition at pp. 54:20, 56:20, 58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff to walk her regularly, recounting communication with defendant Milos); **Exhibit 26** Loretta Lee Deposition at 30:11-13 (Valerie in wheelchair sitting);

**Exhibit 27** Sidney Young Deposition at 41:17-22, 49:10-12, 50:13-15 (Valerie just sitting);  Defendants admit spoliation of the Special Observation Logs (15 minutes checks) that detailed Valerie's level of activity during 2005 (*e.g.*, **Exhibit 40**, extant log pages), **see:** Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand Decl. at ¶27; Hayes Decl. at ¶10; Milos Decl. at ¶17 (all admitting that Special Observation Logs are no longer extant).

107.   Plaintiffs were concerned that Ms. Young be walked around to keep the circulation going and did not think that the swelling in her legs would create a blood clot that would kill her. Viola Young Dep. Tr. at p. 76, ln. 3-11, p. 71, ln. 21 - p. 72, ln. 6; Loretta Young Dep. Tr. at p. 52, ln. 18 - p. 53, ln. 10.

**Response**

Objection. The allegations of ¶107 are not relevant within the meaning of Fed. R. Civ. Pro. Rule 56. There is no claim in this case by the plaintiff that the swelling in Valerie's legs caused the DVT or a blood clot. See **Exhibit 8** (Complaint) and **Exhibit 52** (pretrial order, amending the complaint).

108.   Plaintiffs believe that defendants would have taken care of any medical condition that Ms. Young had that might kill her.  If plaintiffs had believed that Ms. Young was suffering from any condition that might kill her, they would have let defendants know that they had this concern. Viola Young Dep. Tr. at p. 77, lns. 11-25, p. 78, ln. 18 - p. 79, ln. 2, p. 130, ln. 19 - p. 131, ln. 2; Loretta Young Dep. Tr. at p. 43, ln. 11 - p. 46, ln. 6; Sidney Young Dep. Tr. at p. 56, ln. 11 - p. 57, ln. 7.

**Response**

Denied. Defendants grossly mischaracterize and overstate plaintiffs' testimony; e.g. Viola Young testified that she does not know what the defendants thought and cannot speak for them, see Viola Young Deposition, **Exhibit 14** at 77-9 and does not know what 130-131; Loretta Lee testified to her belief (via leading questions and over objection) that if the defendants knew that Valerie had a blood clot that would have killed her the defendants would have acted to get Valerie treatment, rejecting the implication that defendants had an intention to allow Valerie to die (Loretta Lee Deposition pp. 43-46 **Exhibit 26**); Sidney Young testified that he personally does

not know anything about how blood clots work and personally does not know what should or
could have been done to prevent same (**Exhibit 27** Sidney Young Deposition at pp. 56 and 57).

109.   Plaintiffs have no proof that any of the defendants knew Ms. Young had a potentially
dangerous, fatal problem and deliberately chose to ignore it.  Viola Young Dep. Tr. at P. 79, lns.
7-14, p. 80, ln. 10 - p. 82, ln. 2. ln. 18 - p. 53, ln. 10.

**Response**

**Objection**. This misstates a legal standard and conflates legal standards with facts at issue.
Further objection, to the extent that this allegation purports to suggest that the plaintiff must
show that defendants were aware that their failure to meet minimum professional standards
would result in death.

Without waiving this objection, **denied**. Valerie Young was sedentary during her last
months and therefore at risk of DVT. The defendants failed to exercise any professional judg-
ment by failing to take prophylactic action. For example, and not by limitation, see: **Exhibit 34**
October 24, 2005 Letter and Final Agency Determination with attachment ("Can This Happen
Here") of the N.Y. State Commission on the Quality of Care; **Exhibit 7** Case Conference of April
20, 2005 (Valerie to continue use of wheelchair for all mobility purposes); **Exhibit 40** Special
Observation Log pages for June 19, 2005 from 3:00 pm through 9:30 pm (Valerie sitting
throughout that time until she died); **Exhibit 51** Occupational Therapy Note of April 27, 2005
(Valerie was lethargic and sliding forwards in a folding wheelchair and a new wheelchair was
issued with a high padded back and calf support among other features); **Exhibit 9** Physical Ther-
apy Report May 2, 2005 indicating that Valerie is unable to walk without staff assistance;
**Exhibit 53** Progress Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie, no
indication that she was walking independently); **Exhibit 53** at Bates 8188, Dr. Milos Progress

Note of May 28, 2005, finding "Venous insufficiency positional (<u>sitting in wheelchair</u>" (emphasis added); **Exhibit 38** Core Office Log Book March 21 – June 16, 2005 (no indication that staff were walking Valerie and especially at Bates 9947, direction that Valerie "is to remain in wheelchair at all times" as of April 20); **Exhibit 42**, Wing Log March 18 through June 23, 2005 (no indication that staff were walking Valerie and especially at Bates 10020, direction that Valerie "is to be in wheelchair at all times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19, 2005 (no documentation of staff walking Valerie and noting she was using a wheelchair, Bates 8345 May 16, 2005 entry); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC); **Exhibit 1** February 3, 2005 Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2** April 27, 2005 Emergency Adaptive Equipment Work Request for issuance of the new wheelchair (<u>see</u> **Exhibit 51** Occupational Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042) noting that Valerie is now utilizing a wheelchair for transport until further notice (Bates 8047); **Exhibit 33** Annual IPP of April 13, 2005 (7681) noting that Valerie is to use a wheelchair when she is unsteady (7629), for mobility and transportation (7633); **Exhibit 28** Viola Young Deposition at pp. 54:20, 56:20, 58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff to walk her regularly, recounting communication with defendant Milos); **Exhibit 26** Loretta Lee Deposition at 30:11-13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney Young Deposition at 41:17-22, 49:10-12, 50:13-15 (Valerie just sitting);  Defendants admit spoliation of the Special Observation Logs (15 minutes checks) that detailed Valerie's level of activity during 2005 (*e.g.*, **Exhibit 40**, extant log pages), <u>**see:**</u> Jose L. Velez, Esq. May 30, 2008 Declaration at ¶9, filed as Document 26; Uschakow Decl. at ¶ 32; Arya Decl. at ¶6; Williamson Decl. at ¶8; Ferdinand Decl. at ¶27; Hayes Decl. at ¶10; Milos Decl. at ¶17 (consistent with spo-

liation of the Special Observation Logs). Furthermore, Defendant Hayes has admitted that she made numerous observations of Valerie and therefore was aware of, and acted with disregard for the fact that Valerie was frequently sedated and drowsy, especially in the mornings due to lack of sleep and medication side effects, and she suffered from back pain. *E.g.*, **Exhibit 11** Radiology Consult and Report of May 2, 2005 (seen for pain, finding degeneration of spine, report initialed by Dr. Milos); **Exhibit 38** Core Office Log Book for March 21 through June 14, 2005 document- ing lack of sleep at Bates 9920, 9922, 9927, 9932, 9933, 9938, 9940, 9961, 9963, 9974, 9963, 9972, 9923, 9924, 9937, 9942, 9957, 9958, 9960 and 9975; **Exhibit 42** Wing Log Book for March 18 through June 23, 2005 documenting lack of sleep at Bates 1006, 9979, 9981, 9983, 9986, 9987, 9988, 9991, 9993, 9994, 9996, 9998, 9999, 10002, 10005, 10006, 10007, 10008, 10009, 10010, 10012, 10013, 10014, 10017, 10018, 10019, 10019, 10023, 10025, 10027, 10029, 10031, 10031, 10032, 10033, 10034, 10034, 10034, 10035, 10036, 10038, 10041, 10042, 10043, 10043, 10044, 10045, 10046, 10047, 10049, 10050, 10051, 10053, 10054, 10055, 10056, 10056, 10057, 10058, 10058, 10059, 10060, 10062, 10064, 10065, 10067, and 10068; **Exhibit 53** Pro- gress Notes at Bates 8186 (Milos April 20, 2005 entry noting sedation in morning hours),

**Exhibit 7** April 20, 2005 Case Conference, recording physician's opinion that "falls are contrib- uted to medications which are sedating" and observing that "when Valerie does not sleep the night before, her unsteadiness is more pronounced." (Bates 0010); **Exhibit 33** Annual IPP April 13, 2005 at Bates 7630 under the heading "Sleep Habits" documenting bouts of insomnia, Vale- rie is up at night fairly often, contributing to the morning "grogginess that has been noted." (Defendants Milos and Ferdinand in attendance, see Bates 7681); **Exhibit 50** Nursing Notes March 16 through June 19, 2005 at Bates 8349 (March 22 Note documenting that Valerie "did not sleep for the entire night"), Bates 8347 (March 29 Note documenting that Valerie "did not

sleep all night"); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (stating that "Valerie arrived lethargic and was sliding forwards in the folding wheelchair."); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC). Sedation and lethargy were long-standing issues about which therefore defendants were aware of long before the conditions lead to Valerie's death, *e.g.* **Exhibit 31** Incident Report of June 24, 2003 (Valerie found in wheelchair unable to stand up, sliding on to the floor); **Exhibit 5** Case Conference July 14, 2004 (Valerie observed to be unsteady and not sleeping at night, altering medication). This was a long-standing issue about which defendants were aware since at least September 2004, see **Exhibit 10** Psychiatry Consultation September 17, 2004 (observing Valerie "appears increasingly sedated, sleeping most of the time").

## C.   ADDITIONAL MATERIAL FACTS AS TO WHICH PLAINTIFF CONTENDS THERE EXISTS A GENUINE ISSUE TO BE TRIED

1.    Valerie Young was a recipient of Medicaid and/or Medicare and was thus entitled to the benefits and protections of the rules and regulations promulgated by and for the Federal Centers for Medicare and Medicaid, including, but not limited to 42 CFR Part 483. **Exhibit 44** Valerie Young Medicare Card (Bates 8751).

2.    Operating procedures at BDC required that upon Valerie's death, all records and information concerning her be boxed and brought to the Deputy Director of Operations, at the time, defendant herein Jan Williamson. This policy was in effect on the date of Valerie's death. Williamson Deposition at pp. 52:25 – 53:13.

3.    On the date that Valerie died there were at least three notebooks comprising the Special Observation logs maintained in at least two separate locations. The current log was indisputably in the custody of the direct care staff who was making the observations.

4.    (all other defendants).

5.     Valerie suffered from persistent lack of sleep during the last three months of her life as evidenced by the extant log books produced in this action. **Exhibit 38**, Core Office Log Book; **Exhibit 42**, Wing Log Book.

6.     From March 18 through March 31, 2005, Valerie did not get a full night of sleep on the following dates, as documented by defendants' Core and Wing Logs:

(a) March 21, 2005, (Wing Log notation entered between 3 and 5 am), **Exhibit 42**, Bates 9979;

(b) March 22, 2005, (Wing Log notation entered between 1 and 5 am), **Exhibit 42**, Bates 9981;

(c) March 23, 2005, (Core Log notation entered between 2:15 and 6:00 am), **Exhibit 38**, Bates 9920;

(d) March 23, 2005, (Wing Log notation entered between 9:30 and 11 pm), **Exhibit 42**, Bates 9983;

(e) March 24, 2005, (Core Log notation entered at or about 2:15 am), **Exhibit 38**, Bates 9922;

(f) March 25, 2005, (Core Log notation entered at or about 1:15 am), **Exhibit 38**, Bates 9923;

(g) March 25, 2005, (Wing Log notation entered at 11:15 pm), **Exhibit 42**, Bates 9986;

(h) March 26, 2005, (Core Log notation entered at or about 1:15 am), **Exhibit 38**, Bates 9924;

(i) March 26, 2005, (Wing Log notation entered at 1:00 am), **Exhibit 42**, Bates 9987;

(j)  March 26, 2005, (Wing Log notation entered between 9 and 11 pm), **Exhibit 42**,
Bates 9988;

(k)  March 27, 2005, (Wing Log notation entered between 9:30  and 11:30 pm),
**Exhibit 42**, Bates 9990;

(l)  March 28, 2005, (Core Log notation entered between 1:15 and 5:15 am), **Exhibit
38**, Bates 9927;

(m) March 28, 2005, (Wing Log notation entered at 4:00 am), **Exhibit 42**, Bates 9989;

(n)  March 28, 2005, (Wing Log notation entered between 11:00 pm [3/27] and 5 am
[3/28]), **Exhibit 42**, Bates 9991;

(o)  March 28, 2005, (Wing Log notation entered between 9:30 and 11:30 pm),
**Exhibit 42**, Bates 9993;

(p)  March 29, 2005, (Wing Log notation entered between 1:00 and 5:00 am), **Exhibit
42**, Bates 9994;

(q)  March 31, 2005, (Wing Log notation entered at 4:00 am), **Exhibit 42**, Bates 9996;

7.  April 2005:

(a)  April 3, 2005, (Wing Log notation entered prior to and at 4:00 am), **Exhibit 42**,
Bates 9998;

(b)  April 4, 2005, (Core Log notation entered at or about 2:15 am) , **Exhibit 38**, Bates
9932;

(c)  April 5, 2005, (Core Log notation entered at or about 2:15 am) , **Exhibit 38**, Bates
9933;

(d)  April 5, 2005, (Wing Log notation entered commencing 2:00 am), **Exhibit 42**,
Bates 9999;

(e) April 6, 2005, (Wing Log notation entered at 3:00 am), **Exhibit 42**, Bates 10002;

(f) April 7, 2005, (Wing Log notation entered between 9:30 and 11:30 pm), **Exhibit 42**, Bates 10005;

(g) April 8, 2005, (Wing Log notation entered between 9:30 and 11:30 pm), **Exhibit 42**, Bates 10006;

(h) April 9, 2005, (Core Log notation entered between 1:15 and 5:15 am), **Exhibit 38**, Bates 9937;

(i) April 9, 2005, (Wing Log notation entered at 3:00-4:00 am) , **Exhibit 42**, Bates 10007;

(j) April 9, 2005, (Wing Log notation entered between 9:30 and 11:30 pm), **Exhibit 42**, Bates 10008;

(k) April 11, 2005, (Wing Log notation entered between 9:30 and 11:30 pm), **Exhibit 42**, Bates 10009;

(l) April 12, 2005, (Core Log notation entered at or about 2:15 am), **Exhibit 38**, Bates 9938;

(m) April 12, 2005, (Wing Log notation entered at 12:15 am), **Exhibit 42**, Bates 10010;

(n) April 13, 2005, (Core Log notation entered between 2:15 and 4:15 am), **Exhibit 38**, Bates 9940;

(o) April 13, 2005, (Core Log notation entered between 9:00 and 11:30 pm), **Exhibit 38**, Bates 9942;

(p) April 13, 2005, (Wing Log notation entered at 3:00 am and 4:00 am), **Exhibit 42**, Bates 10012;

(q) April 13, 2005, (Wing Log entry evening, times not entered), **Exhibit 42**, Bates 10013;

(r) April 14, 2005, (Wing Log notation entered 1:00 through 5:15 am) , **Exhibit 42**, Bates 10014;

(s) April 17, 2005, (Wing Log notation entered at 4:00 am), **Exhibit 42**, Bates 10017;

(t) April 17, 2005, (Wing Log notation entered between 9:30 and 11:30 pm), **Exhibit 42**, Bates 10018;

(u) April 18, 2005, (Wing Log notation entered between 1:15 and 5:15 am), **Exhibit 42**, Bates 10019;

(v) April 26, 2005, (Wing Log notation entered at 9:30 pm), **Exhibit 42**, Bates 10023.

8.    May 2005:

(a) May 2, 2005, (Wing Log notation entered at 9:30 pm), **Exhibit 42**, Bates 10025;

(b) May 6, 2005, (Wing Log notation entered between 9:30 and 10:30 pm), **Exhibit 42**, Bates 10027;

(c) May 7, 2005, (Core Log notation entered between 1:15 and 3:15 am), **Exhibit 38**, Bates 9957;

(d) May 7, 2005, (Wing Log notation entered between 9:30 and 11:30 pm), **Exhibit 42**, Bates 10029;

(e) May 8, 2005, (Wing Log notation entered between 11:15 pm [5/7] and 5:00 am [5/8]), **Exhibit 42**, Bates 10030;

(f) May 9, 2005, (Wing Log notation entered between 1:00 and 3:15 am), **Exhibit 42**, Bates 10031;

(g) May 11, 2005, (Core Log notation entered between 3:00 and 5:00 am), **Exhibit 38**, Bates 9958;

(h) May 11, 2005, (Wing Log notation entered between 9:30 and 11:30 pm), **Exhibit 42**, Bates 10032;

(i) May 12, 2005, (Wing Log notation entered between 9:30 and 11:30 pm), **Exhibit 42**, Bates 10033;

(j) May 13, 2005, (Core Log notation entered between 3:00 and 5:00 am), **Exhibit 38**, Bates 9960;

(k) May 13, 2005, (Wing Log notation entered at 4:00 am), **Exhibit 42**, Bates 10034;

(l) May 13, 2005, (Wing Log notation entered at or about 9:30 pm), **Exhibit 42**, Bates 10035;

(m) May 14, 2005, (Core Log notation entered between 3:00 and 5:00 am), **Exhibit 38**, Bates 9961;

(n) May 14, 2005, (Wing Log notation entered between 12:00 and 4:00 am), **Exhibit 42**, Bates 10036;

(o) May 18, 2005, (Wing Log notation entered between 1:00 and 4:00 am), **Exhibit 42**, Bates 10038;

(p) May 20, 2005, (Wing Log notation entered at or about 9:30 pm) , **Exhibit 42**, Bates 10041;

(q) May 21, 2005, (Core Log notation entered between 1:15 and 5:15 am), **Exhibit 38**, Bates 9963;

(r) May 21, 2005, (Wing Log notation entered between 3:15 and 5:15 am), **Exhibit 42**, Bates 10042;

(s) May 21, 2005, (Wing Log notation entered between 9:30 and 11:30 pm), **Exhibit 42**, Bates 10043;

(t) May 22, 2005, (Wing Log notation entered between 11:15 and 3:15 am), **Exhibit 42**, Bates 10044;

(u) May 22, 2005, (Wing Log notation entered at 10:30 pm), **Exhibit 42**, Bates 10045;

(v) May 23, 2005, (Core Log notation entered between 10:30 and 11:30 pm), **Exhibit 38**, Bates 9967;

(w) May 23, 2005, (Wing Log notation entered at 11:30 pm), **Exhibit 42**, Bates 10046;

(x) May 24, 2005, (Wing Log notation entered between 1:15 and 5:15 am), **Exhibit 42**, Bates 10047;

(y) May 25, 2005, (Wing Log notation entered at or about 1:15 am), **Exhibit 42**, Bates 10049;

(z) May 25, 2005, (Wing Log notation entered between 10:30 and 11:30 pm), **Exhibit 42**, Bates 10050;

(aa) May 26, 2005, (Core Log notation entered at or about 1:15 am), **Exhibit 38**, Bates 9969;

(bb) May 26, 2005, (Wing Log notation entered at 11:30 pm [5/25] and at 1:30 am [5/26]), **Exhibit 42**, Bates 10051;

(cc) May 26, 2005, (Wing Log notation entered at 9:30 pm), **Exhibit 42**, Bates 10053;

(dd) May 27, 2005, (Wing Log notation entered at 11:30 pm [5/26]), **Exhibit 42**, Bates 10054;

(ee) May 27, 2005, (Wing Log notation entered between 9:00 and 10:00 pm), **Exhibit 42**, Bates 10055;

(ff) May 29, 2005, (Wing Log notation entered between 11:15 pm [5/28] and 1:15 am), **Exhibit 42**, Bates 10056;

(gg) May 31, 2005, (Core Log notation entered between 3:15 and 5:15 am), **Exhibit 38**, Bates 9972.

9.     June 2005:

(a)  June 1, 2005, (Wing Log notation entered between 11:30 pm [5/31] and 1:30 am), **Exhibit 42**, Bates 10057;

(b)  June 2, 2005, (Wing Log notation entered between 11:15 pm [6/1] and 5:15 am [6/2]), **Exhibit 42**, Bates 10058;

(c)  June 3, 2005, (Wing Log notation entered at 4:30 and 5:30 am), **Exhibit 42**, Bates 10059;

(d)  June 5, 2005, (Wing Log notation entered at 1:15 and 3:15-5:15 am), **Exhibit 42**, Bates 10060;

(e)  June 7, 2005, (Core Log entry timing redacted by producing party) , **Exhibit 38**, Bates 9974;

(f)  June 7, 2005, (Wing Log notation entered between 1:30 and 3:15-5:15 am), **Exhibit 42**, Bates 10061;

(g)  June 8, 2005, (Wing Log notation entered between 9:00 and 11:00 pm), **Exhibit 42**, Bates 10062;

(h)  June 9, 2005, (Core Log notation entered between 1:15 and 5:15 am), **Exhibit 38**, Bates 9975;

(i)  June 9, 2005, (Wing Log notation entered between 11:15 pm [6/8] and 1:15 am [6/9]; 1:15 am and 5:15 am), **Exhibit 42**, Bates 10063;

(j) June 10, 2005, (Wing Log notation entered between 7:00 and 9:30 pm), **Exhibit 42**, Bates 10064;

(k) June 13, 2005, (Wing Log entry timing unknown, redacted by producing parties) , **Exhibit 42**, Bates 10065;

(l) June 15, 2005, (Wing Log notation entered between 9:00 and 11:30 pm), **Exhibit 42**, Bates 10067;

(m) June 16, 2005, (Wing Log notation entered between 3:15 and 6:15 am), **Exhibit 42**, Bates 10068.

10.    Valerie's Treatment Team physician felt that Valerie's medications during Spring 2005 were sedating and contributed to her falls. **Exhibit 7** at Bate 7744 (April 20, 2005 Case Conference).

11.    The Treatment Team was aware of the fact that Valerie had difficulty sleeping at night. **Exhibit 7** at Bate 7744 (April 20, 2005 Case Conference).

12.    The Treatment Team was aware of the fact that Valerie was often sedated in the morning. **Exhibit 11** Radiology Consult and Report of May 2, 2005 (seen for pain, finding degeneration of spine, report initialed by Dr. Milos); **Exhibit 38** Core Office Log Book for March 21 through June 14, 2005 documenting lack of sleep at Bates 9920, 9922, 9927, 9932, 9933, 9938, 9940, 9961, 9963, 9974, 9963, 9972, 9923, 9924, 9937, 9942, 9957, 9958, 9960 and 9975; **Exhibit 42** Wing Log Book for March 18 through June 23, 2005 documenting lack of sleep at Bates 1006, 9979, 9981, 9983, 9986, 9987, 9988, 9991, 9993, 9994, 9996, 9998, 9999, 10002, 10005, 10006, 10007, 10008, 10009, 10010, 10012, 10013, 10014, 10017, 10018, 10019, 10019, 10023, 10025, 10027, 10029, 10031, 10031, 10032, 10033, 10034, 10034, 10034, 10035, 10036, 10038, 10041, 10042, 10043, 10043, 10044, 10045, 10046, 10047, 10049, 10050, 10051, 10053,

10054, 10055, 10056, 10056, 10057, 10058, 10058, 10059, 10060, 10062, 10064, 10065, 10067, and 10068; **Exhibit 53** Progress Notes at Bates 8186 (Milos April 20, 2005 entry noting sedation in morning hours), **Exhibit 7** April 20, 2005 Case Conference, recording physician's opinion that "falls are contributed to medications which are sedating" and observing that "when Valerie does not sleep the night before, her unsteadiness is more pronounced." (Bates 0010); **Exhibit 33** Annual IPP April 13, 2005 at Bates 7630 under the heading "Sleep Habits" documenting bouts of insomnia, Valerie is up at night fairly often, contributing to the morning "grogginess that has been noted." (Defendants Milos and Ferdinand in attendance, see Bates 7681); **Exhibit 50** Nursing Notes March 16 through June 19, 2005 at Bates 8349 (March 22 Note documenting that Valerie "did not sleep for the entire night"), Bates 8347 (March 29 Note documenting that Valerie "did not sleep all night"); **Exhibit 51** Occupational Therapy Note of April 27, 2005 (stating that "Valerie arrived lethargic and was sliding forwards in the folding wheelchair."); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the logbooks at the nursing station every day when he comes to BDC). Sedation and lethargy were long-standing issues about which therefore defendants were aware of long before the conditions lead to Valerie's death, *e.g.* **Exhibit 31** Incident Report of June 24, 2003 (Valerie found in wheelchair unable to stand up, sliding on to the floor); **Exhibit 5** Case Conference July 14, 2004 (Valerie observed to be unsteady and not sleeping at night, altering medication); **Exhibit 22** Milos Deposition at 50-51, 130-1 (medication effects).

13.    Sedation was a long-standing issue about which defendants were aware since at least September 2004, <u>see</u> **Exhibit 10** Psychiatry Consultation September 17, 2004 (finding Valerie "appears increasingly sedated, sleeping most of the time").

14.    Defendants were aware that Valerie was primarily confined to her wheelchair or otherwise sedentary and failed to have her walked regularly by direct care staff. **Exhibit 7** Case

Conference of April 20, 2005 (Valerie to <u>continue</u> use of wheelchair for <u>all mobility</u> purposes);

**Exhibit 40** Special Observation Log pages for June 19, 2005 from 3:00 pm through 9:30 pm

(Valerie sitting throughout that time until she died); **Exhibit 51** Occupational Therapy Note of

April 27, 2005 (Valerie was lethargic and sliding forwards in a folding wheelchair and a <u>new</u>

wheelchair was issued with a high padded back and calf support among other features); **Exhibit 9**

Physical Therapy Report May 2, 2005 indicating that Valerie is unable to walk without staff assis-

tance; **Exhibit 53** Progress Notes, March 14, 2005 – June 19, 2005 (no direction to walk Valerie,

no indication that she was walking independently); **Exhibit 53** at Bates 8188, Dr. Milos Progress

Note of May 28, 2005, finding "Venous insufficiency positional (<u>sitting in wheelchair</u>" (emphasis

added); **Exhibit 38** Core Office Log Book March 21 – June 16, 2005 (no indication that staff

were walking Valerie and especially at Bates 9947, direction that Valerie "is to remain in wheel-

chair at all times" as of April 20); **Exhibit 42**, Wing Log March 18 through June 23, 2005 (no

indication that staff were walking Valerie and especially at Bates 10020, direction that Valerie "is

to be in wheelchair at all times" as of April 20); **Exhibit 50** Nursing Notes March 16 – June 19,

2005 (no documentation of staff walking Valerie and noting she was using a wheelchair, Bates

8345 May 16, 2005 entry); **Exhibit 22** Milos Deposition at pg. 122 (Dr. Milos reviews the log-

books at the nursing station every day when he comes to BDC); **Exhibit 1** February 3, 2005

Adaptive Equipment Work Request, apparently for repair of wheelchair; **Exhibit 2** April 27, 2005

Emergency Adaptive Equipment Work Request for issuance of the new wheelchair (<u>see</u> **Exhibit**

**51** Occupational Therapy Note); **Exhibit 32** Annual IPP of April 21, 2004 (Bates 8042) noting

that Valerie is now utilizing a wheelchair for transport until further notice (Bates 8047); **Exhibit**

**33** Annual IPP of April 13, 2005 (7681) noting that Valerie is to use a wheelchair when she is un-

steady (7629), for mobility and transportation (7633); **Exhibit 28** Viola Young Deposition at pp.

54:20, 56:20, 58:8-17, 60:22-24, 62:12-15, 104:11-105:18 (Valerie in wheelchair and no order for staff to walk her regularly, recounting communication with defendant Milos); **Exhibit 26** Loretta Lee Deposition at 30:11-13 (Valerie in wheelchair sitting); **Exhibit 27** Sidney Young Deposition at 41:17-22, 49:10-12, 50:13-15 (Valerie just sitting).

15.    The defendants failure to establish and implement prophylactic measures to prevent DVT in sedentary and/or inactive residents of BDC, particular plaintiffs' decedent Valerie Young amounted to a complete failure to exercise professional judgment and supervision. See **Exhibit 12** (New York State Dep't of Health Death Transcript); **Exhibit 30** (Expert Opinion Letter, Richard Bindie, MD) **Exhibit 34** (October 24, 2005 N.Y. Commission on the Quality of Care Determination); **Exhibit 49** (Investigation, Commission on the Quality of Care); **Exhibit 37** (November 15, 2005 Letter, Commission on the Quality of Care to Mrs. Viola Young).

16.    Special Observation Logs of Valerie Young were subjected to spoliation in a manner consistent with willful destruction and/or grossly reckless loss of documents because the defendants have failed to provide any evidence of the chain of custody of the spoliated documents, notwithstanding the facts that the documents necessarily existed in July 2005 (**Exhibit 40** log pages with fax cover dated July 28, 2005 and **Exhibit 41** log page with fax transmittal confirmation dated July 28, 2005); that the logs were transferred to BDC administrative offices (see Donna Limiti Declaration filed as Document 28 at ¶6) and were in the custody of defendant Williamson (see **Exhibit 43** at Bates 1562, requiring that upon death all records and information be boxed and brought to the office of the Deputy Director for Operations); the numerous misrepresentations that all documents were produced to plaintiff, e.g. **Exhibit 22** Jovan Milos Deposition at page 157, **Exhibit 20** Kathleen Ferdinand Deposition at page 189, **Exhibit 19** Suresh Arya Deposition at pp. 75 and 80, **Exhibit 21**, Gloria Hayes Deposition at pages 163-167, Declaration of

Jose L. Velez, dated March 17, 2008 at ¶5 previously filed with this Court and docketed as

Document 17; all of which is consistent with a willful or grossly reckless destruction of docu-

ments.

 Dated:   September 8, 2008

**Catafago Law Firm, PC**
and **Jonathan Bauer, Esq**.
Empire State Building
350 Fifth Ave. Suite 4810
New York, NY 10118
212-239-9669
212-239-9688 (fax)
catafagolaw@verizon.net

By: Jonathan Bauer