1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5  ESTATE OF VALERIE YOUNG, by VIOLA
   YOUNG, as Administratrix of the
6  Estate of Valerie Young, and in her
   personal capacity, SIDNEY YOUNG,
7  and LORETTA YOUNG LEE,

8                                Plaintiffs,

9        -against-

10 STATE OF NEW YORK OFFICE OF MENTAL
   RETARDATION AND DEVELOPMENTAL
11 DISABILITIES, PETER USCHAKOW,
   personally and in his official
12 capacity, JAN WILLIAMSON, personally
   and in her official capacity, SURESH
13 ARYA, personally and in his
   individual capacity, KATHLEEN
14 FERDINAND, personally and in her
   official capacity, GLORIA HAYES,
15 personally and in her official
   capacity, DR. MILOS, personally and
16 in his official capacity;

17
                                 Defendants.
18 - - - - - - - - - - - - - - - - - - - -x

19           350 Fifth Avenue
             New York, New York
20
             March 27, 2008
21           10:25 A.M.

22

23

24

25

2

1
2        DEPOSITION of JOVAN MILOS, M.D., one
3    of the Defendants in the above-entitled
4    action, held at the above time and place,
5    taken before Gretchen A. Milton, a
6    Shorthand Reporter and Notary Public of
7    the State of New York, pursuant to the
8    Federal Rules of Civil Procedure, Notice
9    and stipulations between Counsel.
10
11
12            *     *     *
13
14
15    APPEARANCES:
16
         CATAFAGO LAW FIRM, P.C.
17            Attorneys for Plaintiffs
              350 Fifth Avenue
18            New York, New York 10118

19       BY:  JACQUES CATAFAGO, ESQ.

20

21       STATE OF NEW YORK
         OFFICE OF THE ATTORNEY GENERAL
22       ANDREW M. CUOMO
              Attorneys for Defendants
23            120 Broadway
              New York, New York 10271-0332
24
         BY:  JOSE L. VELEZ, ESQ.
25

```
                                    3

 1

 2     APPEARANCES:
       (Continued)
 3
           STATE OF NEW YORK
 4         OFFICE OF MENTAL RETARDATION AND
           DEVELOPMENTAL DISABILITIES
 5              Attorneys for Defendants
                75 Morton Street
 6              New York, New York 10014

 7     BY:  PATRICIA DELORY PAWLOWSKI, ESQ.

 8

 9

10
                   *     *     *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

18

```
1                JOVAN MILOS, M.D.
2     specialist different than those of medical
3     doctors?
4          A.   They are no different.
5          Q.   With regard to the BDC residents
6     under your care, those 55 to 70 residents,
7     are you familiar with a patient by the
8     name of Valerie Young?
9          A.   Yes, I am familiar.
10         Q.   When did you first see Valerie
11    Young?
12         A.   I think it was around
13    January 2002.
14         Q.   Is it correct that she was one of
15    the 55 to 70 residents at BDC under your
16    care as a medical specialist?
17         A.   Yes.
18         Q.   Was there anyone --
19              MR. CATAFAGO:  Withdrawn.
20         Q.   During the time that Valerie
21    Young was under your care, did you report
22    to anyone at BDC?
23         A.   I don't understand the question.
24         Q.   With regard to the medical
25    services and care you provided for Valerie
```

19

1        JOVAN MILOS, M.D.
2   Young, did you have someone you reported
3   to?
4       A.   Administration.
5       Q.   Who in the administration?
6       A.   I mean we did have a medical
7   director.  There was no medical specialist
8   on a higher position then me.  But the
9   report -- I mean -- I report -- I reported
10  to the deputy director and the director as
11  needed.
12      Q.   Is that Peter Uschakow and Suresh
13  Arya?
14      A.   Yes.
15      Q.   And how often would you report to
16  them with regard to the medical care that
17  you provided to Valerie Young?
18      A.   Only as needed.
19      Q.   Who makes the determination as to
20  whether it was needed, to report to your
21  superiors?
22      A.   Actually I didn't, I have no need
23  to report.
24      Q.   Is it correct that, from
25  January 2002 until her death in 2005, you

20

1              JOVAN MILOS, M.D.
2    never reported to any of your superiors
3    about your medical care of Valerie Young?
4         MR. VELEZ:  Objection.  That's
5      not his testimony.
6         You can answer.
7      Q.   You can answer the question.
8      A.   I would report to the team.
9      Q.   You would report to the team?
10     A.   Yes.
11     Q.   Who was the team?
12     A.   The team was the medical
13   specialist and other specialists that were
14   involved in the care of Valerie Young.
15     Q.   You testified that there were
16   other medical specialists at BDC at the
17   same time as you?
18     A.   Yes.
19     Q.   Did they also get involved in the
20   medical care of Valerie Young at the same
21   time you did?
22     A.   Yes.
23     Q.   What are their names, if you
24   know?
25     A.   Yes.  It was the psychiatrist.

50

1         JOVAN MILOS, M.D.
2     Q.   With regard to the third
3  recommendation, the potential side
4  effects, behavioral status, to be
5  monitored closely if medication changes
6  are made, what was your understanding as
7  to the potential side effects which are
8  being referenced there?
9     A.   I would say it was for the
10 complete medication regimen at the time.
11    Q.   You can't just say "the complete
12 medication regimen at the time." I need
13 to know what other medications she was
14 getting at that time.
15         What about the psychotropic
16 medications that are discussed on the
17 second page of Exhibit 1?
18    A.   It says:  Reduce Trilofam,
19 T-R-I-L-O-F-A-M, from 32 milligrams to 24
20 milligrams daily.
21    Q.   The side effects of Trilofam are
22 falling and steadiness and dizziness;
23 right?
24         MR. VELEZ:  Objection.
25    Q.   Is that correct, sir?

51

```
1              JOVAN MILOS, M.D.
2         MR. VELEZ:  Objection to the
3    form.  Is there any foundation for
4    that?
5         MR. CATAFAGO:  Yes.  I am asking
6    whether that's the case.
7    Q.   It says right there that
8    falling/unsteadiness can be a side effect.
9         Did you agree with that in this
10   document that you signed?
11   A.   Yes.
12   Q.   Were there side effects that you
13   are aware of -- just looking at the
14   document -- with regard to the medications
15   that are set forth here?  What about the
16   Ambien?
17   A.   I don't understand the question.
18   Q.   Is there anything else that you
19   were concerned about?
20   A.   At that moment, no.
21        MR. CATAFAGO:  This is
22   Plaintiff's Exhibit 2.  It's Bates
23   stamped Young7695 through 7701.
24        (The document entitled,
25   "Individual Progress Plan Review
```

122

1              JOVAN MILOS, M.D.
2    was weekend or... and I was not there on a
3    Sunday.
4         Q.   If you would look at the report
5    now marked as Exhibit 10, Bates No. CQC40,
6    you have the date of death as June 19,
7    2005, and the time as 9:32 p.m.
8         A.   Yes.
9         Q.   Did you learn about it that
10   evening or the next morning?
11        A.   The next morning.
12        Q.   Who specifically told you that
13   she had died?
14        A.   I don't know.  My routine is to
15   go first to my office, leave the things
16   that I brought with me, go to the nursing
17   station, go to the logbook, see what
18   happened last night.  And this is a very
19   significant event, so as soon as I
20   entered, I know what happened; that this
21   is what happened.  This has happened.
22             And who actually told me, with
23   whom I have that conversation, I don't
24   recall at this moment.
25        Q.   Did you speak to anyone about

126

```
 1              JOVAN MILOS, M.D.
 2      Q.   How big is that book in
 3   connection with Valerie Young?
 4      A.   It's mostly the dates for that
 5   last one, one and a half years.
 6      Q.   Is there one DVP book for each
 7   consumer?
 8      A.   Each consumer has a separate
 9   book.
10           MR. CATAFAGO:  I don't know if
11      that was produced.
12           MR. VELEZ:  He was referring to
13      the medical records, at least as I
14      understand it, when he testified
15      earlier today as to where progress
16      notes are kept, the medical records.
17      He said there was a DVP, and I don't
18      know what that stands for, but it
19      basically is where the records are
20      kept.
21           MR. CATAFAGO:  You have produced
22      that?
23           MR. PAWLOWSKI:  That's all this.
24      Q.   With regard to the documents that
25   you reviewed, did you make a list in order
```

130

```
1                JOVAN MILOS, M.D.
2        A.    That's the major ones.
3        Q.    What about the next medication
4   that was prescribed to the decedent as of
5   the time of her death?
6        A.    Klonopin is an anxiolytic to
7   release anxiety.  It's an antianxiety
8   medication.  Half milligram at bedtime.
9   It's pretty much a low dose.  It's also to
10  help with sleep.
11       Q.    What side effects, if any, are
12  you aware of in connection with that
13  medication?
14       A.    Sedation.
15       Q.    Anything else?
16       A.    A potential for low blood
17  pressure.
18       Q.    Is that all?
19       A.    There are others.
20       Q.    What else are you aware of?
21             MR. VELEZ:  If you know.
22       A.    Mostly concerning sedation.
23       Q.    Were you aware or concerned with
24  any other side effects with respect to
25  that medication --
```

131

1              JOVAN MILOS, M.D.
2        A.   That has the potential for
3   addiction.
4        Q.   Anything else?
5        A.   These are the main ones.
6        Q.   Anything else?
7        A.   No.
8        Q.   What about the next medication
9   that was prescribed to the decedent at the
10  time of her death, what's that?
11       A.   Remeron.
12       Q.   What is that prescribed for?
13       A.   It's an antidepressant.  But also
14  it has sedating qualities, and that's the
15  reason it was given at bedtime.  Also to
16  help with sleep.
17       Q.   What side effects were you aware
18  of and concerned in connection with that
19  medication?
20       A.   Sedation, low blood pressure...
21  those are the major ones.
22       Q.   Anything else?
23       A.   There are a number of others.
24       Q.   Can you identify them for the
25  record, the side effects you were aware

Case 1:07-cv-06241-LAK-DCF    Document 54-24    Filed 09/09/2008    Page 13 of 17

148

```
1                JOVAN MILOS, M.D.
2    evaluate for splinting.
3        Q.   What happened after you gave this
4    referral?
5        A.   Valerie Young was seen by the
6    physical therapy department.  They did the
7    evaluation and enclosed recommendations.
8        Q.   What were the recommendations?
9        A.   That Ms. Young be scheduled for
10   physical therapy two times per week, to
11   receive mat exercises, ambulation
12   exercise, range of motion exercises to
13   both upper and lower extremities.
14            Ms. Young will be scheduled to
15   see orthopedist on his next visit to BDC
16   for evaluation of left foot orthosis
17   follow-up.
18       Q.   About six weeks before she passed
19   away, as noted in the report, the physical
20   therapist scheduled Ms. Young for physical
21   therapy treatments twice a week?
22       A.   Yes.
23       Q.   Do you know if that occurred?
24       A.   There is no reason to believe it
25   did not occur.
```

149

1           JOVAN MILOS, M.D.
2      Q.   Do you know if it occurred?
3      A.   I was not physically present when
4  they did it.
5      Q.   Did anyone tell you that it was
6  done?
7      A.   I don't recall that.
8      Q.   Do you know who would have been
9  in charge of providing that physical
10 therapy treatment that you prescribed for
11 Valerie Young twice a week?
12     A.   Physical therapy.
13     Q.   Do you know the name of the
14 physical therapist, of that individual, or
15 those individuals, as of May 2, 2005 until
16 Ms. Young passed away on June 19, 2005?
17     A.   I do not know which physical
18 therapist was assigned to her.
19     Q.   Do you know if anyone was
20 assigned?
21     A.   Somebody was assigned.
22     Q.   But you don't know the person's
23 name?
24     A.   No.
25     Q.   When was the last time you saw

154

```
 1                JOVAN MILOS, M.D.
 2   not my job to go there --
 3        Q.   Did you speak to anyone about her
 4   need for physical therapy at any time
 5   after May 2, 2005?
 6        A.   I sent the request for physical
 7   therapy.  I sent the request for physical
 8   therapy on --
 9        Q.   Please listen to the question.
10        A.   -- on April 27, 2005.
11        Q.   My question is:  After May 2,
12   2005, when the report came in scheduling
13   her for physical therapy twice a week, did
14   you speak to anyone about her need for
15   physical therapy?
16        A.   I don't recall that.
17        Q.   Did you ever observe her
18   receiving physical therapy?
19        A.   Again, it's done in the physical
20   therapy department.  I don't go there.  I
21   go not often there.  Maybe a few times a
22   year.
23        Q.   Is the answer no?
24        A.   The answer is no.  I have no
25   reason to doubt --
```

155

1       JOVAN MILOS, M.D.
2    Q.   I'm not asking for what you have
3 reason to doubt.  I am asking for what you
4 observed and what you spoke about.
5       MR. CATAFAGO:  Let's have a
6    document dated July 26, 2005, Bates
7    stamped Young0111-Young0113, marked as
8    Exhibit 12.
9       (The document entitled,
10   "Mortality Review - Valerie Young,"
11   dated 7/26/05, Bates
12   No. Young0011-0113 was hereby marked
13   as Plaintiff's Exhibit 12 for
14   identification, as of this date.)
15   A.   I'm aware of this document.
16   Q.   Did you attend a mortality review
17 or meeting in which this document as
18 prepared?
19   A.   Yes.
20   Q.   Was it prepared at the meeting
21 or --
22   A.   Subsequent.
23   Q.   -- to the meeting?
24       Which one of you prepared the
25 actual document?

157

```
1              JOVAN MILOS, M.D.
2    at the meeting?
3         A.   Most likely.
4         Q.   Were notes taken by anyone?
5         A.   I don't know.
6         Q.   Was the meeting video-taped or
7    tape-recorded?
8         A.   No.
9         Q.   Did you take notes?
10        A.   No.
11             MR. CATAFAGO:  Counsel, with
12        respect to anybody who took notes at
13        this meeting who was present at the
14        meeting at their facility, is that all
15        part of production?
16             MR. VELEZ:  I will say again that
17        we have produced all documents related
18        to this case.
19             MR. CATAFAGO:  Off the record.
20             (Discussion held off the record.)
21        Q.   Did you believe, after you
22   learned that Valerie Young had passed
23   away, that physical therapy twice a week
24   was sufficient for her needs?
25        A.   Yes.
```