```
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ----------------------------------------X
      Estate of VALERIE YOUNG, by VIOLA YOUNG,
 4    as Administratrix of the Estate of
      Valerie Young, and in her personal
 5    capacity, SIDNEY YOUNG, and LORETTA
      YOUNG LEE,
 6                    Plaintiffs,
                                     Index No.:
 7         vs.                       07CV6241

 8    STATE OF NEW YORK OFFICE OF MENTAL
      RETARDATION AND DEVELOPMENTAL
 9    DISABILITIES, PETER USCHAKOW,
      personally and in his official
10    capacity, JAN WILLIAMSON, personally
      and in her official capacity, SURESH
11    ARYA, personally and in his official
      capacity, KATHLEEN FERDINAND,
12    personally and in her official
      capacity, GLORIA HAYES, personally and
13    in her official capacity, DR. MILOS,
      personally and in his official capacity,
14
                      Defendants.
15    ----------------------------------------X

16                    April 10, 2008
                      10:09 a.m.
17

18         Examination before trial of JAN

19    WILLIAMSON, held at the offices of The

20    Catafago Law Firm, P.C., 350 Fifth

21    Avenue, New York, New York, pursuant to

22    Notice, before Wendy D. Boskind, a

23    Registered Professional Reporter and

24    Notary Public of the State of New York.

25
```

```
 1
 2      A P P E A R A N C E S:
 3
 4      THE CATAFAGO LAW FIRM, P.C.
 5      Attorneys for Plaintiffs
 6           Empire State Building
 7           350 Fifth Avenue
 8           New York, New York 10118
 9      BY:  JACQUES CATAFAGO, ESQ.
10           JCatafago@catafagolaw.com
11
12      STATE OF NEW YORK
13      OFFICE OF THE ATTORNEY GENERAL
14      ANDREW M. CUOMO
15      Attorneys for Defendants
16           120 Broadway
17           New York, New York 10271-0332
18      BY:  JOSE L. VELEZ, ESQ.
19           Jose.Velez@oag.state.ny.us
20
21      ALSO PRESENT:
22           PATRICIA PAWLOWSKI, ESQ.
23           Counsel's Office
24           Office of Mental Retardation
25             and Developmental Disabilities
```

18

```
 1                  Williamson
 2   committee.
 3        Q.    And what is that, the
 4   forensics advisory committee?
 5        A.    We have a number of
 6   individuals who are remanded to our
 7   facilities through the court system, most
 8   of them 730.40's or 730.50's.
 9        Q.    Involuntary --
10        A.    Correct.  So my
11   responsibility would be to ensure that
12   orders of retention were renewed in a
13   timely fashion, that we were in
14   compliance with everything the courts
15   wanted, all that goes along with that
16   status.
17        Q.    And what is the risk
18   management committee?
19        A.    Those individuals who are
20   either 730.50 or 40, or present with
21   high-risk behaviors.  Before we will
22   endorse their ability to go out into the
23   community, on trips or home visits, we do
24   prepare a very extensive plan of
25   protective oversight which gets reviewed
```

19

1        Williamson
2   by the risk management committee, and I
3   am the chairperson of that committee.
4        Q.   Was that done, to your
5   knowledge, for Valerie Young?
6        A.   No.
7        Q.   And she wasn't involved in
8   any aspect of your work in the forensics
9   advisory committee, either.
10       A.   No.
11       Q.   Is that correct?
12       A.   Yes.
13       Q.   And what is the special
14  incident committee?
15       A.   There are categories of
16  incidents within OMRDD.  Two of them are
17  what's called "reportable" and "serious
18  reportable" incidents, which get
19  thoroughly investigated.  After the
20  investigation, the special incident
21  review committee will review them, its
22  content, findings, and its
23  recommendations, and we determine whether
24  or not we concur with the findings and
25  recommendations or if we feel that

```
 1                    Williamson
 2        Q.    And was there any indication
 3   that she appeared heavily sedated? That
 4   you saw.
 5        A.    Not that I recall.
 6        Q.    Did you personally observe
 7   her in a wheelchair ever?
 8        A.    I had seen her being
 9   transported in a wheelchair, yes.
10        Q.    What about sitting in a
11   wheelchair and not being transported?
12        A.    No, I don't remember.
13        Q.    Was it your understanding,
14   based on your discussion with treatment
15   team leader Kathy Ferdinand, that the
16   wheelchair was to be used only for
17   transportation purposes?
18        A.    Our discussion was she needed
19   it for transport for her safety.
20   That -- yeah, I mean, it was for that
21   purpose.
22        Q.    Did anyone ever tell you that
23   the wheelchair would be used for shower
24   purposes --
25        A.    No.
```

52

```
 1                      Williamson
 2    involved in the treatment of Valerie?
 3         A.    It's possible he was the
 4    psychiatrist at the time --
 5         Q.    Yes.
 6         A.    -- but not her primary care
 7    physician.
 8         Q.    Right, but the others were
 9    not.
10         A.    And Dr. Capati may have seen
11    her, if she was taking seizure
12    medication.
13         Q.    Were you ever advised, as
14    acting national deputy director of
15    operations, as to the medications that
16    were prescribed to Valerie?
17         A.    No.
18               (Deposition Exhibit
19          Plaintiffs' Williamson 2, policy on
20          reporting deaths that was in effect
21          at the time of Valerie's death,
22          Bates stamped D 1562 and 1563,
23          marked for identification, as of
24          this date.)
25         Q.    Let me show you what's been
```

```
 1                    Williamson
 2      marked as Williamson Exhibit 2, Bates
 3      stamped D 1562 and 1563.  And I'm going
 4      to ask you to review this document, and
 5      tell me if you know what it is.
 6           A.   (Pause.)
 7                Yes, I am familiar with this.
 8           Q.   What is it?
 9           A.   It's the policy on reporting
10      deaths.
11           Q.   This was in effect at the
12      time of Valerie's death?
13           A.   Correct.
14                (Pause in proceedings.)
15           Q.   I just want to go back for a
16      second to Exhibit 10, Williamson Exhibit
17      10.
18                Take a look at the second
19      page, CQC 31.  And in this mortality
20      review report, it says, and I quote --
21                MR. VELEZ:  The third page;
22           right?
23                MR. CATAFAGO:  Yes, it's the
24           third page, CQC 31.
25           Q.   -- "It was discussed that
```