UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
ESTATE OF VALERIE YOUNG, et. al.,

                Plaintiffs,


         -against-                                             07 Civ. 6241 (LAK)


STATE OF NEW YORK OFFICE OF MENTAL
RETARDATION AND DEVELOPMENTAL
DISABILITIES, et al.,

                Defendants.
------------------------------------x


### MEMORANDUM OPINION


Appearances:

        Jonathan Bauer
        THE CATAFAGO LAW FIRM
        *Attorney for Plaintiffs*


        Jose L. Velez
        Assistant Attorney General
        ANDREW M. CUOMO
        ATTORNEY GENERAL OF THE STATE OF NEW YORK
        *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

At the time of her demise, Valerie Young was a mentally retarded 49 year-old woman who was in defendants' custody and care. Plaintiffs, Viola Young, individually and in her capacity as administrator of Valerie's estate, and Valerie's two siblings, seek damages for Valerie's alleged mistreatment and untimely death. They assert violations of her substantive due process rights, as well as violations of the Americans with Disabilities Act ("ADA")[1] and the Rehabilitation Act of 1973 ("Rehabilitation Act").[2] The matter now is before the Court on defendants' motion for summary judgment dismissing the complaint.[3]

*Facts*

*Valerie Young*

Valerie Young resided at the Brooklyn Developmental Center ("BDC"), a residential treatment facility operated by the New York Office of Mental Retardation and Developmental Disabilities ("OMRDD"), from 1990 until her death on June 19, 2005. She suffered from severe mental retardation and other maladies. These included (1) a seizure disorder that was controlled with medication, (2) a neurological condition that affected her gait and caused her left foot to drop, and (3) bilateral edema of her feet. Despite these conditions, however, Young's health was generally stable. Her mental condition improved and deteriorated over time, prompting her treatment team to

---

[1] 42 U.S.C. § 12101 *et seq.*

[2] 29 U.S.C. § 794(a).

[3] Defendants have not addressed the issue whether the complaint, insofar as it is brought by plaintiffs in their individual capacities, states a claim upon which relief may be granted. The Court therefore expresses no opinion on that question.

2

try different medications.[4]

*The Defendants*

OMRDD is the New York State agency charged with providing services to persons with mental retardation and developmental disabilities. It provides services through thirteen developmental disabilities services offices ("DDSOs"). The BDC is the DDSO for Kings County, New York. The BDC is not a hospital, but its staff includes psychiatrists, psychologists, physicians, nurses, dentists, social workers, and physical and occupational therapists.[5]

Peter Ushakow was director of the BDC from 2000 until his retirement in 2008 and was responsible for overseeing its daily operations. Jan Williamson, deputy director of operations at the BDC since 2004, supervises its residential units. Suresh Ayra is a former deputy director of the BDC who left in 2004 whose duties included overseeing the business office, discipline coordinators, residential services, housekeeping, maintenance and the power plant.[6]

Defendants Ferdinand, Hayes, and Milos all were part of Young's interdisciplinary treatment team ("ITT"). Every resident of a BDC unit has an ITT, comprised of a psychiatrist and/or psychologist, medical providers, social worker and other staff who provide direct care, recreation,

---

[4] Plaintiffs' Response to Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1 St.") ¶¶ 74-75.

[5] Pl. 56.1 St. ¶¶ 9-10, 14, 16.

[6] *See* Pl. 56.1 St. ¶¶ 3, 4, 5, 36-45.

3

speech, physical therapy and occupational therapy.[7] Ferdinand was Young's treatment team leader beginning in May 2001, Hayes was Young's residential unit supervisor beginning in 2003, and Dr. Milos was Young's treating physician starting in January 2002. All three defendants continued in their respective roles until Young's death.[8]

*The Parties' Contentions*

On June 19, 2005, at approximately 8:30 p.m., Young collapsed in the shower and was taken to the hospital where she died later that night. The autopsy report attributed her death to a pulmonary embolism in consequence of deep vein thrombosis ("DVT") of the lower extremities due at least in part to inactivity.[9] Plaintiffs allege that Young was denied necessary health care and treatment by defendants, which caused her pain and suffering and ultimately led to her death.[10]

The core of the complaint is the contention that Young, during the last months of her life, largely was confined to a wheelchair or otherwise kept immobile as a result of sedative medication and untreated and/or inadequately treated conditions.[11] Plaintiffs assert that defendants

---

[7] The ITT prepares an Individualized Program Plan for each consumer which contains annual assessments of the various clinical disciplines. The assessments are used to develop a program to address the consumer's needs. A consumer's guardian and/or family is invited to participate in the IPP meetings. Each consumer has also a Developmental Plan that contains all of the consumer's treatment and care records in one comprehensive binder. Def. 56.1 St. ¶¶ 29,30 32.

[8] Pl. 56.1 St. ¶¶ 53, 62, 70.

[9] Pl. Ex. 4 at 1.

[10] Cpt. ¶¶ 26-27

[11] PTO at 2.

4

knew or should have known that inactivity can cause DVT and, in turn, pulmonary emboli and that they caused Young's death by allowing her to remain sedentary without regular standing and walking.. In plaintiffs' view, Young died because defendants failed to take prophylactic measures meeting minimum professional standards and defendants thus violated Young's substantive due process rights.[12]

Defendants argue that the oversight, monitoring, evaluation, and treatment of Young by BDC staff conformed to the accepted standard of care.[13] They deny that inactivity is a risk factor for DVT and assert that Young's care providers could not reasonably have anticipated that she would develop DVT and a fatal pulmonary embolism because she had none of the currently accepted risk factors or symptoms recognized as increasing the likelihood of DVT. Defendants deny also that Young was sedentary or kept immobile and contend that Young received physical therapy, ambulated with assistance, and appeared wholly asymptomatic in the three weeks prior to her death.[14]

*Prior Proceedings – Plaintiffs' Motion for Sanctions*

In November 2004, Young's ITT placed her on fifteen minute checks that required staff to watch her closely because she had suffered an unexplained injury.[15] BDC staff were required to make entries reflecting these checks in special observation logs. Plaintiffs quite understandably

---

[12] *Id.* at 2.

[13] *Id.* at 3.

[14] Def. Br. at 8-9; PTO at 3.

[15] Def. 56.1 St. ¶ 76; PX 6; PX 45.

5

sought discovery of those logs in this action but, with the exception of four pages from the logs, they were not produced.[16]

On May 14, 2008, plaintiffs moved for sanctions for the alleged spoliation of the logs.[17] On March 31, 2009, this Court found, *inter alia,* that defendants failed in their duty to preserve the logs, that this failure was at least negligent, and that the logs contained information relevant to plaintiffs' substantive due process claim.[18] Accordingly, the Court granted plaintiffs' motion for sanctions to the extent that (1) the Court could draw an adverse inference against defendants on any merits-based dispositive motions that defendants might make before or during trial, and (2) the jury, should the case reach that stage, would be permitted to hear evidence regarding the missing evidence and be given an adverse inference instruction.[19]

*Discussion*

I.      *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue of material fact and the

---

[16] *See* Report and Recommendation ("R&R") of Magistrate Judge Debra Freeman dated March 17, 2009, at 4 (DI 58). As Judge Freeman noted, the 24-hour observation of a patient, with notes made very 15 minutes for the roughly six months that Young was under such observation, should generate over 1000 pages of logbook entries. *Id.*

[17] DI 20.

[18] DI 61. The factual findings and reasoning underpinning the Court's decision are set forth in Judge Freeman's R&R. Defendants did not object to the R&R.

[19] DI 61.

6

moving party is entitled to judgment as a matter of law.[20] In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.[21] For the non-moving party to defeat summary judgment, all that is required "'is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial.'"[22]

II.   *ADA and Rehabilitation Act Claims*

Plaintiffs' second and third claims for relief allege that the defendants' acts and omissions in the treatment of Valerie Young violated the ADA and the Rehabilitation Act. Defendants move for summary judgment dismissing both claims on several grounds.[23]

Plaintiffs have failed to address defendants' arguments or even to mention either claim. They thus have abandoned their ADA and Rehabilitation Act claims.[24] Accordingly,

---

[20] *E.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir.2000); *see also* FED. R. CIV. P. 56(c).

[21] *See Anderson*, 477 U.S. at 255.

[22] *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 248-49).

[23] *See* Def. Br. at 19-20.

[24] *See, e.g.., Bellegar de Dussuau v. Blockbuster, Inc.*, No. 03 Civ.6614(WHP), 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006) (claim abandoned by plaintiff's failure to address it in opposition to defendant's summary judgment motion) (citing *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998)); *DeVito v. Barrant*, No. 03-CV-1927 (DLI), 2005 WL 2033722, at *10 (E.D.N.Y. Aug. 23, 2005); *Taylor v. City of New York*, 269 F. Supp.2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); *National Communications Ass'n, Inc. v. American Tel. & Tel. Co.*, 92 Civ. 1735 (LAP), 1998 WL 118174, at *28 (S.D.N.Y. Mar.

7

defendants are entitled to summary judgment dismissing the second and third causes of action.

III.     *Claims Against Defendant Ayra*

Plaintiffs concede that defendant Suresh Arya left BDC prior to the alleged conduct at issue here and do not oppose defendants' motion to the extent that it seeks Ayra's dismissal from this action.[25]  Accordingly, all claims against Ayra are dismissed.

IV.     *Due Process Claim*

   A.     *Eleventh Amendment*

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ."[26]  Furthermore, "[a] state's Eleventh Amendment protection from suit extends to its agencies and departments,"[27] and it applies to suits

---

16, 1998) (where plaintiff did not address claim in response to defendant's summary judgment motion, claim deemed "abandoned" and defendant granted summary judgment); *Anti-Monopoly, Inc., v. Hasbro, Inc.*, 958 F.Supp. 895, 907 & n. 11 (S.D.N.Y.) ("failure to provide argument on a point at issue constitutes abandonment of the issue"), *aff'd*, 130 F.3d 1101 (2d Cir.1997); *cert. denied, Anti-Monopoly, Inc. v. Hasbro, Inc.,* 525 U.S. 813.  *See also* S.D.N.Y. CIV. R. 7.1 ("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to the motion . . . . Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default.").

[25] Pl. Br. at 18.

[26] U.S. Const. amend. XI.

[27] *Morningside Supermarket Corp. v. New York State Dep't of Health*, 432 F. Supp. 2d 334, 338 (S.D.N.Y. 2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, (1984)).

8

against State officials in their official capacities.[28] Accordingly, defendants are entitled to dismissal of all claims against the OMRDD, which is a State agency,[29] and of the claims against the individual BDC defendants in their official capacities.

### B.     Claim Against Individual Defendants in their Personal Capacities

What remains is plaintiffs' substantive due process claim against the remaining individual defendants in their individual capacities. Defendants argue that this claim too must be dismissed because (1) plaintiffs have failed to raise a genuine issue of material fact, (2) the defendants in any case are entitled to qualified immunity, and (3) defendants Uschakow and Williamson were not personally involved in Young's care and treatment.

#### 1.     The Substantive Due Process Standard

The substantive component of the Due Process Clause bars "certain government actions regardless of the fairness of the procedures used to implement them."[30] To prevail on their substantive due process claims, plaintiffs must show that defendants' actions were "'arbitrary, conscience-shocking, or oppressive in a constitutional sense,' and not merely 'incorrect or

---

[28] *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801 (SAS), 2009 WL 1835939, at *4 (S.D.N.Y. June 26, 2009) (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

[29] *See Komlosi v. New York State Office of Mental Retardation & Development,* 64 F.3d 810, 814-15 (2d Cir. 1995) ("For Eleventh Amendment purposes, OMRDD is to be considered an arm of New York State" and thus "it cannot be sued under § 1983.")

[30] *Daniels v. Williams*, 474 U.S. 327, 331(1986).

9

ill-advised.'"[31] In the context of a state's affirmative duties to individuals in its custody or care, officials may be liable under Section 1983 only if their "omissions were a substantial factor leading to the denial of a constitutionally protected liberty or property interest, and the officials displayed a mental state of deliberate indifference with respect to those rights."[32]

A further note is appropriate in light of the fact that defendant Milos is a physician. "A doctor will not be held liable under Section 1983 for treatment decisions unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.'"[33] This standard requires more than simple negligence by the doctor, but less than deliberate indifference.[34] It is not violated if experts merely disagree with care or treatment decisions that actually were made or think that another course of conduct would have been better.[35] Indeed, the issue is not whether the optimal course of treatment was followed, but whether "'professional judgment in fact was exercised.'"[36]

---

[31] *Catanzaro v. Weiden*, 188 F.3d 56, 64 (2d Cir. 1999) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)).

[32] *P.C. v. McLaughlin*, 913 F.2d 1033, 1044 (2d Cir. 1990) (citing *Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134, 141 (2d Cir. 1981).

[33] *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982).

[34] *Id*. (citing *Estate of Porter by Nelson v. Illinois*, 36 F.3d 684, 688 (7th Cir. 1994); *Shaw by Strain v. Stackhouse*, 920 F.2d 1135, 1144-47 (3d Cir. 1990).

[35] *Youngberg*, 457 U.S. at 321.

[36] *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 902 F.2d 1085, 1089 (2d Cir. 1990) (quoting *Youngberg*, 457 U.S. at 321).

  *2.*  *Disputed Issues of Material Fact*

  Defendants' protestations to the contrary notwithstanding, there remain disputed issues of fact material to plaintiffs' substantive due process claim.

  First, while it is undisputed that Young suffered from drop foot in her left foot and that she had an unstable gait and difficulty walking prior to her death,[37] the parties hotly contest whether Young was kept essentially immobilized in the months and weeks prior to her death.[38] Certainly there is evidence supporting defendants' contention that Young was ambulatory, used a wheelchair merely for transport, and was not kept sedentary.[39]  However, as the Court already observed in addressing the sanctions motion, there is evidence also suggesting that Young may have been kept immobile in that time period.[40]  For instance, the autopsy report concluded that inactivity contributed to Young's death,[41] and the special observation log entries for the date of her death suggest that she sat in her wheelchair continuously from 3:00 p.m. until 8:00 p.m.[42]  Young's mother testified that BDC staff did not regularly walk Young because she was unsteady on her feet,[43] and a log entry from April

---

[37]  *E.g.*, Def. 56.1 St. ¶¶ 79, 82, 85-87.  During the first few months of 2005, for example, Young fell frequently and around April, 2005 she was issued a helmet to protect her head in the case of falls.

[38]  *Compare* Def. Br. at 8-9 *with* Pl. Br. at 12-15.

[39]  *E.g.*, Def. 56.1 St. ¶ 89, 90, 94.

[40]  *See* R&R at 13-14.

[41]  Pl. Ex. 4 at 1.

[42]  Pl. Ex. 40 at 1.

[43]  Pl. Ex. 28 at 56:17-25.

11

20, 2005 stated that Young was "to remain in a wheelchair at all times."[44]  Indeed, the BDC's own mortality review commission discussed the fact that "staff who monitored [Young] may not have encouraged her to walk around because of fear of her falling."[45]  Furthermore, there is at least some evidence supporting plaintiffs' contention that Young's medication kept her sedated and contributed to her alleged sedentariness.[46]

The New York State Commission on the Quality of Care and Advocacy for Persons with Disabilities (the "Commission") also conducted an investigation into Young's death. It found that Young "[d]ied of a PE [pulmonary embolism] from DVT from inactivity" and that the "facility did not adequately address the implications."[47]  In a post-investigation letter sent to director Uschakow, the Commission's investigator noted his suspicion that Young "may have spent extended periods of time in her wheelchair."[48]  The Commission's report noted also that there was evidence that Young, contrary to defendants' claim, may have been using a wheelchair prior to April 2005.[49]

The foregoing evidence would be more than sufficient to demonstrate the existence of genuine issues of material fact without resorting to the spoliation of the observation logs.  That

---

[44] Def. Ex. 38, Bates 9947.

[45] Pl. Ex. 48.  The mortality review commission consisted of the BDC's quality assurance coordinator, six physicians, three psychiatrists, a neurologist and the deputy director of operations.  Def. 56.1 St. ¶ 98.

[46] *E.g.*, Def. 56.1 St. ¶ 79.

[47] *Id*. at 1.

[48] Pl. Ex. 34 at 1.

[49] Pl. Ex. 49 at 3.

spoliation, however, reinforces the conclusion because plaintiffs are entitled to an inference that Young was sedentary in the period leading up to her death.

Defendants attempt to sidestep this factual dispute by asserting that it is immaterial. Specifically, they argue that plaintiffs' claim still would fail even if Young had been kept immobile because plaintiffs "cannot overcome the medical fact that DVT can occur without warning."[50] But the argument is not persuasive.

Defendants' contention that Young's alleged inactivity is immaterial rests on their broader argument, supported by their expert Diane Sixsmith, that inactivity is not a risk factor for DVT and that Young had neither any of the accepted risk factors for DVT nor symptoms recognized as increasing the likelihood of a DVT diagnosis.[51] But they overlook the fact that the question whether inactivity is a risk factor for DVT is itself a disputed issue in this case. Plaintiffs' expert contradicts Sixsmith and contends that inactivity is a risk factor for DVT.[52] Moreover, Sixsmith's ultimate conclusion that Young was not at risk for DVT in consequence of inactivity itself is based at least in part on defendants' version of the disputed issue of whether Young was sedentary.[53]

---

[50] Endorsed Letter, March 29, 2009 at 2 (DI 60)

[51] *E.g.,* Def. Br. at 11-12; Decl. of Dr. Diane M. Sixsmith ("Sixsmith Decl.") Ex. A at 2. According to Sixsmith, the currently accepted risk factors are "active cancer, recently bedridden for major surgery, unilateral calf tenderness, collateral superficial veins". *Id.*

[52] Pl. Ex. 30 at 2 ("Bindie Opinion Letter")

[53] *E.g.*, Sixsmith Decl. Ex. A at 2 ("[t]he fact that she [Young] continued to receive physical therapy, continued to ambulate with assistance at her facility, and appeared to remain completely asymptomatic for the next three weeks until her death would have reinforced the impression that she was not at risk for any serious condition"); Ex. C at 2 (conclusion based in part on the assertion that "while Ms. Young might spent increasing time in a wheelchair for certain of her mobility needs, she continued to be ambulated and go to physical therapy").

13

Further, the autopsy report's conclusion that Young's death was at least in part the result of DVT caused by inactivity on its face suggests at least a potential causal connection between inactivity and DVT.[54] Indeed, the BDC's own mortality review commission on Young's death "discussed possible preventive measures for consumers who are at a high risk for DVT's (i.e., smokers, *sedentary, non ambulatory*)."[55]

Finally, defendants rely on plaintiffs' expert, Dr. Bindie, who stated that "DVT is frequently asymptomatic or the symptoms are not classical" and that the "first sign of DVT can be pulmonary emboli or death."[56] They argue on this basis that plaintiffs essentially have conceded that defendants could not reasonably have anticipated that Young would develop DVT and a fatal pulmonary embolism. But this argument too is insufficient to defeat the motion.

As an initial matter, defendants quote Dr. Bindie out of context, eliding the next

---

[54] Pl. Ex. 4 at 1.

Various reputable and readily available medical information sources list inactivity, such as prolonged periods of sitting, as a risk factor for DVT. *See e.g.*, Deep Vein Thrombosis (DVT), *available at* http://mayoclinic.com/health/deep-vein-thrombosis/DS01005/DSECTION=risk-factors (last visited August 11, 2009).

*See generally McAuley v. Fed. Ins. Co.*, No. 05 Civ. 1826 (AGF), 2009 U.S. Dist. LEXIS 52899, at *50-52 (E.D. Mo. 2009) (citing to *Blotteaux v. Qantas Airways, Ltd.*, 171 Fed. Appx. 566, 568-69 (9th Cir. 2006) (discussing risk of DVT from prolonged sitting on airplanes), *Adams v. Astrue,* No. 07 Civ. 1041 (MLM), 2008 U.S. Dist. LEXIS 56351, at *15-16 (E.D. Mo. July 24, 2008) (discussing "obesity and the sedentary nature of plaintiff's job" as "probably risk factors for his DVT").

[55] Pl. Ex. 48 at 3 (emphasis added).

[56] Pl. Ex. 30 at 2.

sentence in his report in which he concluded that "[a] high index of suspicion is necessary."[57] When read as a whole, it is obvious that Dr. Bindie's point is that a high degree of caution is necessary to prevent DVT precisely because it can be asymptomatic. Together with plaintiffs' core contentions that inactivity is a risk factor for DVT and that a trier of fact would be entitled to conclude that Young was kept inactive for months and weeks before her death, Dr. Bindie's opinion supports rather than undermines plaintiffs' claim.

In sum, there are material disputed factual issues as to whether sedentariness or inactivity are risk factors for DVT and whether Young in fact was maintained in a sedentary state. These disputed issues go to the heart of plaintiffs' claim that the treatment and care Young received fell below professionally accepted minimum standards and shocked the conscience.

### 3. Qualified Immunity

There nevertheless remains the question of whether, as defendants assert, any of the individual defendants on her treatment team is entitled to qualified immunity at this stage of the proceedings.

"Government officials performing discretionary functions are entitled to qualified immunity 'from federal constitutional claims . . . as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'"[58] A defendant is entitled to qualified immunity if either (1) the defendant's actions did not violate clearly established law or (2)

---

[57] *Id.*

[58] *5 Borough Pawn, LLC. v. City of New York*, No. 08 Civ. 3837 (CM), 2009 U.S. Dist. LEXIS 54069, at *27 (S.D.N.Y. June 22, 2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034 (1987)).

15

it was objectively reasonable for the defendant to believe that his actions did not do so.[59]

Defendants assert that defendants Milos, Ferdinand and Hayes are entitled to dismissal on the ground of qualified immunity because their treatment and care of Young was objectively reasonable and that there is "no evidence" that they "were deliberately indifferent to Ms. Young's care and, therefore, no violation of her constitutional rights."[60] But the facts about defendants' conduct remain in sharp dispute. Indeed, defendants do not argue that they would be entitled to qualified immunity *even if* they treated and cared for Young as plaintiffs allege they did. On the contrary, defendants' argument for qualified immunity is predicated on the disputed factual assertions that (1) Young was not kept sedentary, (2) even if she was, sedentariness is not a risk factor for DVT, and (3) "[a]t a minimum, Young received proper treatment and care for her particular medical and mental health conditions."[61]

Thus, while the Court is cognizant of the important role qualified immunity plays as

---

[59]

*Moore v. Andreno*, 505 F.3d 203, 208 (2d Cir. 2007) (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

*See Norton v. Town of Islip*, No. 04 Civ. 3079 (NGG), 2009 U.S. Dist. LEXIS 27565, at *68-71 (summarizing the two step process for assessing qualified immunity elucidated in *Saucier* and the changes wrought to that process by *Pearson v. Callahan*, 129 S.Ct. 808, 815-816 (2009). In *Pearson*, the Supreme Court modified *Saucier* and held that courts may begin their inquiry by asking whether a constitutional violation is established by plaintiff's pleading, or simply whether the right in question was clearly established at the time the violation occurred. *Id.* at *69

[60]

Reply Br. at 14.

Defendants do not argue that the right alleged by plaintiffs was not clearly established, either generally or at a sufficiently particularized level, at the relevant time.

[61]

Df. Br. at 20.

16

a shield not just against ultimate liability, but against lawsuits and their attendant costs,[62] resolving the issue at this stage, when the facts are not clear, would be inappropriate.[63]

    *4.    Supervisory Liability and Lack of Personal Involvement*

Finally, defendants Uschakow and Williamson argue that the substantive due process claims against them must be dismissed because they were not personally involved in Young's treatment or care.[64]

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite" to a damages award under Section 1983.[65] Until recently, the Second Circuit rule was

---

[62] *E.g.*, *Saucier v. Katz*, 533 U.S. at 200.

[63] *Accord*, *Norton*, 2009 U.S. Dist. LEXIS 27565, at *70 ("'While immunity ordinarily should be decided by the court," such questions are only ripe for judgment "where there is no dispute as to the material historical facts.") (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 1991) (*per curiam)* and *Kerman v. City of New York*, 374 F.3d 93, 108-09 (2d Cir. 2004)); *Poe v. Leonard*, 282 F.3d 123, 134 (2d Cir. 2002) ("The qualified immunity analysis depends upon an individualized determination of the misconduct alleged."). *See generally Ford v. McGinnis*, 352 F.3d 582, 598 (2d Cir. 2003) (citing *Stuto v. Fleishman,* 164 F.3d 820, 825 (2d Cir. 1999)) (courts should first determine whether a constitutional violation occurred before deciding whether qualified immunity exists)); *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 793-794 (2d Cir. 2002) (ruling on the availability of a qualified immunity defense premature because the qualified immunity issue "in this case turns on factual questions that cannot be resolved at this stage of the proceedings"); *Abrahams v. Inc. Village of Hempstead*, No. 08 Civ. 02584 (SJF), 2009 U.S. Dist. LEXIS 46725, *19-21 (S.D.N.Y. June 2, 2009) (qualified immunity premature because of disputed facts on summary judgment); *Toth ex rel. Toth v. Board of Educ., Queens Dist*. 25, No. 07 Civ. 3239, 2008 WL 4527833, at *7 (E.D.N.Y. Sept. 30, 2008) (stating that "[b]ecause [the defense of qualified immunity] 'necessarily involves a fact-specific inquiry, [i]t is generally premature to address the defense of qualified immunity in a motion to dismiss . . .'") (quoting *Bernstein v. City of New York*, No. 06 Civ. 895, 2007 WL 1573910, at *9 (S.D.N.Y. May 24, 2007)).

[64] Defendants sought dismissal of Arya on the same grounds. The Court need not address in light Arya's dismissal from the action on other grounds. *See supra* at 7.

[65] *Bellamy* 2009 WL, at *4 (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

17

that a supervisory official was "personally involved" only when that official:

> "(1) participate[d] directly in the alleged constitutional violation; (2) fail[ed] to remedy the violation after being informed of the violation through a report or appeal; (3) create[d] or allow[ed] the continuation of a policy or custom under which unconstitutional practices occurred; (4) act[ed] with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibit[ed] deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring."[66]

This Term, however, the Supreme Court in *Ashcroft v. Iqbal* held that "[b]ecause vicarious liability is inapplicable to . . . [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution,"[67] and it explicitly rejected the argument that "'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.'"[68] Accordingly, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."[69]

Precisely what remains of the Second Circuit rule in light of *Iqbal* is not entirely clear. While the Circuit has not yet addressed the question, one of my colleagues has concluded that:

> "[o]nly the first and part of the third *Colon* categories pass *Iqbal*'s muster -- a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated -- situations where the supervisor

---

[66] *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995).

[67] *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009).

[68] *Bellamy* 2009 WL 1835939, at *4 (quoting *Iqbal*, 129 S.Ct. at 1949).

[69] *Iqbal*, 129 S.Ct. at 1949.

18

knew of and acquiesced to a constitutional violation committed by a subordinate."[70]

Plaintiffs do not contend that Uschakow and Williamson were directly involved in any of the treatment or care at issue. Rather, they assert that they are liable because they failed to failed, either before or after Ms. Young's death, to adopt a policy to prevent DVT.[71]

As an initial matter, it is difficult to see how either Uschakow or Williamson could be held liable on the theory that he failed, after Ms. Young's demise, to adopt a policy to prevent DVT. Any such failure would bear no causal connection to the harm allegedly caused by their alleged constitutional violation.

Plaintiffs' allegations with respect to the inaction of Messrs. Uschakow and Williamson during the period before Ms. Young's death are exceptionally vague, amounting essentially to a claim that they ultimately were responsible for the proper running of the facility and, in consequence, for any failure to adopt a policy to prevent DVT therefore would suffice to establish supervisory liability even after *Iqbal.*

The Court has considerable doubt that supervisory liability properly could be imposed on such a basis, as it appears that the duty would be far too general. But it would be inappropriate to resolve that issue until the facts concerning the actual responsibilities of Messrs. Uschakow and Williamson, what they did and did not do, and the relationship, if any, of their actions and omissions to Ms. Young's situation are clear. As these defendants have failed to demonstrate the absence of a genuine issue of material fact on an issue as to which they would have the burden of proof at trial, summary judgment on qualified immunity grounds would be inappropriate at this juncture.

---

[70] *Bellamy*, 2009 WL 1835939, at *6.

[71] Pl. Br. at 17-18.

19

*Conclusion*

For the foregoing reasons, defendants' motion and amended motion for summary judgment dismissing the complaint [DI 36, 48][72] are granted to the extent that plaintiffs' (1) Section 1983 claims against the OMRDD and against all individual defendants in their official capacities, and (2) the second and third causes of action are dismissed. They are denied in all other respects. SO ORDERED.

Dated: August 27, 2009

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[72] DI 48 is defendants' amended motion for summary judgment. Defendants' first motion for summary judgment dismissing the complaint is DI 36.